1  ERIC F. YUHL (SBN 102051)
2  COLIN A. YUHL (SBN 259196)
   **YUHL CARR LLP**
3  4676 Admiralty Way, Suite 550
   Marina Del Rey, CA 90292
4  Tel.: (310) 827-2800
5  Fax: (310) 827-4200

6  DOUGLAS H. WIGDOR (NY SBN 2609469)
   JEANNE CHRISTENSEN (NY SBN 2622124)
7  TANVIR H. RAHMAN (NY SBN 4921235)
   (All to be admitted *pro hac vice*)
8  **WIGDOR LLP**
9  85 Fifth Avenue
   New York, NY 10003
10 Tel.: (212) 257-6800
   Fax: (212) 257-6845
11

12 Attorneys for Plaintiff,
   **JANE DOE**
13

14                 UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16 JANE DOE,                        │   Case No.: _____
17             Plaintiff,           │
                                    │   **JURY TRIAL DEMAND**
18      vs.                         │
                                    │   **COMPLAINT FOR NEGLIGENCE**
19 UBER TECHNOLOGIES, INC.          │   **AND FRAUD**
20             Defendant.           │
21                                  │
22 ─────────────────────────────────┘

23      Plaintiff Jane Doe, by and through undersigned counsel Yuhl Carr LLP and Wigdor LLP,

24 as and for her Complaint against Defendant Uber Technologies, Inc. ("Uber," the "Company" or

25 Defendant"), hereby alleges as follows:

26

27

28

─────────────────────────────────────────────────────────────────────────
*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

## PRELIMINARY STATEMENT

1.      Through its relentless marketing efforts, Uber has urged the public to defy common sense and undermine every parent's edict – "don't get in a car with a stranger." Unfortunately, despite its self-proclaimed "commitment to safety," opening the Uber app and setting the pick-up location has proven to be the modern day equivalent of electronic hitchhiking. Buyer beware – we all know how those horror movies end.

2.      Focused more on its bottom-line profit than practical and effective safety measures that could save lives, Uber continues to expand throughout the world, while passengers remain in the dark about the looming threats and potential dangers that lurk behind the veneer of a cutting-edge smartphone app.  While Uber lures customers with promises of a "commitment to safety," its only real commitment is to increase its profits by quickly expanding into the most densely populated markets before its competitors, even where it is well aware that its customers are being put in harm's way.

3.      Through the imposition of a court ordered injunction mandating certain immediate safety measures, this lawsuit seeks to slam the brakes on Uber's reckless worldwide expansion at the unfortunate expense of basic customer safety.

4.      This lawsuit also seeks to compensate Jane Doe for the horrific and brutal rape that she suffered due to Uber's inadequate and disingenuous "commitment to safety."

## NATURE OF THE CLAIMS

5.      Uber, the wildly popular and rapidly expanding transportation company whose smart phone app allows people to order and pay for taxi rides through their phones, which is valued as being worth in the tens of billions of dollars, has, sadly, sacrificed the safety and well-being of its customers, particularly its female riders, for the sake of padding its bottom-line.

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

Rather than "set the strictest safety standards possible" and "aim to go above and beyond local requirements" to ensure customer security, as the Company purports on its website, Uber has systemically failed to implement and maintain basic safety procedures.

6.    In fact, Uber's claims that customer safety is its #1 priority have proven to be false and hollow, as investigations into its safety measures reveal that the Company routinely fails to have systems in place to adequately monitor and trace Uber trips, and that it does not adequately screen its drivers, thereby regularly employing drivers with known criminal histories, risking the safety of its unbeknownst customers.

7.    Plaintiff Jane Doe is one such former loyal Uber customer who the Company tragically let down and failed to keep safe. Plaintiff was viciously raped and sexually assaulted on December 5, 2014 by an Uber driver named Shiv Kumar Yadav ("Yadav"). Yadav drove Plaintiff to a secluded and off-route area of Delhi, India, after she used the Uber app to arrange a ride from a restaurant to her home.

8.    As detailed herein, Uber's negligence, fraud and other unlawful actions caused Plaintiff's sexual assault, which has humiliated, degraded, violated and robbed Plaintiff of her dignity. The heinous attack on Plaintiff has caused her to suffer both physical and psychological harm, permanent harm to her professional and personal reputations, and severe mental anguish and emotional distress, from which she may never fully recover.

9.    Uber, in line with its slogan of "Expanding Globally," aggressively entered the Indian taxi market. Unfortunately, these attempts at expansion came at the expense of customer safety, as the Company's background check procedures and other safety efforts have proven to be woefully inadequate, and fall well short of what is required for other transportation providers within India.

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

10.     Had Uber not sacrificed customer safety for the sake of profit and expansion, and actually cared about who it was employing to drive its cars rather than being preoccupied with claiming its share of the India taxi market, Plaintiff Doe would not have been viciously raped.  In fact, a basic background check would have revealed that Yadav had a known propensity for violent and deviant conduct, including numerous arrests for rape and assault, which should have disqualified him from working as an Uber driver.

11.     Moreover, had Uber bothered to review the paperwork and contact information Yadav submitted to become an Uber driver, and applied the slightest level of scrutiny, Uber would have easily discovered that Yadav was providing fraudulent documentation and false information.

12.     Quite simply, Uber breached its duty to protect its customers in exchange for its desire to inflate its bottom-line, resulting in Plaintiff's brutal kidnap and rape at the hands of a known rapist.  In fact, following Plaintiff's horrific assault, Uber even publically admitted, that it "must do better," and that it was "conducting a full audit of [its] verification, rider feedback and support processes."  In addition, in a December 17, 2014 statement from its recently hired Head of Global Safety Phillip Cardenas, Uber acknowledged that Uber "[had] more work to do" with respect to customer safety, and was "committed to developing new technology tools that improve safety, strengthen and increase the number of cities and countries where background checks are conducted and improve communication with local officials and law enforcement."  That a tragic event like Plaintiff's assault had to occur for Uber to finally acknowledge its systemic deficiencies with respect to customer safety is troubling to say the least.

13.     Furthermore, soon after the attack, Uber's Co-Founder and Chief Executive Officer Travis Kalanick issued another statement promising that Uber "will do everything, I

repeat, everything to help bring this perpetrator [of the rape] to justice and to support the victim and her family in her recovery."

14.     Unfortunately, Uber has gone back on its word that it would do "everything" to support Plaintiff in her courageous recovery.   Despite knowing Ms. Doe's identity and having the means to reach her, Uber has shunned and avoided all contact with Ms. Doe and her family. Furthermore, as a demonstration of the Company's relentless determination to profit at the expense of anything or anyone standing in its way, Uber ignored Plaintiff's request to be consulted with in regard to any safety reforms Uber undertakes in India, and instead, boasted about reopening its business operations in India, despite a governmental ban.

15.     To pour salt on Plaintiff's fresh wounds, Uber even taunted Plaintiff by directly sending her an email announcing this news, and outrageously offering her a discount to begin riding again with Uber.

16.     This action seeks declaratory and injunctive relief, and to hold Uber accountable for its negligent and other unlawful conduct, so that no person will ever have to undergo the traumatic and harrowing, life-changing ordeal Plaintiff had to endure.

## JURISDICTION AND VENUE

17.     The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332, given that Plaintiff is a citizen of India, Defendant is a resident of the United States, and this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.

18.     The Court has personal jurisdiction over Defendant because it is headquartered in San Francisco, California, it conducts business in California, and a substantial portion of the events and omissions giving rise to this action took place in San Francisco, California.  By way

*Jane Doe v. Uber Technologies, Inc.*                          *Complaint for Damages*

of only one example supporting the Court's personal jurisdiction over Defendant, Uber's global policies around driver screening and passenger safety are set in San Francisco, California headquarters. All safety protocols governing the events and omissions giving rise to this action were conceived, reviewed, approved and otherwise controlled from Defendant's headquarters in San Francisco, California.

19.     In addition, Defendant routinely communicates with its customers around the world (including with Plaintiff, both prior to and subsequent to her attack) through email communications sent from its San Francisco, California headquarters. These emails conspicuously state that they are being sent from Uber's San Francisco offices, located at 182 Howard Street, #8, San Francisco, California 94105.

20.     By way of example only, in the immediate months prior to the filing of this suit, Plaintiff received email communications from Uber's San Francisco, California offices; (1) announcing that Uber was giving away free rides in Delhi for a week; (2) announcing that Indian users could no longer use Indian issued credit cards directly through the app to request Uber rides but must use a different app; (3) announcing that Uber operations in Delhi were being suspended; and (4) announcing that it was re-launching its Indian operations (despite an ongoing governmental ban).

21.     By way of comparison, at all relevant times, no emails were sent from Uber India (to the extent such an entity even existed), to its customers.

22.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is headquartered in this district, a substantial part of the events and omissions giving rise to this action occurred in this district, and because Defendants have corporate offices that can be found and conduct business in this district.

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

## PARTIES

23.     Plaintiff is an adult woman of Indian descent, who resides in Delhi, India.

24.     Defendant Uber Technologies, Inc. is a Delaware Limited Liability Company with its principal place of business in San Francisco, California.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A. Plaintiff Orders an Uber Ride to Take Her Home After She Has Dinner With a Friend; Yadav Picks Her Up.

25.     On Friday December 5, 2014, following a long day of work, Plaintiff met a friend for dinner at a restaurant in Gurgaon, India.  Following dinner, Plaintiff headed to her home in the northern part of Delhi, India, and rode part of the way back in her friend's car.

26.     Plaintiff and her friend eventually arrived at a marketplace in the neighborhood of Vasant Vihar, India, where the friend ordered an Uber ride through the Uber app to come pick Plaintiff up and drive her the rest of the way home.

27.     At approximately 11:00 p.m., Yadav arrived.  Although Plaintiff's friend had already entered Plaintiff's home address when ordering the car for her, Yadav also asked Plaintiff for her address after she got into his car.

28.     While in Yadav's car, Plaintiff spoke with a friend on her cell phone for a while.  The ride home was expected to last approximately forty-five (45) minutes to an hour.  About half-way to the destination, Yadav stopped at a gas station, and got in line for gas.

29.     Plaintiff asked Yadav for water, which he did not have.  Soon thereafter, Plaintiff fell asleep.

### B. Plaintiff is Violently and Viciously Sexually Assaulted by Yadav in the Back of His Uber Taxi.

30.     After falling asleep for some time, Plaintiff suddenly awoke to find herself on her back in the backseat of the car, with Yadav on top of her, clutching at her body and clothes. Plaintiff could tell that the car was parked in a remote, secluded area, but could not see or identify anything out of the windows.

31.     Plaintiff desperately tried to open the doors to escape, but they were locked.  She tried several times, to no avail.  To stop her from moving, Yadav slapped Plaintiff on the face several times, and banged his head against her head.

32.     Yadav warned Plaintiff that if she yelled or continued to try to escape, he would insert a metal rod inside of her.  Yadav was outrageously alluding to the fatal December 16, 2012 gang rape, known throughout India as "Nirbhaya," that occurred on a public bus in India, and in which the victim was violated using an iron rod.

33.     Plaintiff, frightened by Yadav's threats, stopped shouting, but continued to resist. Yadav began to strangle her with his bare hands.  This caused Plaintiff to almost lose consciousness, and fear for her life.  Plaintiff told herself that if she cried out or continued to resist, Yadav would surely kill her.

34.     Yadav then made it clear to Plaintiff that if she did not let him have his way with her, he would kill her right then and there.

35.     Plaintiff finally relented, begging Yadav to not kill her.  Thereafter, Yadav proceeded to viciously and violently beat and sexually assault Plaintiff.

36.     At one point, Yadav even bit Plaintiff's lower lip, causing her lip to bleed badly, and all over Yadav's shirt.  Yadav removed Plaintiff's clothes, and proceeded to bite her on her chest, neck, back and breasts, as he raped and sodomized her.

37.     Plaintiff begged Yadav to stop, and promised that she would not tell anyone, but the vicious attack continued.

38.     Although the assault lasted between 30 and 45 minutes, Uber has yet to provide any explanation as to why such a lengthy detour to a secluded area off the route Yadav was supposed to take, did not raise any alarms or concerns.

39.     After the brutal attack ended, Yadav made Plaintiff answer her phone, which had been vibrating throughout the assault.  Plaintiff's mother was on the other end.  Plaintiff did not want to alarm her mother, and told her mother that she would be home soon.  Plaintiff hung up the phone and begged Yadav to drive her home.

40.     Yadav then snatched Plaintiff's phone and dialed his own number into her phone, so that he had her telephone number.  Plaintiff continued to tell Yadav that she would not tell anyone, and implored him to just drop her home.  Yadav began to drive.

41.     After some time, Plaintiff, who, until that point, did not know what Yadav intended to do with her, finally saw a metro station near her home that she recognized.  She felt relief to know that she was close to her home.  Soon thereafter, Yadav dropped Plaintiff off near her home.

42.     As Yadav drove away, Plaintiff went behind the car and bravely took two photos of the license plate.

**A. Plaintiff Immediately Reports Her Rape to the Police; However, Officers Are Unable to Track Yadav Down, in Large Part Because of Uber's Remarkable Inability to Provide Any Information That Could Help Them Find Him.**

43.     As soon as Plaintiff exited the car, and before she had even reached her front door, she called the police to report the rape.  At this time, she also sent an email to an Uber

email account (support@uber.com) reporting that she had just been raped.  To this day, Uber has not responded to this distressing email from Plaintiff.

44.     Within ten minutes, several police officers arrived.  She told the officers what happened, and showed them the pictures of the license plate she had taken.  The officers took her to the hospital, where she underwent tests and examinations for the next three to four hours.

45.     Madhur Verma, the Deputy Chief of Police of New Delhi, interviewed Plaintiff at the hospital.  Verma had Yadav's name and license plate number, and tried to contact Uber to get an address for Yadav.  However, despite numerous attempts, Verma was unable to locate a contact number, email address or physical address for Uber's office.

46.     Frustrated by the inability to ascertain even basic information about Uber's Indian "corporate headquarters," Verma decided to download the Uber app onto his own phone, open an Uber account, and order an Uber ride.  When an Uber driver arrived, Verma ordered that he be taken to Uber's Delhi headquarters.

47.     At around 7:00 a.m. that December 6, 2014 morning, Verma was finally brought to a hotel named the Signature Hotel, where he was told that two or three rooms on the first floor supposedly served as the "headquarters" for Uber's entire Delhi operations.  However, troublingly, there was not a single Uber employee at the office, let alone anyone who could help Verma track Yadav down.

48.     After multiple calls to Uber offices, at about 8:30 a.m., an Uber employee finally arrived.  However, the employee remarkably told police that he also could not provide the officers with Yadav's address because there were no employee records kept there.  Further, the employee told Verma that this local Uber office also did not have GPS logs of its drivers, and thus could not help the officer track Yadav's whereabouts after the attack.

---

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

49.     Shockingly, the officers were told that any information regarding Yadav, including the GPS log details for his activity on December 5, 2014, would have to be retrieved from Uber's operations in the United States, where this information was supposedly stored on a main computer server.  Thus, in the immediate critical hours after the Plaintiff's sexual assault, Uber was of literally no help in locating its own driver, Yadav.

50.     It was immediately apparent to the police that all Uber record-keeping was located in the United States and the Delhi "office" was of no assistance.

51.     At last, at around 11:00 a.m. that morning, Uber provided information to the police about Yadav.  However, it was soon learned that Uber did not have Yadav's true permanent address, nor had Uber even verified his local address or mobile phone number.  In fact, Yadav was using a SIM card that had been obtained using a false name and address.

52.     The police further learned that Yadav's car was not properly equipped with a GPS system, and that following the attack, Yadav had apparently turned off his cell phone, rendering the GPS system on the phone worthless in trying to locate him.

53.     In the meantime, police checked Yadav's background and criminal history, and learned that Yadav had been accused of no less than two previous rapes, along with a host of other sexual assaults and crimes.

54.     Police also quickly determined that Yadav had presented a forged "Character Certificate" to Uber that was supposedly from the Delhi police.  A legitimate "Character Certificate" application would have unquestionably revealed Yadav's extensive and disturbing criminal history.

55.     It was also revealed that Yadav never obtained a security badge mandated by the Delhi government for all taxi drivers, which is given only after a police background check.  Uber

had no answers for why such an obviously dangerous person with a propensity for sexual assaults was employed as a driver.

56.     It was not until late the next day, Sunday December 7, 2014, that Yadav was finally tracked down and taken into custody many miles away in a rural village. Yadav was on the verge of fleeing to Nepal before he was apprehended.

### D. Uber's Negligent Hiring of Yadav

57.     Uber has violated numerous regulations and ordinances regarding private taxicab drivers imposed by the Delhi and Indian government. Had Uber not flouted these rules, Yadav would not have been hired, and Ms. Doe would not have had to endure a heart-wrenching sexual assault at his hands.

### (a) Acceptance of Falsified Character Certificate and Contact Information

57.     Uber negligently accepted a forged Character Certificate from Yadav. Specifically, in order to operate his vehicle as a private taxi, Yadav was required to obtain a Character Certificate. To obtain this certificate, an individual's prior criminal history must be produced, and a full background check completed. To obtain the certificate lawfully, the process takes approximately thirty days, and would cost ten (10) Rupees, or about sixteen cents ($.16).

58.     However, Yadav paid another individual two thousand (2000) Rupees to forge a Character Certificate of his behalf. Uber accepted this forged certificate without scrutiny.

59.     It is known throughout India that the practice of forging certificates is widespread. As a result of this, the major taxi companies in Delhi, including Ola Cabs, Mega Cabs and Meru Cabs, regularly and routinely conduct their own background checks on applicants, rather than rely on the government mandated forms. Uber, however, does not conduct its own background checks on applicants.

---

*Jane Doe v. Uber Technologies, Inc.*                                          *Complaint for Damages*

60.     Yadav not only gave Uber a forged Character Certificate, but also a false address of residence.  This address was never verified by Uber, despite Yadav working for Uber for six months.

61.     Yadav also gave Uber a phone number that was obtained under a different individual's name.  Once again, Uber never verified Yadav's number, despite employing him for six months.

62.     Because of Uber's failure to verify this basic information, the police had no address or accurate phone number for Yadav, leaving him with hours to escape Delhi.

### (b) Uber's Failure to Require a Security Badge

63.     After Nirbhaya, the infamous December 12, 2012 rape of a college student aboard a bus by six men, Indian authorities mandated that all taxi drivers obtain an additional certificate, also called a "security badge," in order to operate a private taxi.  The badge must be kept in the vehicle or on the individual driver at all times.  Operating a private taxi without this security badge is a violation of a number of Indian regulations.

64.     Despite these obligations, Yadav failed to obtain this security badge, and Uber did not require him to obtain one.  There is a nominal cost for this certificate (one hundred to three hundred (100-300) Rupees, or $1.60 to $5.00), and it can be obtained in approximately seven to fifteen days.

65.     Uber's failure to abide by Indian regulations and require that Yadav obtain this badge is significant because, in order to obtain the badge, the government must conduct the background check, and a complete criminal history search is made.  Moreover, according to Delhi police officials, it is highly unlikely that a person could obtain a forged security badge.  Therefore, Yadav's extensive history of sexual and other crimes would have been discovered.

---

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

66.     In fact, a background check into Yadav would have revealed the following prior criminal arrests, all of which should have disqualified him from being employed as an Uber driver:

        i.     In 2003, Yadav was charged with molestation and assault.  He was released on bail, and, though this charge has never been prosecuted, the crimes remain classified as "pending";

       ii.    In 2006, Yadav was arrested for unlawful possession of firearms, a charge still classified as "pending";

      iii.   In 2011, Yadav was arrested for raping a female passenger in a cab in Delhi;

      iv.   In 2013, Yadav was again arrested for robbery and rape, and held for six months before being released on bail.

67.     These are just some of the crimes that Yadav has been charged with.  This does not take into account unreported crimes.  According to media reports, Yadav's sexual deviance and criminal history is widely known throughout his home village.  Had a basic background check of Yadav been conducted by Uber, including talking to people familiar with Yadav, Yadav would surely not have been allowed to work for Uber.  In its quest for profit and expansion, Uber disregarded these simple safety measures which could have prevented Plaintiff's horrific attack.

**E.  Uber's Negligent Retention of Yadav**

68.     Uber also negligently retained Yadav as an employee.  Indeed, as of December 5, 2014, Uber was already on actual notice of Yadav's potential for inappropriate and unprofessional conduct towards female riders.

69.     Specifically, on November 26, 2014, a little over the week before the attack on Ms. Doe, Ms. Nidhi Shah, a female chemical engineer, used Uber for transportation in Delhi.  Her driver was Shiv Kumar Yadav.  Ms. Shah provided "feedback" to Uber at the end of her

long cab ride home, giving Yadav one (1) star out of five (5) (there was no option for zero), and describing him as inappropriately "staring" at her.

70.     On December 2, 2014, three days before Plaintiff was raped, Ms. Shah received an email from Uber support in response to her comments regarding Yadav.  The email stated that Shah's feedback was being "passed along to the driver operations team, so that they can check in on Shiv."

71.     After hearing about the sexual assault committed against Plaintiff, Ms. Shah went online and confirmed that the man arrested for the rape, Yadav, was her driver on November 26, 2014.  Ms. Shah tweeted about her experience, and described his stares as "lecherous" and "creepy," causing her to constantly check her own map to make sure that he was not taking her off course.

72.     Had Uber seriously investigated Ms. Shah's (and possibly others') complaints about Yadav, it is likely that Uber would have discovered Yadav's sordid past and fraudulent documentation, disqualifying Yadav as an Uber driver before he even had the opportunity to rape Plaintiff.

**F. Uber's Negligent Failure to Meet Basic Safety Standards Regarding Its Indian Drivers**

73.     Uber has systemically and woefully failed to implement and maintain procedures to effectively track Uber drivers during transportation of customers, and ensure other basic customer safety measures.

74.     In addition to self-servingly advertising that customer safety is its #1 priority, Uber has also claimed that "in India, Uber exclusively partners with registered for-hire drivers who have undergone the commercial licensing process, hold government issued IDs, state-issued permits, and carry full commercial insurance.  Uber also has a GPS trace and record of all trips

---

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

that occur on the platform – information that has been shared with (Indian) authorities." These claims have been proven to be hollow and false.

75.     In fact, the investigation by Delhi police into Plaintiff's rape confirms that Uber failed to have *any* system in place to monitor and trace Uber trips. Specifically, there was nothing in the Uber Delhi office that allowed employees to track GPS systems, monitor the movement of vehicles or otherwise provide any oversight to vehicles transporting customers. In fact, the investigation revealed that an Uber driver simply had to turn off his GPS (*i.e.* turn off his cell phone), and he would be off the grid.

76.     As a result of the Delhi police investigation into Plaintiff's assault, by Uber's own admission, it was revealed that not only was there no tracking system at the Uber Delhi office, but no employee records or other documents were maintained by Uber in Delhi. Rather, all purported GPS tracking and monitoring of drivers was allegedly conducted through Uber's United States offices. As such, the ground floor rooms at the Signature Hotel, containing barely more than desks, telephones, and basic computers, merely served as an interface between Indian employees and Uber's main offices in the United States.

77.     As a result of these so-called "headquarters," Uber was not able to provide the Delhi police with information about Yadav during the critical first hours of the investigation, and provided information only after New York Uber employees responded.

78.     Uber also did not monitor and track Yadav after he picked Plaintiff up, given that no alarms were raised in spite of the detour Yadav took, and the long, unaccounted for stop made before the ride was completed during which Plaintiff was attacked.

79.     Further, there are no Uber executives in India. Uber has no separate corporate identity in India, nor is Uber registered as a corporation in India. At all relevant times, no emails

were ever sent from Uber India (to the extent it even existed) to its customers.  The only Uber executive Delhi police have spoken to is Eric Alexander, head of business for Uber Asia-Pacific, whose office is located, upon information and belief, in Singapore.

80.     Unquestionably, the decisions and conduct of employees located in Uber's headquarters in the United States were responsible for the reckless disregard of customer safety in India.

81.     In addition, since Plaintiff's attack, Uber's has sought to hire a General Manager for its Delhi office, a Director of Public Policy and Community Relations, India, and a Background Check Researcher, India, demonstrating that Uber amazingly lacked employees within these basic and necessary roles in its Indian operations at the time Plaintiff was raped.

82.     It is clear that Uber recklessly and unpreparedly entered the Indian taxi market, blinded by the profit potential in this dense part of the world, to the detriment of the its customers' safety and well-being.

G.     **Delhi Police File Charges Against Uber**

83.     On December 9, 2014, Delhi police issued a First Information Report ("FIR") against the Uber detailing multiple negligent acts and misconduct.  The FIR specifically alleges against Uber:

> Whereas it has come to notice during the investigation that the company claims to provide various security features on its UBER APP like verification of drivers, background checks, safety pick up and driver profile for peace of mind of commuters.  But in the above mentioned case, it has transpired that there was no verification of driver and no appropriate security features provided by company as claimed in their APP, thereby misleading the victim and other commuters resulting in monetary and mental/loss harassment to them.

1        84.    The FIR also stated that the Delhi Police had determined that Uber violated

2   several Delhi transportation department orders, including: *(a)* that its driver did not display his

3   photograph and driving license on the dashboard of the cab; *(b)* that its driver did not have a

4   public service badge; and *(c)* that the company did not verify the criminal history record of its

5   driver, which would have revealed that the driver was already accused of being involved in at

6   least one other serious rape case.

7        85.    The FIR further accused Uber of a "lack of supervision" of its drivers, and stated

8   that there were many more rules which have been "flouted by the company."  The FIR concluded

9   by finding that the "above acts on the part of [UBER] company, through there *(sic)* directors and

10  employees amounts to criminal offenses," and "[h]ence, a case [should] be registered."

11       86.    As a result of the Delhi police investigation, Uber was indefinitely banned from

12  continuing to operate in Delhi and other parts of India.

**H.  Uber Brazenly Re-Enters the Delhi Market Without Governmental Approval or Any Consultation With Plaintiff; Uber Taunts Plaintiff Just Weeks After Her Savage Rape at the Hands of One of Its Drivers by Emailing Her With This "News," and Offering Her a Discount.**

     87.    Just weeks after being savagely raped, and as Yadav's criminal trial was ongoing,

Uber contacted Plaintiff directly (despite already knowing that she had retained counsel in

connection with this matter) to brazenly taunt her by letting her know that Uber was back up and

running in Delhi.  Uber remarkably told Plaintiff that it was ready to "serve" and "get [her]

moving once again," and audaciously offered her a "flat 25% discount."

     88.    This sick email from Uber (which conspicuously stated that it was coming from

Uber's headquarters in San Francisco, California, like the other communications between Uber

and Plaintiff), had the subject line "Uber Back to Serve Again in Delhi," and brashly proclaimed

---

*Jane Doe v. Uber Technologies, Inc.*                            *Complaint for Damages*

1  that Uber had listened to the "Delhi rider community," and knows that the community "want[s it]

2  back."

3      89.    However, although Uber had earlier promised to do "everything" to support

5  Plaintiff in her recovery, it failed to involve Plaintiff in any way with the reintegration of Uber

6  into the Delhi market.  Plaintiff by this time had made it clear to Uber that she wished to be a

7  part of the consultation process regarding safety procedures to ensure that no other person

8  became a victim at the hands of an Uber driver.  Uber, clearly focused on its bottom-line,

9  decided to not only ignore Plaintiff's sincere requests, but chose to add insult to injury by

10  thumbing its nose at Plaintiff, and excluding her from any conversation regarding Uber's

12  attempts to reform its safety procedures in India.

13      90.    However, in spite of Uber's announcement that it was restarting operations in

14  India, the Company was nonetheless still subject to a ban by Indian government officials.

15  Accordingly, Uber's utter disregard for and contemptuous attitude towards India's governmental

16  authorities demonstrates the urgency behind the injunctive relief measures Plaintiff seeks herein.

18  **I.  Uber's Perpetration of Fraud and Misleading Advertising**

19      91.    Uber has and continues to knowingly mislead the public about the safety and

20  security measures employed by Uber in order to ensure even basic levels of customer safety.

21      92.    Although these failures are likely present in each country where Uber operates,

23  specific to India, it is clear that Uber has failed to establish *any* protocols for customer safety, as

24  evidenced by its failure to verify the credentials of its driver applicants (in contrast to the

25  behavior of other major private taxi companies operating in Delhi, including Ola Cabs, Mega

26  Cabs and Meru Cabs), by its failure to require drivers to obtain mandatory security badges prior

*Jane Doe v. Uber Technologies, Inc.*      *Complaint for Damages*

19

to employment, its failure to have a system in place to track Uber drivers (including failing to maintain employee records in Delhi), and its failure to have supervisory employees in Delhi.

93.     Customers, such as Plaintiff, reasonably rely on Uber's representations and promises about its safety and security measures, including its drivers screening and background check procedures.  Uber's customers choose to utilize Uber's taxi services as a result of this reliance.

94.     However, Uber knows that its representations and promises about customer safety are false and misleading, yet continues to allow its customers to believe in the truth of its representations and promises, and to profit from their customers' reliance on such representations and promises.

95.     Unsurprisingly, in the United States, despite its proclamations that customer safety is its top priority, Uber has actively pushed back against legislation and other measures requiring strong background checks for its drivers out of the public's view.

96.     For instance, according to media accounts, in Colorado, Uber persuaded lawmakers to ease drivers' background checks in a bill legalizing ride-sharing companies, including abolishing FBI background checks and fingerprint checks.

97.     Similarly, media reports indicate that in Illinois, Uber lobbied Governor Pat Quinn to veto a bill that would have forced Uber to strengthen background checks.

98.     And in California, Uber is alleged to have helped defeat a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers.

99.     In addition, Uber has been repeatedly sued for its deceptive practices regarding background checks.  For instance, the district attorneys of San Francisco and Los Angeles

1   recently filed suit against Uber alleging that the Company had misled customers about its

2   background checks by misrepresenting the extent to which Uber screens drivers.

3         100.    Furthermore, a class action lawsuit was filed just weeks ago against Uber alleging

4   that the Company misrepresents its $1 "Safe Rides Fee" for UberX rides, as well as the nature of

5   its background checks and safety measures taken on behalf of riders.  The lawsuit alleges that

6   Uber's background checks and other safety measures fall well short of industry standards despite

7   the Company referring to the practices as "industry-leading" on its website.  The suit alleges that,

8   unlike many background checks, Uber does not require fingerprints, or even for the applicant to

9   appear in person, and also that the company allows drivers to simply transmit photographs of

10  vehicles rather than performing inspections.

11        **J.  Several Recently Reported Incidents of Sexual and Other Assaults by Uber
            Drivers Indicate Systemic Deficiencies Regarding Uber's Safety Measures
            Concerning Drivers.**

12        101.    Sadly, Plaintiff's sexual assault was not an isolated attack by an Uber driver on an

13  unsuspecting passenger, but just one in a pattern of similar heinous, but avoidable attacks.

14        102.    Also in Washington D.C., in December 2012, an Uber driver allegedly grabbed a

15  20-year old female customer from behind as she exited the car, knocked her to the ground

16  causing her head to hit the concrete, and then raped her.

17        103.    Similarly, on March 24, 2014, a  Uber passenger, Hy Vo, filed a lawsuit against

18  Uber for an alleged sexual assault committed by an Uber driver in Chicago, who she alleges

19  picked her up,  drove her down side streets, and feigned ignorance of the city's geography until

20  she agreed to sit in the front to give him directions.  At that point, the driver allegedly asked her

21  to dinner and said he wanted to have sex with her.  According to the complaint, when she refused

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

his advances, the driver locked the car door and groped her breast, legs, and groin.  Eventually Ho threatened to call the police and the driver let her out.

104.    Similarly, in June 2014, an Uber driver in Los Angeles named Frederick Dencer was arrested for allegedly kidnapping a female passenger who awoke in a motel room and found Dencer shirtless.  The passenger accused Dencer, who had been hanging out in front of the nightclub the passenger came come out of after dropping off another fare, of fondling her through her clothes.

105.    Furthermore, on August 14, 2014, an Uber driver in Washington D.C. was accused of sexually assaulting a passenger in the back of his Uber car.  The passenger accused the driver of touching her while she was asleep in the car.

106.    Likewise, in September 2014, an Uber driver in Orlando, Florida was arrested after a female passenger accused him of grabbing her breast and fondling it in an aggressive manner.  The driver was accused of repeatedly commenting on her appearance before stopping the car and shoving his hand in her tank top to fondle her breast.

107.    Likewise, on November 16, 2014, between 3:00 and 4:00 a.m. in Chicago, Illinois, Uber driver Maxime Fohounhedo allegedly raped a 22-year-old female passenger that he picked up inside his vehicle.  The passenger allegedly fell asleep in Fohounhedo's car before being sexually assaulted in the vehicle.  She then allegedly passed out again, and eventually woke up in the suspect's apartment, where she was raped once more.

108.    In a remarkably analogous incident, at approximately 7:30 p.m. on December 6, 2014 in Boston, Massachusetts, Uber driver Alejandro Done allegedly pulled up to a residence and picked up a young woman waiting for the pre-arranged driver.  The woman had been out with friends and decided to use a car service to get home.  Done picked up the woman and

*Jane Doe v. Uber Technologies, Inc.*                                               *Complaint for Damages*

allegedly drove to a location that she was not familiar with, pulled over to a secluded area and jumped in the backseat, struck her with his hands, strangled her, locked the car doors so that she could not escape, and sexually assaulted the woman.

109.   Moreover, in January 2015, an Uber driver from Chicago named Adnan Nafasat, was accused of sexually assaulting a 21-year old male, who he allegedly overpowered and choked after also asking him to sit in the front of his car.  Nafasat allegedly told the man that he was not going home, and that nobody knew where he was, before grabbing the man and touching his penis over his pants, and forcing his tongue and finger into the man's mouth.  Nafasat allegedly held the man's throat so tight that he almost lost consciousness.  When Nafasat stopped the car, he unzipped his pants and allegedly tried to force the man's head onto his groin.

110.   Upon information and belief, in addition to these reported cases in the U.S., similar sexual assaults by Uber drivers have occurred in other countries where Uber operates.

111.   Numerous other accusations of violent assaults and kidnappings by Uber drivers against customers have surfaced.

112.   In March 2013, a Washington D.C. Uber driver named Hamza Abu Shariah was sued for spitting in the face of and slapping a customer after ranting and yelling about how he hates Americans and homosexuals and a number of other derogatory comments.

113.   In September 2013, a Washington D.C. Uber driver was accused by Bridget Todd, a writer, activist and former lecturer at Howard University, of grabbing her out of his car by the throat and choking her.  In emails to Uber employees in response to this incident, Uber CEO Travis Kalanick apparently blamed the media for thinking that Uber is "somehow liable for these incidents that aren't even real in the first place," but stressed that Uber needed to "make sure these writers don't come away thinking we are responsible even when things do go bad."

---

*Jane Doe v. Uber Technologies, Inc.*                                                     *Complaint for Damages*

114.   Moreover, in November 2013, an Uber customer named James Alva accused a San Francisco Uber driver, whose vehicle license plate did not match the plate of the car that appeared on Alva's Uber app, of assaulting him after hurling homophobic and racist slurs.  When asked about this incident, Uber spokesperson Andrew Noyes confirmed that the driver in question was in fact an Uber driver, but insisted that "[Uber is] a technology platform that connects riders and providers, so it's not our job to investigate."

115.   For instance, in June 2014, a San Francisco Uber driver named Daveea Whitmire was charged with battery stemming from a fight he had with a passenger in which Whitmire allegedly punched a passenger in the head and elbowed him in the chest.  Surprisingly, it was later revealed that Whitmire should not have even been driving for Uber given the Company's "zero-tolerance" policy for alcohol and drug-related offenses and his 2009 felony conviction for selling marijuana, 2012 felony charge for selling cocaine, and battery charge that he was on probation for at the time he was working for Uber.

116.   Likewise, in September 2014, a San Francisco man was attacked in the face with a hammer by an Uber driver named Patrick Karajah.  Karajah was charged with two felony counts of assault and battery.  The victim needed reconstructive surgery after his skull was fractured, and was in serious danger of losing an eye.

117.   Furthermore, in September 2014, an Uber driver in Atlanta, Georgia was accused of pulling a gun on a valet parking attendant, pointing the gun at the attendant, and threatening to kill him.

118.   The above examples are just a sampling of the number of accusations of violent and aggressive behavior made against Uber drivers by unsuspecting customers, which are no

surprise given Uber's hollow commitment to customer safety, as exemplified by Plaintiff Doe's harrowing ordeal.

**K. Plaintiff Seeks Immediate Injunctive Relief Ordering Uber to Affirmatively Overhaul Its Woefully Inadequate Safety Measures, So That No Woman Has to Ever Endure What She Has Had to Unfortunately Experience.**

119.    The foregoing negligent and fraudulent behavior on the part of Uber demonstrates that the Company must take immediate action to improve the safety of its customers, which has sadly played second-fiddle thus far in the Company's quest to "expand" globally and reap profits.

120.    Accordingly, Uber must promptly implement the following improved safety measures:

(a) Open dedicated, full-service 24/7 customer support centers in every city Uber operates, which will have ready access to all Uber employee records and Uber ride tracking information;

(b) Require all Uber drivers worldwide to install GPS tracking systems in their cars, which immediately trigger alarms if they are deactivated or malfunction;

(c) Install tamper-proof video cameras in all Uber cars which immediately set off alarms if they are disabled or malfunction;

(d) Provide customers with the option of requesting a female Uber driver;

(e) Periodic and annual national criminal background checks of all drivers;

(f) Perform thorough character checks on prospective drivers that go beyond mere criminal background checks, such as by interacting with people who may personally know an applicant, in order to learn about the person's reputation and background;

(g) Make driver photos available for all customers worldwide to view on their phones to guard against identity fraud;

(h) Engage professional, trained, third-party investigators to perform audits of all current driver employment applications and other required documentation to identify inaccurate, outdated or forged information;

(i) In the U.S., utilize the Live Scan, fingerprint-based background checks for drivers administered through the Department of Justice and FBI databases for all current and prospective Uber drivers;

(j) Bar registered sex offenders or individuals with assault or rape convictions (no time limit) from becoming Uber drivers;

(k) In-app panic buttons that send messages to Uber customer support, local police, and a designated safety contact to quickly report an escalating safety situation, such as aggressive driving, a possible abduction, or an assault;

(l) Employ teams of experts dedicated to investigating complaints against Uber drivers of a violent or sexual nature;

(m) Create a separate online form to report complaints of a violent or sexual nature against Uber drivers.

121.   These proposed safety measures are reasonable and necessary, and many would likely have prevented Plaintiff's vicious sexual assault. As such, these changes must be implemented without delay, so that Plaintiff's harrowing ordeal is never repeated.

**FIRST CAUSE OF ACTION**
**(NEGLIGENCE, NEGLIGENT HIRING, NEGLIGENT SUPERVISION, AND NEGLIGENT RETENTION)**

122.   Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

123.   Uber owed Plaintiff and the general public a duty of reasonable care in the hiring, training and supervision of its drivers.

124.   Uber did breach that duty of care in the hiring, retention and/or supervision of Yadav, who was unfit to be a provider of transportation, and who was not adequately trained or supervised in his driving and conduct with customers. Uber knew or should have known that Yadav would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on December 5, 2014.

125. As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Defendant, Plaintiff sustained severe and serious injury to her person.

126. Defendant had advanced knowledge of the unfitness of Yadav, and employed him with a conscious disregard of the rights or safety of others, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

127. The conduct of Defendant Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

128. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (FRAUD)

129. Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein

130. Defendant made intentional misrepresentations of fact to Plaintiff known by Defendant to be false on December 5, 2014, to wit, that Plaintiff would be safely taking an Uber ride with a driver whose background had been screened by Uber, and who would provide her with safe passage, but who, in reality, Defendant had not screened, was a grave threat to Plaintiff's safety and well-being, and who had a known propensity for engaging in sexual misconduct and other violent and unlawful behavior.

131. Defendant made these misrepresentations to Plaintiff despite knowing that they had not adequately screened her driver, Yadav, but rather, knowing that he was a threat to Plaintiff's safety.

132.    Defendant further fraudulently misrepresented to Plaintiff that the Company had the ability to and would in fact, accurately track Yadav's transport of Plaintiff from Vasant Vihar, India where she was picked up, to Plaintiff's residence.  In fact, Uber not only failed to have a tracking system in place at its Delhi office, but recklessly permitted Yadav to use a SIM card obtained with a false name and address.

133.    In addition to false representations that her transport was monitored, Uber fraudulently concealed the fact that its drivers, including Yadav, had the ability to go off-grid simply by turning off the cellular phone in use.

134.    These false statements were made knowingly, or with a willful, wanton and reckless disregard for the truth, and intended to deceive and defraud Plaintiff into agreeing to utilize Uber's services.

135.    Defendant made these misrepresentations with the intent to cause Plaintiff to rely on this false information and induce her into utilizing Uber's services, in spite of the concerns Plaintiff had about her safety.

136.    Plaintiff actually and reasonably relied on the false facts and misrepresentations provided by Defendant when she agreed to utilize Uber's services, after being told that Uber had screened Yadav and that he would provide her with safe passage.

137.    As a result of Defendant's deliberate misrepresentations of material facts, Plaintiff suffered significant damages.

138.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (BATTERY)

139.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

140.    The violent acts committed against Plaintiff by Defendant's employee Yadav while he was performing his job duties, including his sexual assault of Plaintiff, amounted to a series of harmful and offensive contacts to Plaintiff's person, all of which were done intentionally by Yadav without Plaintiff's consent.

141.    Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business.  Defendants breached their duty of care in its actions towards Plaintiff.

142.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

143.    As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages and is obligated to expend sums of money for medical care and attention in an effort to alleviate her pain and suffering, emotional

distress, mental anguish, embarrassment and humiliation. She was unable, and continues to be unable to pursue her usual activities and employment, due to her psychological and emotional injuries and damage.

144. The conduct of Defendant Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

145. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (ASSAULT)

146. Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

147. The violent acts committed against Plaintiff by Defendants' employee Yadav while he was performing his job duties, including his sexual assault of Plaintiff and death threats, amounted to a series of events creating a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person, all of which were done intentionally by Yadav and without Plaintiff's consent.

148. Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*. Defendant is a common carrier who must carry passengers safely. As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and have the vigilance of a very cautious person. They must do all that human care, vigilance and foresight reasonably can do

under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Defendants breached their duty of care in its actions towards Plaintiff.

149.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

150.    As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages and is obligated to expend sums of money for medical care and attention in an effort to alleviate her pain and suffering, emotional distress, mental anguish, embarrassment and humiliation. She was unable, and continues to be unable to pursue her usual activities and employment, due to her psychological and emotional injuries and damage.

151.    The conduct of Defendant Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

152.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (FALSE IMPRISONMENT)

153.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

---

*Jane Doe v. Uber Technologies, Inc.*

*Complaint for Damages*

154.     Defendant's employee Yadav, while he was performing his job duties, would not let Plaintiff exit his car despite repeated requests. As a result, Plaintiff was confined in a car by Yadav without her consent and against her will for a significant period of time.

155.     During her confinement, Plaintiff feared for her safety.

156.     Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*. Defendant is a common carrier who must carry passengers safely. As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Defendants breached their duty of care in its actions towards Plaintiff.

157.     As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

158.     As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages and is obligated to expend sums of money for medical care and attention in an effort to alleviate her pain and suffering, emotional distress, mental anguish, embarrassment and humiliation. She was unable, and continues to be unable to pursue her usual activities and employment, due to her psychological and emotional injuries and damage.

159.    The conduct of Defendant Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

160.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

161.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

162.    Defendant's employee Yadav, while carrying out his job duties, engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society, namely, he violently sexually attacked an innocent woman inside his Uber taxi.

163.    Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*. Defendant is a common carrier who must carry passengers safely. As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Defendants breached their duty of care in its actions towards Plaintiff.

164. By his actions and conduct, Defendant's employee Yadav intended to and did intentionally and recklessly cause Plaintiff to suffer severe emotional distress.

165. As a direct and proximate result of Defendant's employee Yadav's conduct, Plaintiff has suffered, and continues to suffer, severe emotional distress, for which she is entitled to an award of damages.

166. The conduct of Defendant Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

167. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**(NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)**

168. Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

169. Defendant's conduct was extreme and outrageous, taken with the intent to cause or in disregard of a substantial probability of causing severe emotional distress to Plaintiff, and in fact did cause her severe emotional distress.

170. The aforementioned events took place due to the negligent acts and/or omissions of Defendant and its agents, servants, employees, and or licensees, all of whom were acting within the scope of their authority, within the scope of and in furtherance of their employment, and in furtherance of their agency.

171. By reason of Defendant's negligent conduct, Plaintiff suffered pain, shock, mental anguish and serious emotional distress. These injuries and their effects will be permanent.

---

172.     As a result of Defendant's negligent conduct, Plaintiff has suffered and continues to suffer injuries and damages.

173.     The conduct of Defendant was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

174.     Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of California;

B.     An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.     Enter a permanent injunction directing that Uber take all affirmative steps necessary to remedy the effects of the unlawful conduct alleged in this Complaint, and to prevent repeated occurrences in the future;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all physical, monetary and/or economic harm; for harm to her professional and personal reputations and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries; all other monetary and/or non-monetary losses suffered by Plaintiff;

1      E.      An award of punitive damages;

2      F.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's

3 reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

4      G.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 2⁄9, 2015

Los Angeles, California               Respectfully submitted,

YUHL CARR LLP

By: ___ /s/ Colin A. Yuhl _____
        Eric F. Yuhl
        Colin A. Yuhl

4676 Admiralty Way, Suite 550
Marina Del Rey, CA 90292
Telephone:  (310) 827-2800
Facsimile:   (310) 827-4200
eyuhl@yuhlcarr.com
cyuhl@yuhlcarr.com

WIGDOR LLP

By: _____ /s/ _____
        Douglas H. Wigdor
        Jeanne M. Christensen
        Tanvir H. Rahman

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com

*Jane Doe v. Uber Technologies, Inc.*                  *Complaint for Damages*