1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE,<br><br>          Plaintiff,<br><br>   v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>          Defendant. | No. 15-cv-00424-SI<br><br>**DECLARATION OF NAKUL DEWAN IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO (1) FORUM SELECTION CLAUSE; (2) *FORUM NON CONVENIENS*; (3) FED. R. CIV. P. 12(B)(7); AND (4) FED. R. CIV. P. 12(B)(3)** |

Gibson, Dunn & Crutcher LLP

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

_____

|  |  |  |
|---|---|---|
| | ) | |
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 15-cv-00424-SI |
| | ) | |
| UBER TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

_____

## DECLARATION OF NAKUL DEWAN

I, Nakul Dewan, declare as follows:

### QUALIFICATIONS

1.      I have been admitted to practice in the courts of India since 2001.  I have a Bachelors of Commerce (Hons) Degree from Shri Ram College of Commerce, University of Delhi, India and a Bachelors of Law (LL.B.) Degree from the Faculty of Law, University of Delhi, India.  I also have Masters of Law (LL.M.) degrees from New York University School of Law and the National University of Singapore.

2.      From 2001 to 2002, I was a Law Assistant to Mr. Justice A.M. Ahmadi (Former Chief Justice of India), after which time I began my practice as an independent Advocate.  As an Advocate, I have appeared before numerous Indian courts, including the Supreme Court of India, quasi-judicial tribunals and arbitration tribunals in Delhi, primarily doing constitutional, commercial and civil disputes.  I am also admitted to the Singapore Bar and the English Bar and am a tenant at the commercial barristers' chambers 20 Essex Street.   I currently appear before courts in India and Singapore, and also before arbitration tribunals in India, Singapore and London.

3.      In July 2011, I was appointed by the Union of India to its A-Panel of Advocates, to appear for the Union of India in cases before the Supreme Court of India.  During that period, for matters involving the Union of India, I primarily worked with then Solicitor General of India Mr. R.F. Nariman (now a judge of the Supreme Court of India).

4.      A copy of my CV, which details my academic and employment background, is attached hereto as Exhibit A.

5.      A list of my publications for the last 10 years is attached hereto as Exhibit B. Additionally, I have taught courses in India on international arbitration and taught Indian law as a component of a course that I taught at the Singapore campus of Essex Business School from 2009-2011.

### SCOPE OF DECLARATION AND BRIEF ANSWER

6.      I have been asked by counsel for Uber Technologies, Inc. ("Uber U.S."), the Defendant in this action, to address certain aspects of Indian law and the Indian legal system.  I am not a lawyer for Uber U.S. or any other Uber entity, nor have I represented them in the past.

7.  My standard hourly rate translates to 800 USD per hour.  That is the rate I have charged to provide this declaration, on the condition that I am to be paid regardless of whether my declaration ultimately helps or hurts Uber U.S.'s position.

8.  This declaration reflects my independent analysis and judgment, and the conclusions reached herein are my own.

9.  For the reasons explained below, assuming the allegations in the Plaintiff's complaint, this suit would be fairly and appropriately resolved in India and India would provide a suitable forum for adjudication of this suit.  Among other things, the Plaintiff, who is an Indian citizen and resident, would be able to file a civil claim in Delhi, India and would be able to choose to file such a case either before the High Court of Delhi, which exercises original civil jurisdiction as well as writ jurisdiction, or as a consumer action before the National Consumer Disputes Redressal Commission ("NCDRC"), which is also located in New Delhi.  The Plaintiff could also seek to be compensated for her claims by the criminal court before which Shiv Kumar Yadav's ("Yadav") criminal trial is currently pending.

10.  If the Plaintiff states a meritorious claim, she would be fairly compensated and would have relief available to her.  Indian courts would offer a fair and adequate remedy to the Plaintiff if she files her case in India.

11.  I am of the view that it would make imminent sense to have the Plaintiff's civil claims resolved in India, particularly because:

(1) The key bad actor in the matter, Yadav, is an Indian citizen and is based in India;

(2) The primary evidence in relation to this action would be available in India;

(3) Courts in Delhi, where the alleged offence took place, would have jurisdiction to hear the Plaintiff's claims; and

(4) Given the nature of the claims, the court would, in all likelihood, dispose of the matter expeditiously in a manner that was fair to Plaintiff.

## DOCUMENTS AND SOURCES

12.   Counsel for Uber U.S. have provided me with the following documents, which I have consulted in preparing this declaration:

(1) A copy of the Complaint in the above-captioned matter.

(2) A copy of the User Terms Agreement applying between the Plaintiff and Uber B.V., attached to the accompanying Appendix as Exhibit C. It is my understanding that these were the User Terms in effect both when Plaintiff created the Uber account in question and on December 5, 2014.

(3) A copy of the User Terms Agreement in effect when the Plaintiff's friend opened the Uber account he allegedly used to order the ride for the Plaintiff on 5 December 2014. This Agreement is with Uber B.V., and is attached to the accompanying Appendix as Exhibit D.

(4) A copy of the relevant agreement between Yadav and Uber B.V., attached to the accompanying Appendix as Exhibit E.

13.   I have relied on my general knowledge of Indian law, court procedures, statutes and judgments rendered by the Supreme Court of India and various High Courts which, in my view, are relevant to the matters discussed herein.  The statutes I have referred to are set out below:

(1) The Code of Civil Procedure, 1908 (the "CPC")

(2) The Code of Criminal Procedure, 1973 (the "CrPC")

(3) The Consumer Protection Act, 1986 (the "CPA")

(4) The Constitution of India, 1950 (the "Constitution")

(5) The Limitation Act, 1963 (the "Limitation Act")

(6) The Evidence Act, 1872 (the "Evidence Act")

For the convenience of the Court, I have also provided a collection of key sources cited in this Report, which I have attached as an appendix to my Declaration.

## THE INDIAN LEGAL SYSTEM AND HIERARCHY OF
## COURTS ADJUDICATING CIVIL CLAIMS

14.     The Indian legal system is founded on English common law, which was brought to India by the British.  Under British Rule, the Indian legal system was codified by the British, and after Independence by the Parliament of India and the Legislatures of the States.  In areas of law which are not codified, for example the law of tort, India follows English common law principles in a manner that would be in conformity with Indian conditions and circumstances.

15.     Under the Constitution of India, the Supreme Court of India is the apex court of the country and has original writ, appellate, original and advisory jurisdiction, along with the power of judicial review.  Each State of India has a High Court, which has original writ, appellate and supervisory jurisdiction, along with the power of judicial review.  The High Courts of Delhi, Bombay, Calcutta and Madras also have original jurisdictions to adjudicate civil claims based on their pecuniary value.  On the civil side, each State also has district courts which have original civil jurisdiction and which are subordinate to the High Courts.

16.     Based on the allegations in the complaint, the Plaintiff has at least four avenues for monetary relief in India's courts: (1) a civil claim in the High Court of Delhi; (2) a writ petition before the High Court of Delhi; (3) an action before the NCDRC; or (4) a claim for compensation before the criminal court where the trial against Yadav is pending.

### Civil Claim in the High Court of Delhi

17.     The CPC, last amended in 2002, governs the procedure to be followed by the courts of civil judicature in India.  In Delhi, where I am of the view that the Plaintiff could file her claim, the High Court of Delhi would have the jurisdiction to hear all civil claims over the pecuniary value of INR 2 million (i.e. approximately 32,000 USD).

5

18.     If a civil claim of the nature of the Complaint is filed by the Plaintiff in Delhi, it would first come up before a Single Judge of the High Court.

19.     Either party would have the right to appeal the decision from the Single Judge of the High Court.  This appeal would be filed before a Division Bench of the High Court.

20.     There are two mechanisms to challenge the decision of the Division Bench of the High Court, both of which are discretionary appeals and not appeals as a matter of right.  First, an appeal can be filed if the High Court grants a certificate under Article 134-A of the Constitution for an appeal to be filed to the Supreme Court of India.  Second, a party can file a Special Leave Petition under Article 136 of the Constitution, seeking special leave to appeal a decision of the High Court.

21.     In my experience, Article 134-A certificates are relatively rare.  As for leave under Article 136, it is possible in a case such as this that the Supreme Court would exercise its discretion to grant review, if there were grounds justifying the Supreme Court's review. (*See e.g.*, *Guljar Singh v Dy. Director (Consolidation)* (2009) 12 SCC 590 and *Arunachalam v P.S.R. Sadhanantham* (1979) 2 SCC 297).

### Writ Petition before the High Court of Delhi

22.     Judicial precedent shows that the High Court of Delhi would also have jurisdiction to entertain a writ petition under Article 226 of the Constitution if the Plaintiff chooses to assert a civil claim by way of a writ action.  If a writ petition under Article 226 of the Constitution of India is filed before the High Court of Delhi, the judicial route it would take would be similar to that of a civil suit, save and except as set out at paragraph 63.

### Action before the NCDRC

23.     India also has a number of quasi-judicial tribunals and dispute adjudicating bodies that have been established for the purpose of resolving specific types of disputes.  One such

tribunal is the consumer dispute redressal tribunal that has been established in accordance with powers conferred on the Central Government and State Governments under the CPA.  The NCDRC is located in Delhi, and the State and District Consumer Disputes Redressal Commissions are located in different States and Districts in India.   An appeal from a decision of the NCDRC lies to the Supreme Court of India, which is the final court for such matters.

24.     Claims over the pecuniary value of INR 10 million (approximately 161,000 USD) are heard by the NCDRC.  Thus, if the Plaintiff believes her claim is worth more than 161,000 USD, she would have the third option of filing a claim before the NCDRC.  (*See section 21 of the CPA*).

**Civil Claim for compensation in the on-going criminal trial against Yadav**

25.     The Plaintiff can also be compensated by the criminal court where the criminal trial against Yadav is on-going.  In terms of section 357 of the CrPC the criminal court can award civil compensation to the Plaintiff.  If the Plaintiff is awarded compensation by the criminal court, but is dissatisfied with the quantum awarded, she can also file a civil suit for additional compensation (*See section 357(5) of the CrPC*).

26.     In addition, the Plaintiff could also be awarded compensation by the criminal court under section 357A, which was an amendment introduced into the CrPC to deal particularly with trials relating to sexual offences (*See Ankush Shivaji Gaikwad v State of Maharashtra* (2013) 6 SCC 770).

## JURISDICTION

### Jurisdiction of an Indian Civil Court

27.    Section 9 of the CPC sets out that a civil court in India has jurisdiction to try all suits of a civil nature excepting such suits, the cognizance of which is expressly or impliedly barred.[1]

28.    Section 19 of the CPC, which is the provision applicable to those suits where compensation is being sought by a person for any wrong done, can be tried at the option of the Plaintiff either within the local limits of where the cause of action arises or where the defendant resides.  The illustrations to section 19 set out as follows:

(a) A, residing in Delhi, beats B in Calcutta.  B may sue A either in Calcutta or Delhi.

(b) A, residing in Delhi, publishes in Calcutta statements defamatory of B.  B may sue A either in Calcutta or in Delhi.

29.    Similarly, section 20 of the CPC, which is the residuary provision for determining jurisdiction, also confers jurisdiction on a civil court on the basis of either where the cause of action arises or where the defendant resides.

30.    Therefore, a civil court in India can exercise jurisdiction on the basis that the subject matter of the claim arises within its jurisdiction or if it has personal jurisdiction over the defendant.

---

[1]    Expressly barred suits are those that are explicitly barred by a law currently in force.  For instance, Section 293 of the Indian Income Tax Act, 1961 bars a civil action to set aside or modify any assessment made under that Act.  Implicitly barred suits are those where such exclusion is not explicitly provided in a statute and is determined by implication, such as disputes related to rent control under the Andhra Pradesh Buildings (Lease, Rent and Eviction) Control Act, 1960 were implied to be outside the jurisdiction of a civil court after Section 32 (b) of that Act, which was the enabling section that conferred jurisdiction on civil courts in certain cases, was struck down as unconstitutional (*See* Sir Dinshaw Fardunji Mulla*, BM Prasad and Manish Mohan (eds.), *Mulla on Code of Civil Procedure*, Vol 1, Sec. 9 at pages 72-73 and 98,(18th ed., 2013, Lexis Nexis India).  None of these provisions apply here to bar the Plaintiff's suit in India.

31. As the Complaint alleges that the act(s) giving rise to the Complaint occurred in Delhi, i.e. the cause of action arose in Delhi, and since the claim exceeds the pecuniary value of 32,000 USD, the Plaintiff can file a civil suit before the High Court of Delhi. On the basis that the cause of action arose in New Delhi, the High Court of Delhi would accept jurisdiction over the Plaintiff's case.

32. I would also like to add that the allegations in the Complaint make averments against Uber's India office ("Uber India"). It likewise appears that this case potentially implicates Uber B.V. (a Dutch entity) (*See* Exhs. D to F). Indian law recognizes the doctrine that each company within a group company is a separate legal entity (*See Vodafone International Holdings B.V. v. Union of India*, (2012) 6 SCC 613) and it may well be that Uber India and / or Uber B.V. are the proper parties to defend against the Plaintiff's case.

33. Be that as it may, i.e. whether the proper party is Uber U.S., Uber India or Uber B.V., given that the cause of action has arisen in Delhi, the High Court of Delhi would have jurisdiction over the subject matter of the claim as well as the proper party, should a claim be filed before it. Should the Plaintiff file a suit before the High Court, the appropriate party, be it Uber U.S., Uber B.V., or Uber India, could accept service and appear before the High Court.[2]

**Jurisdiction of a High Court exercising Writ Jurisdiction under Article 226**

34. Under Article 226 of the Constitution, every High Court in India is conferred with the power to issue to any person or authority, including in appropriate cases, any Government, directions, orders or writs. A writ petition under Article 226 is a public law remedy (*Nilabati Behera v State of Orissa* (1993) 2 SCC 746).

35. Thus, for example, in the case of *Chairman, Railway Board and Others v Chandrima Das (Mrs) and Others* (2000) 2 SCC 465), the Supreme Court held that rape violated a

---

[2] It may be that, in response to such a suit, Uber B.V. would argue that the suit should be litigated in the Netherlands because of the forum selection clause in the User Terms Agreements. Indian courts would regard this as an argument within their competence to resolve.

woman's right to live with human dignity and constituted a breach of the victim's fundamental right to life conferred under Article 21 of the Constitution. On that basis, the Supreme Court held that a writ petition could be filed raising a civil damages claim for rape. In *Shanti Mukund Hospital v Rinchu and Others* (2008) 100 DRJ 43 (DB), the High Court of Delhi likewise granted civil compensation to a rape victim in writ proceedings when the primary parties involved were two private hospitals.

### Jurisdiction of the NCDRC

36.   The NCDRC has jurisdiction over consumer claims exceeding 161,000 USD (*See* Section 21 of the CPA).

37.   Section 2(2)(ii) of the CPA, defines a consumer to mean any person who hires any services for a consideration which has been paid or promised, and includes any beneficiary of such services other than the person who hires the services for consideration paid or promised.

38.   Thus, if the Plaintiff believes that her claim is worth 161,000 USD or more and alleges— as the Plaintiff has in the Complaint—that she is a consumer of Uber services, then she also has the option of filing a consumer complaint. Such a claim would need to allege the purported deficiency of service provided by Uber. In that complaint, the Plaintiff could claim compensation against Uber for any loss or injury that she suffered due to Uber's alleged negligence and Uber's alleged failure to provide the Plaintiff with the manner of performance she alleges it had undertaken to provide (*See* Section 22 read with section 14 of the CPA).

### Jurisdiction of the Criminal Court

39.   If the criminal court convicts Yadav in the on-going criminal proceedings, it could, in addition to awarding Yadav a sentence, require Yadav to compensate the Plaintiff under sections 357 (1)(b) or 357(3) of the CrPC, as well as direct the State to compensate the Plaintiff under section 357A.

40.     If Yadav is acquitted, the criminal court could under section 357A (3) of the CrPC direct the State to compensate the Plaintiff, if in the opinion of the Court the Plaintiff is required to be rehabilitated.

**NO LIMITATION BAR IF THE PLAINTIFF APPROACHES AN INDIAN COURT**

41.     The Complaint shows that in sum and substance the Plaintiff is seeking relief on account of the alleged rape and sexual assault committed on 5 December 2014. If a case of the nature set out in the Complaint is filed by the Plaintiff before an Indian court, such a case would not be barred by the statute of limitation:

(1) If the Plaintiff chooses to file a civil suit before the High Court of Delhi, then by virtue of Article 113 of the Schedule to the Limitation Act, the Plaintiff would have to do so within 3 years from 5 December 2014, which is the date the alleged cause of action arose.

(2) If the Plaintiff files a writ petition under Article 226 before the High Court of Delhi, there would be no period of limitation, except that if the petition is filed with delay or laches the writ court would have the judicial discretion not to grant the Plaintiff any relief (*See Sri Vallabh Glassworks v Union of India* 1984 SCR (3) 180).

(3) If the Plaintiff files a consumer complaint before the NCDRC, she would have to do so within 2 years from 5 December 2014, under the terms of section 24 A of the CPA.

(4) As the criminal proceedings are on-going, the Plaintiff could always raise the issue of civil compensation in those proceedings.

**ASSUMING THE TRUTH OF THE PLAINTIFF'S ALLEGATIONS, AN INDIAN COURT WOULD BE ABLE TO GRANT ADEQUATE RELIEF TO THE PLAINTIFF**

42.     The Complaint alleges that the Plaintiff is primarily proceeding on the basis of a claim in tort. While the alleged perpetrator of the rape and sexual assault is Yadav, the Plaintiff

seeks to hold Uber U.S. liable on, amongst others, the grounds of negligence, fraud and being vicariously liable for Yadav's actions.

43.    Indian law recognizes and provides relief for claims in tort. (*See MS Grewal v Deep Chand Sood* (2001) 8 SCC 151 and *Ellerman & Bucknall Steamship Co. Ltd. v Sha Misrimal Bherajee* (1966) Supp SCR 92).  Indian law also recognizes that a company can be vicariously liable for tortious claims, under certain circumstances (*See Union Carbide Corporation and Ors. v Union of India* (1991) 4 SCC 584 and *Shanti Mukund Hospital v Rinchu and Others* (supra)).

44.    For example in *MS Grewal v Deep Chand Sood* (supra), the Supreme Court of India held the management of a school to be vicariously liable for negligence of its teachers which resulted in the drowning of fourteen children when the school took them on a picnic.

45.    Similarly in *Sumatidevi M. Dhanwatay v Union of India* (2004) 6 SCC 113, a consumer complaint was filed before the State Consumer Disputes Redressal Commission ("SCDRC") for an assault on passengers by an unruly crowd inside a railway compartment.  The Railway Administration asserted that they could not be held liable for the assault.  The SCDRC held the Railway Administration to be liable on the ground that the Railway Administration was aware of the lawlessness but had failed to devise any measures to curb it, and directed the Railway Administration to compensate the victim. The decision of the SCDRC was affirmed by the Supreme Court, which held the Railway Administration to be negligent and liable to compensate the victim.

46.    Assuming the correctness of the Complaint, including the Plaintiff's assertion relating to Yadav's alleged employment status and the sexual offences of the nature described in the Complaint, at least two judgments should be mentioned:

(1) In *Chandrima Das* (Supra) a claim for compensation was made by a rape-victim against the Railway Board and the Union of India on the ground that the rape had been committed by employees of the Railways in the premises of the Railways.  The

High Court of Calcutta, which was the first instance court, allowed the claim.  The Railways and the Union of India challenged the decision before the Supreme Court of India and *inter alia* asserted that they could not be held vicariously liable.  That assertion was made on the ground that the employees were not acting in their official capacity when they raped the victim.  Rejecting that assertion, the Supreme Court affirmed the decision of the High Court of Calcutta and held that "42…[i]f any of such employees commits an act of tort, the Union Government, of which they are employees, can, subject to other legal requirements being satisfied, be held vicariously liable in damages to the person wronged by those employees."

(2) In *Shanti Mukund Hospital* (Supra) a case before the High Court of Delhi, a writ petition was filed under Article 226 of the Constitution against the Government of the National Capital Territory of Delhi and against private respondents (which were two hospitals).  In that case the petitioner was a nurse who was raped by a ward boy in a hospital.  The Court granted the victim compensation for the rape, and directed that such compensation be paid by the hospital.

47.  Similarly, the Supreme Court has observed that substantial compensation should be granted to a rape victim under sections 357 and 357A of the CrPC after considering the facts and circumstances of each case (*See Indian Woman* (2014) 4 SCC 786 and *Mohd. Haroon v Union of India* (2014) 5 SCC 252).  Such compensation aims to restitute the victim of a crime (*See Ankush Shivaji Gaikwad* (supra)).

48.  Given the aforestated measures of relief available to the Plaintiff in both the civil and criminal law system of India, I am of the opinion that India would be the appropriate alternate forum for the Plaintiff to claim relief of the nature claimed in the Complaint.

## THE RELEVANT AND MATERIAL EVIDENCE IS IN INDIA AND CAN BE MORE EASILY PLACED BEFORE AN INDIAN COURT

49.  A review of the Complaint shows that a number of allegations have been made against Uber U.S. in relation to an alleged incident which occurred in Delhi (*See* paragraphs 25

to 42 of the Complaint).  For obvious reasons, and especially because there is already an on-going criminal proceeding in India relating to the alleged incident, the key evidence in this dispute would be more easily accessible in India than in the United States.

50.   Under the CPC, a civil court in India can either on its own motion or on an application by a party pass orders requiring a party to answer interrogatories or produce documents, as well as issue summons requiring the attendance of persons to give evidence (*See* Section 30 CPC).

51.   If a person, including a non-party to the suit, ignores the summons issued by the Court to give evidence, the Court has the power to compel his or her attendance as a witness by *inter alia* issuing a warrant for arrest. (*See* Section 32 CPC and Order 16 CPC).

52.   In relation to discovery, Indian Courts have taken a liberal approach, holding that documents which may be relevant for the purpose of shedding light on the matter in controversy would be discoverable (*See* Order 11 CPC and *M.L. Sethi v. R.P. Kapur*, (1972) 2 SCC 427).

53.   Indeed, it appears that the police investigation into the alleged incident has been very involved and widely reported in the news in India, and thus there is likely substantial evidence in India already collected and highly relevant to this dispute.

54.   Given these and other facts tying this dispute to India, it appears an Indian court would far more easily be able to have all the evidence placed before it for making a determination on a case filed by the Plaintiff than a United States Court.  I wish to point out that under factual circumstances where the documents, correspondence and witnesses were located in India and the matter involved application of Indian law a United States court found an Indian court to be *"[a]n alternative forum, one that is more convenient to the witnesses…"*, and allowed the motion to dismiss the complaint for *forum non conveniens* (*See Shin-Etsu Chemical Co. Ltd.* v. *ICICI Bank Ltd.* (9 A.D.3d 171 (2004)).

## INDIAN COURTS RECEIVE FOREIGN LAW

55.     If the Plaintiff files a case in India and is able to establish that foreign law would be relevant to her case, there is no reason why an Indian court would not receive the applicable law.

56.     For the Plaintiff to rely on foreign law she would have to plead it as a question of fact and support it with expert evidence.  The Supreme Court's decision in *Hari Shanker Jain v Sonia Gandhi*, (2001) 8 SCC 233 is instructive, where dealing with Italian law, the Court set out:

> *"27. Italian law is a foreign law so far as the courts in India are concerned. Under Section 57(1) of the Indian Evidence Act, 1872, the court shall take judicial notice of, inter alia, all laws in force in the territory of India. Foreign laws are not included therein. Sections 45 and 84 of the Evidence Act permit proof being tendered and opinion of experts being adduced in evidence in proof of a point of foreign law. Under Order 6 Rule 2 of the Code of Civil Procedure, 1908, every pleading shall contain a statement in concise form of the material facts relied on by a party but not the evidence nor the law of which a court may take judicial notice. But the rule against pleading law is restricted to that law only of which a court is bound to take judicial notice. As the court does not take judicial notice of foreign law, it should be pleaded like any other fact, if a party wants to rely on the same."*

57.     Therefore if the Plaintiff is able to show that foreign law ought to be applied to her complaint, then an Indian court would receive such law through expert evidence and apply it to the Plaintiff's claim.

## ESTIMATED TIMELINES

58.   If the Plaintiff files her case before one of the civil courts described above, I am of the view that such a case could be disposed of by the judge at the first instance within 2 to 4 years, and by an appellate court within 1 or 2 years thereafter.  I form that view based on the fact that the Plaintiff would file in Delhi, where based on current statistics, in light of the drive in the Indian legislature and the judiciary to speed up justice disposal, and the nature of the Plaintiff's case, I expect an expeditious disposal.

59.   A clarion call has been given by the Supreme Court and by the Indian Government to reduce delays.  In 2009 the Ministry of Law and Justice issued a report under its National Mission for Delivery of Justice and Legal Reform titled *Towards Timely Delivery of Justice to All* (Strategic Initiatives 2009-2012), where it stated that Courts must aim to reduce the pendency of cases to 3 years (the "2009 Report").  It also set the National Court Performance Standards as under:

> *"Disposal level of the national system should be raised from 60% of total case load (as at present) to 95% to 100% of total case load in three years.  This target must be established at the district and the State levels.*
>
> *Each court to ensure that no more than 5% of the cases in that court should be more than 5 years old (5x5) rule within the next three years; and in 5 years, to ensure that no more than 1% of the cases should be more than 1 year old (1x1) rule."*

60.   The official statistical data released by the NCDRC indicates the overall disposal rate of the consumer forums as on 10 March 2015 to be 91.40%, with the NCDRC's individual disposal rate being 88.74% that of the SCDRC's being 86.74% and that of the District Forums being 92.36%.

61.   The procedural rules under the CPC provide in pertinent part:

(1) Under Order 8 Rule 1 of the CPC after a party is served, the defendant is required to file his defence by way of a written statement within 30 days and if he fails to do so, then only after getting leave from the Court, within a period of 90 days.  Only in extraordinary circumstances can a written statement be filed beyond the 90 days period, for which also the defendant requires leave from the Court (*See Kailash v Nanhku*, (2005) 4 SCC 480).

(2) After the pleadings are filed, the Court frames issues and considers interlocutory applications for disclosure of documents etc.

(3) After documentary disclosure, the matter is set out for the recording of evidence. In terms of Order 18 Rule 4 of the CPC, evidence-in-chief is recorded by way of affidavit and cross-examination is conducted before a commissioner, who is required to prepare and submit his report to the Court within a period of 60 days.

62.    Therefore, in my view, if adjournments are not taken by parties, the trial of a civil case can be concluded within a period of 12 to 18 months, after which it is placed into the docket of the Court for closing oral submissions, where it could be disposed of expeditiously.

63.    If a writ petition is filed, the matter is usually disposed of on the basis of documentary evidence and affidavits, unless the High Court takes the view that it may be in the interest of justice to summon a defendant for cross-examination (*See BabubhaiMuljibhai Patel v Nandlal Khodidas Barot and Ors*. (1974) 2 SCC 706).  However, it is only in exceptional cases that witnesses are cross-examined in a writ action.  Therefore, if pleadings and affidavits can be filed within a period of 1 year, assuming there is no cross-examination, the High Court could decide on the case within a few months thereafter.

64.    Similarly, even before the NCDRC, the procedure is typically documents only.  While NCDRC allows a party to file its evidence through a witness who files an affidavit of evidence-in-chief, in most cases, a challenge to such evidence is done by serving written interrogatories on the witness instead of calling witnesses for an oral cross-examination.

Thus if both parties do not seek any adjournments, even the matter before the NCDRC can be disposed of expeditiously.

65.     In relation to civil compensation claims before a criminal court, if the compensation is awarded under section 357 of the CrPC, it is to be done on the conclusion of the trial but before the award of sentence, with at best a summary inquiry into the capacity of the offender to pay (*See Ankush Shivaji Gaikwad* (Supra)).   On the other hand, in cases where compensation is required to be paid under section 357A of the CrPC, the Supreme Court in *Suresh and Another v State of Haryana* (2015) (2) SCC 227) has observed that a criminal court had a duty to award interim-compensation to the victim during the pendency of the case, either *suo-moto* or on an application made by the victim.

66.     I am also minded to observe that the nature of the Complaint in this matter would be a factor which is likely to ensure that the matter does not get buried into the back-log of cases pending in India.

67.     That is evident from the two examples where civil compensation for similar offences has been granted by Indian courts.  In *Chandrima Das* (Supra), the victim, a foreign national from Bangladesh, was raped on 26 February 1998.  A criminal complaint was registered on 27 February 1998 against the perpetrators of the crime, after which a writ petition was filed under Article 226 of the Constitution before the High Court of Calcutta claiming compensation for the rape-victim. In June 1998, the High Court of Calcutta passed its judgment allowing the claim.   The Railways and the Union of India challenged the decision before the Supreme Court, which by a final judgment dated 28 January 2000 affirmed the decision of the High Court of Calcutta.  The Supreme Court also directed that payment of the compensation would be made to the High Commissioner of Bangladesh with the request to remit it to the victim, within 3 months from the date of their decision.   Therefore, in less than 2 years from the incident, the civil claim for compensation was finally concluded before the Indian Courts after having been first heard and disposed of by a Single Judge of the High Court of Calcutta and thereafter by the Supreme Court of India.

18

68.    Similarly in *Shanti Mukund Hospital* (Supra), which was a case before the High Court of
        Delhi, the incident of rape occurred on 6-7 September 2003.  A Single Judge of the High
        Court of Delhi allowed the claim and granted the victim compensation.   One of the
        Respondents carried the matter in appeal before the Division Bench of the High Court,
        which by its judgment dated 7 December 2007, affirmed the order of the Single Judge.
        To ensure the expeditious disbursement of the monies to the victim, the Division Bench
        of the High Court directed for part of the compensation ordered by the Single Judge to be
        deposited in the Court while the appeal was pending, and while disposing of the matter
        on 7 December 2007, the Division Bench directed that the balance monies be deposited
        with the Court within one week and then disbursed to the victim.   Therefore, in just a
        little over 4 years from the date of the incident, the victim was compensated for her civil
        claims arising from the incident, after the matter had been dealt with by the first instance
        judge, as well as by the appellate court.

69.    In sum, based on the above and my general knowledge of the civil system in Delhi and,
        more broadly, India, I believe that the Plaintiff would be treated fairly in any proceedings
        she filed relating to this dispute where she claimed compensation.  India would have a
        strong interest in protecting fundamental rights enshrined under Part III of the
        Constitution, particularly if the alleged violation against an individual has taken place in
        India.   I therefore believe that the Indian courts would provide an appropriate forum for
        Plaintiff to litigate her dispute and that Indian law offers compensation for her alleged
        harm.

70.    I am of the view that if the Plaintiff approached an Indian Court, her case would be fairly
        and appropriately resolved in India.

I declare under penalty of perjury under the laws of the United States of America and the State of California and the laws of India that the above is true and correct.

Executed by me in Delhi this 6th day of April 2015.

By: _____

Nakul Dewan

**APPENDIX TO THE**

**DECLARATION OF NAKUL DEWAN**

# TABLE OF CONTENTS

Ex. A     Nakul Dewan, Curriculum Vita

Ex. B     Nakul Dewan, Publications 2003 – 2015

Ex. C     User Terms Agreement (Jane Doe and Uber B.V.)

Ex. D     User Terms Agreement (Jane Doe's Friend and Uber B.V.)

Ex. E     Transportation Service Provider Agreement (Yadav and Uber B.V)

Ex. F     *Ankush Shivaji Gaikwad v State of Maharashtra* (2013) 6 SCC 770

Ex. G     *Chairman, Railway Board and Others v Chandrima Das (Mrs) and Others* (2000)
          2 SCC 465

Ex. H     *Indian Woman* (2014) 4 SCC 786

Ex. I     *MS Grewal v Deep Chand Sood* (2001) 8 SCC 151

Ex. J     *Shanti Mukund Hospital v Rinchu and Others* (2008) 100 DRJ 43 (DB)

Ex. K     Constitution of India, Article 21

Ex. L     Constitution of India, Article 226

Ex. M     Consumer Protection Act of 1987 § 14

Ex. N     Consumer Protection Act of 1987 § 21

Ex. O     Consumer Protection Act of 1987 § 22

Ex. P     Consumer Protection Act of 1987 § 24 A

Ex. Q     India Code of Civil Procedure § 9

Ex. R     India Code of Civil Procedure § 19

Ex. S     India Code of Civil Procedure § 20

Ex. T     India Code of Civil Procedure § 30

Ex. U     India Code of Criminal Procedure § 357

Ex. V     India Code of Criminal Procedure § 357A

Ex. W     Limitation Act of 1963, Article 113

Ex. X     Ministry of Law and Justice, National Mission for Delivery of Justice and Legal
          Reform, *Towards Timely Delivery of Justice to All* (Strategic Initiatives 2009-
          2012)

Ex. Y     National Consumer Disputes Redressal Commission Homepage, available at
          http://ncdrc.nic.in/

# EXHIBIT A

**Nakul Dewan**
Curriculum Vita

**INDIA**
**Advocate,** August 2002 - April 2007 and January 2011 to present

Practice commercial and constitutional law and appear before the Supreme Court of India, High Court of Delhi, other High Courts in India and quasi-judicial tribunals, as well as before domestic and international arbitration tribunals.

Appointed from 2011 - 2014 to the A - Panel of Advocates to represent the Union of India in cases before the Supreme Court of India.

Act as an arbitrator in arbitrations under the Arbitration and Conciliation Act 1996.

**Honourable Justice A.M. Ahmadi (Former Chief Justice of India)**
**Legal Assistant,** June 2001 - July 2002

Researched for and drafted legal opinions on various issues of Indian commercial and constitutional law.

**SINGAPORE**
**20 Essex Street Chambers,** June 2014 to present
**Allen & Gledhill LLP,** January 2008 - May 2014
**Counsel**

Practice commercial law and appear before the Court of Appeal and the High Court of Singapore, as well as before domestic and international arbitration tribunals.

Represented / advised parties from Singapore, India, Philippines, United States, Australia, United Kingdom, Dubai, Malaysia, Maldives, China and Vietnam in commercial disputes.

Act as an arbitrator in arbitrations conducted under the rules of the Singapore International Arbitration Centre (SIAC).

## EDUCATIONAL QUALIFICATIONS

| 2007 - 2008 | : | **New York University School of Law** |
| | | LL.M (Law and the Global Economy) |
| 2007 - 2008 | : | **National University of Singapore** |
| | | LL.M (International and Comparative Law) |
| 1998 - 2001 | : | **Faculty of Law, University of Delhi** |
| | | LL.B |
| 1995 - 1998 | : | **Shri Ram College of Commerce, University of Delhi** |
| | | B.Com (Hons) |

## BAR STATUS

Called to the Bar in India (2001), Singapore (2010) and England & Wales (2014)

## LAW SOCIETY / BAR MEMBERSHIPS

Middle Temple, London
Law Society of Singapore
Supreme Court of India Bar Association
Associate, Chartered Institute of Arbitrators.

## ACADEMIC AND NON - ACADEMIC HONOURS

Deans' Award, Ministry of Education, Government of Singapore, through New York University School of Law.
Certificate for Superior Appellate Advocacy Skills, Stetson University, Florida, USA.
Founder President, Students for the Promotion of International Law (SPIL).

# EXHIBIT B

NAKUL DEWAN
PUBLICATIONS 2003-**2015**

Singapore's Proposed International Commercial Court: The Antidote to an ill of International Arbitration? Asian Dispute Review, April 2014.

To "seat" or not to "seat": Art thou relevant!! SIAC, January 2014.

Energising Security for Costs: Three realities yawing the boat!! LCIA India, Vol.1 Issue 1, 2012.

Bankruptcy & Arbitrability: Public Interest Considerations must be weighed, SIAC, July 2011.

The Threshold of Reason, Singapore Arbitrator, 3 SINARB, July 2009.

Drafting Arbitration Agreements with Consolidation in Mind, Asian International Arbitration Journal, Vol. 5 No.1, 2009 (Co-authored).

'Wither' or 'Whether' to Consolidate International Arbitration Proceedings, Mealey's International Arbitration Report, Vol.24 #3, March 2009 (Co-authored).

Indian Law: Singapore Arbitration, Singapore Arbitrator, 3 SINARB, July 2008.

Arbitration in India: An Unenjoyable litigating jamboree! Asian International Arbitration Journal, Vol. 3 No. 1, 2007.

Revising the Appointment of Judges: Will the Executive Initiate a Change? Journal of Indian Law Institute, Vol. 47 No.2, April-June 2005.

Interim Measures in Arbitration proceedings: A comparison of the English and Indian Laws, International Business Law Journal, Paris, France (IBLJ), 6[th]ed., 2003.

Lord of the Rings Part 4: the quest for natural justice, Volume 9 - Issue 5, 7 October 2014.

# EXHIBIT C

<% include ../header.html %>

## USER TERMS

21 March 2013

<% include ../country-picker-terms.html %>

These terms and conditions ("**User Terms**") apply to your visit to and your use of our website at **www.uber.com** (the "**Website**"), the Service and the Application (as defined below), as well as to all information, recommendations and/or services provided to you on or through the Website, the Service and the Application.

PLEASE READ THESE USER TERMS CAREFULLY BEFORE DOWNLOADING OUR APPLICATION AND/OR USING OUR SERVICE.

**Uber**

Your contracting partner is Uber B.V., a private limited liability company established in the Netherlands, having its offices at Barbara Strozzilaan 101, 1083 HN Amsterdam, the Netherlands, registered at the Chamber of Commerce under number 55808646 ("**Uber**").

**What services does Uber provide?**

Uber offers information and a means to obtain transportation services offered by third party transportation providers, drivers or vehicle operators (the "**Transportation Provider**"), which may be requested through the use of an application supplied by Uber and downloaded and installed by you on your single mobile device (smart phone) (the "**Application**"). All services provided by Uber to you by means of your use of the Application are hereafter referred to as the "**Service**".

**How is a contract concluded between Uber and you?**

By using the Application or the Service, you enter into a contract with Uber (the "**Contract**"). In order to be able to use the Application or Service, you first need to sign up with Uber. When signing up, you are obligated to provide Uber with your personal information, mobile telephone number and credit card data. Upon successful completion of your signing up with Uber, Uber will provide you with a personal account, accessible for you with a password of your choice.

You have to be 18 years of age or older to use the Service or Application. If you reside in a jurisdiction that restricts the use of the Service or Application because of age, or restricts the ability to enter into contracts such as this one due to age, you must abide by such age limits and you must not use the Service and the Application. You represent that if you are an individual, you are of legal age to enter into a binding contract, or that if you are registering on behalf of a legal entity, that you are authorized to enter into, and bind the entity to, these User Terms and register for the Service and the Application.

**How to use the Service and the Application**

The Application allows you to send a request for transportation service to a Transportation Provider. The GPS receiver - which should be installed on the mobile device (smart phone) on which you have downloaded the Application - detects your location and sends your location information to the relevant Transportation Provider. The Transportation Provider has sole and complete discretion to accept or reject each request for transportation service. The Transportation Provider also has sole and complete discretion over whether to use the Application to receive the leads generated through the Application. If the Transportation Provider accepts a request, the Application notifies you and provides

information regarding the Transportation Provider - including its name, vehicle license number, and customer service rating - and the ability to contact the Transportation Provider by telephone. The Application also allows you to view the Transportation Provider's progress towards the pick-up point, in real time.

Uber shall procure reasonable efforts to bring you into contact with a Transportation Provider in order to obtain transportation services, subject to the availability of Transportation Providers in or around your location at the moment of your request for transportation services.

For the avoidance of doubt: Uber itself does not provide transportation services, and Uber is not a transportation carrier. It is up to the Transportation Provider to offer transportation services, which may be requested through the use of the Application and/or the Service. Uber only acts as intermediary between you and the Transportation Provider. The provision of the transportation services by the Transportation Provider to you is therefore subject to the agreement (to be) entered into between you and the Transportation Provider. Uber shall never be a party to such agreement.

**Your use of the Application or the Service**

You warrant that the information you provide to Uber is accurate and complete. Uber is entitled at all times to verify the information that you have provided and to refuse the Service or use of the Application without providing reasons.

You may only access the Service using authorized means. It is your responsibility to check to ensure you download the correct Application for your device. Uber is not liable if you do not have a compatible mobile device or if you download the wrong version of the Application for your mobile device. Uber reserves the right to terminate the Service and the use of the Application should you be using the Service or Application with an incompatible or unauthorized device.

By using the Application or the Service, you further agree that:

1. You will only use the Service or download the Application for your sole, personal use and will not resell it to a third party;
2. You will not authorize others to use your account;
3. You will not assign or otherwise transfer your account to any other person or legal entity;
4. You will not use an account that is subject to any rights of a person other than you without appropriate authorization;
5. You will not use the Service or Application for unlawful purposes, including but not limited to sending or storing any unlawful material or for fraudulent purposes;
6. You will not use the Service or Application to cause nuisance, annoyance or inconvenience;
7. You will not impair the proper operation of the network;
8. You will not try to harm the Service or Application in any way whatsoever;
9. You will not copy, or distribute the Application or other Uber Content without written permission from Uber;
10. You will keep secure and confidential your account password or any identification we provide you which allows access to the Service and the Application;
11. You will provide us with whatever proof of identity we may reasonably request;
12. You will only use an access point or 3G data account (AP) which you are authorized to use;
13. You are aware that when requesting transportation services by SMS (if available in your jurisdiction), standard messaging charges will apply;
14. You will not use the Service or Application with an incompatible or unauthorized device;
15. You will comply with all applicable law from your home nation, the country, state and/or city in which you are present while using the Application or Service.
    Uber reserves the right to immediately terminate the Service and the use of the Application should you not comply with any of the above rules.

**Payment**

The use of the Application and the Service is free of charge. Uber reserves the right to introduce a fee for the use

of the Application and/or the Service. If Uber decides to introduce such a fee, Uber shall inform you accordingly and allow you to either continue or terminate the Contract.

The rates that apply for the transportation services by the Transportation Provider can be found on the Website and through the Application. These may be modified or updated by Uber from time to time. It is your own responsibility to remain informed about the current rates for the transportation services.

Uber shall charge you for the transportation services provided to you by the Transportation Provider on behalf of the Transportation Provider. You agree that you will pay for all transportation services you purchase from the Transportation Provider, and that Uber may charge your credit card account as provided by you when registering for the Service for the transportation services (including any taxes and late fees, as applicable) that may be accrued by or in connection with your account. You are responsible for the timely payment of all fees and for providing Uber with a valid credit card account for payment of all fees at all times. Any payment made is non-refundable.

Uber uses a third-party payment processor (the "**Payment Processor**") to link your credit card account to the Application and Service. The processing of payments or credits, as applicable, in connection with your use of the Application and Service will be subject to the terms, conditions and privacy policies of the Payment Processor and your credit card issuer in addition to these User Terms. Uber is not responsible for any errors by the Payment Processor. In connection with your use of the Services, Uber will obtain certain transaction details, which Uber will use solely in accordance with its Privacy and Cookie Notice.

**Indemnification**

By accepting these User Terms and using the Application or Service, you agree that you shall defend, indemnify and hold Uber, its affiliates, its licensors, and each of their officers, directors, other users, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with:

    a.  your violation or breach of any term of these User Terms or any applicable law or regulation, whether or not referenced herein;

    b.  your violation of any rights of any third party, including Transportation Providers arranged via the Application, or

    c.  your use or misuse of the Application or Service.

**Liability**

The information, recommendations and/or services provided to you on or through the Website, the Service and the Application is for general information purposes only and does not constitute advice. Uber will reasonably keep the Website and the Application and its contents correct and up to date but does not guarantee that (the contents of) the Website and/or Application are free of errors, defects, malware and viruses or that the Website and/or Application are correct, up to date and accurate.

Uber shall not be liable for any damages resulting from the use of (or inability to use) the Website or Application (but to the exclusion of death or personal injury), including damages caused by malware, viruses or any incorrectness or incompleteness of the Information or the Website or Application, unless such damage is the result of any wilful misconduct or from gross negligence on the part of Uber.

Uber shall further not be liable for damages resulting from the use of (or the inability to use) electronic means of communication with the Website or the Application, including — but not limited to — damages resulting from failure or delay in delivery of electronic communications, interception or manipulation of electronic communications by third parties or by computer programs used for electronic communications and transmission of viruses.

Without prejudice to the foregoing, and insofar as allowed under mandatory applicable law, Uber's aggregate liability shall in no event exceed an amount of EUR 500 or, where applicable, the equivalent of that amount in the currency used by you for the payment of the transportation services to the Transportation Provider.

The quality of the transportation services requested through the use of the Application or the Service is entirely the responsibility of the Transportation Provider who ultimately provides such transportation services to you. Uber under no circumstance accepts liability in connection with and/or arising from the transportation services provided by the Transportation Provider or any acts, actions, behaviour, conduct, and/or negligence on the part of the Transportation Provider. Any complaints about the transportation services provided by the Transportation Provider should therefore be submitted to the Transportation Provider.

### License Grant, Restrictions and Copyright Policy

For the purpose of this User Term, the following definitions apply:

"**Content**" means all content featured or displayed, including, but not limited to, logos, icons, trademarks, text, graphics text, graphics, photographs, images, moving images, sound, illustrations, music, software (excluding the Application), opinions, remarks, comments, artwork, links, questions, suggestions, information or other materials.
"**Uber Content**" means Content owned or used by Uber, its affiliates or licensors and made available through the Website, Service or Application, including any Content licensed from a third party, but excluding User Content.
"**User**" means a person who accesses or uses the Service or Application.
"**User Content**" means Content that a User posts, uploads, publishes, submits or transmits to be made available on the Website or through the Service or Application.
"**Collective Content**" means, collectively, Uber Content and User Content.

Subject to your compliance with these User Terms, Uber grants you a limited, non-exclusive, non-transferable license:

   i. to view, download and print any Uber Content solely for your personal and non-commercial purposes; and
  ii. to view any User Content to which you are permitted access solely for your personal and non-commercial purposes.

You have no right to sublicense the license rights granted in this section.

You may not use, copy, adapt, modify, create derivative works from, distribute, license, sell, transfer, publicly display, publicly perform, reproduce, transmit, stream, broadcast or otherwise exploit the Website, Service, Application or Collective Content, except as expressly permitted in these User Terms. You may not reuse any Collective Content without first obtaining the written consent of Uber. No licenses or rights are granted to you by implication or otherwise under any intellectual property rights owned or controlled by Uber or its licensors, except for the licenses and rights expressly granted in these User Terms.

### License Granted by User

We may, in our sole discretion, permit Users to post, upload, publish, submit or transmit User Content on the Website or through the Service or Application. User Content will be deemed non-confidential and non-proprietary. Accordingly, Uber shall have the non-exclusive, royalty-free, right to use, copy, distribute and disclose to third parties any User Content for any purpose, in any medium and throughout the world ("**License Grant**").

You acknowledge that Uber only acts as a passive conduit for the distribution of the User Content and is not responsible or liable to you or to any third party for the content or accuracy of the User Content. Uber shall not be continuously monitoring User Content published by you or moderating between Users, nor shall Uber be under an obligation to do so. Without limiting the foregoing, you acknowledge and agree that any remarks, opinions, comments, suggestions and other information expressed or included in the User Content do not

necessarily represent those of Uber.

Any use by you of the User Content is entirely at your own risk. You represent and warrant that any User Content posted or transmitted by you is original to you and does not copy the work of any third party or otherwise infringe any third party intellectual property rights, rights of privacy or personality rights and does not contain any defamatory or disparaging statements. Furthermore, you represent and warrant that you have the capacity to grant the license as stipulated in this paragraph.

You agree to indemnify and keep Uber, its affiliates and licensors indemnified against all costs, expenses, damages, losses and liabilities incurred or suffered by Uber or its affiliated companies related to any User Content posted or transmitted by you or your other use of the Website, the Service or the Application.

Uber reserves the right at its sole discretion to block or remove (in whole or in part) any User Content posted or transmitted by you and which Uber believes is not in accordance with these User Terms (including materials which infringe or may infringe third party intellectual property rights, rights of privacy or personality rights), or is otherwise unacceptable to Uber.

You agree to promptly notify Uber in writing of any User Content which breaches these User Terms. You agree to provide to Uber sufficient information to enable Uber to investigate whether such User Content breaches these User Terms. Uber agrees to make good faith efforts to investigate such complaint and shall take such action as Uber in its sole discretion decides. However, Uber does not warrant or represent that it will block or remove (in whole or in part) such user Content.

**Application License**

Subject to your compliance with these User Terms, Uber grants you a limited non-exclusive, non-transferable license to download and install a copy of the Application on a single mobile device that you own or control and to run such copy of the Application solely for your own personal use.

**You shall not**

    i. license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party the Service or Application in any way;
   ii. modify or make derivative works based upon the Service or Application;
  iii. create Internet "links" to the Service or "frame" or "mirror" any Application on any other server or wireless or Internet-based device;
   iv. reverse engineer or access the Application in order to
       a. design or build a competitive product or service,
       b. design or build a product using similar ideas, features, functions or graphics of the Service or Application, or
       c. copy any ideas, features, functions or graphics of the Service or Application, or
    v. launch an automated program or script, including, but not limited to, web spiders, web crawlers, web robots, web ants, web indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burdens or hinders the operation and/or performance of the Service or Application.

    **You shall not:**

      i. send spam or otherwise duplicative or unsolicited messages in violation of applicable laws;
     ii. send or store infringing, obscene, threatening, libellous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights;
    iii. send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs;

iv. interfere with or disrupt the integrity or performance of the Website, the Application or Service or the data contained therein; or

v. attempt to gain unauthorized access to the Website, the Application or Service or its related systems or networks.

Uber will have the right to investigate and prosecute violations of any of the above to the fullest extent of the law. Uber may involve and cooperate with law enforcement authorities in prosecuting users who violate these User Terms. You acknowledge that Uber has no obligation to monitor your access to or use of the Website, Service, Application or Collective Content or to review or edit any Collective Content, but has the right to do so for the purpose of operating the Website, the Application and Service, to ensure your compliance with these User Terms, or to comply with applicable law or the order or requirement of a court, administrative agency or other governmental body. Uber reserves the right, at any time and without prior notice, to remove or disable access to any Collective Content that Uber, at its sole discretion, considers to be in violation of these User Terms or otherwise harmful to the Website, the Service or Application.

### Copyright Policy

Uber respects copyright law and expects its users to do the same. It is Uber's policy to terminate in appropriate circumstances Users or other account holders who (repeatedly) infringe or are believed to be (repeatedly) infringing the rights of copyright holders. Please see Uber's Copyright Policy at https://www.uber.com/legal/copyright, for further information.

### Intellectual Property Ownership

Uber alone (and its licensors, where applicable) shall own all right, title and interest, including all related intellectual property rights, in and to the Website, Application and the Service and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any other party relating to the Website, Application or the Service.

These User Terms do not constitute a sale and do not convey to you any rights of ownership in or related to the Website, the Application or the Service, or any intellectual property rights owned by Uber. Uber's name, logo, and the product names associated with the Application and Service are trademarks of Uber, its affiliated companies or third parties, and no right or license is granted to use them.

### App Store Sourced Application

With respect to any Application accessed through or downloaded from the Apple App Store ("**App Store Sourced Application**"), you will use the App Store Sourced Application only:

i. on an Apple-branded product that runs iOS (Apple's proprietary operating system software); and

ii. as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Uber reserves all rights in and to the Application not expressly granted to you under these User Terms.

### You acknowledge and agree that

i. these User Terms are valid between you and Uber only, and not Apple, and

ii. Uber, not Apple, is solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

In the event of any failure of the App Store Sourced Application to conform to any applicable warranty,

you may notify Apple, and Apple will, where applicable, refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Uber and Apple, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Uber.

You and Uber acknowledge that, as between Uber and Apple, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to:

    i. product liability claims;
   ii. any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and
  iii. claims arising under consumer protection or similar legislation.

You and Uber acknowledge that, in the event of any third party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Uber and Apple, Uber, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by this Agreement.

You and Uber acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries relating to your license of the App Store Sourced Application, and that, upon your acceptance of these User Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the rights under these User Terms as related to your license of the App Store Sourced Application against you as a third party beneficiary thereof.

Without limiting any other provisions of these User Terms, you must comply with all applicable third party terms of agreement when using the App Store Sourced Application.

**Third Party Interactions**

During the use of the Website, the Application and the Service, links to websites that are owned and controlled by third parties may be provided from time to time in order to enter into correspondence with, purchase goods or services from, participate in promotions of third parties. These links take you off the Website, the Application and the Service and are beyond Uber's control.

During use of the Website, the Application and the Service, you may enter into correspondence with, purchase goods and/or services from, or participate in promotions of third party service providers, advertisers or sponsors showing their goods and/or services through a link on the Website or through the Application or Service. These links take you off the Website, the Application and the Service and are beyond Uber's control. The websites you can link to have their own separate terms and conditions as well as a privacy policy. Uber is not responsible and cannot be held liable for the content and activities of these websites. You therefore visit or access these websites entirely at your own risk.

Please note that these other websites may send their own cookies to users, collect data or solicit personal information, and you are therefore advised to check the terms of use or privacy policies on those websites prior to using them.

**Term and termination of the contract**

The Contract between Uber and you is concluded for an indefinite period.

You are entitled to terminate the Contract at all times by permanent deletion of the Application installed on

your smart phone, thus disabling the use by you of the Application and the Service. You can close your user account at any time by following the instructions on Uber's website.

Uber is entitled to terminate the Contract at all times and with immediate effect (by disabling your use of the Application and the Service) if you:

a. violate or breach any term of these User Terms, or
b. in the opinion of Uber, misuse the Application or the Service. Uber is not obliged to give notice of the termination of the Contract in advance. After termination Uber will give notice thereof in accordance with these User Terms.

### Invalidity of one or more provisions

The invalidity of any term of these User Terms shall not affect the validity of the other provisions of these User Terms.

If and to the extent that any provision of these User Terms is invalid, or is unacceptable in the given circumstances according to the criteria of reasonableness and fairness, a provision shall apply between the parties instead that is acceptable considering all the circumstances and which corresponds with the provisions of the void part as much as possible, taking into account the content and the purpose of these User Terms.

### Modification of the Service and User Terms

Uber reserves the right, at its sole discretion, to modify or replace any of these User Terms, or change, suspend, or discontinue the Service or Application (including without limitation, the availability of any feature, database, or content) at any time by posting a notice on the Website or by sending you notice through the Service, Application or via email. Uber may also impose limits on certain features and services or restrict your access to parts or all of the Service without notice or liability.

### Notice

Uber may give notice by means of a general notice on the Service or Application, or by electronic mail to your email address on record in Uber's account information, or by written communication sent by regular mail to your address on record in Uber's account information.

### Assignment

You may not assign your rights under these User Terms without prior written approval of Uber.

### Privacy and Cookie Notice

Uber collects and processes the personal data of the visitors of the Website and users of the Application according to the Privacy and Cookie Notice **uber.com/privacy**.

### Applicable law and Dispute Resolution

These User Terms are subject to the laws of the Netherlands. Any dispute, claim or controversy arising out of or relating to these User Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Website, the Service or the Application (collectively, "Disputes") will be settled exclusively by the competent court in Amsterdam, the Netherlands, unless you notify Uber within one month after Uber invoking its right pursuant to this provision to commence court proceedings in

Amsterdam, the Netherlands, that you demand settlement of the dispute, claim or controversy at hand before the relevant court competent by law.

**Final provision**

The English text of these User Terms constitutes the sole authentic text. In the event of any discrepancy between the English text and a translation into a foreign language, the English text shall prevail.

<% include ../footer.html %>

# EXHIBIT D

<% include ../header.html %>

## Terms and Conditions

May 6, 2013

<% include ../country-picker-terms.html %>

These terms and conditions (**"User Terms"**) apply to your visit to and your use of our website at www.uber.com (the **"Website"**), the Service and the Application (as defined below), as well as to all information, recommendations and or services provided to you on or through the Website, the Service and the Application.

PLEASE READ THESE USER TERMS CAREFULLY BEFORE DOWNLOADING OUR APPLICATION AND/OR USING OUR SERVICE.

### Uber

Your contracting partner is Uber B.V., a private limited liability company established in the Netherlands, having its offices at Barbara Strozzilaan 101, 1083 HN Amsterdam, the Netherlands, registered at the Chamber of Commerce under number 55808646 (**"Uber"**).

### What services does Uber provide?

Uber offers information and a means to obtain transportation services offered by third party transportation providers, drivers or vehicle operators (the **"Transportation Provider"**), which may be requested through the use of an application supplied by Uber and downloaded and installed by you on your single mobile device (smart phone) (the **"Application"**). All services provided by Uber to you by means of your use of the Application are hereafter referred to as the **"Service"**.

### How is a contract concluded between Uber and you?

By using the Application or the Service, you enter into a contract with Uber (the **"Contract"**). In order to be able to use the Application or Service, you first need to sign up with Uber. When signing up, you are obligated to provide Uber with your personal information, mobile telephone number and credit card data. Upon successful completion of your signing up with Uber, Uber will provide you with a personal account, accessible for you with a password of your choice.

You have to be 18 years of age or older to use the Service or Application. If you reside in a jurisdiction that restricts the use of the Service or Application because of age, or restricts the ability to enter into contracts such as this one due to age, you must abide by such age limits and you must not use the Service and the Application. You represent that if you are an individual, you are of legal age to enter into a binding contract, or that if you are registering on behalf of a legal entity, that you are authorized to enter into, and bind the entity to, these User Terms and register for the Service and the Application.

### How to use the Service and the Application

The Application allows you to send a request for transportation service to a Transportation Provider. The GPS receiver - which should be installed on the mobile device (smart phone) on which you have downloaded the Application - detects your location and sends your location information to the relevant Transportation Provider. The Transportation Provider has sole and complete discretion to accept or reject each request for transportation service. The Transportation Provider also has sole and complete discretion over whether to use the Application to receive the leads generated through the Application. If the Transportation Provider accepts a request, the Application notifies you and provides

information regarding the Transportation Provider - including its name, vehicle license number, and customer service rating - and the ability to contact the Transportation Provider by telephone. The Application also allows you to view the Transportation Provider's progress towards the pick-up point, in real time.

Uber shall procure reasonable efforts to bring you into contact with a Transportation Provider in order to obtain transportation service, subject to the availability of Transportation Providers in or around your location at the moment of your request for transportation services.

For the avoidance of doubt: Uber itself does **<u>not</u>** provide transportation services, and Uber is not a transportation carrier. It is up to the Transportation Provider to offer transportation services, which may be requested through the use of the Application and/or the Service. Uber only acts as intermediary between you and the Transportation Provider. The provision of the transportation services by the Transportation Provider to you is therefore subject to the agreement (to be) entered into between you and the Transportation Provider. Uber shall never be a party to such agreement.

## Your use of the Application or the Service

You warrant that the information you provide to Uber is accurate and complete. Uber is entitled at all times to verify the information that you have provided and to refuse the Service or use of the Application without providing reasons.

You may only access the Service using authorized means. It is your responsibility to check to ensure you download the correct Application for your device. Uber is not liable if you do not have a compatible mobile device or if you download the wrong version of the Application for your mobile device. Uber reserves the right to terminate the Service and the use of the Application should you be using the Service or Application with an incompatible or unauthorized device.

By using the Application or the Service, you further agree that:

- You will only use the Service or download the Application for your sole, personal use and will not resell it to a third party;
- You will not authorize others to use your account;
- You will not assign or otherwise transfer your account to any other person or legal entity;
- You will not use an account that is subject to any rights of a person other than you without appropriate authorization;
- You will not use the Service or Application for unlawful purposes, including but not limited to sending or storing any unlawful material or for fraudulent purposes;
- You will not use the Service or Application to cause nuisance, annoyance or inconvenience;
- You will not impair the proper operation of the network;
- You will not try to harm the Service or Application in any way whatsoever;
- You will not copy, or distribute the Application or other Uber Content without written permission from Uber;
- You will keep secure and confidential your account password or any identification we provide you which allows access to the Service and the Application;
- You will provide us with whatever proof of identity we may reasonably request;
- You will only use an access point or 3G data account (AP) which you are authorized to use;
- You are aware that when requesting transportation services by SMS if available in your jurisdiction), standard messaging charges will apply;
- You will not use the Service or Application with an incompatible or unauthorized device;
- You will comply with all applicable law from your home nation, the country, state and/or city in which you are present while using the Application or Service.

Uber reserves the right to immediately terminate the Service and the use of the Application should you not comply with any of the above rules.

## Payment

The use of the Application and the Service is free of charge. Uber reserves the right to introduce a fee for the use of the Application and/or the Service. If Uber decides to introduce such a fee, Uber shall inform you accordingly and allow you to either continue or terminate the Contract.

The rates that apply for the transportation services by the Transportation Provider can be found on the Website and through the Application. These may be modified or updated by Uber from time to time. It is your own responsibility to remain informed about the current rates for the transportation services.

Uber shall charge you for the transportation services provided to you by the Transportation Provider on behalf of the Transportation Provider. You agree that you will pay for all transportation services you purchase from the Transportation Provider, and that Uber may charge your credit card account as provided by you when registering for the Service for the transportation services including any taxes and late fees, as applicable) that may be accrued by or in connection with your account. You are responsible for the timely payment of all fees and for providing Uber with a valid credit card account for payment of all fees at all times. Any payment made is non-refundable.

Uber uses a third-party payment processor (the **"Payment Processor"**) to link your credit card account to the Application and Service. The processing of payments or credits, as applicable, in connection with your use of the Application and Service will be subject to the terms, conditions and privacy policies of the Payment Processor and your credit card issuer in addition to these User Terms. Uber is not responsible for any errors by the Payment Processor. In connection with your use of the Service, Uber will obtain certain transaction details, which Uber will use solely in accordance with its Privacy and Cookie Notice.

## Indemnification

By accepting these User Terms and using the Application or Service, you agree that you shall defend, indemnify and hold Uber, its affiliates, its licensors, and each of their officers, directors, other users, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with: (a) your violation or breach of any term of these User Terms or any applicable law or regulation, whether or not referenced herein; (b) your violation of any rights of any third party, including Transportation Providers arranged via the Application, or (c) your use or misuse of the Application or Service.

## Liability

The information, recommendations and/or services provided to you on or through the Website, the Service and the Application is for general information purposes only and does not constitute advice. Uber will reasonably keep the Website and the Application and its contents correct and up to date but does not guarantee that (the contents of) the Website and/or Application are free of errors, defects, malware and viruses or that the Website and/or Application are correct, up to date and accurate.

Uber shall not be liable for any damages resulting from the use of or inability to use) the Website or Application (but to the exclusion of death or personal injury), including damages caused by malware, viruses or any incorrectness or incompleteness of the Information or the Website or Application, unless such damage is the result of any wilful misconduct or from gross negligence on the part of Uber.

Uber shall further not be liable for damages resulting from the use of (or the inability to use) electronic means of communication with the Website or the Application, including â€" but not limited to â€" damages resulting from failure or delay in delivery of electronic communications, interception or manipulation of electronic communications by third parties or by computer programs used for electronic communications and transmission of viruses.

Without prejudice to the foregoing, and insofar as allowed under mandatory applicable law, Uber's aggregate liability shall in no event exceed an amount of EUR 500 or, where applicable, the equivalent of that amount in the currency used by you for the payment of the transportation services to the Transportation Provide.

The quality of the transportation services requested through the use of the Application or the Service is entirely the responsibility of the Transportation Provider who ultimately provides such transportation services to you. Uber under no circumstance accepts liability in connection with and/or arising from the transportation services provided by the Transportation Provider or any acts, action, behaviour, conduct, and/or negligence on the part of the Transportation Provider. Any complaints about the transportation services provided by the Transportation Provider should therefore be submitted to the Transportation Provider.

## License Grant, Restrictions and Copyright Policy

For the purpose of this User Term, the following definitions apply:

**"Content"** means all content featured or displayed, including, but not limited to, logos, icons, trademarks, text, graphics text, graphics, photographs, images, moving images, sound, illustrations, music, software (excluding the Application), opinion, remarks, comments, artwork, links, questions, suggestions, information or other materials.

**"Uber Content"** means Content owned or used by Uber, its affiliates or licensors and made available through the Website, Service or Application, including any Content licensed from a third party, but excluding User Content.

**"User"** means a person who accesses or uses the Service or Application.

**"User Content"** means Content that a User posts, uploads, publishes, submits or transmits to be made available on the Website or through the Service or Application.

**"Collective Content"** means, collectively, Uber Content and User Content.

Subject to your compliance with these User Terms, Uber grants you a limited, non-exclusive, non-transferable license:

- (i) to view, download and print any Uber Content solely for your personal and non-commercial purposes; and
- (ii) to view any User Content to which you are permitted access solely for your personal and non-commercial purposes.

You have no right to sublicense the license rights granted in this section.

You may not use, copy, adapt, modify, create derivative works from, distribute, license, sell, transfer, publicly display, publicly perform, reproduce, transmit, stream, broadcast or otherwise exploit the Website, Service, Application or Collective Content, except as expressly permitted in these User Terms. You may not reuse any Collective Content without first obtaining the written consent of Uber. No licenses or rights are granted to you by implication or otherwise under any intellectual property rights owned or controlled by Uber or its licensors, except for the licenses and rights expressly granted in these User Terms.

### License Granted by User

We may, in our sole discretion, permit Users to post, upload, publish, submit or transmit User Content on the Website or through the Service or Application. User Content will be deemed non-confidential and non-proprietary. Accordingly, Uber shall have the non-exclusive, royalty-free, right to use, copy, distribute and disclose to third parties any User Content for any purpose, in any medium and throughout the world (**"License Grant"**).

You acknowledge that Uber only acts as a passive conduit for the distribution of the User Content and is not responsible or liable to you or to any third party for the content or accuracy of the User Content. Uber shall not be continuously monitoring User Content published by you or moderating between Users, nor shall Uber be under an obligation to do so. Without limiting the foregoing, you acknowledge and agree that any remarks, opinions, comments, suggestions and other information expressed or included in the User Content do not necessarily represent those of Uber.

Any use by you of the User Content is entirely at your own risk. You represent and warrant that any User Content

posted or transmitted by you is original to you and does not copy the work of any third party or otherwise infringe any third party intellectual property rights, rights of privacy or personality rights and does not contain any defamatory or disparaging statements. Furthermore, you represent and warrant that you have the capacity to grant the license as stipulated in this paragraph.

You agree to indemnify and keep Uber, its affiliates and licensors indemnified against all costs, expenses, damages, losses and liabilities incurred or suffered by Uber or its affiliated companies related to any User Content posted or transmitted by you or your other use of the Website, the Service or the Application.

Uber reserves the right at its sole discretion to block or remove (in whole or in part) any User Content posted or transmitted by you and which Uber believes is not in accordance with these User Terms (including materials which infringe or may infringe third party intellectual property rights, rights of privacy or personality rights), or is otherwise unacceptable to Uber.

You agree to promptly notify Uber in writing of any User Content which breaches these User Terms. You agree to provide to Uber sufficient information to enable Uber to investigate whether such User Content breaches these User Terms. Uber agrees to make good faith efforts to investigate such complaint and shall take such action as Uber in its sole discretion decides. However, Uber does not warrant or represent that it will block or remove (in whole or in part) such user Content.

**Application License**

Subject to your compliance with these User Terms, Uber grants you a limited non-exclusive, non-transferable license to download and install a copy of the Application on a single mobile device that you own or control and to run such copy of the Application solely for your own personal use.

You shall not (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party the Service or Application in any way; (ii) modify or make derivative works based upon the Service or Application; (iii) create Internet "links" to the Service or "frame" or "mirror" any Application on any other server or wireless or Internet-based device; (iv) reverse engineer or access the Application in order to (a) design or build a competitive product or service, (b) design or build a product using similar ideas, features, functions or graphics of the Service or Application, or (c) copy any ideas, features, functions or graphics of the Service or Application, or (v) launch an automated program or script, including, but not limited to, web spiders, web crawlers, web robots, web ants, web indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burdens or hinders the operation and/or performance of the Service or Application.

You shall not: (i) send spam or otherwise duplicative or unsolicited messages in violation of applicable laws; (ii) send or store infringing, obscene, threatening, libellous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights; (iii) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs; (iv) interfere with or disrupt the integrity or performance of the Website, the Application or Service or the data contained therein; or (v) attempt to gain unauthorized access to the Website, the Application or Service or its related systems or networks.

Uber will have the right to investigate and prosecute violations of any of the above to the fullest extent of the law. Uber may involve and cooperate with law enforcement authorities in prosecuting users who violate these User Terms. You acknowledge that Uber has no obligation to monitor your access to or use of the Website, Service, Application or Collective Content or to review or edit any Collective Content, but has the right to do so for the purpose of operating the Website, the Application and Service, to ensure your compliance with these User Terms, or to comply with applicable law or the order or requirement of a court, administrative agency or other governmental body. Uber reserves the right, at any time and without prior notice, to remove or disable access to any Collective Content that Uber, at its sole discretion, considers to be in violation of these User Terms or otherwise harmful to the Website, the Service or Application.

**Copyright Policy**

Uber respects copyright law and expects its users to do the same. It is Uber's policy to terminate in appropriate circumstances Users or other account holders who (repeatedly) infringe or are believed to be (repeatedly) infringing the rights of copyright holders. Please see Uber's Copyright Policy at https://www.uber.com/legal/copyright, for further information.

## Intellectual Property Ownership

Uber alone (and its licensors, where applicable) shall own all right, title and interest, including all related intellectual property rights, in and to the Website, Application and the Service and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any other party relating to the Website, Application or the Service.

These User Terms do not constitute a sale and do not convey to you any rights of ownership in or related to the Website, the Application or the Service, or any intellectual property rights owned by Uber. Uber's name, logo, and the product names associated with the Application and Service are trademarks of Uber, its affiliated companies or third parties, and no right or license is granted to use them.

## App Store Sourced Application

With respect to any Application accessed through or downloaded from the Apple App Store (**"App Store Sourced Application"**), you will use the App Store Sourced Application only: (i) on an Apple-branded product that runs iOS (Apple's proprietary operating system software); and (ii) as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Uber reserves all rights in and to the Application not expressly granted to you under these User Terms.

You acknowledge and agree that (i) these User Terms are valid between you and Uber only, and not Apple, and (ii) Uber, not Apple, is solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

In the event of any failure of the App Store Sourced Application to conform to any applicable warranty, you may notify Apple, and Apple will, where applicable, refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Uber and Apple, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Uber.

You and Uber acknowledge that, as between Uber and Apple, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to: (i) product liability claims; (ii) any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation.

You and Uber acknowledge that, in the event of any third party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Uber and Apple, Uber, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by this Agreement.

You and Uber acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries relating to your license of the App Store Sourced Application, and that, upon your acceptance of these User Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the rights under these User Terms as related to your

license of the App Store Sourced Application against you as a third party beneficiary thereof.

Without limiting any other provisions of these User Terms, you must comply with all applicable third party terms of agreement when using the App Store Sourced Application.

**Third Party Interactions**

During the use of the Website, the Application and the Service, links to websites that are owned and controlled by third parties may be provided from time to time in order to enter into correspondence with, purchase goods or services from, participate in promotions of third parties. These links take you off the Website, the Application and the Service and are beyond Uber's control.

During use of the Website, the Application and the Service, you may enter into correspondence with, purchase goods and/or services from, or participate in promotions of third party service providers, advertisers or sponsors showing their goods and/or services through a link on the Website or through the Application or Service. These links take you off the Website, the Application and the Service and are beyond Uber's control. The websites you can link to have their own separate terms and conditions as well as a privacy policy. Uber is not responsible and cannot be held liable for the content and activities of these websites. You therefore visit or access these websites entirely at your own risk.

Please note that these other websites may send their own cookies to users, collect data or solicit personal information, and you are therefore advised to check the terms of use or privacy policies on those websites prior to using them.

**Term and termination of the contract**

The Contract between Uber and you is concluded for an indefinite period.

You are entitled to terminate the Contract at all times by permanent deletion of the Application installed on your smart phone, thus disabling the use by you of the Application and the Service. You can close your user account at any time by following the instructions on Uber's website.

Uber is entitled to terminate the Contract at all times and with immediate effect (by disabling your use of the Application and the Service) if you: (a) violate or breach any term of these User Terms, or (b) in the opinion of Uber, misuse the Application or the Service. Uber is not obliged to give notice of the termination of the Contract in advance. After termination Uber will give notice thereof in accordance with these User Terms.

**Invalidity of one or more provisions**

The invalidity of any term of these User Terms shall not affect the validity of the other provisions of these User Terms.

If and to the extent that any provision of these User Terms is invalid, or is unacceptable in the given circumstances according to the criteria of reasonableness and fairness, a provision shall apply between the parties instead that is acceptable considering all the circumstances and which corresponds with the provisions of the void part as much as possible, taking into account the content and the purpose of these User Terms.

**Modification of the Service and User Terms**

Uber reserves the right, at its sole discretion, to modify or replace any of these User Terms, or change, suspend, or discontinue the Service or Application (including without limitation, the availability of any feature, database, or content) at any time by posting a notice on the Website or by sending you notice through the Service, Application or via email. Uber may also impose limits on certain features and services or restrict your access to parts or all of the Service without notice or liability.

**Notice**

Uber may give notice by means of a general notice on the Service or Application, or by electronic mail to your email address on record in Uber's account information, or by written communication sent by regular mail to your address on record in Uber's account information.

## Assignment

You may not assign your rights under these User Terms without prior written approval of Uber.

## Privacy and Cookie Notice

Uber collects and processes the personal data of the visitors of the Website and users of the Application according to the Privacy and Cookie Notice.

## Applicable law and Dispute Resolution

These User Terms are subject to the laws of the Netherlands. Any dispute, claim or controversy arising out of or relating to these User Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Website, the Service or the Application (collectively, **"Disputes"**) will be settled exclusively by the competent court in Amsterdam, the Netherlands, unless you notify Uber within one month after Uber invoking its right pursuant to this provision to commence court proceedings in Amsterdam, the Netherlands, that you demand settlement of the dispute, claim or controversy at hand before the relevant court competent by law.

## Final provision

The English text of these User Terms constitutes the sole authentic text. In the event of any discrepancy between the English text and a translation into a foreign language, the English text shall prevail.

<% include ../footer.html %>

# EXHIBIT E



**PARTNER TERMS**

**BY REGISTERING AND SIGNING THE PARTNER REGISTRATION FORM, THE PARTNER HEREBY ACKNOWLEDGES, ACCEPTS AND AGREES TO THE FOLLOWING TERMS AND CONDITIONS ("PARTNER TERMS"):**

**1. DEFINITIONS, INTERPRETATION, SCOPE AND CHANGE OF THE PARTNER TERMS**
1.1 Definitions and interpretation
1.1.1 In addition to the terms defined elsewhere in these Partner Terms, the following definitions apply, unless the contrary intention appears:

"**Affiliated Company**" means a company that directly or indirectly is under control of or controls that relevant Party, by having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights.

"**App**" means the software application owned, controlled, managed, maintained, hosted, licensed and/or designed by Uber (or its Affiliated Companies) to run on smartphones, tablet computers and/or other devices, through which the Service is made available.

"**Change Notice**" has the meaning as set out in Clause 5.4.

"**City**" means the state, city, municipality, place, region or territory as set out in the PRF in which the Driving Service shall be made available by the Partner.

"**Commission**" means the remuneration for the Service provided by Uber to the Partner.

"**Customer**" means a person who has signed up and is registered with Uber for the use of the App and/or the Service.

"**Data**" means all data with regard to or transmitted using the Device, the App, the Driver App, the Service or the Driver ID, or data relating to the Customer and/or the Ride.

"**Device**" means the relevant smartphone or such other device as made available by Uber (in its sole discretion) to the Driver in order to use and have (limited) access to the Service and enable and provide the Driving Service to the Customers.

"**Driver**" means the person who is an employee or business partner of, or otherwise retained by the Partner and who shall render the Driving Service of whom the relevant (contact) details (including copy of the driver's license) are provided to Uber.

"**Driver App**" means the software application owned, controlled, managed, maintained, hosted, licensed and/or designed by Uber (or its Affiliated Companies) to run on the Device.

"**Driver ID**" means the identification and password key allotted by Uber to a Driver by which the Driver can access and use the Driver App and Device.

"**Driving Service**" means the driving transportation service as provided, made available or rendered by the Partner (through the Driver (as applicable) with the Vehicle) upon request of the Customer.

"**Fare**" means the amount (including applicable Taxes and Fees) that the Partner is entitled to charge the Customer for the Ride, based on the recommended fares for the City as set out on www.uber.com, on the App or in the PRF.

"**Indirect Taxes**" means VAT, GST, or any other consumption, sales or use tax or any other similar transaction taxes.

"**Intellectual Property Right**" means any patent, copyright, invention, database right, design right, registered design, trade mark, trade name, brand, logo, slogan, service mark, know-how, utility model, unregistered design or, where relevant, any application for any such right, know-how, trade or business name, domain name (under whatever extension, e.g. .com, .nl, .fr, .eu, etc.) or other similar right or obligation whether registered or unregistered or other industrial or intellectual property right subsisting in any territory or jurisdiction anywhere in the world.

"**Party**" means the Partner or Uber (collectively the "**Parties**").

"**Partner**" means the party having sole responsibility for the Driving Service as set out in the PRF.

"**Partner Agreement**" means the PRF, the Partner Terms (as amended from time to time) and any appendixes, schedules and annexes thereto.

"**PRF**" means Partner Registration Form.



**"Ride"** means the transportation of the Customer by the Driver from the point of pick-up of the Customer until the point of drop-off of the Customer.

**"Service"** means the on-demand, intermediary service through the App, SMS (text messaging), web based requests or such other platforms, communication media or channels as –from time to time– operated and made available by or on behalf of Uber that allows a Customer to request Driving Service from such a Driver (who shall render the Driving Service on behalf of the Partner) as available to and accepted by the Customer.

**"Taxes and Fees"** means VAT or sales taxes (as applicable) and such other applicable national, governmental, provincial, state, municipal, local or other applicable taxes, levies, tax-like assessments, (waiting) fees, Toll Charges (including surcharges thereon) or any other charges levied by any competent authority or agency in relation to the Driving Service.

**"Toll Charges"** means any and all road, bridge, ferry, tunnel and airport toll charges, including inner-city congestion, environmental or similar charges.

**"Uber"** means Uber B.V., a private limited liability company incorporated under the laws of the Netherlands, with its registered seat in Amsterdam, the Netherlands.

**"Vehicle"** means any motorized vehicle (whether powered by an internal combustion or an electrical engine) that is in safe and cleanly condition and fit for passenger transportation as required by applicable laws and regulations and that has been approved by Uber for the provision of the Driving Service.

**"Website"** means the Uber website www.uber.com.

1.1.2    These Partner Terms (as amended from time to time) form an integral part of the PRF and must be read in conjunction with the PRF (including all appendixes, schedules and annexes). Uber – acting reasonably and giving reasonable (not less than seven (7) days') prior notice to the Partner – reserves the right to modify the Partner Terms (including the appendixes, schedules and annexes) or its policies relating to the Service, the App, the Driver App or the Device by posting an updated version of this Partner Agreement through the Service, the Driver App or the Device or by providing the Partner with a copy of the amended Partner Terms.

## 2    SCOPE
### 2.1    Role of Uber
2.1.1    Partner acknowledges and agrees that Uber does not provide any transportation services, and that Uber is not a transportation or passenger carrier. Uber offers information and a tool to connect Customers seeking Driving Services to Drivers who can provide the Driving Service, and it does not and does not intend to provide transportation or act in any way as a transportation or passenger carrier. Uber has no responsibility or liability for any driving or transportation services provided by the Partner or the Drivers to third parties (including the Customers). The Partner and/or the Drivers will be solely responsible for any and all liability which results or is alleged to be as a result of the operation of the Vehicle(s) and/or the driving or transportation service, including, but not limited to personal injuries, death and property damage. Partner agrees to indemnify, defend and hold Uber harmless from and against any (potential) claims or (potential) damages incurred by any third party, including the Customer or the Driver, raised on account of the provision of the Driving Service. By providing the Driving Service to the Customer, the Partner accepts, agrees and acknowledges that a direct legal relationship is created and assumed solely between the Partner and the Customer. Uber shall not be responsible or liable for the actions, omissions and behaviour of the Customer in or in relation to the Partner, the Driver and the Vehicle. The Drivers are solely responsible for taking reasonable and appropriate precautions in relation to any third party with which they interact in connection with the Driving Service. Where this allocation of the Parties' mutual responsibilities may be ineffective under applicable law, the Partner undertakes to indemnify, defend and hold Uber harmless from and against any claims that may be brought against Uber in relation to the Partner's provision of the Driving Service under such applicable law.

### 2.2    Relationship with Partner/Drivers



2.2.1    Notwithstanding the Partner's right, if applicable, to take recourse against the Driver, the Partner acknowledges and agrees that he is at all times responsible and liable for the acts and omissions of the Driver(s) vis-à-vis the Customer and Uber, even where such vicarious liability may not be mandated under applicable law. The Partner represents and undertakes to procure that the Driver shall comply with, adhere to and observe the Partner Terms and all applicable laws, regulations, rules, statutes or ordinances governing or otherwise relating to the Driving Service. To the extent required, the Partner hereby agrees and procures that the rights, covenants, undertakings, representations and obligations of the Driver as set out in this Agreement shall apply to, and be assumed, accepted and taken over by the Driver. The Partner acknowledges and agrees that he will retain and, where necessary exercise, sole control over the Driver and comply with all applicable laws and regulations (incl. tax, social security and employment laws) governing or otherwise applicable to his relationship with the Driver. Uber does not and does not intend to exercise any control over the Driver (or the Partner's) actions or the operation or physical condition of the Vehicle – except as provided under the Agreement - and nothing in the Agreement shall create an employment relationship between Uber and the Partner and/or the Driver or create either of them an agent of Uber. The Partner acknowledges and agrees that he has no authority to bind Uber and undertakes not to hold himself out and to procure that the Driver does not hold himself out, as an agent or authorized representative of Uber. Where, by implication of mandatory law or otherwise, the Driver and/or the Partner may be deemed an agent, employee or representative of Uber, the Partner undertakes and agrees to indemnify, defend and hold Uber harmless from and against any claims by any person or entity based on such implied employment or agency relationship.

## 3.    PARTNER RIGHTS AND OBLIGATIONS

### 3.1    Use of and access to the Driver App

3.1.1    Uber (and its Affiliated Companies and licensors, where applicable) shall own and have all rights (including Intellectual Property Rights) in and to the Device, the App, the Driver App, the Service, the Driver ID and the Data. Insofar the Partner and/or Driver may, by operation of applicable law or otherwise, obtain any rights (including Intellectual Property Rights) in relation thereto, these rights shall be and are hereby transferred (insofar permitted under the applicable law, in advance) to Uber (rights obtained by any Driver should be transferred via the Partner). Where a transfer may not be permissible under the applicable mandatory law, the Partner hereby undertakes to grant and to procure that the Driver grants Uber a perpetual, exclusive (exclusive also with regard to Partner and/or Driver), world-wide and transferable right and license under any such non-transferable rights.

3.1.2    Uber hereby grants the Partner (and to the extent required, the Driver) a limited, revocable, non-exclusive, royalty free, non-transferable and non-assignable right to use the Driver App and the Device during the term of this Agreement solely for the purpose of having (limited) access to the Service with the sole purpose to provide and render the Driving Service in and/or from within the City to and for the benefit of the Customers. All rights not expressly granted to the Partner are reserved by Uber, its Affiliated Companies or its licensors (as the case may be).

3.1.3    Partner undertakes that it will, and that it will ensure that its Driver(s) will, safeguard, protect and keep the Driver ID at all times confidential and safely stored and shall not disclose it to any person other than those who need to have access to the Driver ID in order to render and/or provide the Driving Service. The Partner shall immediately notify Uber of any (suspected) security breach or improper use of the Driver ID.

3.1.4    The Partner undertakes that it will not and that it will ensure that the Driver does not (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit, dispose of or make available to any third party the Service, the Device, the Driver App or App in any way, (ii) modify or make derivative works based upon the Service, the Device, the Driver App or App, (iii) for other purposes of the provision of the Service under the terms of this Agreement and the instructions of Uber or (iv) modify, decompile, reverse engineering or disassemble, except as allowed under the applicable mandatory law.

UBER

3.1.5    The Partner will immediately notify a (suspected) security breach or improper use of the Device, the Driver App or the Data to Uber.

3.1.6    The Partner acknowledges and agrees that the App, the Driver App or the Service may, from time to time, be unavailable (e.g. due to scheduled maintenance or system upgrades) and that Uber cannot, and does not, guarantee an specific or minimum availability of the App, the Driver App or the Service.

## 4.      UBER RIGHTS AND OBLIGATIONS
### 4.1      Driver ID
4.1.1    Uber will issue a Driver ID per Driver to the Partner to enable Partner and/or the Driver (as applicable) to access and use the Driver App and the Device in accordance with the Partner Terms. Uber will have the right, at all times and at Uber' sole discretion, to reclaim, prohibit, limit or otherwise restrict the Partner and/or the Driver from accessing or using the Driver App or the Device. Uber may charge a fee for the use of the Device or request a retainer fee and/or a security deposit per Device before issuing the Partner with a Device per Driver.

### 4.2      Transportation
4.2.1    Uber will provide information to the Driver via the Driver App indicating the location of Customer (**"A"**). The Customer shall inform the Driver of the destination (**"B"**). Partner acknowledges and agrees that Uber may provide further specific information regarding the Partner with regard to the Driving Service.

4.2.2    The Partner acknowledges and agrees that he and the Driver are solely responsible for taking such precautions as may be reasonable and proper (including taking out adequate insurance in conformity with standard market practice and in conformance with any applicable regulations or other licensing requirements) regarding any acts or omissions of the Customer.

### 4.3      Driver and Customer review
4.3.1    Customers who have used the Driving Service will be asked by Uber to comment on the Driving Service and to provide a score for the Driving Service and the Driver. Uber reserves the right to post these comments and scores on the App or the Website (or such other platforms as owned, managed, controlled or managed by Uber). Uber shall also request the Partner and/or the Driver to comment on and to provide a score for the Customer on the Driver App. Partner will and will procure that its Drivers will provide accurate and objective feedback that does not violate any applicable laws and regulations.

4.3.2    The Partner acknowledges that Uber is a distributor (without any obligation to verify) and not a publisher of these comments and scores. Uber reserves the right to refuse, edit or remove unfavourable reviews in the event that such reviews include obscenities or mention an individual's name or violate any privacy laws or any other applicable laws and regulations. Beyond the legal and regulatory requirements, Uber shall not have and hereby disclaims any liability and responsibility for the content and consequences of (the publication or distribution of) any comments, scores or reviews howsoever or whatsoever.

4.3.3    In case of a complaint, dispute or conflict between the Partner or the Driver on the one hand and the Customer on the other hand or in other appropriate instances where a legitimate reason for such disclosure exists, Uber may, but shall not be required to, – to the extent permitted by applicable laws and regulations – provide the Customer, Partner, the Driver and/or the relevant authorities the relevant data (including personal data) of the Partner, the Driver or the Customer.

4.3.4    The Partner will, and will procure that the Driver will:
          a.      support Uber in all communications;
          b.      if requested by Uber, actively engage other Partners or Drivers;



    c.    refrain from speaking negatively on Uber's business and business concept in public.

## 5. COMPENSATION AND PAYMENT

### 5.1 Fares

5.1.1 The Fare for the Driver Service can be found at www.uber.com, or on the App or can at any time be communicated to the Partner by Uber. These Fares are inclusive of Indirect Taxes, which Indirect Taxes will be due and will have to be paid by the Partner at the applicable Indirect Tax rate of the country in which the Driving Service takes place. The Fares are recommended, maximum fares. The Partner is free to charge lower fares to the Customer.

5.1.2 The Fare is generally paid for by the Customer by credit card. The Partner authorizes Uber to use the credit card information of the Customer to process payment of the Fare for and on his behalf.

### 5.2 Commission

5.2.1 Uber will be paid the Commission per Ride at a percentage as agreed in the PRF. The Commission is calculated as a percentage of the Fare including Indirect Taxes, irrespective of a lower fare as may be agreed between the Partner/Driver on the one hand and the Customer on the other hand for a Ride. The Fare (or the lower fare as agreed with the Customer) will be collected by Uber for and on behalf of the Partner. The Commission will be paid by the Partner by way of deduction from the Fare (or the lower fare) upon collection of the Fare by Uber for and on behalf of the Partner. The Commission will at all times be based on the Fare (irrespective of any lower fare granted by the Partner to the Customer pursuant to Clause 5.1.1). The Partner agrees and undertakes to pay to Uber the Commission on all Fares payable in connection with the Driving Service.

5.2.2 The Commission calculated on the basis of Clause 5.2.1. will be exclusive of Indirect Taxes. For the Netherlands, Indirect Taxes will be calculated on top of the Commission at the general Indirect Taxes rate of 21%. For all other EU countries the Service rendered by Uber is considered taxable for Indirect Taxes in the EU country in which the Partner has established his business or has a permanent establishment to which the Service is rendered. The Indirect Taxes will be due by and will have to be paid by the Partner, on the basis of the so-called 'reverse charge mechanism' to which Uber's invoices will refer.

5.2.3 For all non-EU countries the Service rendered by Uber may be considered taxable for Indirect Taxes in the non- EU country in which the Partner has established his business or has a permanent establishment to which the Service is rendered. If any Indirect Taxes are required to be charged by Uber to the Partner, the Partner will pay Uber the Indirect Taxes in addition to the Commission amount. If under local tax law any Indirect Taxes are payable by the Partner, the Partner shall be responsible for paying the Indirect Taxes without recourse to Uber.

### 5.3 Change Agreement, Commission and Partner Fee

Uber may at any time or times notify the Partner of a proposed amendment of or change to the Partner Terms, the agreed Commission (a "**Change Notice**"). If the Partner does not object to such Change Notice within seven (7) days after receipt thereof, he shall be deemed to have accepted the changes comprised in the Change Notice. If Partner objects to the changes/amendments comprised in the Change Notice, Uber may terminate the Partner Agreement with Partner for cause, with immediate effect and without having to compensate Partner in any way.



5.4    Invoicing and payment terms
5.4.1  Payment of the Commission shall be made in accordance with the payment method as mutually agreed upon by Parties.

5.4.2  Uber operates, and the Partner accepts, a system for receipts being issued by Uber for and on behalf of the Partner to the Customer. The receipts, which are issued by Uber for and on behalf of the Partner to the Customer shall be sent in copy by email or made available online to the Partner. The Partner ensures that the Driver checks the correctness of the receipts to the Customer within three (3) business days after each Ride. After this term Uber is not liable for any mistakes in the invoices.

5.4.3  Uber, as an agent of the Partner, is in no circumstances liable for any Indirect Taxes that the Partner has to pay to the authorities in case an incorrect Indirect Tax rate has been applied to the Fare for the Ride.

5.5    Tax gross-up
5.5.1  All payments to be made by the Partner under this Agreement shall be made in cleared funds, without any deduction or set-off and free and clear of and without deduction for or on account of any taxes, levies, imports, duties, charges, fees and withholdings of any nature now or hereafter imposed by any governmental, fiscal or other authority. If the Partner is compelled to make any such deduction or withholding, it will pay to Uber such additional amounts as are necessary to ensure receipt by Uber of the full (net) amount as set out in the invoice which Uber would have received but for the deduction. The Partner is responsible and liable for the payment and remittance of any taxes, levies, imports, duties, charges, fees and withholdings over and above the full (net) payment due by the Partner to Uber.

# 6.    REPRESENTATIONS
6.1    Partner/Driver representations
6.1.1  The Partner represents and shall procure that the Driver shall represent, to Uber that for the term of this Agreement:
  (i)   they hold, comply and shall continue to hold and comply with all permits, licenses and other governmental authorisations necessary for conducting, carrying out and continuing their activities, operations and business in general and the Driving Service in particular;
  (ii)  they shall comply with all local laws and regulations, including the laws related to the operation of a taxi/passenger delivery, driving service or transportation service and will be solely responsible for any violations of such local laws and regulations;
  (iii) the Driver has a valid driver's license and is authorized to operate the Vehicle as set out in the PRF and has all the appropriate licenses, approvals and authority to provide transportation for hire to third parties in the City where the Driving Service is rendered or performed;
  (iv)  they have appropriate and up-to-date level of expertise and experience to enable and provide the Driving Service and the Driving Service will be supplied, provided and supported by appropriately qualified and trained Drivers acting with due skill, care and diligence;
  (v)   the Partner and the Driver have and maintain a valid policy for the appropriate (transportation, personal injury, third party or general) liability insurance and such other insurances as are considered market practice (all in industry-standard coverage amounts) for the operation of the Vehicle and/or business insurance to cover any anticipated risks, damages and losses related to the operation of a taxi/passenger delivery, driving service or transportation services (including the Driving Service). The Partner shall upon first request of Uber provide Uber with a copy of the insurance certificates;
  (vi)  the Vehicle is kept in a clean condition at all times, such Vehicle is in good operating condition and meets the industry safety standards for a Vehicle of its kind;

 UBER

(vii) the Driver and the Vehicle comply at all times with the quality standards set by Uber, which quality standards have been made available or upon request can be made available to Partner and/or the Driver.

6.2     Disclaimer
6.2.1   Uber provides, and the Partner and Driver accept, the Service, the Device and Driver App on an "as is" and "as available" basis. Uber does not warrant or guarantee that the Partner, the Driver or the Customer's access to or use of the Service, the Website, the Device, the App or the Driver App will be uninterrupted or error free.

6.3     Partner/ Driver indemnifications
6.3.1   The Partner agrees and undertakes and procures that the Driver will indemnify, defend and hold Uber (and its Affiliated Companies and employees and, at the request of Uber, Uber's licensors, suppliers, officers, directors and subcontractors) harmless from and against any and all claims, demands, expenses (including legal fees), damages, penalties, fines, social contributions and taxes by a third party (including Customers, regulators and governmental authorities) directly or indirectly related to this Agreement, except where such claims relate to a culpable breach of Uber's obligations under this Agreement.

6.3.2.  The Parties expressly agree that this Agreement cannot be regarded as an employment agreement or employment relationship and that Uber is an agent of the Partner or the Driver, exclusively providing an intermediary service to the Partner in return for a Commission.

6.3.3.  In all other cases than Clause 6.3.2, Uber is entitled to withhold employer taxes and social security premiums on all payments to be made to the Partner. In that case, all past, present and future payments to the Partner pursuant to this Agreement shall be regarded as gross salary payments subject to employer taxes and social security premiums. The Partner shall indemnify and hold Uber harmless for all taxes and contributions in that respect, plus interest, penalties and costs, payable within 14 days after of a written request to that extent by Uber.

7.      **LIABILITY**
7.1     Uber is not responsible for, and excludes any and all liability for any type of damages, losses (including direct, indirect, consequential, punitive, special damages or losses, etc), claims, demands, expenses (including legal fees), damages, penalties and fines (including third party) directly or indirectly related to the Partner Agreement, including for: (i) the Device, the App, the Driver App, the Service and the Data, (ii) the Service, the Ride and the Vehicle, (iii) any damages or dangers associated with the execution of the Partner Agreement, (iv) acts or omissions of the Customer (including payment), (v) the content and consequences of (the publication or distribution of) any comments, ratings or reviews about the Partner or the Driver and (vi) the termination of the Partner Agreement for any reason whatsoever.

7.2     If the disclaimer of liability by Uber as set out in Clause 7.1 shall, for some reason, not have any effect, the maximum aggregate liability of Uber vis-a-vis the Partner and its Drivers collectively, is limited to 50% of the total amount of the Commission paid to Uber by the Partner in the year (12 months) preceding the event that led to the liability.

7.3     All defenses (including limitations and exclusions of liability) in favour of Uber apply (i) regardless of the ground upon which a liability is based (whether default, tort or otherwise), (ii) irrespective of the type of breach of obligations (guarantees, contractual obligations or otherwise), (iii) for all events and all agreements together, (iv) insofar no event of willful misconduct or gross negligence of Uber or its management has occurred, and (v) also for the benefit of its Affiliated Companies and employees and, at the request of Uber, Uber's licensors, suppliers and subcontractors.

8.      **TERM, TERMINATION AND SUSPENSION**



8.1    This Partner Agreement shall commence on the date specified in the PRF, for an indefinite period of time, unless terminated by either Party by written notice with due observance of a notice period of seven (7) calendar days. The Partner Agreement terminates automatically, without any notice requirement, at such moment when the Partner and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle.

8.2    Each Party may terminate the Partner Agreement or suspend the Partner Agreement in respect of the other Party, with immediate effect and without a notice of default being required in case of:
       (a) a material breach by the other Party of any term of the Partner Agreement (e.g. breach of representations, insolvency or receipt of a significant number of Customer complaints); or
       (b) (filing or submission of request for) bankruptcy or suspension of payment (or similar action or event) in respect of the other Party.

8.3    Upon termination of the Partner Agreement, the Partner and/ or the Driver shall promptly return all Data provided to either of them by Uber without withholding a copy thereof.

## 9.    CONFIDENTIALITY
9.1    Parties understand and agree that in the performance of this Partner Agreement, each Party may have access to or may be exposed to, directly or indirectly, confidential information of the other Party (the **"Confidential Information"**). Confidential Information includes Data, transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information that either a disclosing Party designates as being private or confidential or of which a receiving Party should reasonably know that it should be treated as private and confidential.

9.2    Each Party agrees that: (a) all Confidential Information shall remain the exclusive property of the disclosing Party and receiving Party shall not use any Confidential Information for any purpose except in furtherance of this Agreement; (b) it shall maintain, and shall use prudent methods to cause its employees, officers, representatives, contracting parties and agents (the **"Permitted Persons"**) to maintain, the confidentiality and secrecy of the Confidential Information; (c) it shall disclose Confidential Information only to those Permitted Persons who need to know such information in furtherance of this Partner Agreement; (d) it shall not, and shall use prudent methods to ensure that the Permitted Persons do not, copy, publish, disclose to others or use (other than pursuant to the terms hereof) the Confidential Information; and (e) it shall return or destroy all ((hard and soft) copies of) Confidential Information upon written request of the other Party.

9.3    Notwithstanding the foregoing, (a) Confidential Information shall not include any information to the extent it (i) is or becomes part of the public domain through no act or omission on the part of the receiving Party, (ii) was possessed by the receiving Party prior to the date of this Partner Agreement, (iii) is disclosed to the receiving Party by a third party having no obligation of confidentiality with respect thereto, or (iv) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, and (b) nothing in this Agreement shall prevent, limit or restrict a Party from disclosing this Partner Agreement (including the any technical, operational, performance and financial data (but excluding any Customer Data)) in confidence to an Affiliated Company.

9.4    For the purpose of rendering the Service, the Partner explicitly agrees and acknowledges, and procures that the Driver agrees and acknowledges, that the Driver who is available for the Driving Service or performing the Driving Service shall be monitored and traced through the Driver App via GPS tracking. The Device and the relevant details of the Driver and the Ride and the position of the Driver shall be disclosed to the Customer on the App. The Data relating to the Ride are monitored and retained by Uber for complaints by Customers or Drivers, as well as for analytical-, marketing- and commercial purposes of Uber.



## 10.    MISCELLANEOUS

10.1    If any provision of this Agreement is or becomes invalid or non-binding, the Parties shall remain bound by all other provisions hereof. In that event, the Parties shall replace the invalid or non-binding provision by provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

10.2    Neither Party shall be entitled to assign, transfer, encumber any of its rights and/or the obligations under this Agreement without the prior written consent of the other Party, provided that Uber may assign, transfer, encumber any of its rights and/or the obligations under this Agreement (in whole or in part or from time to time) to an Affiliated Company without the prior written consent of the Partner or the Driver.

10.3    This Agreement (including the schedules, annexes and appendixes, which form an integral part of this Agreement) constitutes the entire agreement and understanding of the Parties with respect to its subject matter and replaces and supersedes all prior agreements, arrangements, ((non) binding) offers, undertakings or statements regarding such subject matter.

10.4    The original English version of these Partner Terms may have been translated into other languages. The translated version of the English Partner Terms is a courtesy and office translation only and the Partner and/or the Driver cannot derive any rights from the translated version. In the event of a dispute about the contents or interpretation of these terms and conditions of this Partner Agreement or in the event of a conflict, ambiguity, inconsistency or discrepancy between the English version and any other language version of these Partner Terms, the English language version shall prevail, apply and be binding and conclusive. The English version shall be used in legal proceedings. The English version shall be sent to you upon written request.

## 11.    GOVERNING LAW AND JURISDICTION

Save as set out otherwise in this Agreement, this Agreement shall be exclusively governed by and construed in accordance with the laws of the Netherlands, excluding its rules on conflicts of laws. The Vienna Convention on the International Sale of Goods of 1980 (CISG) shall not apply. Any dispute, conflict or controversy, howsoever arising out of or broadly in connection with or relating to this Partner Agreement, including but not limited to those relating to its validity, its construction or its enforceability, shall be first mandatorily submitted to settlement proceedings under the International Chamber of Commerce Amicable Dispute Resolution Rules (ICC ADR Rules). If the said dispute has not been settled within 60 days after a request for Amicable Dispute Resolution has been submitted under the said ICC ADR Rules, such dispute shall be exclusively and finally resolved by arbitration under the Rules of Arbitration of the International Chamber of Commerce (ICC Arbitration Rules). The ICC Rules' Emergency Arbitrator provisions are excluded. The dispute shall be resolved by one arbitrator to be appointed in accordance with the ICC Rules. The place of arbitration shall be Amsterdam, The Netherlands. The language of the arbitration shall be English.

# EXHIBIT F

SCC Online Web Edition, Copyright © 2015
Page 1 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

770    SUPREME COURT CASES    (2013) 6 SCC

### (2013) 6 Supreme Court Cases 770

(BEFORE T.S. THAKUR AND GYAN SUDHA MISRA, JJ.)

ANKUSH SHIVAJI GAIKWAD    ..    Appellant;

*Versus*

STATE OF MAHARASHTRA    ..    Respondent.

Criminal Appeal No. 689 of 2013[†], decided on May 3, 2013

**A. Victimology — Award of compensation to victim(s) of crime or their dependants under S. 357 CrPC — Mandatory duty of criminal court to apply its mind to question of awarding compensation in every case — Power is not ancillary to other sentences but in addition thereto — Use of word "may" in S. 357, held, does not mean that court need not consider applicability of S. 357 in every criminal case — S. 357 CrPC confers power coupled with duty on court to mandatorily apply its mind to question of awarding compensation in every criminal case — Court must also disclose that it has applied its mind to such question by recording reasons for awarding/refusing grant of compensation — Power given to courts under S. 357 is intended to reassure victim that he/she is not forgotten in criminal justice system — Very object of S. 357 would be defeated if courts choose to ignore S. 357 and do not apply their mind to question of compensation — Hence, S. 357 is to be read as imposing a mandatory duty on court to apply its mind to question of awarding compensation in every case — Courts directed to remain careful in future as to their mandatory duty under S. 357 CrPC — Copy of order directed to be forwarded to Registrars General of all High Courts for its circulation amongst Judges handling criminal trials and hearing criminal appeals — Criminal Procedure Code, 1973 — S. 357 — Interpretation of Statutes — Basic Rules — Mischief rule/Heydon's rule — Applied — Criminal Trial — Sentence — Compensation to victim**

**B. Victimology — Award of compensation to victim(s) of crime or their dependants under S. 357 CrPC — Factors to be considered — Capacity of accused to pay — Enquiry in respect of — When warranted — Held, enquiry albeit summary in nature needs to be conducted to determine paying capacity of offender unless facts as emerging in course of trial are so clear that court considers it unnecessary to do so — Enquiry can precede an order on sentence to enable court to take a view, both on question of sentence and compensation payable to victim or his/her family — Criminal Procedure Code, 1973, S. 357**

*Held* :

The language of Section 357 CrPC at a glance may not suggest that any obligation is cast upon a court to apply its mind to the question of compensation in every case. Section 357(1) states that the Court "may" order for the whole or any part of a fine recovered to be applied towards compensation. Section 357(3)

---

† Arising out of SLP (Crl.) No. 6287 of 2011. From the Judgment and Order dated 24-8-2010 of the High Court of Judicature of Bombay, Bench at Aurangabad in Crl. A. No. 359 of 2008


SCC Online Web Edition, Copyright © 2015
Page 2 : Monday, March 30, 2010
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

CrPC further empowers the court by stating that it "may" award compensation even in such cases where the sentence imposed does not include a fine. The legal position is however well established that cases may arise where a provision is mandatory despite the use of language that makes it discretionary. Section 357 CrPC confers a power coupled with a mandatory duty on the court to apply its mind to the question of awarding compensation in every criminal case. It is said so because in the background and context in which Section 357 CrPC was introduced, the power to award compensation was intended to reassure the victim that he or she is not forgotten in the criminal justice system. The victim would remain forgotten if despite the legislature having gone so far as to enact specific provisions relating to victim compensation, courts choose to ignore the provisions altogether and do not even apply their mind to the question of compensation. If application of mind to the question of compensation in every case is not considered mandatory, Section 357 CrPC would be rendered a dead letter. Further, the court must disclose that it has applied its mind to this question in every criminal case. The disclosure of application of mind is best demonstrated by recording reasons in support of the order or conclusion.

(Paras 49 to 55 and 61)

*Julius* v. *Lord Bishop of Oxford*, (1880) 5 AC 214 : (1874-80) All ER Rep 43 (HL); *Bachahan Devi* v. *Nagar Nigam, Gorakhpur*, (2008) 12 SCC 372; *Dhampur Sugar Mills Ltd.* v. *State of U.P.*, (2007) 8 SCC 338, *followed*

*NEPC Micon Ltd.* v. *Magma Leasing Ltd.*, (1999) 4 SCC 253 : 1999 SCC (Cri) 524; *Swantraj* v. *State of Maharashtra*, (1975) 3 SCC 322 : 1974 SCC (Cri) 930; *Maya Devi* v. *Raj Kumari Batra*, (2010) 9 SCC 486 : (2010) 3 SCC (Civ) 842; *State of Rajasthan* v. *Sohan Lal*, (2004) 5 SCC 573 : (2008) 2 SCC (Cri) 53; *Hindustan Times Ltd.* v. *Union of India*, (1998) 2 SCC 242 : 1998 SCC (L&S) 481; *Director, Horticulture, Punjab* v. *Jagjivan Parshad*, (2008) 5 SCC 539 : (2008) 2 SCC (L&S) 121; *United Commercial Bank* v. *P.C. Kakkar*, (2003) 4 SCC 364, *relied on*

*State of A.P.* v. *Polamala Raju*, (2000) 7 SCC 75 : 2000 SCC (Cri) 1284; *State of Punjab* v. *Prem Sagar*, (2008) 7 SCC 550 : (2008) 3 SCC (Cri) 183; *Sangeet* v. *State of Haryana*, (2013) 2 SCC 452 : (2013) 2 SCC (Cri) 611, *considered*

*Heydon case*, (1584) 3 Co Rep 7a : 76 ER 637; *Arun* v. *Inspector General of Police*, (1986) 3 SCC 696 : 1986 SCC (L&S) 707 : (1986) 1 ATC 330; *Union of India* v. *Jai Prakash Singh*, (2007) 10 SCC 712; *Victoria Memorial Hall* v. *Howrah Ganatantrik Nagrik Samity*, (2010) 3 SCC 732; *Ram Phal* v. *State of Haryana*, (2009) 3 SCC 258 : (2009) 2 SCC (Cri) 72 : (2009) 1 SCC (L&S) 645, *cited*

Maxwell: *Interpretation of Statute, referred to*

The Supreme Court has through a line of cases held that the power of courts to award compensation to victims under Section 357 CrPC is not ancillary to other sentences but in addition thereto. It would necessarily follow that the court has a duty to apply its mind to the question of awarding compensation under Section 357 too. (Para 58)

*Hari Singh* v. *Sukhbir Singh*, (1988) 4 SCC 551 : 1998 SCC (Cri) 984; *Sarwan Singh* v. *State of Punjab*, (1978) 4 SCC 111 : 1978 SCC (Cri) 549; *Balraj* v. *State of U.P.*, (1994) 4 SCC 29 : 1994 SCC (Cri) 823; *Baldev Singh* v. *State of Punjab*, (1995) 6 SCC 593 : 1995 SCC (Cri) 1132; *Dilip S. Dahanukar* v. *Kotak Mahindra Co. Ltd.*, (2007) 6 SCC 528 : (2007) 3 SCC (Cri) 209, *relied on*

Thus, while the award or refusal of compensation in a particular case may be within the court's discretion, there exists a mandatory duty on the court to apply its mind to the question in every criminal case. Application of mind to the

SCC Online Web Edition, Copyright © 2015
Page 3 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

question is best disclosed by recording reasons for awarding/refusing compensation. It is axiomatic that for any exercise involving application of mind, the Court ought to have the necessary material which it would evaluate to arrive at a fair and reasonable conclusion. It is also beyond dispute that the occasion to consider the question of award of compensation would logically arise only after the court records a conviction of the accused. The amount of compensation is to be determined by the courts depending upon the facts and circumstances of each case, the nature of the crime, the justness of the claim and the capacity of the accused to pay. This capacity of the accused to pay which constitutes an important aspect of any order under Section 357 CrPC would involve a certain enquiry albeit summary unless of course the facts as emerging in the course of the trial are so clear that the court considers it unnecessary to do so. Such an enquiry can precede an order on sentence to enable the court to take a view, both on the question of sentence and compensation that it may in its wisdom decide to award to the victim or his/her family.                        (Paras 31 and 66)

> *Hari Singh* v. *Sukhbir Singh*, (1988) 4 SCC 551 : 1998 SCC (Cri) 984; *Dilip S. Dahanukar* v. *Kotak Mahindra Co. Ltd.*, (2007) 6 SCC 528 : (2007) 3 SCC (Cri) 209, *relied on*

A copy of this order be forwarded to the Registrars General of the High Courts in the country for circulation among the Judges handling criminal trials and hearing appeals.                                        (Paras 67 and 68)

**C. Victimology — Compensation to victims of crime — Approach — Shift from retribution to restitution of victims — Historical perspective of concept of restitution, traced — Development of law in many countries across the world providing for restitution of victims by criminal courts that was earlier in domain of civil courts — Recognition of rights of victims by UN General Assembly — Introduction of S. 357 in CrPC, 1973 for payment of compensation to victims of crime — Introduction of S. 357-A vide Act 5 of 2009 to further strengthen victim's rehabilitation — Failure of Indian courts in recognising such rights and giving effect to the provisions of S. 357, deprecated — Scope of court's power and duty under S. 357, explained — Held, it is a mandatory duty of criminal court to apply its mind to the question of awarding compensation in every criminal case — Criminal Procedure Code, 1973 — S. 357 and S. 357-A (as *ins.* by Act 5 of 2009) — Criminal Procedure Code, 1898 — S. 545(1)(b) — Criminal Injuries Compensation Scheme, 1964 (UK) — Criminal Justice Act, 1972 (UK) — Victim and Witness Protection Act, 1982 (US) — Title 18, Ss. 3553(a)(7) and (c) — Human and Civil Rights — United Nations Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power, 1985 — Arts. 8 to 13 — United Nations Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, 2005, Arts. 19 and 20**                    (Paras 28 and 33 to 47)

> *Maru Ram* v. *Union of India*, (1981) 1 SCC 107 : 1981 SCC (Cri) 112; *Delhi Domestic Working Women's Forum* v. *Union of India*, (1995) 1 SCC 14 : 1995 SCC (Cri) 7; *State of Gujarat* v. *High Court of Gujarat*, (1998) 7 SCC 392 : 1998 SCC (Cri) 1640, *considered*
> "Victim Restitution in Criminal Law Process: A Procedural Analysis", Harvard Law Review (1984); *Oxford Handbook of Criminology*, 1994 Edn., pp. 1237-38; *Law*

SCC Online Web Edition, Copyright © 2015
Page 4 - Monday, March 30, 2015
Printed For: Nakul Dewan
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

*Commission of India*, 41st Report (1969), Para 46.12; *Law Commission of India*, 152nd Report (1994); *Law Commission of India*, 154th Report (1996). Ch. XV, Paras 1, 9.1, 9.2 and 11, *referred to*

D. **Penal Code, 1860 — S. 302 or S. 304 Pt. II [S. 300 Exception 4] — Murder or culpable homicide not amounting to murder — Determination of — Nature of injury, weapon used, and part of body on which injury inflicted — Inference from — Applicability of S. 300 Exception 4 — Sudden quarrel ensuing over barking of dog — Appellant angered by barking of dog at him started beating the dog with iron rod that he was carrying — Deceased, owner of dog objected to the beating and the same led to scuffle between parties — Appellant hit the deceased with iron rod on head which caused injuries which proved to be fatal four days later — No premeditation — No prior enmity or motive to commit the offence — No lethal weapon used — No second blow/injury given once deceased collapsed to the ground — No act committed in unusual or cruel manner — Further, use of words by appellant that if deceased did not keep quiet he too would be beaten like a dog indicated that intention was only to beat up deceased and not to kill him — Benefit of Exception 4 to S. 300, held, available to appellant — Conviction by lower courts under S. 302 and sentence of RI for life altered to one under S. 304 Pt. II and sentence of 5 yrs' RI**          (Paras 11, 27 and 68)

*Surinder Kumar v. UT, Chandigarh*, (1989) 2 SCC 217 : 1989 SCC (Cri) 348; *Ghapoo Yadav v. State of M.P.*, (2003) 3 SCC 528 : 2003 SCC (Cri) 765; *Sukhbir Singh v. State of Haryana*, (2002) 3 SCC 327 : 2002 SCC (Cri) 616; *Mahesh v. State of M.P.*, (1996) 10 SCC 668 : 1997 SCC (Cri) 181; *Vadla Chandraiah v. State of A.P.*, (2006) 13 SCC 587 : (2007) 3 SCC (Cri) 709; *Shankar Diwal Wadu v. State of Maharashtra*, (2007) 12 SCC 518 : (2008) 3 SCC (Cri) 285; *Camilo Vaz v. State of Goa*, (2000) 9 SCC 1 : 2000 SCC (Cri) 1128; *Jagrup Singh v. State of Haryana*, (1981) 3 SCC 616 : 1981 SCC (Cri) 768; *Chamru Budhwa v. State of M.P.*, AIR 1954 SC 652 : 1954 Cri LJ 1676; *Sarabjeet Singh v. State of U.P.*, (1984) 1 SCC 673 : 1984 SCC (Cri) 151; *Mer Dhana Sida v. State of Gujarat*, (1985) 1 SCC 200 : 1985 SCC (Cri) 54; *Sukhmandar Singh v. State of Punjab*, 1998 SCC (Cri) 701, *followed*

*Alister Anthony Pareira v. State of Maharashtra*, (2012) 2 SCC 648 : (2012) 1 SCC (Civ) 848 : (2012) 1 SCC (Cri) 953; *Singapagu Anjaiah v. State of A.P.*, (2010) 9 SCC 799 : (2010) 3 SCC (Cri) 1498; *Basdev v. State of Pepsu*, AIR 1956 SC 488 : 1956 Cri LJ 919 (2); *R. v. Monkhouse*, (1849) 4 Cox CC 55; *Pulicherla Nagaraju v. State of A.P.*, (2006) 11 SCC 444 : (2007) 1 SCC (Cri) 500, *relied on*

*Ankush v. State of Maharashtra*, Criminal Appeal No. 359 of 2008, decided on 24-8-2010 (Bom), *modified*

*Kasam Abdulla Hafiz v. State of Maharashtra*, (1998) 1 SCC 526 : 1998 SCC (Cri) 427, *considered*

*Ankush Shivaji Gaikwad v. State of Maharashtra*, SLP (Cri) No. 6287 of 2011, order dated 2-9-2011 (SC), *referred to*

Appeal partly allowed          O-D/51807/CR

Advocates who appeared in this case :
M.Y. Deshmukh, Yalin M. Jagtap and Rameshwar Prasad Goyal, Advocates, for the Appellant;
Shankar Chillarge and Ms Asha Gopalan Nair, Advocates, for the Respondent.

Case 3:15-cv-01324-SI Document31-1 Filed04/06/15 Page62 of 202

SCC Online Web Edition, Copyright © 2015
Page 5 : Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

774          SUPREME COURT CASES          (2013) 6 SCC

*Chronological list of cases cited*             *on page(s)*

1. (2013) 2 SCC 452 : (2013) 2 SCC (Cri) 611, *Sangeet* v. *State of Haryana* — 794*f-g*

2. (2012) 2 SCC 648 : (2012) 1 SCC (Civ) 848 : (2012) 1 SCC (Cri) 953, *Alister Anthony Pareira* v. *State of Maharashtra* — 780*f-g*

3. SLP (Cri) No. 6287 of 2011, order dated 2-9-2011 (SC), *Ankush Shivaji Gaikwad* v. *State of Maharashtra* — 777*a-b*

4. (2010) 9 SCC 799 : (2010) 3 SCC (Cri) 1498, *Singapagu Anjaiah* v. *State of A.P.* — 781*a-b*

5. (2010) 9 SCC 486 : (2010) 3 SCC (Civ) 842, *Maya Devi* v. *Raj Kumari Batra* — 795*a-b*, 796*d*

6. (2010) 3 SCC 732, *Victoria Memorial Hall* v. *Howrah Ganatantrik Nagrik Samity* — 796*f-g*

7. Criminal Appeal No. 359 of 2008, decided on 24-8-2010 (Bom), *Ankush* v. *State of Maharashtra* — 775*d*, 776*h*, 777*a*

8. (2009) 3 SCC 258 : (2009) 2 SCC (Cri) 72 : (2009) 1 SCC (L&S) 645, *Ram Phal* v. *State of Haryana* — 797*a*

9. (2008) 12 SCC 372, *Bachahan Devi* v. *Nagar Nigam, Gorakhpur* — 792*e*

10. (2008) 7 SCC 550 : (2008) 3 SCC (Cri) 183, *State of Punjab* v. *Prem Sagar* — 794*d-e*

11. (2008) 5 SCC 539 : (2008) 2 SCC (L&S) 121, *Director, Horticulture, Punjab* v. *Jagjivan Parshad* — 796*a-b*, 797*a-b*

12. (2007) 12 SCC 518 : (2008) 3 SCC (Cri) 285, *Shankar Diwal Wadu* v. *State of Maharashtra* — 780*f*

13. (2007) 10 SCC 712, *Union of India* v. *Jai Prakash Singh* — 796*f*

14. (2007) 8 SCC 338, *Dhampur Sugar Mills Ltd.* v. *State of U.P.* — 793*a*

15. (2007) 6 SCC 528 : (2007) 3 SCC (Cri) 209, *Dilip S. Dahanukar* v. *Kotak Mahindra Co. Ltd.* — 784*g*, 785*a-b*

16. (2006) 13 SCC 587 : (2007) 3 SCC (Cri) 709, *Vadla Chandraiah* v. *State of A.P.* — 780*e-f*

17. (2006) 11 SCC 444 : (2007) 1 SCC (Cri) 500, *Pulicherla Nagaraju* v. *State of A.P.* — 782*g*

18. (2004) 5 SCC 573 : (2008) 2 SCC (Cri) 53, *State of Rajasthan* v. *Sohan Lal* — 795*f*

19. (2003) 4 SCC 364, *United Commercial Bank* v. *P.C. Kakkar* — 796*c-d*

20. (2003) 3 SCC 528 : 2003 SCC (Cri) 765, *Ghapoo Yadav* v. *State of M.P.* — 778*g-h*

21. (2002) 3 SCC 327 : 2002 SCC (Cri) 616, *Sukhbir Singh* v. *State of Haryana* — 779*g*

22. (2000) 9 SCC 1 : 2000 SCC (Cri) 1128, *Camilo Vaz* v. *State of Goa* — 781*g*

23. (2000) 7 SCC 75 : 2000 SCC (Cri) 1284, *State of A.P.* v. *Polamala Raju* — 794*b*

24. (1999) 4 SCC 253 : 1999 SCC (Cri) 524, *NEPC Micon Ltd.* v. *Magma Leasing Ltd.* — 793*d-e*

25. (1998) 7 SCC 392 : 1998 SCC (Cri) 1640, *State of Gujarat* v. *High Court of Gujarat* — 788*b-c*

26. (1998) 2 SCC 242 : 1998 SCC (L&S) 481, *Hindustan Times Ltd.* v. *Union of India* — 795*g*, 796*e*

27. (1998) 1 SCC 526 : 1998 SCC (Cri) 427, *Kasam Abdulla Hafiz* v. *State of Maharashtra* — 782*e*

28. 1998 SCC (Cri) 701, *Sukhmandar Singh* v. *State of Punjab* — 782*d*

29. (1996) 10 SCC 668 : 1997 SCC (Cri) 181, *Mahesh* v. *State of M.P.* — 780*b-c*

30. (1995) 6 SCC 593 : 1995 SCC (Cri) 1132, *Baldev Singh* v. *State of Punjab* — 784*g*

31. (1995) 1 SCC 14 : 1995 SCC (Cri) 7, *Delhi Domestic Working Women's Forum* v. *Union of India* — 786*c-d*


SCC Online Web Edition, Copyright © 2015
Monday, March 30, 2015
Printed For: Nakul Dewan
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

32. (1994) 4 SCC 29 : 1994 SCC (Cri) 823, *Balraj* v. *State of U.P.*    784g
33. (1989) 2 SCC 217 : 1989 SCC (Cri) 348, *Surinder Kumar* v. *UT, Chandigarh*    778c-d
34. (1988) 4 SCC 551 : 1998 SCC (Cri) 984, *Hari Singh* v. *Sukhbir Singh*    784c, 794a
35. (1986) 3 SCC 696 : 1986 SCC (L&S) 707 : (1986) 1 ATC 330, *Arun* v. *Inspector General of Police*    796e-f
36. (1985) 1 SCC 200 : 1985 SCC (Cri) 54, *Mer Dhana Sida* v. *State of Gujarat*    782c-d
37. (1984) 1 SCC 673 : 1984 SCC (Cri) 151, *Sarabjeet Singh* v. *State of U.P.*    782c-d
38. (1981) 3 SCC 616 : 1981 SCC (Cri) 768, *Jagrup Singh* v. *State of Haryana*    782b
39. (1981) 1 SCC 107 : 1981 SCC (Cri) 112, *Maru Ram* v. *Union of India*    784a-b
40. (1978) 4 SCC 111 : 1978 SCC (Cri) 549. *Sarwan Singh* v. *State of Punjab*    784g
41. (1975) 3 SCC 322 : 1974 SCC (Cri) 930. *Swantraj* v. *State of Maharashtra*    793e-f, 793f-g
42. AIR 1956 SC 488 : 1956 Cri LJ 919 (2), *Basdev* v. *State of Pepsu*    781b-c, 781e
43. AIR 1954 SC 652 : 1954 Cri LJ 1676, *Chamru Budhwa* v. *State of M.P.*    782b-c
44. (1880) 5 AC 214 : (1874-80) All ER Rep 43 (HL), *Julius* v. *Lord Bishop of Oxford*    792a
45. (1849) 4 Cox CC 55, *R.* v. *Monkhouse*    781d-e
46. (1584) 3 Co Rep 7a : 76 ER 637, *Heydon case*    793f

The Judgment of the Court was delivered by

**T.S. THAKUR, J.—** Leave granted. This appeal arises out of a judgment and order dated 24-8-2010[1] passed by the High Court of Judicature of Bombay, Aurangabad Bench, whereby Criminal Appeal No. 359 of 2008 filed by the appellant and two others has been dismissed insofar as the appellant is concerned and allowed qua the remaining two, thereby upholding the appellant's conviction for the offence of murder punishable under Section 302 IPC and the sentence of imprisonment for life with a fine of Rs 2000 awarded to him. In default of payment of fine the appellant has been sentenced to undergo a further imprisonment for a period of three months.

**2.** The factual matrix in which the appellant came to be prosecuted and convicted has been set out in detail by the trial court as also the High Court in the orders passed by them. We need not, therefore, recapitulate the same all over again except to the extent it is necessary to do so for the disposal of this appeal. Briefly stated, the incident that culminated in the death of deceased Nilkanth Pawar and the consequent prosecution of the appellant and two others occurred at about 10.00 p.m. on 3-2-2006 while the deceased and his wife PW 1, Mangalbai were guarding their jaggery crop growing in their field.

**3.** The prosecution story is that the appellant, Ankush Shivaji Gaikwad accompanied by Madhav Shivaji Gaikwad (Accused 2) and Shivaji Bhivaji Gaikwad (Accused 3) were walking past the field of the deceased when a dog owned by the deceased started barking at them. Angered by the barking of the animal, the appellant is alleged to have hit the dog with the iron pipe that he was carrying in his hand. The deceased objected to the appellant beating the dog, whereupon the appellant started abusing the former and told him to

1 *Ankush* v. *State of Maharashtra*, Criminal Appeal No. 359 of 2008, decided on 24-8-2010 (Bom)

SCC Online Web Edition, Copyright © 2015
Page 2 — Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

keep quiet or else he too would be beaten like a dog. The exchange of hot words, it appears, led to a scuffle between the deceased and the accused persons in the course whereof, while Accused 2 and 3 beat the deceased with fist and kicks, the appellant hit the deceased with the iron pipe on the head.

**4.** On account of the injury inflicted upon him, the deceased fell to the ground whereupon all the three accused persons ran away from the spot. The incident was witnessed by the wife of the deceased, PW 1 Mangalbai and by PW 5, Ramesh Ganpati Pawar who was also present in the field nearby at the time of the occurrence. The deceased was carried on a motorcycle to the hospital of one Dr Chinchole at Omerga from where he was shifted to Solapur for further treatment.

**5.** Two days after the occurrence when the condition of the deceased became precarious, PW 1 Mangalbai filed a complaint at the Police Station, Omerga on 5-2-2006 on the basis whereby Crime No. 25 of 2006 under Sections 326, 504 and 323 read with Section 34 IPC was registered by the police. Investigation of the case was taken up by PW 6, Police Sub-Inspector Parihar who recorded the panchnama of the scene of the crime and arrested the accused persons. The deceased eventually succumbed to his injuries on 7-2-2006 whereupon Section 302 read with Section 34 IPC was added to the case.

**6.** The post-mortem examination of the deceased revealed a contusion behind his right ear, a contusion on the right arm and an abrasion on the right ankle joint. Internal examination, however, showed that the deceased had sustained an internal injury to the temporal and occipital region under the scalp and a fracture on the base of the skull. Blood clots were noted in the brain tissues and the base of the skull, besides internal bleeding. According to the doctor, the death was caused by the injury to the head. After completion of the investigation that included seizure of the alleged weapon used by the appellant, the police filed a charge-sheet before the Judicial Magistrate, who committed the appellant and co-accused to face trial for the offence of murder punishable under Section 302 read with Section 34 IPC before the Sessions Court. Before the Sessions Court the appellant and his co-accused pleaded not guilty and claimed a trial.

**7.** The prosecution examined as many as six witnesses including PW 1 Mangalbai, the widow of the deceased and PW 5 Ramesh, both of whom were presented as eyewitnesses to the occurrence. The remaining witnesses included PW 3, Dr Kamble and PW 6 Police Sub-Inspector Parihar. Appraisal of the evidence adduced by the prosecution led the trial court to hold the appellant and his co-accused guilty for the offence of murder and sentenced them to imprisonment for life besides a fine of Rs 2000 each and a default sentence of three months' rigorous imprisonment.

**8.** The appellant and his co-accused preferred Criminal Appeal No. 359 of 2008 before the High Court of Judicature of Bombay, Bench at Aurangabad. The High Court has by the judgment impugned[1] in this appeal

---

1 *Ankush v. State of Maharashtra*, Criminal Appeal No. 359 of 2008, decided on 24-8-2010 (Bom)

SCC Online Web Edition, Copyright © 2015
Page 3 15- Monday, March 30, 2015 ocument31-1 Filed 04/06/15 Page 65 of 202
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

dismissed the appeal of the appellant before us but allowed the same insofar as the co-accused are concerned. The correctness of the said judgment and order[1] is under challenge before us.

**9.** When the matter initially came up before us for hearing on 2-9-2011 we issued[2] notice to the respondent State confined to the question of the nature of offence only. We have accordingly heard the learned counsel for the parties on the said question. The trial court as also the High Court have, as noticed earlier, found the appellant guilty of murder. The question, however, is whether in the facts and circumstances of the case the appellant has been rightly convicted for the capital offence and if not whether the act attributed to him would constitute a lesser offence like culpable homicide not amounting to murder punishable under Section 304 Part I or II IPC.

**10.** On behalf of the appellant it was contended that the appellant's case fell within Exception 4 to Section 300 IPC which reads as under:

"**Exception 4.**—Culpable homicide is not murder if it is committed without premeditation in a sudden fight in the heat of passion upon a sudden quarrel and without the offender's having taken undue advantage or acted in a cruel or unusual manner."

**11.** It was argued that the incident in question took place on a sudden fight without any premeditation and the act of the appellant hitting the deceased was committed in the heat of passion upon a sudden quarrel without the appellant having taken undue advantage or acting in a cruel or unusual manner. There is, in our opinion, considerable merit in that contention. We say so for three distinct reasons:

**11.1.** Firstly, because even according to the prosecution version, there was no premeditation in the commission of the crime. There is not even a suggestion that the appellant had any enmity or motive to commit any offence against the deceased, leave alone a serious offence like murder. The prosecution case, as seen earlier, is that the deceased and his wife were guarding their jaggery crop in their field at around 10 p.m. when their dog started barking at the appellant and his two companions who were walking along a mud path by the side of the field nearby. It was the barking of the dog that provoked the appellant to beat the dog with the rod that he was carrying apparently to protect himself against being harmed by any stray dog or animal. The deceased took objection to the beating of the dog without in the least anticipating that the same would escalate into a serious incident in the heat of the moment. The exchange of hot words in the quarrel over the barking of the dog led to a sudden fight which in turn culminated in the deceased being hit with the rod unfortunately on a vital part like the head.

**11.2.** Secondly, because the weapon used was not lethal nor was the deceased given a second blow once he had collapsed to the ground. The

---

1 *Ankush v. State of Maharashtra*, Criminal Appeal No. 359 of 2008, decided on 24-8-2010 (Bom)

2 *Ankush Shivaji Gaikwad v. State of Maharashtra*, SLP (Cri) No. 6287 of 2011, order dated 2-9-2011 (SC), wherein it was directed:

"Issue notice to the respondent confined to the question of nature of offence."

SCC Online Web Edition, Copyright © 2015
Page 3 of 5 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

prosecution case is that no sooner the deceased fell to the ground on account of the blow on the head, the appellant and his companions took to their heels—a circumstance that shows that the appellant had not acted in an unusual or cruel manner in the prevailing situation so as to deprive him of the benefit of Exception 4.

**11.3.** Thirdly, because during the exchange of hot words between the deceased and the appellant all that was said by the appellant was that if the deceased did not keep quiet even he would be beaten like a dog. The use of these words also clearly shows that the intention of the appellant and his companions was at best to belabour him and not to kill him as such. The cumulative effect of all these circumstances, in our opinion, should entitle the appellant to the benefit of Exception 4 to Section 300 IPC.

**12.** Time now to refer to a few decisions of this Court where in similar circumstances this Court has held Exception 4 to Section 300 IPC to be applicable and converted the offence against the appellant in those cases from murder to culpable homicide not amounting to murder.

**13.** In *Surinder Kumar* v. *UT, Chandigarh*[3] this Court held that if on a sudden quarrel a person in the heat of the moment picks up a weapon which is handy and causes injuries out of which only one proves fatal, he would be entitled to the benefit of the Exception provided he has not acted cruelly. This Court held that the number of wounds caused during the occurrence in such a situation was not the decisive factor. What was important was that the occurrence had taken place on account of a sudden and unpremeditated fight and the offender must have acted in a fit of anger. Dealing with the provision of Exception 4 to Section 300 this Court observed: (SCC p. 220, para 7)

"**7.** ... To invoke this exception four requirements must be satisfied, namely, (*i*) it was a sudden fight; (*ii*) there was no premeditation; (*iii*) the act was done in a heat of passion; and (*iv*) the assailant had not taken any undue advantage or acted in a cruel manner. The cause of the quarrel is not relevant nor is it relevant who offered the provocation or started the assault. The number of wounds caused during the occurrence is not a decisive factor but what is important is that the occurrence must have been sudden and unpremeditated and the offender must have acted in a fit of anger. Of course, the offender must not have taken any undue advantage or acted in a cruel manner. *Where, on a sudden quarrel, a person in the heat of the moment picks up a weapon which is handy and causes injuries, one of which proves fatal, he would be entitled to the benefit of this Exception provided he has not acted cruelly.*"

(emphasis supplied)

**14.** We may also refer to the decision of this Court in *Ghapoo Yadav* v. *State of M.P.*[4] wherein this Court held that in a heat of passion there must be no time for the passions to cool down and that the parties had in that case before the Court worked themselves into a fury on account of the verbal

3 (1989) 2 SCC 217 : 1989 SCC (Cri) 348
4 (2003) 3 SCC 528 : 2003 SCC (Cri) 765


SCC Online Web Edition, Copyright © 2015
Page 1 5 Cr-1 Tu 24 37 (Monday, March 30, 2015)
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

altercation in the beginning. Apart from the incident being the result of a sudden quarrel without premeditation, the law requires that the offender

*a* should not have taken undue advantage or acted in a cruel or unusual manner to be able to claim the benefit of Exception 4 to Section 300 IPC. Whether or not the fight was sudden, was declared by the Court to be decided in the facts and circumstances of each case. The following passage from the decision is apposite: (SCC p. 532, paras 10-11)

*b*      "*10.* ... The help of Exception 4 can be invoked if death is caused: (*a*) without premeditation; (*b*) in a sudden fight; (*c*) without the offender's having taken undue advantage or acted in a cruel or unusual manner; and (*d*) the fight must have been with the person killed. To bring a case within Exception 4 all the ingredients mentioned in it must be found. It is to be noted that the 'fight' occurring in Exception 4 to Section 300 IPC is not defined in the Penal Code. It takes two to make a fight.

*c* Heat of passion requires that there must be no time for the passions to cool down and in this case, the parties have worked themselves into a fury on account of the verbal altercation in the beginning. A fight is a combat between two and more persons whether with or without weapons. It is not possible to enunciate any general rule as to what shall be deemed to be a sudden quarrel. It is a question of fact and whether a

*d* quarrel is sudden or not must necessarily depend upon the proved facts of each case. For the application of Exception 4, *it is not sufficient to show that there was a sudden quarrel and there was no premeditation. It must further be shown that the offender has not taken undue advantage or acted in a cruel or unusual manner.* The expression 'undue advantage' as used in the provision means 'unfair advantage'.

*e*      *11.* ... *After the injuries were inflicted the injured has fallen down, but there is no material to show that thereafter any injury was inflicted when he was in a helpless condition. The assaults were made at random. Even the previous altercations were verbal and not physical. It is not the case of the prosecution that the accused-appellants had come prepared and armed for attacking the deceased.* ... This goes to show that in the

*f* heat of passion upon a sudden quarrel followed by a fight the accused persons had caused injuries on the deceased, but had not acted in a cruel or unusual manner. That being so, Exception 4 to Section 300 IPC is clearly applicable."                    (emphasis supplied)

   **15.** In *Sukhbir Singh* v. *State of Haryana*[5] the appellant caused two bhala-blows on the vital part of the body of the deceased that was sufficient in the

*g* ordinary course of nature to cause death. The High Court held that the appellant had acted in a cruel and unusual manner. Reversing the view taken by the High Court this Court held that all fatal injuries resulting in death cannot be termed as cruel or unusual for the purposes of Exception 4 of Section 300 IPC. In cases where after the injured had fallen down, the

*h* appellant did not inflict any further injury when he was in a helpless position,

   5 (2002) 3 SCC 327 : 2002 SCC (Cri) 616


SCC Online Web Edition, Copyright © 2015
Page 1 15-cv-00724-S3, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

it may indicate that he had not acted in a cruel or unusual manner. The Court observed: (SCC p. 340, para 19)

> "*19.* ... All fatal injuries resulting in death cannot be termed as cruel *a* or unusual for the purposes of not availing the benefit of Exception 4 to Section 300 IPC. *After the injuries were inflicted and the injured had fallen down, the appellant is not shown to have inflicted any other injury upon his person when he was in a helpless position.* It is proved that in the heat of passion upon a sudden quarrel followed by a fight, the accused who was armed with bhala caused injuries at random and thus *b* did not act in a cruel or unusual manner." (emphasis supplied)

**16.** Reference may also be made to the decision in *Mahesh* v. *State of M.P.*[6], wherein the appellant had assaulted the deceased in a sudden fight and after giving him one blow he had not caused any further injury to the deceased which fact situation was held by this Court to be sufficient to bring the case under Exception 4 to Section 300 IPC. This Court held: (SCC *c* p. 670, para 4)

> "*4.* ... Thus, placed as the appellant and the deceased were at the time of the occurrence, it appears to us that the appellant assaulted the deceased in that sudden fight and after giving him one blow took to his heels. He did not cause any other injury to the deceased and therefore it cannot be said that he acted in any cruel or unusual manner. Admittedly, d he did not assault PW 2 or PW 6 who were also present* along with the deceased and who had also requested the appellant not to allow his cattle to graze in the field of PW 1. This fortifies our belief that the assault on the deceased was made during a sudden quarrel without any premeditation. In this fact situation, we are of the opinion that Exception 4 to Section 300 IPC is clearly attracted to the case of the appellant and the offence of *e* which the appellant can be said to be guilty would squarely fall under Section 304 (Part I) IPC." (emphasis supplied)

**17.** To the same effect are the decisions of this Court in *Vadla Chandraiah* v. *State of A.P.*[7] and *Shankar Diwal Wadu* v. *State of Maharashtra*[8].                                                      *f*

**18.** The next question then is whether the case falls under Section 304 Part I or Part II IPC? The distinction between the two parts of that provision was drawn by this Court in *Alister Anthony Pareira* v. *State of Maharashtra*[9] in the following words: (SCC p. 661, para 28)

> "*28.* ... For punishment under Section 304 Part I, the prosecution must prove the death of the person in question; that such death was *g* caused by the act of the accused and that the accused intended by such act to cause death or cause such bodily injury as was likely to cause death. As regards punishment for Section 304 Part II, the prosecution has

6 (1996) 10 SCC 668 : 1997 SCC (Cri) 181

7 (2006) 13 SCC 587 : (2007) 3 SCC (Cri) 709 : (2006) 14 Scale 108

8 (2007) 12 SCC 518 : (2008) 3 SCC (Cri) 285                                                      *h*

9 (2012) 2 SCC 648 : (2012) 1 SCC (Civ) 848 : (2012) 1 SCC (Cri) 953

SCC Online Web Edition, Copyright © 2015
Page 1:15-cv-01024-SD Document31-1 Filed 04/06/15 Page 69 of 202
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

to prove the death of the person in question; that such death was caused by the act of the accused and that he knew that such act of his was likely to cause death."

**19.** Reference may also be made to the decision of this Court in *Singapagu Anjaiah* v. *State of A.P.*[10] wherein this Court observed: (SCC p. 803, para 16)

"*16.* In our opinion, as nobody can enter into the mind of the accused, his intention has to be gathered from the *weapon used, the part of the body chosen for the assault and the nature of the injuries caused.*"

(emphasis supplied)

**20.** The decision of this Court in *Basdev* v. *State of Pepsu*[11], drew a distinction between motive, intention and knowledge in the following words: (AIR p. 490, para 6)

"*6.* Of course, we have to distinguish between motive, intention and knowledge. Motive is something which prompts a man to form an intention and knowledge is an awareness of the consequences of the act. In many cases intention and knowledge merge into each other and mean the same thing more or less and intention can be presumed from knowledge. The demarcating line between knowledge and intention is no doubt thin but it is not difficult to perceive that they connote different things."

**21.** This Court in the above decisions quoted the following passage from *R.* v. *Monkhouse*[12] where Coleridge, J. speaking for the Court observed: (*Basdev case*[11], AIR p. 490, para 9)

"*9.* ... 'The inquiry as to intent is far less simple than that as to whether an act has been committed, because you cannot look into a man's mind to see what was passing there at any given time. *What he intends can only be judged of by what he does or says, and if he says nothing, then his act alone must guide you to your decision.* It is a general rule in criminal law, and one founded on common sense, that juries are to presume a man to do what is the natural consequence of his act. The consequence is sometimes so apparent as to leave no doubt of the intention. A man could not put a pistol which he knew to be loaded to another's head, and fire it off, without intending to kill him; but even there the state of mind of the party is most material to be considered.' "

(emphasis supplied)

**22.** In *Camilo Vaz* v. *State of Goa*[13] the accused had hit the deceased with a danda during a premeditated gang-fight, resulting in the death of the victim. Both the trial court and the Bombay High Court convicted the appellant

10 (2010) 9 SCC 799 : (2010) 3 SCC (Cri) 1498
11 AIR 1956 SC 488 : 1956 Cri LJ 919 (2)
12 (1849) 4 Cox CC 55
13 (2000) 9 SCC 1 : 2000 SCC (Cri) 1128


SCC Online Web Edition, Copyright © 2015
Page 3: 15-cv-00424, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

under Section 302 IPC. This Court, however, converted the conviction to one under Section 304 Part II IPC and observed: (SCC p. 9, para 14)

> "*14. ...* When a person hits another with a danda on a vital part of the body with such a force that the person hit meets his death, knowledge has to be imputed to the accused. *In that situation case will fall in Part II of Section 304 IPC* as in the present case."        (emphasis supplied)

**23.** In *Jagrup Singh* v. *State of Haryana*[14] the accused had given a blow on the head of the deceased with the blunt side of a gandhala during a sudden fight causing a fracture to the skull and consequent death. This Court altered the conviction from Section 302 to Section 304 Part II IPC placing reliance upon the decision in *Chamru Budhwa* v. *State of M.P.*[15] in which case also the exchange of abuses had led both the parties to use lathis in a fight that ensued in which the deceased was hit on the head by one of the lathi-blows causing a fracture of the skull and his ultimate death. The accused was convicted for the offence of culpable homicide not amounting to murder under Section 304 Part II IPC.

**24.** Reference may also be made to the decisions of this Court in *Sarabjeet Singh* v. *State of U.P.*[16], *Mer Dhana Sida* v. *State of Gujarat*[17] and *Sukhmandar Singh* v. *State of Punjab*[18] in which cases also the cause of death was a fracture to the skull in a sudden fight without premeditation. The Court altered the conviction from Section 302 IPC to Section 304 Part II IPC.

**25.** Though the accused had inflicted only one injury upon the deceased, the fact that he had attempted to stab him a second time was taken as an indication of the accused having any intention to kill for the purpose of Section 304 Part I IPC in *Kasam Abdulla Hafiz* v. *State of Maharashtra*[19], wherein this Court observed: (SCC p. 537, para 12)

> "*12. ...* Looking at the nature of injuries sustained by the deceased and the circumstances as enumerated above the conclusion is irresistible that the death was caused by the acts of the accused done with the intention of causing such bodily injury as is likely to cause death and therefore the offence would squarely come within the first part of Section 304 IPC. *The guilty intention of the accused to cause such bodily injury as is likely to cause death is apparent from the fact that he did attempt a second blow though did not succeed in the same and it somehow missed.*"        (emphasis supplied)

**26.** We may lastly refer to the decision of this Court in *Pulicherla Nagaraju* v. *State of A.P.*[20] wherein this Court enumerated some of the

14 (1981) 3 SCC 616 : 1981 SCC (Cri) 768
15 AIR 1954 SC 652 : 1954 Cri LJ 1676
16 (1984) 1 SCC 673 : 1984 SCC (Cri) 151
17 (1985) 1 SCC 200 : 1985 SCC (Cri) 54
18 1998 SCC (Cri) 701 : AIR 1995 SC 583
19 (1998) 1 SCC 526 : 1998 SCC (Cri) 427
20 (2006) 11 SCC 444 : (2007) 1 SCC (Cri) 500


Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

circumstances relevant to finding out whether there was any intention to cause death on the part of the accused. This Court observed: (SCC pp. 457-58, para 29)

*a*

"29. Therefore, the court should proceed to decide the pivotal question of intention, with care and caution, as that will decide whether the case falls under Section 302 or 304 Part I or 304 Part II. Many petty or insignificant matters — plucking of a fruit, straying of cattle, quarrel of children, utterance of a rude word or even an objectionable glance,

*b* may lead to altercations and group clashes culminating in deaths. Usual motives like revenge, greed, jealousy or suspicion may be totally absent in such cases. There may be no intention. There may be no premeditation. In fact, there may not even be criminality. At the other end of the spectrum, there may be cases of murder where the accused attempts to avoid the penalty for murder by attempting to put forth a case

*c* that there was no intention to cause death. It is for the courts to ensure that the cases of murder punishable under Section 302, are not converted into offences punishable under Section 304 Part I/II, or cases of culpable homicide not amounting to murder, are treated as murder punishable under Section 302. *The intention to cause death can be gathered generally from a combination of a few or several of the following, among*

*d* *other, circumstances: (i) nature of the weapon used; (ii) whether the weapon was carried by the accused or was picked up from the spot; (iii) whether the blow is aimed at a vital part of the body; (iv) the amount of force employed in causing injury; (v) whether the act was in the course of sudden quarrel or sudden fight or free for all fight; (vi) whether the incident occurs by chance or whether there was any premeditation; (vii)*

*e* *whether there was any prior enmity or whether the deceased was a stranger; (viii) whether there was any grave and sudden provocation, and if so, the cause for such provocation; (ix) whether it was in the heat of passion; (x) whether the person inflicting the injury has taken undue advantage or has acted in a cruel and unusual manner; (xi) whether the accused dealt a single blow or several blows.* The above list of circumstances is, of course, not exhaustive and there may be several

*f* other special circumstances with reference to individual cases which may throw light on the question of intention."     (emphasis supplied)

**27.** Coming back to the case at hand, we are of the opinion that the nature of the simple injury inflicted by the accused, the part of the body on which it was inflicted, the weapon used to inflict the same and the circumstances in which the injury was inflicted do not suggest that the

*g* appellant had the intention to kill the deceased. All that can be said is that the appellant had the knowledge that the injury inflicted by him was likely to cause the death of the deceased. The case would, therefore, more appropriately fall under Section 304 Part II IPC.

**28.** The only other aspect that needs to be examined is whether any compensation be awarded against the appellant and in favour of the bereaved

*h* family under Section 357 of the Code of Criminal Procedure, 1973. This aspect arises very often and has been a subject-matter of several

SCC Online Web Edition, Copyright © 2015
Page: 15 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



pronouncements of this Court. The same may require some elaboration to place in bold relief certain aspects that need to be addressed by the courts but have despite the decisions of this Court remained obscure and neglected by the courts at different levels in this country.

**29.** More than four decades back Krishna Iyer, J. speaking for the Court in *Maru Ram* v. *Union of India*[21], in his inimitable style said that while social responsibility of the criminal to restore the loss or heal the injury is a part of the punitive exercise, the length of the prison term is no reparation to the crippled or bereaved but is futility compounded with cruelty. Victimology must find fulfilment said the Court, not through barbarity but by compulsory recoupment by the wrongdoer of the damage inflicted not by giving more pain to the offender but by lessening the loss of the forlorn.

**30.** In *Hari Singh* v. *Sukhbir Singh*[22] this Court lamented the failure of the courts in awarding compensation to the victims in terms of Section 357(1) CrPC. The Court recommended to all courts to exercise the power available under Section 357 CrPC liberally so as to meet the ends of justice. The Court said: (SCC pp. 557-58, para 10)

> "*10.* ... Sub-section (1) of Section 357 provides power to award compensation to victims of the offence out of the sentence of fine imposed on accused. ... *It is an important provision but courts have seldom invoked it. Perhaps due to ignorance of the object of it. It empowers the court to award compensation to victims while passing judgment of conviction.* In addition to conviction, the court may order the accused to pay some amount by way of compensation to victim who has suffered by the action of accused. *It may be noted that this power of courts to award compensation is not ancillary to other sentences but it is in addition thereto. This power was intended to do something to reassure the victim that he or she is not forgotten in the criminal justice system. It is a measure of responding appropriately to crime as well of reconciling the victim with the offender. It is, to some extent, a constructive approach to crimes. It is indeed a step forward in our criminal justice system. We, therefore, recommend to all courts to exercise this power liberally so as to meet the ends of justice in a better way.*"                    (emphasis supplied)

**31.** The amount of compensation, observed this Court, was to be determined by the courts depending upon the facts and circumstances of each case, the nature of the crime, the justness of the claim and the capacity of the accused to pay.

**32.** In *Sarwan Singh* v. *State of Punjab*[23], *Balraj* v. *State of U.P.*[24], *Baldev Singh* v. *State of Punjab*[25], *Dilip S. Dahanukar* v. *Kotak Mahindra Co. Ltd.*[26]

21 (1981) 1 SCC 107 : 1981 SCC (Cri) 112
22 (1988) 4 SCC 551 : 1998 SCC (Cri) 984
23 (1978) 4 SCC 111 : 1978 SCC (Cri) 549
24 (1994) 4 SCC 29 : 1994 SCC (Cri) 823
25 (1995) 6 SCC 593 : 1995 SCC (Cri) 1132
26 (2007) 6 SCC 528 : (2007) 3 SCC (Cri) 209

Case 3:15-cv-01024-JAH-RBB Document31-1 Filed04/06/15 Page73 of 202
SCC Online Web Edition, Copyright © 2015
Page 1 of 5 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

this Court held that the power of the courts to award compensation to victims under Section 357 is not ancillary to other sentences but in addition thereto and that imposition of fine and/or grant of compensation to a great extent must depend upon the relevant factors apart from such fine or compensation being just and reasonable. In *Dilip S. Dahanukar case*[26] this Court even favoured an inquiry albeit summary in nature to determine the paying capacity of the offender. The Court said: (SCC p. 545, para 38)

"*38.* The purpose of imposition of fine and/or grant of compensation to a great extent must be considered having the relevant factors therefor in mind. It may be compensating the person in one way or the other. The amount of compensation sought to be imposed, thus, must be reasonable and not arbitrary. Before issuing a direction to pay compensation, the capacity of the accused to pay the same must be judged. A fortiori, an enquiry in this behalf even in a summary way, may be necessary. Some reasons, which may not be very elaborate, may also have to be assigned; the purpose being that whereas the power to impose fine is limited and direction to pay compensation can be made for one or the other factors enumerated out of the same; but sub-section (3) of Section 357 does not impose any such limitation and thus, power thereunder should be exercised only in appropriate cases. Such a jurisdiction cannot be exercised at the whims and caprice of a Judge."

**33.** The long line of judicial pronouncements of this Court recognised in no uncertain terms a paradigm shift in the approach towards victims of crimes who were held entitled to reparation, restitution or compensation for loss or injury suffered by them. This shift from retribution to restitution began in the mid-1960s and gained momentum in the decades that followed. Interestingly the clock appears to have come full circle by the lawmakers and courts going back in a great measure to what was in ancient times common place. Harvard Law Review (1984) in an article on *Victim Restitution in Criminal Law Process: A Procedural Analysis* sums up the historical perspective of the concept of restitution in the following words:

"Far from being a novel approach to sentencing, restitution has been employed as a punitive sanction throughout history. In ancient societies, before the conceptual separation of civil and criminal law, it was standard practice to require an offender to reimburse the victim or his family for any loss caused by the offense. The primary purpose of such restitution was not to compensate the victim, but to protect the offender from violent retaliation by the victim or the community. It was a means by which the offender could buy back the peace he had broken. As the State gradually established a monopoly over the institution of punishment, and a division between civil and criminal law emerged, the victim's right to compensation was incorporated into civil law."

**34.** With modern concepts creating a distinction between civil and criminal law in which civil law provides for remedies to award compensation

26 *Dilip S. Dahanukar v. Kotak Mahindra Co. Ltd.,* (2007) 6 SCC 528 : (2007) 3 SCC (Cri) 209


SCC Online Web Edition, Copyright © 2015
Page 1 of 1 - Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

for private wrongs and the criminal law takes care of punishing the wrongdoer, the legal position that emerged till recent times was that criminal law need not concern itself with compensation to the victims since compensation was a civil remedy that fell within the domain of the civil courts. This conventional position has in recent times undergone a notable sea change, as societies world over have increasingly felt that victims of the crimes were being neglected by the legislatures and the courts alike. Legislations have, therefore, been introduced in many countries including Canada, Australia, England, New Zealand, Northern Ireland and in certain States in the USA providing for restitution/reparation by the courts administering criminal justice.

**35.** England was perhaps the first to adopt a separate statutory scheme for victim compensation by the State under the Criminal Injuries Compensation Scheme, 1964. Under the Criminal Justice Act, 1972 the idea of payment of compensation by the offender was introduced. The following extract from the *Oxford Handbook of Criminology* (1994 Edn., pp. 1237-38), which has been quoted with approval in *Delhi Domestic Working Women's Forum* v. *Union of India*[27] is apposite: (SCC pp. 20-21, para 16)

> "*16.* ... 'Compensation payable by the offender was introduced in the Criminal Justice Act, 1972 which gave the courts powers to make an ancillary order for compensation in addition to the main penalty in cases where 'injury, loss, or damage' had resulted. The Criminal Justice Act, 1982 made it possible for the first time to make a compensation order as the sole penalty. It also required that in cases where fines and compensation orders were given together, the payment of compensation should take priority over the fine. *These developments signified a major shift in penological thinking, reflecting the growing importance attached to restitution and reparation over the more narrowly retributive aims of conventional punishment. The Criminal Justice Act, 1988 furthered this shift. It required courts to consider the making of a compensation order in every case of death, injury, loss or damage and, where such an order was not given, imposed a duty on the court to give reasons for not doing so.* It also extended the range of injuries eligible for compensation. *These new requirements mean that if the court fails to make a compensation order it must furnish reasons.* Where reasons are given, the victim may apply for these to be subject to judicial review....
>
> The 1991 Criminal Justice Act contains a number of provisions which directly or indirectly encourage an even greater role for compensation.'"                    (emphasis supplied)

**36.** In the United States of America, the Victim and Witness Protection Act, 1982 authorises a federal court to award restitution by means of monetary compensation as a part of a convict's sentence. Section 3553(*a*)(7) of Title 18 of the Act requires courts to consider in every case "the need to provide restitution to any victims of the offense". Though it is not mandatory

27  (1995) 1 SCC 14 : 1995 SCC (Cri) 7

SCC Online Web Edition, Copyright © 2015
Page 1 of 5 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

for the court to award restitution in every case, the Act demands that the Court provide its reasons for denying the same. Section 3553(*c*) of Title 18 of the Act states as follows:

> "If the court does not order restitution or orders only partial restitution, *the court shall include in the statement the reason thereof.*"

(emphasis supplied)

**37.** In order to be better equipped to decide the quantum of money to be paid in a restitution order, the United States federal law requires that details such as the financial history of the offender, the monetary loss caused to the victim by the offence, etc. be obtained during a presentence investigation, which is carried out over a period of 5 weeks after an offender is convicted.

**38.** Domestic/Municipal legislation apart even the UN General Assembly recognised the right of victims of crimes to receive compensation by passing a resolution titled "Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power, 1985". The Resolution contained the following provisions on restitution and compensation:

### *"Restitution*

**8.** Offenders or third parties responsible for their behaviour should, where appropriate, make fair restitution to victims, their families or dependants. Such restitution should include the return of property or payment for the harm or loss suffered, reimbursement of expenses incurred as a result of the victimisation, the provision of services and the restoration of rights.

**9.** Governments should review their practices, regulations and laws to consider restitution as an available sentencing option in criminal cases, in addition to other criminal sanctions.

**10.** In cases of substantial harm to the environment, restitution, if ordered, should include, as far as possible, restoration of the environment, reconstruction of the infrastructure, replacement of community facilities and reimbursement of the expenses of relocation, whenever such harm results in the dislocation of a community.

**11.** Where public officials or other agents acting in an official or quasi-official capacity have violated national criminal laws, the victims should receive restitution from the State whose officials or agents were responsible for the harm inflicted. In cases where the Government under whose authority the victimising act or omission occurred is no longer in existence, the State or Government successor-in-title should provide restitution to the victims.

### *Compensation*

**12.** When compensation is not fully available from the offender or other sources, States should endeavour to provide financial compensation to:

(*a*) victims who have sustained significant bodily injury or impairment of physical or mental health as a result of serious crimes;

(*b*) the family, in particular dependants of persons who have died or become physically or mentally incapacitated as a result of such victimisation.


SCC Online Web Edition, Copyright © 2015
Page 1 of 5 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**13.** The establishment, strengthening and expansion of national funds for compensation to victims should be encouraged. Where appropriate, other funds may also be established for this purpose, including those cases where the State of which the victim is a national is not in a position to compensate the victim for the harm."

**39.** The UN General Assembly passed a resolution titled "Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, 2005" which deals with the rights of victims of international crimes and human rights violations. These principles (while in their draft form) were quoted with approval by this Court in *State of Gujarat* v. *High Court of Gujarat*[28] in the following words: (SCC pp. 432-33, para 94)

"*94.* In recent years, the right to reparation for victims of violation of human rights is gaining ground. The United Nations Commission of Human Rights has circulated draft Basic Principles and Guidelines on the Right to Reparation for Victims of Violation of Human Rights. (*see* annexure.)"

**40.** Amongst others the following provisions on restitution and compensation have been made:

"**12.** Restitution shall be provided to re-establish the situation that existed prior to the violations of human rights or international humanitarian law. Restitution requires, inter alia, restoration of liberty, family life, citizenship, return to one's place of residence, and restoration of employment or property.

**13.** Compensation shall be provided for any economically assessable damage resulting from violations of human rights or international humanitarian law, such as:

(*a*) Physical or mental harm, including pain, suffering and emotional distress;

(*b*) Lost opportunities including education;

(*c*) Material damages and loss of earnings, including loss of earning potential;

(*d*) Harm to reputation or dignity;

(*e*) Costs required for legal or expert assistance, medicines and medical services."

**41.** Back home the Criminal Procedure Code of 1898 contained a provision for restitution in the form of Section 545, which stated in sub-clause (1)(*b*) that the Court may direct

"payment to any person of compensation for any loss or injury caused by the offence, when substantial compensation is, in the opinion of the court, recoverable by such person in a civil court".

28 (1998) 7 SCC 392 : 1998 SCC (Cri) 1640


SCC Online Web Edition, Copyright © 2015
Page 2 of 5 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**42.** The Law Commission of India in its 41st Report submitted in 1969 discussed Section 545 CrPC of 1898 extensively and stated as follows:

*a*        "**46.12. Section 545.**—Under clause (*b*) of sub-section (1) of Section 545, the court may direct

'in the payment to any person of compensation for any loss or injury caused by the offence, when substantial compensation is, in the opinion of the court, recoverable by such person in a civil court'.

*b*        The significance of the requirement that compensation should be recoverable in a civil court is that the act which constitutes the offence in question should also be a tort. The word 'substantial' appears to have been used to exclude cases where only nominal damages would be recoverable. *We think it is hardly necessary to emphasise this aspect, since in any event it is purely within the discretion of the criminal courts to order or not to order payment of compensation, and in practice, they are not particularly liberal in utilising this provision.* We propose to

*c*        omit the word 'substantial' from the clause."        (emphasis supplied)

**43.** On the basis of the recommendations made by the Law Commission in the above report, the Government of India introduced the Criminal Procedure Code Bill, 1970, which aimed at revising Section 545 and introducing it in the form of Section 357 as it reads today. The Statement of Objects and Reasons underlying the Bill was as follows:

*d*        "Clause 365 (now Section 357) which corresponds to Section 545 makes provision for payment of compensation to victims of crimes. At present such compensation can be ordered only when the court imposes a fine the amount is limited to the amount of fine. Under the new provision, compensation can be awarded irrespective of whether the offence is punishable with fine and fine is actually imposed, but such compensation can be ordered only if the accused is convicted. The compensation should be

*e*        payable for any loss or injury whether physical or pecuniary and *the court shall have due regard to the nature of injury, the manner of inflicting the same, the capacity of the accused to pay and other relevant factors.*"

(emphasis supplied)

**44.** As regards the need for courts to obtain comprehensive details regarding the background of the offender for the purpose of sentencing, the

*f*        Law Commission in its 48th Report on "Some Questions Under the Code of Criminal Procedure Bill, 1970" submitted in 1972 discussed the matter in some detail, stating as follows:

"**45. Sentencing.**—It is now being increasingly recognised that a rational and consistent sentencing policy requires the removal of several deficiencies in the present system. *One such deficiency is a lack of comprehensive information as to the characteristics and background of the*

*g*        *offender.*

The aims of sentencing—themselves obscure—become all the more so in the absence of comprehensive information on which the correctional process is to operate. The public as well as the courts themselves are in the dark about judicial approach in this regard.

We are of the view that the taking of evidence as to the circumstances

*h*        relevant to sentencing should be encouraged, and both the prosecution and the accused should be allowed to cooperate in the process."    (emphasis supplied)

SCC Online Web Edition, Copyright © 2015
Page 2 Tuesday, March 30, 2019
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**45.** The Criminal Procedure Code of 1973 which incorporated the changes proposed in the said Bill of 1970 states in its Statement of Objects and Reasons that Section 357 was "*intended to provide relief to the poorer sections of the community*" and that the amended CrPC empowered the Court to order payment of compensation by the accused to the victims of crimes "to a larger extent" than was previously permissible under the Code. The changes brought about by the introduction of Section 357 were as follows:

(*i*) The word "substantial" was excluded.

(*ii*) A new sub-section (3) was added which provides for payment of compensation even in cases where the fine does not form part of the sentence imposed.

(*iii*) Sub-section (4) was introduced which states that an order awarding compensation may be made by an appellate court or by the High Court or Court of Session when exercising its powers of revision.

**46.** The amendments to CrPC brought about in 2008 focused heavily on the rights of victims in a criminal trial, particularly in trials relating to sexual offences. Though the 2008 amendments left Section 357 unchanged, they introduced Section 357-A under which the Court is empowered to direct the State to pay compensation to the victim in such cases where

"*the compensation awarded under Section 357 is not adequate for such rehabilitation, or where the cases end in acquittal or discharge and the victim has to be rehabilitated*".

Under this provision, even if the accused is not tried but the victim needs to be rehabilitated, the victim may request the State or District Legal Services Authority to award him/her compensation. This provision was introduced due to the recommendations made by the Law Commission of India in its 152nd and 154th Reports in 1994 and 1996 respectively.

**47.** The 154th Law Commission Report on CrPC devoted an entire chapter to "Victimology" in which the growing emphasis on victims' rights in criminal trials was discussed extensively as under:

"*1.* Increasingly the attention of criminologists, penologists and reformers of criminal justice system has been directed to victimology, control of victimisation and protection of victims of crimes. Crimes often entail substantive harm to people and not merely symbolic harm to the social order. Consequently, the needs and rights of victims of crime should receive priority attention in the total response to crime. One recognised method of protection of victims is compensation to victims of crime. The needs of victims and their family are extensive and varied.

\*                    \*                    \*

*9.1.* The principles of victimology has foundations in Indian constitutional jurisprudence. The provision on Fundamental Rights (Part III) and Directive Principles of State Policy (Part IV) form the bulwark for a new social order in which social and economic justice would blossom in the national life of the country (Article 38). Article 41 mandates, inter alia, that the State shall make effective provisions for 'securing the right to public

SCC Online Web Edition, Copyright © 2015
Page 2, 2.5.0, Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

assistance in cases of disablement and in other cases of undeserved want'. So also Article 51-A makes it a fundamental duty of every Indian citizen, *a* inter alia, 'to have compassion for living creatures' and 'to develop humanism'. If emphatically interpreted and imaginatively expanded these provisions can form the constitutional underpinnings for victimology.

*9.2.* However, in India, the criminal law provides compensation to the victims and their dependants, only in a limited manner. Section 357 of the Code of Criminal Procedure incorporates this concept to an extent and *b* empowers the criminal courts to grant compensation to the victims.

      *       *       *

*11.* In India the principles of compensation to crime victims need to be reviewed and expanded to cover all cases. The compensation should not be limited only to fines, penalties and forfeitures realised. The State should accept the principle of providing assistance to victims out of its own *c* funds...."

**48.** The question then is whether the plenitude of the power vested in the courts under Sections 357 and 357-A, notwithstanding, the courts can simply ignore the provisions or neglect the exercise of a power that is primarily meant to be exercised for the benefit of the victims of crimes that are so often committed though less frequently punished by the courts. In other words, *d* whether courts have a duty to advert to the question of awarding compensation to the victim and record reasons while granting or refusing relief to them?

**49.** The language of Section 357 CrPC at a glance may not suggest that any obligation is cast upon a court to apply its mind to the question of compensation. Sub-section (1) of Section 357 states that the Court "*may*" *e* order for the whole or any part of a fine recovered to be applied towards compensation in the following cases:

    (*i*) To any person who has suffered loss or injury by the offence, when in the opinion of the court, such compensation would be recoverable by such person in a civil court.

*f*

    (*ii*) To a person who is entitled to recover damages under the Fatal Accidents Act, when there is a conviction for causing death or abetment thereof.

    (*iii*) To a bona fide purchaser of property, which has become the subject of theft, criminal misappropriation, criminal breach of trust, *g* cheating, or receiving or retaining or disposing of stolen property, and which is ordered to be restored to its rightful owner.

**50.** Sub-section (3) of Section 357 further empowers the court by stating that it "*may*" award compensation even in such cases where the sentence imposed does not include a fine. The legal position is, however, well established that cases may arise where a provision is mandatory despite the *h* use of language that makes it discretionary. We may at the outset, refer to the


SCC Online Web Edition, Copyright © 2015
Page 2.1-5-cv00424-S0, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

oft-quoted passage from *Julius* v. *Lord Bishop of Oxford*[29] wherein the Court summed up the legal position thus: (AC pp. 222-23)

> "… The words 'it shall be lawful' are not equivocal. They are plain and unambiguous. They are words merely making that legal and possible which there would otherwise be no right or authority to do. They confer a faculty or power, and they do not of themselves do more than confer a faculty or power. But there may be something in the nature of the thing empowered to be done, something in the object for which it is to be done, something in the conditions under which it is to be done, something in the title of the person or persons for whose benefit the power is to be exercised, which may couple the power with a duty, and make it the duty of the person in whom the power is reposed, to exercise that power when called upon to do so."

**51.** There is no gainsaying that Section 357 confers a power on the Court insofar as it makes it "*legal and possible which there would otherwise be no right or authority to do*" viz. to award compensation to victims in criminal cases. The question is whether despite the use of discretionary language such as the word "*may*", there is "*something*" in the nature of the power to award compensation in criminal cases, in the object for which the power is conferred or in the title of the persons for whose benefit it is to be exercised which, coupled with the power conferred under the provision, casts a duty on the court to apply its mind to the question of exercise of this power in every criminal case.

**52.** In *Bachahan Devi* v. *Nagar Nigam, Gorakhpur*[30], this Court while dealing with the use of the word "may" summed up the legal position thus: (SCC p. 383, para 18)

> "*18.* It is well settled that the use of word 'may' in a statutory provision would not by itself show that the provision is directory in nature. In some cases, the legislature may use the word 'may' as a matter of pure conventional courtesy and yet intend a mandatory force. In order, therefore, to interpret the legal import of the word 'may', the court has to consider various factors, namely, the *object and the scheme of the Act, the context and the background against which the words have been used, the purpose and the advantages sought to be achieved by the use of this word, and the like. It is equally well settled that where the word 'may' involves a discretion coupled with an obligation or where it confers a positive benefit to a general class of subjects in a utility Act, or where the court advances a remedy and suppresses the mischief, or where giving the words directory significance would defeat the very object of the Act, the word 'may' should be interpreted to convey a mandatory force.*"
> (emphasis supplied)

29  (1880) 5 AC 214 : (1874-80) All ER Rep 43 (HL)
30  (2008) 12 SCC 372 : AIR 2008 SC 1282


SCC Online Web Edition, Copyright © 2015
Page 2.15-Cv-01024-24-319, 2019
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**53.** Similarly in *Dhampur Sugar Mills Ltd.* v. *State of U.P.*[31] this Court held that the mere use of word "may" or "shall" was not conclusive. The question whether a particular provision of a statute is directory or mandatory, held the Court, can be resolved by ascertaining the intention of the legislature and not by looking at the language in which the provision is clothed. And for finding out the legislative intent, the Court must examine the scheme of the Act, purpose and object underlying the provision, consequences likely to ensue or inconvenience likely to result if the provision is read one way or the other and many more considerations relevant thereto.

**54.** Applying the tests which emerge from the above cases to Section 357, it appears to us that the provision confers a power coupled with a duty on the courts to apply its mind to the question of awarding compensation in every criminal case. We say so because in the background and context in which it was introduced, the power to award compensation was intended to reassure the victim that he or she is not forgotten in the criminal justice system. The victim would remain forgotten in the criminal justice system if despite the legislature having gone so far as to enact specific provisions relating to victim compensation, courts choose to ignore the provisions altogether and do not even apply their mind to the question of compensation. It follows that unless Section 357 is read to confer an obligation on the courts to apply their mind to the question of compensation, it would defeat the very object behind the introduction of the provision.

**55.** If application of mind is not considered mandatory, the entire provision would be rendered a dead letter. It was held in *NEPC Micon Ltd.* v. *Magma Leasing Ltd.*[32] albeit in the context of Section 138 of the Negotiable Instruments Act that even in regard to a penal provision, any interpretation, which withdraws the life and blood of the provision and makes it ineffective and a dead letter should be avoided.

**56.** Similarly in *Swantraj* v. *State of Maharashtra*[33] this Court speaking through Krishna Iyer, J. held: (SCC p. 323, para 1)

"*1.* Every legislation is a social document and judicial construction seeks to decipher the statutory mission, language permitting, taking the one from the rule in *Heydon case*[34] of suppressing the evil and advancing the remedy."

**57.** The Court in *Swantraj case*[33] extracted with approval the following passage from *Maxwell on Interpretation of Statutes*:

"There is no doubt that 'the office of the Judge is, to make such construction as will suppress the mischief, and advance the remedy, and to suppress all evasions for the continuance of the mischief'. To carry out effectually the object of a statute, it must be so construed as to defeat all attempts to do, or avoid doing, in an indirect or circuitous manner that

31 (2007) 8 SCC 338
32 (1999) 4 SCC 253 : 1999 SCC (Cri) 524
33 (1975) 3 SCC 322 : 1974 SCC (Cri) 930
34 (1584) 3 Co Rep 7a : 76 ER 637


SCC Online Web Edition, Copyright © 2015
Page 23 5 C Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

which it has prohibited or enjoined: *quando aliquid prohibetur, prohibetur et omne per quod devenitur ad illud.*"

**58.** This Court has through a line of cases beginning with *Hari Singh* *a* *case*[22] held that the power to award compensation under Section 357 is not ancillary to other sentences but in addition thereto. It would necessarily follow that the court has a duty to apply its mind to the question of awarding compensation under Section 357 too. Reference may also be made to the decision of this Court in *State of A.P.* v. *Polamala Raju*[35] wherein a three-Judge Bench of this Court set aside a judgment of the High Court for *b* non-application of mind to the question of sentencing. In that case, this Court reprimanded the High Court for having reduced the sentence of the accused convicted under Section 376 IPC from 10 years' imprisonment to 5 years without recording any reasons for the same. This Court said: (SCC pp. 78-79, paras 9 & 11)

"*9.* We are of the considered opinion that it is an obligation of the *c* sentencing court to consider all relevant facts and circumstances bearing on the question of sentence and impose a sentence commensurate with the gravity of the offence. ...

\*          \*          \*

*11.* To say the least, the order contains no reasons, much less 'special *d* or adequate reasons'. The sentence has been reduced in a rather mechanical manner without proper application of mind."

**59.** In *State of Punjab* v. *Prem Sagar*[36] this Court stressed the need for greater application of mind of the courts in the field of sentencing. Setting aside the order granting probation by the High Court, the Court stated as follows: (SCC p. 560, paras 30-31)                                                    *e*

"*30.* The High Court does not rest its decision on any legal principle. No sufficient or cogent reason has been arrived.

*31.* We have noticed the development of law in this behalf in other countries only to emphasise that the courts while imposing sentence must take into consideration the principles applicable thereto. It requires application of mind. The purpose of imposition of sentence must also be *f* kept in mind."

**60.** Although speaking in the context of capital punishment, the following observation of this Court in *Sangeet* v. *State of Haryana*[37] could be said to apply to other sentences as well, particularly the award of compensation to the victim: (SCC p. 478, para 77)

"*77.3.* In the sentencing process, both the crime and the criminal are *g* equally important. We have unfortunately, not taken the sentencing process as seriously as it should be with the result that in capital

22 *Hari Singh* v. *Sukhbir Singh*, (1988) 4 SCC 551 : 1998 SCC (Cri) 984

35 (2000) 7 SCC 75 : 2000 SCC (Cri) 1284

36 (2008) 7 SCC 550 : (2008) 3 SCC (Cri) 183                                                    *h*

37 (2013) 2 SCC 452 : (2013) 2 SCC (Cri) 611

SCC Online Web Edition, Copyright © 2015
Page 2 of 5 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

offences, it has become Judge-centric sentencing rather than principled sentencing."

**61.** Section 357 CrPC confers a duty on the court to apply its mind to the question of compensation in every criminal case. It necessarily follows that the court must disclose that it has applied its mind to this question in every criminal case. In *Maya Devi* v. *Raj Kumari Batra*[38] this Court held that the disclosure of application of mind is best demonstrated by recording reasons in support of the order or conclusion. The Court observed: (SCC p. 495, paras 28-30)

"*28.* ... There is nothing like a power without any limits or constraints. That is so even when a court or other authority may be vested with wide discretionary power, for even discretion has to be exercised only along well recognised and sound juristic principles with a view to promoting fairness, inducing transparency and aiding equity.

*29.* What then are the safeguards against an arbitrary exercise of power? The first and the most effective check against any such exercise is the well-recognised legal principle that orders can be made only after due and proper application of mind. Application of mind brings reasonableness not only to the exercise of power but to the ultimate conclusion also. *Application of mind in turn is best demonstrated by disclosure of the mind. And disclosure is best demonstrated by recording reasons in support of the order or conclusion.*

*30. Recording of reasons in cases where the order is subject to further appeal is very important from yet another angle. An appellate court or the authority ought to have the advantage of examining the reasons that prevailed with the court or the authority making the order. Conversely, absence of reasons in an appealable order deprives the appellate court or the authority of that advantage and casts an onerous responsibility upon it to examine and determine the question on its own.*"

(emphasis supplied)

**62.** Similarly, in *State of Rajasthan* v. *Sohan Lal*[39] this Court emphasised the need for reasons thus: (SCC p. 576, para 3)

"*3.* ... The giving of reasons for a decision is an essential attribute of judicial and judicious disposal of a matter before courts, and which is the only indication to know about the manner and quality of exercise undertaken, as also the fact that the court concerned had really applied its mind."

**63.** In *Hindustan Times Ltd.* v. *Union of India*[40] this Court stated that the absence of reasons in an order would burden the appellate court with the responsibility of going through the evidence or law for the first time. The Court observed: (SCC p. 248, para 8)

"*8.* ... In our view, the satisfaction which a reasoned judgment gives to the losing party or his lawyer is the test of a good judgment. Disposal

38  (2010) 9 SCC 486 : (2010) 3 SCC (Civ) 842
39  (2004) 5 SCC 573 : (2008) 2 SCC (Cri) 53
40  (1998) 2 SCC 242 : 1998 SCC (L&S) 481



SCC Online Web Edition, Copyright © 2015
Page 2: 15-CV-10024-3D Document31-1 Filed04/06/15 Page84 of 202
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

of cases is no doubt important but quality of the judgment is equally, if
not more, important. There is no point in shifting the burden to the higher
court either to support the judgment by reasons or to consider the
evidence or law for the first time to see if the judgment needs a reversal."

**64.** In *Director, Horticulture, Punjab* v. *Jagjivan Parshad*[41] this Court
stated that the spelling out of reasons in an order is a requirement of natural
justice: (SCC p. 541, para 9)

"*9. '15. ...* Reasons substitute subjectivity by objectivity. The
emphasis on recording reasons is that if the decision reveals the
'inscrutable face of the sphinx', it can, by its silence, render it virtually
impossible for the courts to perform their appellate function or exercise
the power of judicial review in adjudging the validity of the decision.
Right to reason is an indispensable part of a sound judicial system.
Another rationale is that the affected party can know why the decision
has gone against him. One of the salutary requirements of natural justice
is spelling out reasons for the order made, in other words, a speaking-out.
The 'inscrutable face of the sphinx' is ordinarily incongruous with a
judicial or quasi-judicial performance.'*"

**65.** In *Maya Devi case*[38] this Court summarised the existing case law on
the need for reasoned orders as follows: (SCC pp. 494-95, paras 22-27)

"22. The juristic basis underlying the requirement that courts and
indeed all such authorities, as exercise the power to determine the rights
and obligations of individuals must give reasons in support of their
orders has been examined in a long line of decisions rendered by this
Court. In *Hindustan Times Ltd.* v. *Union of India*[40] the need to give
reasons has been held to arise out of the need to minimise chances of
arbitrariness and induce clarity.

23. In *Arun* v. *Inspector General of Police*[42] the recording of reasons
in support of the order passed by the High Court has been held to inspire
public confidence in administration of justice, and help the Apex Court to
dispose of appeals filed against such orders.

24. In *Union of India* v. *Jai Prakash Singh*[43], reasons were held to be
live links between the mind of the decision-maker and the controversy in
question as also the decision or conclusion arrived at.

25. In *Victoria Memorial Hall* v. *Howrah Ganatantrik Nagrik
Samity*[44], reasons were held to be the heartbeat of every conclusion, apart
from being an essential feature of the principles of natural justice, that
ensure transparency and fairness, in the decision-making process.

41 (2008) 5 SCC 539 : (2008) 2 SCC (L&S) 121
  * Ed.: As observed in *United Commercial Bank* v. *P.C. Kakkar*, (2003) 4 SCC 364, p. 377, para 15.
38 *Maya Devi* v. *Raj Kumari Batra*, (2010) 9 SCC 486 : (2010) 3 SCC (Civ) 842
40 (1998) 2 SCC 242 : 1998 SCC (L&S) 481
42 (1986) 3 SCC 696 : 1986 SCC (L&S) 707 : (1986) 1 ATC 330
43 (2007) 10 SCC 712
44 (2010) 3 SCC 732

Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*26.* In *Ram Phal* v. *State of Haryana*[45], giving of satisfactory reasons was held to be a requirement arising out of an ordinary man's sense of justice and a healthy discipline for all those who exercise power over others.

*27.* In *Director, Horticulture, Punjab* v. *Jagjivan Parshad*[41], the recording of reasons was held to be indicative of application of mind specially when the order is amenable to further avenues of challenge."

**66.** To sum up: while the award or refusal of compensation in a particular case may be within the court's discretion, there exists a mandatory duty on the court to apply its mind to the question in every criminal case. Application of mind to the question is best disclosed by recording reasons for awarding/ refusing compensation. It is axiomatic that for any exercise involving application of mind, the Court ought to have the necessary material which it would evaluate to arrive at a fair and reasonable conclusion. It is also beyond dispute that the occasion to consider the question of award of compensation would logically arise only after the court records a conviction of the accused. Capacity of the accused to pay which constitutes an important aspect of any order under Section 357 CrPC would involve a certain enquiry albeit summary unless of course the facts as emerging in the course of the trial are so clear that the court considers it unnecessary to do so. Such an enquiry can precede an order on sentence to enable the court to take a view, both on the question of sentence and compensation that it may in its wisdom decide to award to the victim or his/her family.

**67.** Coming then to the case at hand, we regret to say that the trial court and the High Court appear to have remained oblivious to the provisions of Section 357 CrPC. The judgments under appeal betray ignorance of the courts below about the statutory provisions and the duty cast upon the courts. Remand at this distant point of time does not appear to be a good option either. This may not be a happy situation but having regard to the facts and the circumstances of the case and the time lag since the offence was committed, we conclude this chapter in the hope that the courts remain careful in future.

**68.** In the result, we allow this appeal but only to the extent that instead of Section 302 IPC the appellant shall stand convicted for the offence of culpable homicide not amounting to murder punishable under Section 304 Part II IPC and sentenced to undergo rigorous imprisonment for a period of five years. The fine imposed upon the appellant and the default sentence awarded to him shall remain unaltered. The appeal is disposed of in the above terms in modification of the order passed by the courts below. A copy of this order be forwarded to the Registrars General of the High Courts in the country for circulation among the Judges handling criminal trials and hearing appeals.

---

45  (2009) 3 SCC 258 : (2009) 2 SCC (Cri) 72 : (2009) 1 SCC (L&S) 645
41  (2008) 5 SCC 539 : (2008) 2 SCC (L&S) 121

# EXHIBIT G

SCC Online Web Edition, Copyright © 2015
Page 1 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**14.** According to learned counsel for the appellants, accused Satya Dev was arrested by the police from his house in the midnight and he was also assaulted. We are unable to accept the above submission in view of the clear evidence of the Head Constable, PW 6 who not only registered the case on the receipt of FIR but also recorded that accused Satya Dev was brought by PW 1 and others. The *sooja* which was also brought along with the accused Satya Dev was seized by PW 6. This witness also stated that Satya Dev was put in the lock-up at the police station.

**15.** For the reasons stated above we do not find any merit in the present appeal and accordingly dismiss it.

---

### (2000) 2 Supreme Court Cases 465

(BEFORE S. SAGHIR AHMAD AND R.P. SETHI, JJ.)

CHAIRMAN, RAILWAY BOARD AND OTHERS      ..      Appellants;

*Versus*

CHANDRIMA DAS (MRS) AND OTHERS      ..      Respondents.

Civil Appeal No. 639 of 2000†, decided on January 28, 2000

A. **Constitution of India — Arts. 226 & 21 — Public law remedies — Award of compensation — Enforcement of public duties — State or its instrumentality operating in contractual or commercial field — Violation of fundamental rights by public functionaries — Employees of Railways causing injury amounting to tortious act or violating fundamental rights of any person (rape on a woman) — Writ petition under Art. 226 against the State or its instrumentality, inter alia, for payment of compensation, held, maintainable irrespective of availability of alternative remedy by way of civil suit for damages**

B. **Constitution of India — Art. 226 — Maintainability of writ petition — Standing/Locus standi — Scope — PIL by advocate — Personal injury or loss not essential element of standing — Writ petition filed by a practising advocate of the High Court against the State or its instrumentality seeking not only compensation to a victim of rape committed by its employees (railway employees) but also other reliefs including eradication of anti-social and criminal activities at railway station — Held, petition is in the nature of PIL which an advocate has locus standi to file**

C. **Constitution of India — Arts. 21 and 51 — Right to "life" — Includes right to live with human dignity — Rape violates this right of women — Right to life is recognised as a basic human right — It has to be read in consonance with Universal Declaration of Human Rights, 1948, Preamble and Arts. 1, 2, 3, 5, 7, 9, Declaration on the Elimination of Violence Against Women, Arts. 1, 2, 3 as also Declaration and Covenants of Civil and Political Rights and Covenants of Economic, Social and Cultural Rights to which India is a party having ratified them — However, this right has to be**

† From the Judgment and Order dated 25/26/29 and 30-6-1998 of the Calcutta High Court in WP No. 494 of 1998

SCC OnLine Web Edition, Copyright © 2015
Page: 15 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

subject to such restrictions as may be imposed in the interest of the nation and security of the State — Primacy of interest of the nation and security of the State will have to be read into the Universal Declaration as also Art. 21 — Penal Code, 1860, S. 376 — International Law — When to be read as part of the municipal law

D. Constitution of India — Art. 21 — "Person" — Includes not only citizens of India but also other persons who are not citizens but foreign nationals subject to restrictions as may be imposed in the interest of security of the country and other important considerations

E. Constitution of India — Arts. 21 and 226 & 32 — Public law remedies — State operating in contractual or commercial field — It has vicarious liability to pay compensation for tortious acts of its employees — Doctrine of sovereign power not applicable in welfare State where functions of the State now extend to various fields which cannot be strictly related to sovereign power — *Kasturi Lal* decision has lost its efficacy and cannot be applied, more so while dealing with a case under public law domain — When a woman, even though a foreign national, gang-raped by railway employees in Railway's Yatri Niwas, held, Union of India which runs the Railways as a commercial activity, would be vicariously liable to pay compensation to the victim of the rape — Tort Law

F. Constitution of India — Pt. III — Object of — Limitations inherent in — Primacy of interest of the nation and security of the State must be read into every article dealing with fundamental rights

A lady *H* had arrived at Howrah Railway Station from Bangladesh with a view to catch a train for Ajmer. She was taken by some of the employees of the Railways to Yatri Niwas. The room of the Yatri Niwas was booked in the name of one of the employees against railway card pass. She was raped there by four employees. Later she was taken out to a rented house by another railway employee and was raped. Following the hue and cry raised by her, she was rescued by the police. A practising lady advocate of Calcutta High Court (respondent) filed a writ petition before the High Court against the appellants claiming compensation for the victim. The respondent also claimed several other reliefs including a direction to the appellants to eradicate anti-social and criminal activities at Howrah Railway Station. The High Court awarded a sum of Rs 10 lakhs as compensation to *H* as it was of the opinion that the rape was committed at the building (Rail Yatri Niwas) belonging to the Railways and was perpetrated by the railway employees. The contention raised before the Supreme Court was that the Railways would not be liable to pay compensation to *H* who was a foreigner and was not an Indian national. It was also contended that commission of the offence by the person concerned would not make the Railways or the Union of India liable to pay compensation to the victim of the offence. It was contended that since it was the individual act of those persons, they alone would be prosecuted and on being found guilty would be punished and may also be liable to pay fine or compensation, but having regard to the facts of the case, the Railways, or, for that matter, the Union of India would not even be vicariously liable. It was also contended that for claiming damages for the offence perpetrated on *H* the remedy lay in the domain of private law and not under public law and, therefore, no compensation could have been legally awarded by the High Court in proceedings under Article 226 of the Constitution and, that too, at the instance of a practising advocate who, in no way, was concerned or

SCC Online Web Edition, Copyright © 2015
Page 3, Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

connected with the victim. Rejecting the contentions and dismissing the appeal, the Supreme Court

*a* *Held* :

Though initially a petition under Article 226 relating to commercial matters was held not to lie, but the law has undergone a change by subsequent decisions and now even contractual matters are amenable to writ jurisdiction of the High Court under Article 226. The public law remedies have also been extended to the realm of tort and the court can award compensation to petitioners who suffer personal injuries amounting to tortious acts at the hand of officers of the Govt.

*b* Therefore, the contention that *H* should have approached the civil court for damages and the matter should not have been considered in a petition under Article 226 of the Constitution, cannot be accepted. In the instant case, it is not a mere matter of violation of an ordinary right of a person but the violation of fundamental rights which is involved. "Rape" is an offence which is violative of the fundamental right of a person guaranteed under Article 21 of the

*c* Constitution. Where public functionaries are involved and the matter relates to the violation of fundamental rights or the enforcement of public duties, the remedy would still be available under the public law notwithstanding that a suit could be filed for damages under private law. (Paras 9, 11 and 12)

*Common Cause, A Regd. Society* v. *Union of India*, (1999) 6 SCC 667 : 1999 SCC (Cri) 1196 : AIR 1999 SC 2979 : JT (1999) 5 SC 237; *LIC of India* v. *Escorts Ltd.*, (1986) 1
*d* SCC 264 : AIR 1986 SC 1370 : 1985 Supp (3) SCR 909; *Rudul Sah* v. *State of Bihar*, (1983) 4 SCC 141 : 1983 SCC (Cri) 798 : AIR 1983 SC 1086 : (1983) 3 SCR 508; *Bhim Singh* v. *State of J&K*, (1985) 4 SCC 577 : 1986 SCC (Cri) 47 : AIR 1986 SC 494; *Peoples' Union for Democratic Rights* v. *State of Bihar*, (1987) 1 SCC 265 : 1987 SCC (Cri) 58 : (1987) 1 SCR 631 : AIR 1987 SC 355; *Peoples' Union for Democratic Rights* v. *Police Commr., Delhi Police Headquarters*, (1989) 4 SCC 730 : 1990 SCC (Cri) 75 : (1989) 1 Scale 599; *Saheli, A Women's Resources Centre* v. *Commr. of Police*, (1990) 1 SCC 422 : 1990 SCC (Cri) 145 : 1989 Supp (2) SCR 488 : AIR 1990 SC 513; *Arvinder*
*e* *Singh Bagga* v. *State of U.P.*, (1994) 6 SCC 565 : 1995 SCC (Cri) 29 : AIR 1995 SC 117; *P. Rathinam* v. *Union of India*, 1989 Supp (2) SCC 716 : 1991 SCC (Cri) 228; *Death of Sawinder Singh Grower, Re*, 1995 Supp (4) SCC 450 : 1994 SCC (Cri) 1464 : JT (1992) 6 SC 271 : (1992) 3 Scale 34; *Inder Singh* v. *State of Punjab*, (1995) 3 SCC 702 : 1995 SCC (L&S) 857 : 1995 SCC (Cri) 586 : (1995) 30 ATC 122 : AIR 1995 SC 1949; *D.K. Basu* v. *State of W.B.*, (1997) 1 SCC 416 : 1997 SCC (Cri) 92 : AIR 1997 SC 610; *Nilabati Behera* v. *State of Orissa*, (1993) 2 SCC 746 : 1993 SCC (Cri) 527 : (1993)
*f* 2 SCR 581 : AIR 1993 SC 1960; *State of M.P.* v. *Shyamsunder Trivedi*, (1995) 4 SCC 262 : 1995 SCC (Cri) 715 : 1995 3 Scale 343; *People's Union for Civil Liberties* v. *Union of India*, (1997) 3 SCC 433 : 1997 SCC (Cri) 434 : AIR 1997 SC 1203; *Kaushalya* v. *State of Punjab*, (1999) 6 SCC at p. 754 : (1996) 7 Scale (SP) 13; *Supreme Court Legal Aid Committee* v. *State of Bihar*, (1991) 3 SCC 482 : 1991 SCC (Cri) 639; *Jacob George (Dr)* v. *State of Kerala*, (1994) 3 SCC 430 : 1994 SCC (Cri) 774 : (1994) 2 Scale 563; *Paschim Banga Khet Mazdoor Samity* v. *State of W.B.*, (1996) 4 SCC 37 : AIR 1996
*g* SC 2426; *Manju Bhatia* v. *New Delhi Municipal Council*, (1997) 6 SCC 370 : AIR 1998 SC 223 : (1997) 4 Scale 350; *Bodhisattwa Gautam* v. *Subhra Chakraborty*, (1996) 1 SCC 490 : 1996 SCC (Cri) 133, *relied on*

The existence of a legal right, no doubt, is the foundation for a petition under Article 226 and a bare interest, maybe of a minimum nature, may give locus standi to a person to file a writ petition, but the concept of "locus standi" has undergone a sea change. There has been a spectacular expansion of the

*h* concept of locus standi. The concept is much wider and it takes in its stride anyone who is not a mere "busybody". Public-spirited citizens having faith in

SCC Online Web Edition, Copyright © 2015
Page 1 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

the rule of law are rendering great social and legal service by espousing causes of public nature. They cannot be ignored or overlooked on a technical or conservative yardstick of the rule of locus standi or the absence of personal loss or injury. In this case the reliefs which were claimed in the petition included the relief for compensation. But many other reliefs as, for example, relief for eradicating anti-social and criminal activities of various kinds at Howrah Railway Station were also claimed. The true nature of the petition, therefore, was that of a petition filed in public interest. Having regard to the nature of the petition filed by the respondent and the reliefs claimed it is clear that this petition was filed in public interest which could legally be filed by the respondent and the argument that she could not file that petition as there was nothing personal to her involved in this petition must be rejected.

(Paras 15, 17, 14 and 18)

*Satyanarayana Sinha (Dr) v. S. Lal & Co. (P) Ltd.*, (1973) 2 SCC 696 : AIR 1973 SC (Cri) 1002 : AIR 1973 SC 2720; *S.P. Gupta* v. *Union of India*, 1981 Supp SCC 87 : AIR 1982 SC 149; *People's Union for Democratic Rights* v. *Union of India*, (1982) 3 SCC 235 : 1982 SCC (L&S) 275 : AIR 1982 SC 1473; *Bandhua Mukti Morcha* v. *Union of India*, (1984) 3 SCC 161 : 1984 SCC (L&S) 389 : AIR 1984 SC 802 : (1984) 2 SCR 67; *State of H.P.* v. *A Parent of a Student of Medical College*, (1985) 3 SCC 169 : AIR 1985 SC 910; *Bangalore Medical Trust* v. *B.S. Muddappa*, (1991) 4 SCC 54 : AIR 1991 SC 1902 : (1991) 3 SCR 102, *relied on*

The argument that *H* was a foreign national and therefore, no relief under public law could be granted to her as there was no violation of the fundamental rights available under the Constitution must also fail for two reasons: first, on the ground of domestic jurisprudence based on constitutional provisions and secondly, on the ground of human rights jurisprudence based on the Universal Declaration of Human Rights, 1948, which has the international recognition as the "Moral Code of Conduct" having been adopted by the General Assembly of the United Nations.

(Para 19)

The International Covenants and Declarations as adopted by the United Nations have to be respected by all signatory States and the meaning given to the provisions of those Declarations and Covenants have to be such as would help in effective implementation of those rights. The applicability of the Universal Declaration of Human Rights and the principles thereof may have to be read, if need be, into the domestic jurisprudence.

(Para 24)

*Salomon* v. *Commrs. of Customs and Excise*, (1996) 3 All ER 871; *Brind* v. *Secy. of State for the Home Deptt.*, (1991) 1 All ER 720 (HL), *referred to*

Our Constitution guarantees all the basic and fundamental human rights set out in the Universal Declaration of Human Rights, 1948, to its citizens and other persons. The chapter dealing with the fundamental rights is contained in Part III of the Constitution. The purpose of Part III is to safeguard the basic human rights from the vicissitudes of political controversy and to place them beyond the reach of the political parties who, by virtue of their majority, may come to form the Government at the Centre or in the State.

(Para 27)

The fundamental rights are available to all the "citizens" of the country but a few of them are also available to "persons". The word "LIFE" has also been used prominently in the Universal Declaration of Human Rights, 1948. The fundamental rights under the Constitution are almost in consonance with the rights contained in the Universal Declaration of Human Rights as also the Declaration and the Covenants of Civil and Political Rights and the Covenants

SCC Online Web Edition, Copyright © 2015
Page 5 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

of Economic, Social and Cultural Rights, to which India is a party having ratified them. That being so, since "LIFE" is also recognised as a basic human right in the Universal Declaration of Human Rights, 1948, it has to have the same meaning and interpretation as has been placed on that word by the Supreme Court in its various decisions relating to Article 21 of the Constitution. The meaning of the word "life" cannot be narrowed down. According to the tenor of the language used in Article 21, it will be available not only to every citizen of this country, but also to a "person" who may not be a citizen of the country. On this principle, even those who are not citizens of this country and come here merely as tourists or in any other capacity will be entitled to the protection of their lives in accordance with the constitutional provisions. They also have a right to "life" in this country. Thus, they also have the right to live, so long as they are here, with human dignity. Just as the State is under an obligation to protect the life of every citizen in this country, so also the State is under an obligation to protect the life of the persons who are not citizens.

(Paras 28, 32 and 34)

*STC of India Ltd. v. CTO*, AIR 1963 SC 1811 : (1964) 4 SCR 99; *Hans Muller of Nuremberg v. Supdt., Presidency Jail Calcutta*, AIR 1955 SC 367, 374 : (1955) 1 SCR 1284; *Anwar v. State of J&K*, (1971) 3 SCC 104 : AIR 1971 SC 337 : (1971) 1 SCR 637; *Nazirambai v. State*, AIR 1957 MB 1; *Laxmi Prasad v. Shiv Pal*, AIR 1974 All 313 : 1973 All LJ 832; *Sk. Md. Soleman v. State of W.B.*, AIR 1965 Cal 312 : (1965) 1 Cri LJ 679; *Kubic Darusz v. Union of India*, (1990) 1 SCC 568 : 1990 SCC (Cri) 227 : AIR 1990 SC 605; *Kharak Singh v. State of U.P.*, AIR 1963 SC 1295 : (1964) 1 SCR 332; *State of Maharashtra v. Chandrabhan Tale*, (1983) 3 SCC 387 : 1983 SCC (L&S) 391 : 1983 SCC (Cri) 667 : AIR 1983 SC 803 : (1983) 3 SCR 337; *Maneka Gandhi v. Union of India*, (1978) 1 SCC 248 : AIR 1978 SC 597 : (1978) 2 SCR 621; *Board of Trustees of the Port of Bombay v. Dilipkumar Raghavendranath Nadkarni*, (1983) 1 SCC 124 : 1983 SCC (L&S) 61 : AIR 1983 SC 109 : (1983) 1 SCR 828, *relied on*

However, the rights guaranteed under Part III of the Constitution are not absolute in terms. They are subject to reasonable restrictions and, therefore, in case of a non-citizen also, those rights will be available subject to such restrictions as may be imposed in the interest of the security of the State or other important considerations. Interest of the nation and security of the State is supreme. Since 1948 when the Universal Declaration was adopted till this day, there have been many changes — political, social and economic while terrorism has disturbed the global scenario. Primacy of the interest of the nation and security of the State will have to be read into the Universal Declaration as also in every article dealing with fundamental rights, including Article 21.    (Para 35)

*Bodhisattwa Gautam v. Subhra Chakraborty*, (1996) 1 SCC 490 : 1996 SCC (Cri) 133, *relied on*

H, who was not the citizen of this country but came here as a citizen of Bangladesh was, nevertheless, entitled to all the constitutional rights available to a citizen so far as "right to life" was concerned. She was entitled to be treated with dignity and was also entitled to the protection of her person as guaranteed under Article 21 of the Constitution. As a national of another country, she could not be subjected to a treatment which was below dignity nor could she be subjected to physical violence at the hands of government employees who outraged her modesty. The right available to her under Article 21 was thus violated. Consequently, the State was under a constitutional liability to pay compensation to her. The judgment passed by the Calcutta High Court,

SCC Online Web Edition, Copyright © 2015
Page 8 - Thursday, March 19, 2019
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

470                     SUPREME COURT CASES                     (2000) 2 SCC

therefore, allowing compensation to her for having been gang-raped, cannot be said to suffer from any infirmity.                                        (Para 37)

It is not possible to accept the contention that the Central Government *a* cannot be held vicariously liable for the offence of rape committed by the employees of the Railways. The theory of sovereign power which was propounded in *Kasturi Lal case* has yielded to new theories and is no longer available in a welfare State. Functions of the Government in a welfare State are manifold, all of which cannot be said to be the activities relating to exercise of sovereign powers. The functions of the State not only relate to the defence of the country or the administration of justice, but they extend to many other spheres *b* as, for example, education, commercial, social, economic, political and even marital. These activities cannot be said to be related to sovereign power. Running of the Railways is a commercial activity. Establishing the Yatri Niwas at various railway stations to provide lodging and boarding facilities to passengers on payment of charges is a part of the commercial activity of the Union of India and this activity cannot be equated with the exercise of sovereign *c* power. The employees of the Union of India who are deputed to run the Railways and to manage the establishment, including the railway stations and the Yatri Niwas, are essential components of the government machinery which carries on the commercial activity. If any of such employees commits an act of tort, the Union Government, of which they are the employees, can, subject to other legal requirements being satisfied, be held vicariously liable in damages to the person wronged by those employees. *Kasturi Lal decision,* therefore, cannot *d* be pressed into aid. As observed in *Common Cause* v. *Union of India,* (1999) 6 SCC 667 the efficacy of *Kasturi Lal case* as a binding precedent has been eroded. Moreover, the present case is one under the public law domain and not in a suit instituted under the private law domain against persons who, utilising their official position, got a room in the Yatri Niwas booked in their own name where the act complained of was committed.                   (Paras 38, 41 and 42) *e*

> *State of Rajasthan* v. *Vidhyawati,* AIR 1962 SC 933 : 1962 Supp (2) SCR 989; *State of Gujarat* v. *Memon Mahomed Haji Hasan,* AIR 1967 SC 1885 : (1967) 3 SCR 838; *Basavva Kom Dyamangouda Patil* v. *State of Mysore,* (1977) 4 SCC 358 : 1977 SCC (Cri) 598 : AIR 1977 SC 1749; *N. Nagendra Rao & Co.* v. *State of A.P.,* (1994) 6 SCC 205 : 1994 SCC (Cri) 1609 : AIR 1994 SC 2663; *State of Maharashtra* v. *Kanchanmala Vijaysing Shirke,* (1995) 5 SCC 659 : 1995 SCC (Cri) 1002 : 1995 ACJ 1021 : JT (1995) 6 SC 155, *relied on*
>
> *Kasturi Lal Ralia Ram Jain* v. *State of U.P.,* AIR 1965 SC 1039 : (1965) 1 SCR 375, *limited* *f*

The amount of compensation shall be made over to the High Commissioner for Bangladesh in India for payment to the victim. The payment to the High Commissioner shall be made within three months.                   (Para 43)

R-M/TZ/22156/C *g*

**Suggested Case Finder Search Text** (*inter alia*) :

tort* {state or govt. or government or public or sovereign} {compensation* or liab*}

Advocates who appeared in this case :

R.N. Trivedi and K.N. Raval, Additional Solicitor Generals and Raju Ramachandran, Senior Advocate (Ashok Kr. Srivastava, Ms Sushma Suri, R.N. Verma, D.S. Mahra, W.A. Quadri, A.S. Rawat, A. Subhashini, Ms Naina Kapoor, Ms Meenakshi Arora, *h* Ms Priya Rao, Naila Ansari and A.K. Thiruengadam, Advocates, with them) for the appearing parties.


SCC Online Web Edition, Copyright © 2015
Page 1 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

CHAIRMAN, RAILWAY BOARD v. CHANDRIMA DAS     471

*Chronological list of cases cited*     *on page(s)*

1. (1999) 6 SCC at p. 754 : (1996) 7 Scale (SP) 13, *Kaushalya* v. *State of Punjab* — 477a
2. (1999) 6 SCC 667 : 1999 SCC (Cri) 1196 : AIR 1999 SC 2979 : JT (1999) 5 SC 237, *Common Cause, A Regd. Society* v. *Union of India* — 475b-c, 485e
3. (1997) 6 SCC 370 : AIR 1998 SC 223 : (1997) 4 Scale 350, *Munju Bhatia* v. *New Delhi Municipal Council* — 477a-b
4. (1997) 3 SCC 433 : 1997 SCC (Cri) 434 : AIR 1997 SC 1203, *People's Union for Civil Liberties* v. *Union of India* — 477a
5. (1997) 1 SCC 416 : 1997 SCC (Cri) 92 : AIR 1997 SC 610, *D.K. Basu* v. *State of W.B.* — 476f
6. (1996) 4 SCC 37 : AIR 1996 SC 2426, *Paschim Banga Khet Mazdoor Samity* v. *State of W.B.* — 477a
7. (1996) 3 All ER 871, *Salomon* v. *Commr. of Customs and Excise* — 481f
8. (1996) 1 SCC 490 : 1996 SCC (Cri) 133, *Bodhisattwa Gautam* v. *Subhra Chakraborty* — 477c, 484e
9. (1995) 5 SCC 659 : 1995 SCC (Cri) 1002 : 1995 ACJ 1021 : JT (1995) 6 SC 155, *State of Maharashtra* v. *Kanchanmala Vijaysing Shirke* — 485c
10. (1995) 4 SCC 262 : 1995 SCC (Cri) 715 : 1995 3 Scale 343, *State of M.P.* v. *Shyamsunder Trivedi* — 477a
11. (1995) 3 SCC 702 : 1995 SCC (L&S) 857 : 1995 SCC (Cri) 586 : (1995) 30 ATC 122 : AIR 1995 SC 1949, *Inder Singh* v. *State of Punjab* — 476f
12. 1995 Supp (4) SCC 450 : 1994 SCC (Cri) 1464 : JT (1992) 6 SC 271 : (1992) 3 Scale 34, *Death of Sawinder Singh Grower, Re* — 476e-f
13. (1994) 6 SCC 565 : 1995 SCC (Cri) 29 : AIR 1995 SC 117, *Arvinder Singh Bagga* v. *State of U.P.* — 476e-f
14. (1994) 6 SCC 205 : 1994 SCC (Cri) 1609 : AIR 1994 SC 2663, *N. Nagendra Rao & Co.* v. *State of A.P.* — 485c
15. (1994) 3 SCC 430 : 1994 SCC (Cri) 774 : (1994) 2 Scale 563, *Jacob George (Dr)* v. *State of Kerala* — 477a
16. (1993) 2 SCC 746 : 1993 SCC (Cri) 527 : (1993) 2 SCR 581 : AIR 1993 SC 1960, *Nilabati Behera* v. *State of Orissa* — 477a
17. (1991) 4 SCC 54 : AIR 1991 SC 1902 : (1991) 3 SCR 102, *Bangalore Medical Trust* v. *B.S. Muddappa* — 479a
18. (1991) 3 SCC 482 : 1991 SCC (Cri) 639, *Supreme Court Legal Aid Committee* v. *State of Bihar* — 477a
19. (1991) 1 All ER 720 (HL), *Brind* v. *Secy. of State for the Home Deptt.* — 481f-g
20. (1990) 1 SCC 568 : 1990 SCC (Cri) 227 : AIR 1990 SC 605, *Kubic Darusz* v. *Union of India* — 483d-e
21. (1990) 1 SCC 422 : 1990 SCC (Cri) 145 : 1989 Supp (2) SCR 488 : AIR 1990 SC 513, *Saheli, A Women's Resources Centre* v. *Commr. of Police* — 476e-f
22. (1989) 4 SCC 730 : 1990 SCC (Cri) 75 : (1989) 1 Scale 599, *Peoples' Union for Democratic Rights* v. *Police Commr., Delhi Police Headquarters* — 476e
23. 1989 Supp (2) SCC 716 : 1991 SCC (Cri) 228, *P. Rathinam* v. *Union of India* — 476e-f
24. (1987) 1 SCC 265 : 1987 SCC (Cri) 58 : (1987) 1 SCR 631 : AIR 1987 SC 355, *Peoples' Union for Democratic Rights* v. *State of Bihar* — 476e
25. (1986) 1 SCC 264 : AIR 1986 SC 1370 : 1985 Supp (3) SCR 909, *LIC of India* v. *Escorts Ltd.* — 476a


SCC Online Web Edition, Copyright © 2015
Page 3 of 9 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

26. (1985) 4 SCC 677 : 1986 SCC (Cri) 47 : AIR 1986 SC 494, *Bhim Singh* v.
    *State of J&K*                                                      476*e*
27. (1985) 3 SCC 169 : AIR 1985 SC 910, *State of H.P.* v. *A Parent of a Student*
    *of Medical College*                                            *a*479*g-h*
28. (1984) 3 SCC 161 : 1984 SCC (L&S) 389 : AIR 1984 SC 802 : (1984) 2
    SCR 67, *Bandhua Mukti Morcha* v. *Union of India*          478*g-h*, 484*a*
29. (1983) 4 SCC 141 : 1983 SCC (Cri) 798 : AIR 1983 SC 1086 : (1983) 3
    SCR 508, *Rudul Sah* v. *State of Bihar*                            476*e*
30. (1983) 3 SCC 387 : 1983 SCC (L&S) 391 : 1983 SCC (Cri) 667 : AIR 1983
    SC 803 : (1983) 3 SCR 337, *State of Maharashtra* v.              *b*
    *Chandrabhan Tale*                                               484*f-g*
31. (1983) 1 SCC 124 : 1983 SCC (L&S) 61 : AIR 1983 SC 109 : (1983) 1 SCR
    828, *Board of Trustees of the Port of Bombay* v. *Dilipkumar*
    *Raghavendranath Nadkarni*                                         484*a*
32. (1982) 3 SCC 235 : 1982 SCC (L&S) 275 : AIR 1982 SC 1473, *People's*
    *Union for Democratic Rights* v. *Union of India*                 478*g*
33. 1981 Supp SCC 87 : AIR 1982 SC 149, *S.P. Gupta* v. *Union of India*   *c* 478*c*
34. (1978) 1 SCC 248 : AIR 1978 SC 597 : (1978) 2 SCR 621, *Maneka Gandhi*
    v. *Union of India*                                                484*a*
35. (1977) 4 SCC 358 : 1977 SCC (Cri) 598 : AIR 1977 SC 1749, *Basavva Kom*
    *Dyamangouda Patil* v. *State of Mysore*                      485*c*, 485*d*
36. AIR 1974 All 313 : 1973 All LJ 832, *Laxmi Prasad* v. *Shiv Pal*     483*a-b*
37. (1973) 2 SCC 696 : 1973 SCC (Cri) 1002 : AIR 1973 SC 2720,
    *Satyanarayana Sinha (Dr)* v. *S. Lal & Co. (P) Ltd.*           *d*478*b-c*
38. (1971) 3 SCC 104 : AIR 1971 SC 337 : (1971) 1 SCR 637, *Anwar* v. *State of*
    *J&K*                                                         483*a*, 483*b*
39. AIR 1967 SC 1885 : (1967) 3 SCR 838, *State of Gujarat* v. *Memon*
    *Mahomed Haji Hasam*                                          485*c*, 485*d*
40. AIR 1965 SC 1039 : (1965) 1 SCR 375, *Kasturi Lal Ralia Ram Jain* v. *State*
    *of U.P.*                              485*d*, 485*d-e*, 485*e*, 485*e-f*, 486*b*
41. AIR 1965 Cal 312 : (1965) 1 Cri LJ 679, *Sk. Md. Soleman* v. *State of W.B.*  483*a-b*
42. AIR 1963 SC 1811 : (1964) 4 SCR 99, *STC of India Ltd.* v. *CTO*     483*h*
43. AIR 1963 SC 1295 : (1964) 1 SCR 332, *Kharak Singh* v. *State of U.P.*   483*f*
44. AIR 1962 SC 933 : 1962 Supp (2) SCR 989, *State of Rajasthan* v.
    *Vidhyawati*                                                       485*b*
45. AIR 1957 MB 1, *Naziranbai* v. *State*                           483*a-b*
46. AIR 1955 SC 367, 374 : (1955) 1 SCR 1284, *Hans Muller of Nuremberg* v.  *f*
    *Supdt., Presidency Jail*                                          483*a*

The Judgment of the Court was delivered by

S. SAGHIR AHMAD, J.— Leave granted.

**2.** Mrs Chandrima Das, a practising advocate of the Calcutta High Court,
filed a petition under Article 226 of the Constitution against the Chairman,
Railway Board; General Manager, Eastern Railway; Divisional Railway
Manager, Howrah Division; Chief Commercial Manager, Eastern Railway;
State of West Bengal through the Chief Secretary; Home Secretary,
Government of West Bengal; Superintendent of Police (Railways), Howrah;
Superintendent of Police, Howrah; Director General of Police, West Bengal
and many other officers including the Deputy High Commissioner, Republic
of Bangladesh; claiming compensation for the victim, Smt Hanuffa Khatoon,
a Bangladeshi national who was gang-raped by many including employees of

SCC Online Web Edition, Copyright © 2015
Page 5 of 9  Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

the Railways in a room at Yatri Niwas at Howrah Station of the Eastern Railway regarding which GRPS Case No. 19 of 1998 was registered on 27-2-1998. Mrs Chandrima Das also claimed several other reliefs including a direction to the respondents to eradicate anti-social and criminal activities at Howrah Railway Station.

**3.** The facts as noticed by the High Court in the impugned judgment are as follows:

"Respondents Railways and the Union of India have admitted that amongst the main accused you are employees of the Railways and if the prosecution version is proved in accordance with law, they are perpetrators of the heinous crime of gang-rape repeatedly committed upon the hapless victim Hanuffa Khatoon. It is not in dispute that Hanuffa came from Bangladesh. She at the relevant time was the elected representative of the Union Board. She arrived at Howrah Railway Station on 26th February, 1998 at about 1400 hours to avail Jodhpur Express at 2300 hours for paying a visit to Ajmer Sharif. With that intent in mind, she arrived at Calcutta on 24th February, 1998 and stayed at a hotel at 10, Sudder Street, Police Station Taltola and came to Howrah Station on the date and time aforementioned. She had, however, a waitlisted ticket and so she approached a Train Ticket Examiner at the station for confirmation of berth against her ticket. The Train Ticket Examiner asked her to wait in the Ladies' Waiting Room. She accordingly came to the Ladies' Waiting Room and rested there.

At about 1700 hours on 26th February, 1998 two unknown persons (later identified as one Ashoke Singh, a tout who posed himself as a very influential person of the Railways and Siya Ram Singh, a railway ticket broker having good acquaintance with some of the railway staff of Howrah Station) approached her, took her ticket and returned the same after confirming reservation in Coach No. S-3 (Berth No. 17) of Jodhpur Express. At about 2000 hours Siya Ram Singh came again to her with a boy named Kashi and told her to accompany the boy to a restaurant if she wanted to have food for the night. Accordingly at about 2100 hours she went to a nearby eating house with Kashi and had her meal there. Soon after she had taken her meal, she vomited and came back to the Ladies' Waiting Room. At about 2100 hours Ashoke Singh along with Rafi Ahmed, a Parcel Supervisor at Howrah Station came to the Ladies' Niwas before boarding the train. She appeared to have some doubt initially but on being certified by the lady attendants engaged on duty at the Ladies' Waiting Room about their credentials she accompanied them to Yatri Niwas. Sita Ram Singh, a khalasi of Electric Department of Howrah Station joined them on the way to Yatri Niwas. She was taken to Room No. 102 on the first floor of Yatri Niwas. The room was booked in the name of Ashoke Singh against Railway Card Pass No. 3638 since 25th February, 1998. In Room No. 102 two other persons viz. one Lalan Singh, Parcel Clerk of Howrah Railway Station and Awdesh Singh, Parcel Clearing Agent were waiting. Hanuffa Khatoon suspected

SCC Online Web Edition, Copyright © 2015
Page 16 of 5 Thursday, March 19, 2019
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

something amiss when Ashoke Singh forced her into the room. Awdesh Singh bolted the room from outside and stood on guard outside the room. The remaining four persons viz. Ashoke, Lalan, Rafi and Sita Ram took a liquor inside the room and also forcibly compelled her to consume liquor. All the four persons who were present inside the room brutally violated Hanuffa Khatoon, who, it is said, was in a state of shock and daze. When she could recover she managed to escape from the room of Yatri Niwas and came back to the platform where again she met Siya Ram Singh and found him talking to Ashoke Singh. Seeing her plight b Siya Ram Singh pretended to be her saviour and also abused and slapped Ashoke Singh. Since it was well past midnight and Jodhpur Express had already departed, Siya Ram requested Hanuffa Khatoon to accompany him to his residence to rest for the night with his wife and children. He assured her to help entrain Poorva Express on the following morning. Thereafter Siya Ram accompanied by Ram Samiran Sharma, a friend of c Siya Ram took her to the rented flat of Ram Samiran Sharma at 66, Pathuriaghata Street, Police Station Jorabagan, Calcutta. There Siya Ram raped Hanuffa and when she protested and resisted violently Siya Ram and Ram Samiran Sharma gagged her mouth and nostrils intending to kill her; as a result Hanuffa bled profusely. On being informed by the landlord of the building following the hue and cry raised by Hanuffa d Khatoon, she was rescued by Jorabagan Police."

**4.** It was on the basis of the above facts that the High Court had awarded a sum of Rs 10 lakhs as compensation for Smt Hanuffa Khatoon as the High Court was of the opinion that the rape was committed at the building (Rail Yatri Niwas) belonging to the Railways and was perpetrated by the railway employees.                                                                              e

**5.** In the present appeal, we are not concerned with the many directions issued by the High Court. The only question argued before us was that the Railways would not be liable to pay compensation to Smt Hanuffa Khatoon who was a foreigner and was not an Indian national. It is also contended that commission of the offence by the person concerned would not make the Railways or the Union of India liable to pay compensation to the victim of f the offence. It is contended that since it was the individual act of those persons, they alone would be prosecuted and on being found guilty would be punished and may also be liable to pay fine or compensation, but having regard to the facts of this case, the Railways, or, for that matter, the Union of India would not even be vicariously liable. It is also contended that for claiming damages for the offence perpetrated on Smt Hanuffa Khatoon, the g remedy lay in the domain of private law and not under public law and, therefore, no compensation could have been legally awarded by the High Court in proceedings under Article 226 of the Constitution and, that too, at the instance of a practising advocate who, in no way, was concerned or connected with the victim.

**6.** We may first dispose of the contention raised on behalf of the h appellants that proceedings under Article 226 of the Constitution could not

SCC Online Web Edition, Copyright © 2015
Page 1, 15 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

have been legally initiated for claiming damages from the Railways for the offence of rape committed on Smt Hanuffa Khatoon and that Smt Hanuffa Khatoon herself should have approached the court in the realm of private law so that all the questions of fact could have been considered on the basis of the evidence adduced by the parties to record a finding whether all the ingredients of the commission of "tort" against the person of Smt Hanuffa Khatoon were made out, so as to be entitled to the relief of damages. We may also consider the question of locus standi as it is contended on behalf of the appellants that Mrs Chandrima Das, who is a practising advocate of the High Court of Calcutta, could not have legally instituted these proceedings.

**7.** The distinction between "public law" and "private law" was considered by a three-Judge Bench of this Court in *Common Cause, A Regd. Society* v. *Union of India*[1] in which it was, inter alia, observed as under: (SCC p. 701, paras 39-40)

"*39.* Under Article 226 of the Constitution, the High Court has been given the power and jurisdiction to issue appropriate writs in the nature of mandamus, certiorari, prohibition, quo warranto and habeas corpus for the enforcement of fundamental rights or for any other purpose. Thus, the High Court has jurisdiction not only to grant relief for the enforcement of fundamental rights but also for 'any other purpose' which would include the enforcement of public duties by public bodies. So also, the Supreme Court under Article 32 has the jurisdiction to issue prerogative writs for the enforcement of fundamental rights guaranteed to a citizen under the Constitution.

*40.* Essentially, under public law, it is the dispute between the citizen or a group of citizens on the one hand and the State or other public bodies on the other, which is resolved. This is done to maintain the rule of law and to prevent the State or the public bodies from acting in an arbitrary manner or in violation of that rule. The exercise of constitutional powers by the High Court and the Supreme Court under Articles 226 and 32 has been categorised as power of 'judicial review'. Every executive or administrative action of the State or other statutory or public bodies is open to judicial scrutiny and the High Court or the Supreme Court can, in exercise of the power of judicial review under the Constitution, quash the executive action or decision which is contrary to law or is violative of fundamental rights guaranteed by the Constitution. With the expanding horizon of Article 14 read with other articles dealing with fundamental rights, every executive action of the Government or other public bodies, including instrumentalities of the Government, or those which can be legally treated as 'authority' within the meaning of Article 12, if arbitrary, unreasonable or contrary to law, is now amenable to the writ jurisdiction of this Court under Article 32 or the High Courts under Article 226 and can be validly scrutinised on the touchstone of the constitutional mandates."

1 (1999) 6 SCC 667 : 1999 SCC (Cri) 1196 : AIR 1999 SC 2979 : JT (1999) 5 SC 237


SCC Online Web Edition, Copyright © 2015
Page 1 of 5 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**8.** The earlier decision, namely, *LIC of India* v. *Escorts Ltd.*[2] in which it was observed as under: (SCC p. 344, para 102)

> "Broadly speaking, the Court will examine actions of State if they pertain to the public law domain and refrain from examining them if they pertain to the private law field. The difficulty will lie in demarcating the frontier between the public law domain and the private law field. It is impossible to draw the line with precision and we do not want to attempt it. The question must be decided in each case with reference to the particular action, the activity in which the State or the instrumentality of the State is engaged when performing the action, the public law or private law character of the action and a host of other relevant circumstances."

was relied upon.

**9.** Various aspects of the public law field were considered. It was found that though initially a petition under Article 226 of the Constitution relating to contractual matters was held not to lie, the law underwent a change by subsequent decisions and it was noticed that even though the petition may relate essentially to a contractual matter, it would still be amenable to the writ jurisdiction of the High Court under Article 226. The public law remedies have also been extended to the realm of tort. This Court, in its various decisions, has entertained petitions under Article 32 of the Constitution on a number of occasions and has awarded compensation to the petitioners who had suffered personal injuries at the hands of the officers of the Government. The causing of injuries, which amounted to tortious act, was compensated by this Court in many of its decisions beginning from *Rudul Sah* v. *State of Bihar*[3]. (See also *Bhim Singh* v. *State of J&K*[4], *Peoples' Union for Democratic Rights* v. *State of Bihar*[5], *Peoples' Union for Democratic Rights* v. *Police Commr., Delhi Police Headquarters*[6], *Saheli, A Women's Resources Centre* v. *Commr. of Police*[7], *Arvinder Singh Bagga* v. *State of U.P.*[8], *P. Rathinam* v. *Union of India*[9], *Death of Sawinder Singh Grower In re*[10], *Inder Singh* v. *State of Punjab*[11] and *D.K. Basu* v. *State of W.B.*[12])

**10.** In cases relating to custodial deaths and those relating to medical negligence, this Court awarded compensation under the public law domain in

2 (1986) 1 SCC 264 : AIR 1986 SC 1370 : 1985 Supp (3) SCR 909

3 (1983) 4 SCC 141 : 1983 SCC (Cri) 798 : AIR 1983 SC 1086 : (1983) 3 SCR 508

4 (1985) 4 SCC 677 : 1986 SCC (Cri) 47 : AIR 1986 SC 494

5 (1987) 1 SCC 265 : 1987 SCC (Cri) 58 : (1987) 1 SCR 631 : AIR 1987 SC 355

6 (1989) 4 SCC 730 : 1990 SCC (Cri) 75 : (1989) 1 Scale 599

7 (1990) 1 SCC 422 : 1990 SCC (Cri) 145 : 1989 Supp (2) SCR 488 : AIR 1990 SC 513

8 (1994) 6 SCC 565 : 1995 SCC (Cri) 29 : AIR 1995 SC 117

9 1989 Supp (2) SCC 716 : 1991 SCC (Cri) 228

10 1995 Supp (4) SCC 450 : 1994 SCC (Cri) 1464 : JT (1992) 6 SC 271 : (1992) 3 Scale 34

11 (1995) 3 SCC 702 : 1995 SCC (L&S) 857 : 1995 SCC (Cri) 586 : (1995) 30 ATC 139 : AIR 1995 SC 1949

12 (1997) 1 SCC 416 : 1997 SCC (Cri) 92 : AIR 1997 SC 610

SCC Online Web Edition, Copyright © 2015
Page 1.5 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Nilabati Behera* v. *State of Orissa*[13], *State of M.P.* v. *Shyamsunder Trivedi*[14], *People's Union for Civil Liberties* v. *Union of India*[15] and *Kaushalya* v. *State of Punjab*[16], *Supreme Court Legal Aid Committee* v. *State of Bihar*[17], *Jacob George (Dr)* v. *State of Kerala*[18], *Paschim Banga Khet Mazdoor Samity* v. *State of W.B.*[19] and *Manju Bhatia* v. *New Delhi Municipal Council*[20].

**11.** Having regard to what has been stated above, the contention that Smt Hanuffa Khatoon should have approached the civil court for damages and the matter should not have been considered in a petition under Article 226 of the Constitution, cannot be accepted. Where public functionaries are involved and the matter relates to the violation of fundamental rights or the enforcement of public duties, the remedy would still be available under the public law notwithstanding that a suit could be filed for damages under private law.

**12.** In the instant case, it is not a mere matter of violation of an ordinary right of a person but the violation of fundamental rights which is involved. Smt Hanuffa Khatoon was a victim of rape. This Court in *Bodhisattwa Gautam* v. *Subhra Chakraborty*[21] has held "rape" as an offence which is violative of the fundamental right of a person guaranteed under Article 21 of the Constitution. The Court observed as under: (SCC p. 500, para 10)

> Rape is a crime not only against the person of a woman, it is a crime against the entire society. It destroys the entire psychology of a woman and pushes her into deep emotional crisis. Rape is, therefore, the most hated crime. It is a crime against basic human rights and is violative of the victim's most cherished right, namely, right to life which includes right to live with human dignity contained in Article 21.

**13.** Rejecting, therefore, the contention of the learned counsel for the appellants that the petition under public law was not maintainable, we now proceed to his next contention relating to the locus standi of the respondent, Mrs Chandrima Das, in filing the petition.

**14.** The main contention of the learned counsel for the appellants is that Mrs Chandrima Das was only a practising advocate of the Calcutta High Court and was, in no way, connected or related to the victim, Smt Hanuffa Khatoon and, therefore, she could not have filed a petition under Article 226 for damages or compensation being awarded to Smt Hanuffa Khatoon on account of the rape committed on her. This contention is based on a misconception. Learned counsel for the appellants is under the impression

13  (1993) 2 SCC 746 : 1993 SCC (Cri) 527 : (1993) 2 SCR 581 : AIR 1993 SC 1960
14  (1995) 4 SCC 262 : 1995 SCC (Cri) 715 : 1995 3 Scale 343
15  (1997) 3 SCC 433 : 1997 SCC (Cri) 434 : AIR 1997 SC 1203
16  (1999) 6 SCC at p. 754 : (1996) 7 Scale (SP) 13
17  (1991) 3 SCC 482 : 1991 SCC (Cri) 639
18  (1994) 3 SCC 430 : 1994 SCC (Cri) 774 : (1994) 2 Scale 563
19  (1996) 4 SCC 37 : AIR 1996 SC 2426
20  (1997) 6 SCC 370 : AIR 1998 SC 223 : (1997) 4 Scale 350
21  (1996) 1 SCC 490 : 1996 SCC (Cri) 133


SCC Online Web Edition, Copyright © 2015
Page 1 of 3 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

that the petition filed before the Calcutta High Court was only a petition for damages or compensation for Smt Hanuffa Khatoon. As a matter of fact, the reliefs which were claimed in the petition included the relief for compensation. But many other reliefs as, for example, relief for eradicating anti-social and criminal activities of various kinds at Howrah Railway Station were also claimed. The true nature of the petition, therefore, was that of a petition filed in public interest.

**15.** The existence of a legal right, no doubt, is the foundation for a petition under Article 226 and a bare interest, maybe of a minimum nature, may give locus standi to a person to file a writ petition, but the concept of "locus standi" has undergone a sea change, as we shall presently notice. In *Satyanarayana Sinha (Dr)* v. *S. Lal & Co. (P) Ltd.*[22] it was held that the foundation for exercising jurisdiction under Article 32 or Article 226 is ordinarily the personal or individual right of the petitioner himself. In writs like habeas corpus and quo warranto, the rule has been relaxed and modified.

**16.** In *S.P. Gupta* v. *Union of India*[23] the law relating to locus standi was explained so as to give a wider meaning to the phrase. This Court laid down (at SCC p. 220, para 26) that

practising lawyers have undoubtedly a vital interest in the independence of the judiciary; they would certainly be interested in challenging the validity or constitutionality of an action taken by the State or any public authority which has the effect of impairing the independence of the judiciary.

It was further observed that

lawyer's profession was an essential and integral part of the judicial system; they could figuratively be described as priests in the temple of justice. They have, therefore, a special interest in preserving the integrity and independence of the judicial system; they are equal partners with the Judges in the administration of justice. The lawyers, either in their individual capacity or as representing some lawyers' associations have the locus standi to challenge the circular letter addressed by the Union Law Minister to the Governors and Chief Ministers directing that one-third of the Judges of the High Court should, as far as possible, be from outside the State.

**17.** In the context of public interest litigation, however, the Court in its various judgments has given the widest amplitude and meaning to the concept of locus standi. In *People's Union for Democratic Rights* v. *Union of India*[24] it was laid down that public interest litigation could be initiated not only by filing formal petitions in the High Court but even by sending letters and telegrams so as to provide easy access to court. (See also *Bandhua Mukti Morcha* v. *Union of India*[25] and *State of H.P.* v. *A Parent of a Student of*

22 (1973) 2 SCC 696 : 1973 SCC (Cri) 1002 : AIR 1973 SC 2720
23 1981 Supp SCC 87 : AIR 1982 SC 149
24 (1982) 3 SCC 235 : 1982 SCC (L&S) 275 : AIR 1982 SC 1473
25 (1984) 3 SCC 161 : 1984 SCC (L&S) 389 : AIR 1984 SC 802 : (1984) 2 SCR 67

SCC Online Web Edition, Copyright © 2015
Page 15, Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Medical College*[26] on the right to approach the court in the realm of public interest litigation.) In *Bangalore Medical Trust* v. *B.S. Muddappa*[27] the Court held that the restricted meaning of aggrieved person and the narrow outlook of a specific injury has yielded in favour of a broad and wide construction in the wake of public interest litigation. The Court further observed that public-spirited citizens having faith in the rule of law are rendering great social and legal service by espousing causes of public nature. They cannot be ignored or overlooked on a technical or conservative yardstick of the rule of locus standi or the absence of personal loss or injury. There has, thus, been a spectacular expansion of the concept of locus standi. The concept is much wider and it takes in its stride anyone who is not a mere "busybody".

**18.** Having regard to the nature of the petition filed by respondent Mrs Chandrima Das and the relief claimed therein it cannot be doubted that this petition was filed in public interest which could legally be filed by the respondent and the argument that she could not file that petition as there was nothing personal to her involved in that petition must be rejected.

**19.** It was next contended by the learned counsel appearing on behalf of the appellants that Smt Hanuffa Khatoon was a foreign national and, therefore, no relief under public law could be granted to her as there was no violation of the fundamental rights available under the Constitution. It was contended that the fundamental rights in Part III of the Constitution are available only to citizens of this country and since Smt Hanuffa Khatoon was a Bangladeshi national, she cannot complain of the violation of fundamental rights and on that basis she cannot be granted any relief. This argument must also fail for two reasons: first, on the ground of domestic jurisprudence based on constitutional provisions and secondly, on the ground of human rights jurisprudence based on the Universal Declaration of Human Rights, 1948, which has the international recognition as the "Moral Code of Conduct" having been adopted by the General Assembly of the United Nations.

**20.** We will come to the question of domestic jurisprudence a little later as we intend to first consider the principles and objects behind the Universal Declaration of Human Rights, 1948, as adopted and proclaimed by the United Nations General Assembly Resolution of 10-12-1948. The Preamble, inter alia, sets out as under:

> "WHEREAS recognition of the INHERENT DIGNITY and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world.

> WHEREAS disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people.

26 (1985) 3 SCC 169 : AIR 1985 SC 910
27 (1991) 4 SCC 54 : AIR 1991 SC 1902 : (1991) 3 SCR 102

SCC Online Web Edition, Copyright © 2015
Page 15-5-CV-00022-ASR March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

480                    SUPREME COURT CASES          (2000) 2 SCC

WHEREAS it is essential to promote the development of friendly relations between nations.

WHEREAS the people of the United Nations have in the Charter affirmed their faith in fundamental human rights, IN THE DIGNITY AND WORTH OF THE HUMAN PERSON AND IN THE EQUAL RIGHTS OF MEN AND WOMEN and have determined to promote social progress and better standards of life in larger freedom.

WHEREAS member States have pledged themselves to achieve, in cooperation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms.

WHEREAS a common understanding of these rights and freedoms is of the greatest importance for the full realisation of this pledge."

**21.** Thereafter, the Declaration sets out, inter alia, in various articles, the following:

"1. All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

2. Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, NATIONAL OR SOCIAL ORIGIN, PROPERTY, BIRTH OR OTHER STATUS.

Furthermore, NO DISTINCTION SHALL BE MADE ON THE BASIS OF THE POLITICAL, JURISDICTIONAL OR INTERNATIONAL STATUS OF THE COUNTRY OR TERRITORY to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

3. Everyone has the right to life, liberty and security of person.

           *           *           *

5. No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

           *           *           *

7. All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

           *           *           *

9. No one shall be subjected to arbitrary arrest, detention or exile."

**22.** Apart from the above, the General Assembly also while adopting the Declaration on the Elimination of Violence against Women, by its resolution dated 20-12-1993, observed in Article 1 that

" 'violence against women' means any act of gender-based violence that results in, or is likely to result in, physical, sexual or psychological harm or suffering to women, including threats of such acts, coercion or


SCC Online Web Edition, Copyright © 2015
Page 1 of 1 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

arbitrary deprivation of liberty, whether occurring in public or in private life".

*a* In Article 2, it was specified that :

"... violence against women shall be understood to encompass, but not be limited to:

(*a*) physical, sexual and psychological violence occurring in the family including battering, sexual abuse of female children in the household, dowry-related violence, marital rape, female genital
*b* mutilation and other traditional practices harmful to women, non-spousal violence and violence related to exploitation;

(*b*) physical, sexual and psychological violence occurring within the general community, including rape, sexual abuse, sexual harassment and intimidation at work, in educational institutions and elsewhere,
*c* trafficking in women and forced prostitution;

(*c*) physical, sexual and psychological violence perpetrated or condoned by the State, wherever it occurs."

**23.** In Article 3, it was specified that:

"... women are entitled to the equal enjoyment and protection of all human rights, which would include, inter alia:

*d*     (*a*) the right to life,

    (*b*) the right to equality, and

    (*c*) the right to liberty and security of person."

**24.** The International Covenants and Declarations as adopted by the United Nations have to be respected by all signatory States and the meaning
*e* given to the above words in those Declarations and Covenants have to be such as would help in effective implementation of those rights. The applicability of the Universal Declaration of Human Rights and the principles thereof may have to be read, if need be, into the domestic jurisprudence.

**25.** Lord Diplock in *Salomon* v. *Commr. of Customs and Excise*[28] said
*f* that there is a prima facie presumption that Parliament does not intend to act in breach of international law, including specific treaty obligations. So also, Lord Bridge in *Brind* v. *Secy. of State for the Home Deptt.*[29] observed that it was well settled that, in construing any provision in domestic legislation which was ambiguous in the sense that it was capable of a meaning which either conforms to or conflicts with the International Convention, the courts
*g* would presume that Parliament intended to legislate in conformity with the Convention and not in conflict with it.

**26.** The domestic application of international human rights and norms was considered by the Judicial Colloquia (Judges and Lawyers) at Bangalore in 1988. It was later affirmed by the Colloquia that it was the vital duty of an

*h*
28 (1996) 3 All ER 871
29 (1991) 1 All ER 720 (HL)

SCC Online Web Edition, Copyright © 2015
Page 103 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

independent judiciary to interpret and apply national Constitutions in the light of those principles. Further Colloquia were convened in 1994 at Zimbabwe, in 1996 at Hong Kong and in 1997 at Guyana and in all those Colloquia, the question of domestic application of international and regional human rights specially in relation to women, was considered. The Zimbabwe Declaration 1994, inter alia, stated:

> "Judges and lawyers have duty to familiarise themselves with the growing international jurisprudence of human rights and particularly with the expanding material on the protection and promotion of the human rights of women."

But this situation may not really arise in our country.

**27.** Our Constitution guarantees all the basic and fundamental human rights set out in the Universal Declaration of Human Rights, 1948, to its citizens and other persons. The chapter dealing with the fundamental rights is contained in Part III of the Constitution. The purpose of this Part is to safeguard the basic human rights from the vicissitudes of political controversy and to place them beyond the reach of the political parties who, by virtue of their majority, may come to form the Government at the Centre or in the State.

**28.** The fundamental rights are available to all the "citizens" of the country but a few of them are also available to "persons". While Article 14, which guarantees equality before law or the equal protection of laws within the territory of India, is applicable to "person" which would also include the "citizen" of the country and "non-citizen", both, Article 15 speaks only of "citizen" and it is specifically provided therein that there shall be no discrimination against any "citizen" on the ground only of religion, race, caste, sex, place of birth or any of them nor shall any citizen be subjected to any disability, liability, restriction or condition with regard to access to shops, public restaurants, hotels and places of public entertainment, or the use of wells, tanks, bathing ghats, roads and places of public resort on the aforesaid grounds. Fundamental right guaranteed under Article 15 is, therefore, restricted to "citizens". So also, Article 16 which guarantees equality of opportunity in matters of public employment is applicable only to "citizens". The fundamental rights contained in Article 19, which contains the right to "basic freedoms", namely, freedom of speech and expression; freedom to assemble peaceably and without arms; freedom to form associations or unions; freedom to move freely throughout the territory of India; freedom to reside and settle in any part of the territory of India and freedom to practise any profession, or to carry on any occupation, trade or business, are available only to "citizens" of the country.

**29.** The word "citizen" in Article 19 has not been used in a sense different from that in which it has been used in Part II of the Constitution dealing with "citizenship". (See *STC of India Ltd.* v. *CTO*[30].) It has also been held in this case that the words "all citizens" have been deliberately used to

30. AIR 1963 SC 1811 : (1964) 4 SCR 99

SCC Online Web Edition, Copyright © 2015
Page 115 : Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

keep out all "non-citizens" which would include "aliens". It was laid down in *Hans Muller of Nuremberg* v. *Supdt., Presidency Jail*[31] AIR at p. 374 that this article applies only to "citizens". In another decision in *Anwar* v. *State of J&K*[32] it was held that non-citizens could not claim fundamental rights under Article 19. In *Naziranbai* v. *State*[33] and *Laxmi Prasad* v. *Shiv Pal*[34] it was held that Article 19 does not apply to a "foreigner". The Calcutta High Court in *Sk. Md. Soleman* v. *State of W.B.*[35] held that Article 19 does not apply to a Commonwealth citizen.

**30.** In *Anwar* v. *State of J&K*[32] (already referred to above), it was held that the rights under Articles 20, 21 and 22 are available not only to "citizens" but also to "persons" which would include "non-citizens".

**31.** Article 20 guarantees right to protection in respect of conviction for offences. Article 21 guarantees right to life and personal liberty while Article 22 guarantees right to protection against arbitrary arrest and detention. These are wholly in consonance with Article 3, Article 7 and Article 9 of the Universal Declaration of Human Rights, 1948.

**32.** The word "LIFE" has also been used prominently in the Universal Declaration of Human Rights, 1948. (See Article 3 quoted above.) The fundamental rights under the Constitution are almost in consonance with the rights contained in the Universal Declaration of Human Rights as also the Declaration and the Covenants of Civil and Political Rights and the Covenants of Economic, Social and Cultural Rights, to which India is a party having ratified them, as set out by this Court in *Kubic Darusz* v. *Union of India*[36]. That being so, since "LIFE" is also recognised as a basic human right in the Universal Declaration of Human Rights, 1948, it has to have the same meaning and interpretation as has been placed on that word by this Court in its various decisions relating to Article 21 of the Constitution. The meaning of the word "life" cannot be narrowed down. According to the tenor of the language used in Article 21, it will be available not only to every citizen of this country, but also to a "person" who may not be a citizen of the country.

**33.** Let us now consider the meaning of the word "LIFE" interpreted by this Court from time to time. In *Kharak Singh* v. *State of U.P.*[37] it was held that the term "life" indicates something more than mere animal existence. (See also *State of Maharashtra* v. *Chandrabhan Tale*[38].) The inhibitions contained in Article 21 against its deprivation extend even to those faculties

31 AIR 1955 SC 367, 374 : (1955) 1 SCR 1284
32 (1971) 3 SCC 104 : AIR 1971 SC 337 : (1971) 1 SCR 637
33 AIR 1957 MB 1
34 AIR 1974 All 313 : 1973 All LJ 832
35 AIR 1965 Cal 312 : (1965) 1 Cri LJ 679
36 (1990) 1 SCC 568 : 1990 SCC (Cri) 227 : AIR 1990 SC 605
37 AIR 1963 SC 1295 : (1964) 1 SCR 332
38 (1983) 3 SCC 387 : 1983 SCC (L&S) 391 : 1983 SCC (Cri) 667 : AIR 1983 SC 803 : (1983) 3 SCR 337

SCC Online Web Edition, Copyright © 2015
Page 2 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

by which life is enjoyed. In *Bandhua Mukti Morcha* v. *Union of India*[25] it was held that the right to life under Article 21 means the right to live with dignity, free from exploitation. (See also *Maneka Gandhi* v. *Union of India*[39] and *Board of Trustees of the Port of Bombay* v. *Dilipkumar Raghavendranath Nadkarni*[40].)

**34.** On this principle, even those who are not citizens of this country and come here merely as tourists or in any other capacity will be entitled to the protection of their lives in accordance with the constitutional provisions. They also have a right to "life" in this country. Thus, they also have the right to live, so long as they are here, with human dignity. Just as the State is under an obligation to protect the life of every citizen in this country, so also the State is under an obligation to protect the life of the persons who are not citizens.

**35.** The rights guaranteed under Part III of the Constitution are not absolute in terms. They are subject to reasonable restrictions and, therefore, in case of a non-citizen also, those rights will be available subject to such restrictions as may be imposed in the interest of the security of the State or other important considerations. Interest of the nation and security of the State is supreme. Since 1948 when the Universal Declaration was adopted till this day, there have been many changes — political, social and economic while terrorism has disturbed the global scenario. Primacy of the interest of the nation and the security of the State will have to be read into the Universal Declaration as also in every article dealing with fundamental rights, including Article 21 of the Indian Constitution.

**36.** It has already been pointed out above that this Court in *Bodhisattwa case*[21] has already held that "rape" amounts to violation of the fundamental right guaranteed to a woman under Article 21 of the Constitution.

**37.** Now, Smt Hanuffa Khatoon, who was not the citizen of this country but came here as a citizen of Bangladesh was, nevertheless, entitled to all the constitutional rights available to a citizen so far as "right to life" was concerned. She was entitled to be treated with dignity and was also entitled to the protection of her person as guaranteed under Article 21 of the Constitution. As a national of another country, she could not be subjected to a treatment which was below dignity nor could she be subjected to physical violence at the hands of government employees who outraged her modesty. The right available to her under Article 21 was thus violated. Consequently, the State was under a constitutional liability to pay compensation to her. The judgment passed by the Calcutta High Court, therefore, allowing compensation to her for having been gang-raped, cannot be said to suffer from any infirmity.

25  (1984) 3 SCC 161 : 1984 SCC (L&S) 389 : AIR 1984 SC 802 : (1984) 2 SCR 67
39  (1978) 1 SCC 248 : AIR 1978 SC 597 : (1978) 2 SCR 621
40  (1983) 1 SCC 124 : 1983 SCC (L&S) 61 : AIR 1983 SC 109 : (1983) 1 SCR 828
21  (1996) 1 SCC 490 : 1996 SCC (Cri) 133

SCC Online Web Edition, Copyright © 2015
Page 215 · CV Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**38.** Learned counsel for the appellants then contended that the Central Government cannot be held vicariously liable for the offence of rape committed by the employees of the Railways. It was contended that the liability under the law of torts would arise only when the act complained of was performed in the course of official duty and since rape cannot be said to be an official act, the Central Government would not be liable even under the law of torts. The argument is wholly bad and is contrary to the law settled by this Court on the question of vicarious liability in its various decisions.

**39.** In *State of Rajasthan* v. *Vidhyawati*[41] it was held that the Government will be vicariously liable for the tortious act of its employees. This was a case where a claim for damages was made by the heirs of a person who died in an accident caused by the negligence of the driver of a government vehicle. Reference may also be made to the decisions of this Court in *State of Gujarat* v. *Memon Mahomed Haji Hasam*[42] and *Basavva Kom Dyamangouda Patil* v. *State of Mysore*[43]. These principles were reiterated in *N. Nagendra Rao & Co.* v. *State of A.P.*[44] and again in *State of Maharashtra* v. *Kanchanmala Vijaysing Shirke*[45].

**40.** Reliance placed by the counsel for the appellants on the decision of this Court in *Kasturi Lal Ralia Ram Jain* v. *State of U.P.*[46] cannot help him as this decision has not been followed by this Court in the subsequent decisions, including the decisions in *State of Gujarat* v. *Memon Mahomed Haji Hasam*[42] and *Basavva Kom Dyamangouda Patil* v. *State of Mysore*[43]. The decision in *Kasturi Lal case*[46] was also severely criticised by Mr Seervai in his prestigious book — *Constitutional Law of India*. A three-Judge Bench of this Court in *Common Cause, A Regd. Society* v. *Union of India*[1] also did not follow the decision in *Kasturi Lal case*[46] and observed that the efficacy of this decision as a binding precedent has been eroded.

**41.** The theory of sovereign power which was propounded in *Kasturi Lal case*[46] has yielded to new theories and is no longer available in a welfare State. It may be pointed out that functions of the Government in a welfare State are manifold, all of which cannot be said to be the activities relating to exercise of sovereign powers. The functions of the State not only relate to the defence of the country or the administration of justice, but they extend to many other spheres as, for example, education, commercial, social, economic, political and even marital. These activities cannot be said to be related to sovereign power.

**42.** Running of the Railways is a commercial activity. Establishing the Yatri Niwas at various railway stations to provide lodging and boarding

41 AIR 1962 SC 933 : 1962 Supp (2) SCR 989
42 AIR 1967 SC 1885 : (1967) 3 SCR 838
43 (1977) 4 SCC 358 : 1977 SCC (Cri) 598 : AIR 1977 SC 1749
44 (1994) 6 SCC 205 : 1994 SCC (Cri) 1609 : AIR 1994 SC 2663
45 (1995) 5 SCC 659 : 1995 SCC (Cri) 1002 : 1995 ACJ 1021 : JT (1995) 6 SC 155
46 AIR 1965 SC 1039 : (1965) 1 SCR 375
1 (1999) 6 SCC 667 : 1999 SCC (Cri) 1196 : AIR 1999 SC 2979 : JT (1999) 5 SC 237

SCC Online Web Edition, Copyright © 2015
Page 2 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

facilities to passengers on payment of charges is a part of the commercial activity of the Union of India and this activity cannot be equated with the exercise of sovereign power. The employees of the Union of India who are deputed to run the Railways and to manage the establishment, including the railway stations and the Yatri Niwas, are essential components of the government machinery which carries on the commercial activity. If any of such employees commits an act of tort, the Union Government, of which they are the employees, can, subject to other legal requirements being satisfied, be held vicariously liable in damages to the person wronged by those employees. *Kasturi Lal decision*[46] therefore, cannot be pressed into aid. Moreover, we are dealing with this case under the public law domain and not in a suit instituted under the private law domain against persons who, utilising their official position, got a room in the Yatri Niwas booked in their own name where the act complained of was committed.

**43.** No other point was raised before us. The appeal having no merit is dismissed with the observation that the amount of compensation shall be made over to the High Commissioner for Bangladesh in India for payment to the victim, Smt Hanuffa Khatoon. The payment to the High Commissioner shall be made within three months. There will be no order as to costs.

---

### (2000) 2 Supreme Court Cases 486

(BEFORE B.N. KIRPAL AND M.B. SHAH, JJ.)

SPRINT RPG INDIA LTD.          .. Appellant;

*Versus*

COMMISSIONER OF CUSTOMS-I, DELHI          .. Respondent.

Civil Appeal No. 5582 of 1999[†], decided on January 20, 2000

**A. Customs Tariff Act, 1975 — Headings 85.24 & 84.71, Ch. 85 Chapter Note 6 and General Rules for Interpretation of Sch. I, Rr. 2(b), 3 & 4 — Heading 85.24 or 84.71 — Computer software loaded on a hard disk drive, held, covered by Heading 85.24 and not by Heading 84.71 — Hence, assessable @ 10% and not @ 25% — Customs Act, 1962, S. 25(1) — Noti. No. 59/95-Cus. dated 16-3-1995 — Customs Tariff — Articles/Commodities — Computer software loaded on hard disk drive — Classification**

**B. Customs Tariff Act, 1975 — General Rules for Interpretation of Sch. I — R. 3(b) — Material or component which gave the goods their essential character — Factors relevant for determination of such material or component — Price factor taken into consideration in the instant case**

**C. Customs Tariff Act, 1975 — Ch. 84 — Chapter Note 5(B)(b) & (c) — Applicability — Held, not applicable where the goods in question covered by a specific heading**

---

46 *Kasturi Lal Ralia Ram Jain v. State of U.P.*, AIR 1965 SC 1039 : (1965) 1 SCR 375
† From the Judgment and Order dated 14-5-1999 of the Central Excise, Customs and Gold (Control) Appellate Tribunal, New Delhi in CA No. 161 of 1996-B2 in FO No. 103 of 1999-B2

# EXHIBIT H

SCC Online Web Edition, Copyright © 2015
Page 1 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------------

786 SUPREME COURT CASES (2014) 4 SCC

### (2014) 4 Supreme Court Cases 786

(BEFORE P. SATHASIVAM, C.J. AND S.A. BOBDE AND N.V. RAMANA, JJ.)

INDIAN WOMAN SAYS GANG-RAPED ON
    ORDERS OF VILLAGE COURT
    PUBLISHED IN BUSINESS AND
    FINANCIAL NEWS DATED 23-1-2014,
    IN RE

Suo Motu Writ Petition (Crl.) No. 24 of 2014†,
decided on March 28, 2014

A. **Constitution of India — Arts. 21 and 32 — PIL — Suo motu action of Supreme Court — Gang-rape of woman to purportedly save honour of community/caste — Lapses on part of State in taking preventive measures as also procedural safeguards provided for women under CrPC and in protecting victim's fundamental rights**

— Gang-rape of victim ordered as punishment by community panchayat for having relationship with a man belonging to a different community — Violative of victim's right under Art. 21 — Supreme Court, by taking suo motu action on basis of newspaper report, called for reports from District Judge after inspecting place of occurrence and of Chief Secretary of State as regards steps taken by police against persons concerned and also directed State to place on record FIR, case diaries, result of investigation/police report, statements recorded under S. 161 CrPC, forensic and medical test reports, etc. — Non-compliance with Ss. 154, 161, 164 and 164-A CrPC (as amended w.e.f. 3-2-2013) and other lapses pointed out by amicus curiae, having regard to all materials on record — Held, State has bounden duty to protect fundamental rights of victim which it failed to do — Courts and police should also be vigilant in ensuring effective implementation of amended procedural rights provided to women under CrPC so as to instil sense of security and confidence in them — State machinery should work in harmony and police should work in more organised and dedicated manner — Criminal Procedure Code, 1973 — Ss. 154, 161, 164 and 164-A (as amended w.e.f. 3-2-2013) — Penal Code, 1860, Ss. 376-D and 376

B. **Constitution of India — Art. 21 — Freedom of choice in marriage — Forms part of Art. 21 — State duty-bound to protect this right of citizen**

C. **Constitution of India — Arts. 21 and 32 — Compensation — Gang-rape of victim ordered as punishment by community panchayat for having relationship with a man belonging to a different community — Violative of victim's right under Art. 21 — State's failure to protect victim's right under Art. 21 — Interim compensation as remedial measure — Quantum — No rigid formula for determining can be laid down — Would depend upon facts and circumstances of each case — Rehabilitation of victim also a relevant factor**

† Under Article 32 of the Constitution of India

SCC Online Web Edition, Copyright © 2015
Page 2 : Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnlineWeb Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*a*

— Held, in present case, interim compensation of Rs 5 lakhs should be given to victim by State in addition to Rs 50,000 already sanctioned by State Government under Victim Compensation Scheme — Victim also entitled to benefits provided under Ss. 357-A and 357-B CrPC — Other benefits granted as rehabilitation measures announced by State Government in name of victim's mother should instead be in name of victim when she is a major — Long-term measures for safety and security of victim and her family also needed — Criminal Procedure Code, 1973 — Ss. 357, 357-A and 357-B — Penal Code, 1860 — Ss. 376-D and 376 — Victimology

*b*

Held :

(1) Ultimately, the State police machinery could certainly have prevented the said occurrence. The State is duty-bound to protect the fundamental rights of its citizens; and an inherent aspect of Article 21 of the Constitution would be the freedom of choice in marriage. Such offences are resultant of the State's incapacity or inability to protect the fundamental rights of its citizens. (Para 16)

*c*

*Lata Singh v. State of U.P.,* (2006) 5 SCC 475 : (2006) 2 SCC (Cri) 478; *Arumugam Servai v. State of T.N.,* (2011) 6 SCC 405 : (2011) 2 SCC (Cri) 993, *relied on*

*Gang-Rape Ordered by Village Kangaroo Court in W.B., In re,* WP (Cri) No. 24 of 2014. order dated 14-2-2014 (SC), *referred to*

*d*

Violence against women is a recurring crime across the globe and India is no exception in this regard. The case at hand is the epitome of aggression against a woman and it is shocking that even with rapid modernisation such crimes persist in our society. These crimes are not only in contravention of domestic laws, but are also a direct breach of the obligations under the international law. India has ratified various international conventions and treaties, which oblige the protection of women from any kind of discrimination. However, women of all classes are still suffering from discrimination even in this contemporary society.

*e*

(Paras 10 and 28)

It will be wrong to blame only the attitude of the people. Such crimes can certainly be prevented if the State police machinery work in a more organised and dedicated manner. The different parts of the State machinery should work in harmony with each other to safeguard the rights of women in our country. Registration of FIR is mandatory under Section 154 CrPC, if the information discloses commission of a cognizable offence and the police officers are duty-bound to register the same. Keeping in view this dreadful increase in crime against women, CrPC has been specifically amended by recent amendment dated 3-2-2013 in order to advance the safeguards for women in such circumstances. The courts and the police officials are required to be vigilant in upholding these rights of the victims of crime as the effective implementation of these provisions lies in their hands. (Paras 28, 10 and 11)

*f*

*g*

*Lalita Kumari v. State of U.P.,* (2014) 2 SCC 1 : (2014) 1 SCC (Cri) 524, *followed*

As a long-term measure to curb such crimes, a larger societal change is required via education and awareness. The Government will have to formulate and implement policies in order to uplift the socio-economic condition of women, sensitisation of the police and other parties concerned towards the need for gender equality and it must be done with focus in areas where statistically there is higher percentage of crimes against women. (Para 18)

*h*


Case 3:15-cv-00421-SI Document31-1 Filed04/06/15 Page112 of 202
SCC Online Web Edition, Copyright © 2015
Page 3 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

(2) No compensation can be adequate nor can it be of any respite for the victim but as the State has failed in protecting such serious violation of a victim's fundamental right, the State is duty-bound to provide compensation, which may help in the victim's rehabilitation. The humiliation or the reputation that is snuffed out cannot be recompensed but then monetary compensation will at least provide some solace. The payment of interim compensation to rape victims is a remedial measure. In 2009, a new Section 357-A was introduced in CrPC whereunder the onus is put on the District Legal Services Authority or the State Legal Services Authority to determine the quantum of compensation in each case. However, no rigid formula can be evolved as to have a uniform amount, it should vary in facts and circumstances of each case. The failure to grant uniform ex gratia relief is not arbitrary or unconstitutional.          (Paras 19 and 20)

*State of Rajasthan* v. *Sanyam Lodha,* (2011) 13 SCC 262 : (2012) 1 SCC (Cri) 831; *Bodhisattwa Gautam* v. *Subhra Chakraborty,* (1996) 1 SCC 490 : 1996 SCC (Cri) 133; *Delhi Domestic Working Women's Forum* v. *Union of India,* (1995) 1 SCC 14 : 1995 SCC (Cri) 7; *P. Rathinam* v. *State of Gujarat,* 1994 SCC (Cri) 1163; *Railway Board* v. *Chandrima Das,* (2000) 2 SCC 465; *Satya Pal Anand* v. *State of M.P.,* (2014) 4 SCC 800, *followed*

*State* v. *Mohd. Moinul Haque,* (2001) 21 BLD 465 (Bangladesh SC), *considered*

Nevertheless, the obligation of the State does not extinguish on payment of compensation, rehabilitation of victim is also of paramount importance. The mental trauma that the victim suffers due to the commission of such heinous crime, rehabilitation becomes a must in each and every case.          (Para 24)

The report of the Chief Secretary of the State (see para 25) indicates the steps taken by the State Government including the compensation of Rs 50,000 awarded to the victim. Nevertheless, considering the facts and circumstances of this case, the victim should be given a compensation of at least Rs 5 lakhs for rehabilitation by the State. We, accordingly, direct Respondent 1 (the State of West Bengal through the Chief Secretary) to make a payment of Rs 5 lakhs, in addition to the already sanctioned amount of Rs 50,000, within one month from today. Besides, it would be appropriate and beneficial to the victim if the compensation and other benefits are directly given to her.          (Para 26)

Further according to Section 357-B CrPC, the compensation payable by the State Government under Section 357-A CrPC shall be in addition to the payment of fine to the victim under Section 326-A or Section 376-D IPC. Also, no details have been given as to the measures taken for security and safety of the victim and her family. Merely providing interim measure for their stay may protect them for the time being but long-term rehabilitation is needed as they are all material witnesses and likely to be socially ostracised. Consequently, the Circle Officer of the area is directed to inspect the victim's place on day-to-day basis.

(Para 27)

*Gang-Rape Ordered by Village Kangaroo Court in W.B., In re,* (2014) 2 SCC 751 : (2014) 2 SCC (Cri) 177; *Gang-Rape Ordered by Village Kangaroo Court in W.B., In re,* WP (Cri) No. 24 of 2014, order dated 14-2-2014 (SC); *Gang-Rape Ordered by Village Kangaroo Court in W.B., In re,* WP (Cri) No. 24 of 2014, order dated 13-3-2014 (SC), *referred to*

Suo Motu Petition disposed of                    R-D/53077/CR

SCC Online Web Edition, Copyright © 2015
Page 4 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

Advocates who appeared in this case :
By Court's Motion;
Sidharth Luthra, Additional Solicitor General (Amicus Curiae);
Anip Sachthey, Kabir S. Bose and Ms Shagun Matta, Advocates, for the Respondent.

| *Chronological list of cases cited* | *on page(s)* |
|---|---|
| 1. (2014) 4 SCC 800, *Satya Pal Anand* v. *State of M.P.* | 797*d-e* |
| 2. (2014) 2 SCC 751 : (2014) 2 SCC (Cri) 177, *Gang-Rape Ordered by Village Kangaroo Court in W.B., In re* | 789*f-g*, 789*g*, 789*g-h* |
| 3. (2014) 2 SCC 1 : (2014) 1 SCC (Cri) 524, *Lalita Kumari* v. *State of U.P.* | 799*e* |
| 4. WP (Cri) No. 24 of 2014, order dated 13-3-2014 (SC), *Gang-Rape Ordered by Village Kangaroo Court in W.B., In re* | 790*c* |
| 5. WP (Cri) No. 24 of 2014, order dated 14-2-2014 (SC), *Gang-Rape Ordered by Village Kangaroo Court in W.B., In re* | 790*b* |
| 6. (2011) 13 SCC 262 : (2012) 1 SCC (Cri) 831. *State of Rajasthan* v. *Sanyam Lodha* | 797*a* |
| 7. (2011) 6 SCC 405 : (2011) 2 SCC (Cri) 993, *Arumugam Servai* v. *State of T.N.* | 794*e* |
| 8. (2006) 5 SCC 475 : (2006) 2 SCC (Cri) 478, *Lata Singh* v. *State of U.P.* | 793*g*, 794*f-g* |
| 9. (2001) 21 BLD 465 (Bangladesh SC), *State* v. *Mohd. Moinul Haque* | 797*e* |
| 10. (2000) 2 SCC 465, *Railway Board* v. *Chandrima Das* | 797*d* |
| 11. (1996) 1 SCC 490 : 1996 SCC (Cri) 133, *Bodhisattwa Gautam* v. *Subhra Chakraborty* | 797*b*, 797*b-c* |
| 12. (1995) 1 SCC 14 : 1995 SCC (Cri) 7, *Delhi Domestic Working Women's Forum* v. *Union of India* | 797*b* |
| 13. 1994 SCC (Cri) 1163, *P. Rathinam* v. *State of Gujarat* | 797*c-d* |

The Judgment of the Court was delivered by

**P. SATHASIVAM, C.J.**— This Court, based on the news item published in the *Business and Financial News* dated 23-1-2014 relating to the gang-rape of a 20-year-old woman of Subalpur Village, PS Labpur, District Birbhum, the State of West Bengal on the intervening night of 20-1-2014/21-1-2014 on the orders of community panchayat as punishment for having relationship with a man from a different community, by order dated 24-1-2014[1], took suo motu action and directed the District Judge, Birbhum District, West Bengal to inspect the place of occurrence and submit a report to this Court within a period of one week from that date.

**2.** Pursuant to the direction dated 24-1-2014[1], the District Judge, Birbhum District, West Bengal along with the Chief Judicial Magistrate inspected the place in question and submitted a report to this Court. However, this Court, on 31-1-2014[1], after noticing that there was no information in the report as to the steps taken by the police against the persons concerned, directed the Chief Secretary, West Bengal to submit a detailed report in this

1 *Gang-Rape Ordered by Village Kangaroo Court in West Bengal, In re*, (2014) 2 SCC 751 : (2014) 2 SCC (Cri) 177. Orders dated 24-1-2014 and 31-1-2014 were published together.

SCC Online Web Edition, Copyright © 2015
Page 5 · Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

regard within a period of two weeks. On the same day, Mr Sidharth Luthra, learned Additional Solicitor General was requested to assist the Court as amicus in the matter.

**3.** Pursuant to the aforesaid direction, the Chief Secretary submitted a detailed report dated 10-2-2014 and the copies of the same were provided to the parties. On 14-2-2014[2], this Court directed the State to place on record the first information report (FIR), case diaries, result of the investigation/ police report under Section 173 of the Code of Criminal Procedure, 1973 (in short "the Code"), statements recorded under Section 161 of the Code, forensic opinion, report of vaginal swab/other medical tests, etc. conducted on the victim on the next date of hearing.

**4.** After having gathered all the requisite material, on 13-3-2014[3], we heard the learned amicus as well as Mr Anip Sachthey, learned counsel for the State of West Bengal extensively and reserved the matter.

### Discussion

**5.** Mr Sidharth Luthra, learned amicus curiae having perused and scrutinised all the materials on record in his submissions had highlighted three aspects viz. (i) issues concerning the investigation; (ii) prevention of recurring of such crimes; and (iii) victim compensation; and invited this Court to consider the same.

### (i) Issues concerning the investigation

**6.** Certain relevant issues pertaining to the investigation were raised by the learned amicus curiae. Primarily, Mr Luthra stated that although the FIR

---

2 *Gang-Rape Ordered by Village Kangaroo Court in West Bengal, In re,* WP (Cri) No. 24 of 2014, order dated 14-2-2014 (SC), wherein it was directed:

   "The State of West Bengal represented by the Chief Secretary, is impleaded as respondent in this matter. Pursuant to our direction dated 31-1-2014, Chief Secretary, West Bengal, submitted a report dated 10-2-2014. Registry is directed to supply a copy of the report dated 29-1-2014 submitted by acting District Judge, Birbhum, West Bengal as well as the report of the Chief Secretary, West Bengal dated 10-2-2014 to Mr Sidharth Luthra, learned ASG as well as the counsel appearing for the State of West Bengal. The State of West Bengal is directed to place on record the first information report, case diaries and result of investigation/police report under Section 173 CrPC, statements recorded under Section 161 CrPC, final forensic opinion, report of vaginal swab/other medical tests conducted on the victim on the next date of hearing. The counsel appearing on behalf of the State of West Bengal is also directed to place the translated copies of the abovementioned documents on record and supply copies to Mr Sidharth Luthra, ASG, who is assisting the Court in this matter. List on 4-3-2014."

3 *Gang-Rape Ordered by Village Kangaroo Court in West Bengal, In re,* WP (Cri) No. 24 of 2014, order dated 13-3-2014 (SC), wherein it was directed:

   "Heard Mr Sidharth Luthra, learned Additional Solicitor General and Mr Anip Sachthey, learned counsel for the State of West Bengal. Hearing concluded. Judgment reserved."

Case 15-cv-00221-SS Document 31-1 Filed 04/06/15 Page 115 of 202
SCC Online Web Edition, Copyright © 2015
Page 4 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

has been scribed by one Anirban Mondal, a resident of Labpur, Birbhum
*a*   District, West Bengal, there is no basis as to how Anirban Mondal came to
the police station and there is also no justification for his presence there.
Further, he stressed on the point that Section 154 of the Code requires such
FIR to be recorded by a woman police officer or a woman officer and, in
addition, as per the latest amendment dated 3-2-2013, a woman officer
should record the statements under Section 161 of the Code. While
*b*   highlighting the relevant provisions, he also submitted that there was no
occasion for the Deputy Superintendent of Police to re-record the statements
on 26-1-2014, 27-1-2014 and 29-1-2014 and that too in gist which would
lead to possible contradictions being derived during cross-examinations.

**7.** Mr Luthra also drew our attention to the statement of the victim under
Section 164 of the Code. He pointed out that mobile details have not been
*c*   obtained. He also brought to our notice that if the Salishi (meeting) is
relatable to a village, then the presence of persons of neighbouring villages
i.e. Bikramur and Rajarampur is not explained. Moreover, Mr Luthra
submitted that there is variance in the version of the FIR and the report of the
Judicial Officer as to the holding of the meeting (Salishi) on the point
whether it was held in the night of 20-1-2014 as per the FIR or the next
*d*   morning as per the Judicial Officer's report, which is one of the pertinent
issues to be looked into.

**8.** Mr Luthra also submitted that the offence of extortion under Section
385 of the Penal Code, 1860 (in short "IPC") and related offences have not
been invoked. Similarly, offence of criminal intimidation under Section 506
IPC and grievous hurt under Section 325 IPC have not been invoked.
*e*   Furthermore, Sections 354-A and 354-B ought to have been considered by
the investigating agency. He further pointed out the discrepancy in the name
of accused Ram Soren mentioned in the FIR and in the report of the Judicial
Officer which refers to Bhayek Soren which needs to be explained. He also
submitted that the electronic documents (e-mail) need to be duly certified
under Section 65-A of the Evidence Act, 1872. Finally, he pointed out that
*f*   the aspect as to whether there was a larger conspiracy must also be seen.

**9.** Mr Anip Sachthey, learned counsel for the State assured this Court that
the deficiency, if any, in the investigation, as suggested by the learned
amicus, would be looked into and rectified. The above statement is hereby
recorded.

*g*   *(ii) Prevention of recurring of such crimes*

**10.** Violence against women is a recurring crime across the globe and
India is no exception in this regard. The case at hand is the epitome of
aggression against a woman and it is shocking that even with rapid
modernisation such crimes persist in our society. Keeping in view this
dreadful increase in crime against women, the Code of Criminal Procedure
*h*   has been specifically amended by recent amendment dated 3-2-2013 in order

SCC Online Web Edition, Copyright © 2015
Page 1 -- Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

to advance the safeguards for women in such circumstances which are as under:

"**154. Information in cognizable cases.**—(1)     *       *       *

Provided that if the information is given by the woman against whom an offence under Section 326-A, Section 326-B, Section 354, Section 354-A, Section 354-B, Section 354-C, Section 354-D, Section 376, Section 376-A, Section 376-B, Section 376-C, Section 45 of 1860, Section 376-D, Section 376-E, or Section 509 of the Indian Penal Code is alleged to have been committed or attempted, then such information shall be recorded, *by a woman police officer or any woman officer:*

Provided further that—

     (*a*) in the event that the person against whom an offence under Section 354, Section 354-A, Section 354-B, Section 354-C, Section 354-D, Section 376, Section 376-A, Section 376-B, Section 376-C, Section 376-D, Section 376-E or Section 509 of the Indian Penal Code is alleged to have been committed or attempted, is temporarily or permanently mentally or physically disabled, then such information *shall be recorded by a police officer, at the residence of the person* seeking to report such offence *or at a convenient place of such person's choice,* in the presence of an interpreter or a special educator, as the case may be;

(2)-(3)       *          *          *
               *          *          *

**161. Examination of witnesses by police .**—(1)-(3)    *      *      *

Provided further that the statement of a woman against whom an offence under Section 354, Section 354-A, Section 354-B, Section 354-C, Section 354-D, Section 376, Section 376-A, Section 376-B, Section 376-C, Section 376-D, Section 376-E or Section 509 of the Indian Penal Code is alleged to have been committed or attempted *shall be recorded, by a woman police officer or any woman officer.*

           *          *          *

**164. Recording of confessions and statements.**—(1)-(5)    *      *      *

5-A. (*a*) In cases punishable under Section 354, Section 354-A, Section 354-B, Section 354-C, Section 354-D, sub-section (1) or sub-section (2) of Section 376, Section 376-A, Section 376-B, Section 376-C, Section 376-D, Section 376-E or Section 509 of the Indian Penal Code, the Judicial Magistrate shall record the statement of the person against whom such offence has been committed in the manner prescribed in sub-section (5), as soon as the commission of the offence is brought to the notice of the police:

**164-A. Medical examination of the victim of rape.**—(1) Where, during the stage when an offence of committing rape or attempt to commit rape is under investigation, it is proposed to get the person of the woman with whom rape is alleged or attempted to have been committed or attempted, examined by a medical expert, such examination shall be conducted by a registered medical practitioner employed in a hospital run by the Government or a local authority and in the absence of such a practitioner, by any other registered medical practitioner, with the consent of such woman or of a person competent to give such consent on her behalf and such woman

Case 1:15-cv-00123-SS Document31-1 Filed04/06/15 Page117 of 202

SCC Online Web Edition, Copyright © 2015
Page 8 - Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a  shall be sent to such registered medical practitioner within twenty-four hours from the time of receiving the information relating to the commission of such offence.

(2) The registered medical practitioner, to whom such woman is sent shall, without delay, examine her person and prepare a report of his examination giving the following particulars, namely—

b  (*i*) the name and address of the woman and of the person by whom she was brought;

(*ii*) the age of the woman;

(*iii*) the description of material taken from the person of the woman for DNA profiling;

(*iv*) marks of injury, if any, on the person of the woman;

(*v*) general mental condition of the woman; and

c  (*vi*) other material particulars in reasonable detail,

(3) The report shall state precisely the reasons for each conclusion arrived at.

(4) The report shall specifically record that the consent of the woman or of the person competent, to give such consent on her behalf to such examination had been obtained.

d  (5) The exact time of commencement and completion of the examination shall also be noted in the report.

(6) The registered medical practitioner shall, without delay forward the report to the investigating officer who shall forward it to the Magistrate referred to in Section 173 as part of the documents referred to in clause (*a*) of sub-section (5) of that section.

e  (7) Nothing in this section shall be construed as rendering lawful any examination without the consent of the woman or of any person competent to give such consent on her behalf.

*Explanation.*—For the purposes of this section, 'examination' and 'registered medical practitioner' shall have the same meanings as in Section 53."

f  **11.** The courts and the police officials are required to be vigilant in upholding these rights of the victims of crime as the effective implementation of these provisions lies in their hands. In fact, the recurrence of such crimes has been taken note of by this Court in few instances and seriously condemned in the ensuing manner.

**12.** In *Lata Singh* v. *State of U.P.*[4], this Court, in paras 17 and 18, held as
g  under: (SCC p. 480)

"*17.* The caste system is a curse on the nation and the sooner it is destroyed the better. In fact, it is dividing the nation at a time when we have to be united to face the challenges before the nation unitedly. Hence, inter-caste marriages are in fact in the national interest as they will result in destroying the caste system. However, disturbing news is

h
4 (2006) 5 SCC 475 : (2006) 2 SCC (Cri) 478


Case 1:15-cv-00122-SS Document31-1 Filed04/06/15 Page118 of 202
Page 9 - Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

coming from several parts of the country that young men and women who undergo inter-caste marriage, are threatened with violence, or violence is actually committed on them. In our opinion, such acts of *a* violence or threats or harassment are wholly illegal and those who commit them must be severely punished. This is a free and democratic country, and once a person becomes a major he or she can marry whosoever he/she likes. If the parents of the boy or girl do not approve of such inter-caste or inter-religious marriage the maximum they can do is that they can cut off social relations with the son or the daughter, but they *b* cannot give threats or commit or instigate acts of violence and cannot harass the person who undergoes such inter-caste or inter-religious marriage. We, therefore, direct that the administration/police authorities throughout the country will see to it that if any boy or girl who is a major undergoes inter-caste or inter-religious marriage with a woman or man who is a major, the couple is not harassed by anyone nor subjected to *c* threats or acts of violence, and anyone who gives such threats or harasses or commits acts of violence either himself or at his instigation, is taken to task by instituting criminal proceedings by the police against such persons and further stern action is taken against such persons as provided by law.

*18.* We sometimes hear of 'honour' killings of such persons who *d* undergo inter-caste or inter-religious marriage of their own free will. There is nothing honourable in such killings, and in fact they are nothing but barbaric and shameful acts of murder committed by brutal, feudal-minded persons who deserve harsh punishment. Only in this way can we stamp out such acts of barbarism."

**13.** In *Arumugam Servai* v. *State of T.N.*[5], this Court, in paras 12 and 13, observed as under: (SCC p. 411)

"*12.* We have in recent years heard of 'Khap Panchayats' (known as 'Katta Panchayats' in Tamil Nadu) which often decree or encourage honour killings or other atrocities in an institutionalised way on boys and girls of different castes and religion, who wish to get married or have *f* been married, or interfere with the personal lives of people. We are of the opinion that this is wholly illegal and has to be ruthlessly stamped out. As already stated in *Lata Singh case*[4], there is nothing honourable in honour killing or other atrocities and, in fact, it is nothing but barbaric and shameful murder. Other atrocities in respect of personal lives of people committed by brutal, feudal-minded persons deserve harsh *g* punishment. Only in this way can we stamp out such acts of barbarism and feudal mentality. Moreover, these acts take or law into their own hands, and amount to kangaroo courts, which are wholly illegal.

5 (2011) 6 SCC 405 : (2011) 2 SCC (Cri) 993
4 *Lata Singh* v. *State of U.P.*, (2006) 5 SCC 475 : (2006) 2 SCC (Cri) 478

SCC Online Web Edition, Copyright © 2015
Page 115-C (Monday, March 30, 2015)
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*a*     *13.* Hence, we direct the administrative and police officials to take strong measures to prevent such atrocious acts. If any such incidents happen, apart from instituting criminal proceedings against those responsible for such atrocities, the State Government is directed to immediately suspend the District Magistrate/Collector and SSP/SPs of the district as well as other officials concerned and charge-sheet them and proceed against them departmentally if they do not (*1*) prevent the

*b*     incident if it has not already occurred but they have knowledge of it in advance, or (2) if it has occurred, they do not promptly apprehend the culprits and others involved and institute criminal proceedings against them, as in our opinion they will be deemed to be directly or indirectly accountable in this connection."

*c*     **14.** Likewise, the Law Commission of India, in its 242nd Report on Prevention of Interference with the Freedom of Matrimonial Alliances (in the Name of Honour and Tradition) had suggested that:

> "**11.1** In order to keep a check on the high-handed and unwarranted interference by the caste assemblies or *panchayats* with *sagotra*, inter-caste or inter-religious marriages, which are otherwise lawful, this legislation has been proposed so as to prevent the acts endangering the liberty of the couple
>
> *d*    married or intending to marry, and their family members. It is considered necessary that there should be a threshold bar against the congregation or assembly for the purpose of disapproving such marriage/intended marriage and the conduct of the young couple. The members gathering for such purpose, i.e., for condemning the marriage with a view to take necessary consequential action, are to be treated as members of unlawful assembly for
>
> *e*    which a mandatory minimum punishment has been prescribed.
>
>     **11.2** So also the acts of endangerment of liberty including social boycott, harassment, etc. of the couple or their family members are treated as offences punishable with mandatory minimum sentence. The acts of criminal intimidation by members of unlawful assembly or others acting at their instance or otherwise are also made punishable with mandatory
>
> *f*    minimum sentence.
>
>     **11.3** A presumption that a person participating in an unlawful assembly shall be presumed to have also intended to commit or abet the commission of offences under the proposed Bill is provided for in Section 6.
>
>     **11.4** Power to prohibit the unlawful assemblies and to take preventive measures are conferred on the Sub-Divisional/District Magistrate. Further, a
>
> *g*    SDM/DM is enjoined to receive a request or information from any person seeking protection from the assembly of persons or members of any family who are likely to or who have been objecting to the lawful marriage.
>
>     **11.5** The provisions of this proposed Bill are without prejudice to the provisions of Indian Penal Code. Care has been taken, as far as possible, to see that there is no overlapping with the provisions of the general penal law.
>
> *h*    In other words, the criminal acts other than those specifically falling under the proposed Bill are punishable under the general penal law.

SCC Online Web Edition, Copyright © 2015
Page 1 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**11.6** The offence will be tried by a Court of Session in the district and the offences are cognizable, non-bailable and non-compoundable.

**11.7** Accordingly, the Prohibition of Interference with the Freedom of Matrimonial Alliances Bill 20 has been prepared in order to effectively check the existing social malady."

**15.** It is further pertinent to mention that the issue relating to the role of Khap Panchayats is pending before this Court in *Shakti Vahini* v. *Union of India* in WP (C) No. 231 of 2010.

**16.** Ultimately, the question which ought to consider and assess by this Court is whether the State police machinery could have possibly prevented the said occurrence. The response is certainly a "yes". The State is duty-bound to protect the fundamental rights of its citizens; and an inherent aspect of Article 21 of the Constitution would be the freedom of choice in marriage. Such offences are resultant of the State's incapacity or inability to protect the fundamental rights of its citizens.

**17.** In a report by the Commission of Inquiry, headed by a former Judge of the Delhi High Court Justice Usha Mehra (Retd.), (at p. 86), it was seen (although in the context of the NCR) that police officers seldom visit villages; it was suggested that a police officer must visit a village on every alternate day to "instil a sense of security and confidence amongst the citizens of the society and to check the depredations of criminal elements".

**18.** As a long-term measure to curb such crimes, a larger societal change is required via education and awareness. The Government will have to formulate and implement policies in order to uplift the socio-economic condition of women, sensitisation of the police and other parties concerned towards the need for gender equality and it must be done with focus in areas where statistically there is higher percentage of crimes against women.

*(iii) Victim compensation*

**19.** No compensation can be adequate nor can it be of any respite for the victim but as the State has failed in protecting such serious violation of a victim's fundamental right, the State is duty-bound to provide compensation, which may help in the victim's rehabilitation. The humiliation or the reputation that is snuffed out cannot be recompensed but then monetary compensation will at least provide some solace.

**20.** In 2009, a new Section 357-A was introduced in the Code which casts a responsibility on the State Governments to formulate schemes for compensation to the victims of crime in coordination with the Central Government whereas, previously, Section 357 ruled the field which was not mandatory in nature and only the offender can be directed to pay compensation to the victim under this section. Under the new Section 357-A, the onus is put on the District Legal Services Authority or the State Legal Services Authority to determine the quantum of compensation in each case. However, no rigid formula can be evolved as to have a uniform amount, it

Case 1:15-cv-00224-SJ Document31-1 Filed04/06/15 Page121 of 202
SCC Online Web Edition, Copyright © 2015
Page 125 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

should vary in facts and circumstances of each case. In *State of Rajasthan* v.
*a* *Sanyam Lodha*[6], this Court held that the failure to grant uniform ex gratia
relief is not arbitrary or unconstitutional. It was held that the quantum may
depend on facts of each case.

**21.** The learned amicus also advocated for awarding interim
compensation to the victim by relying upon judicial precedents. The concept
of the payment of interim compensation has been recognised by this Court in
*b* *Bodhisattwa Gautam* v. *Subhra Chakraborty*[7]. It referred to *Delhi Domestic
Working Women's Forum* v. *Union of India*[8] to reiterate the centrality of
compensation as a remedial measure in case of rape victims. It was observed
as under: (*Bodhisattwa Gautam case*[7], SCC p. 503, para 18)

"*18.* ... If the court trying an offence of rape has jurisdiction to award
the compensation at the final stage, there is no reason to deny to the court
*c* the right to award interim compensation which should also be provided
in the Scheme."

**22.** This Court in *P. Rathinam* v. *State of Gujarat*[9], which pertained to
rape of a tribal woman in police custody awarded an interim compensation of
Rs 50,000 to be paid by the State Government. Likewise, this Court, in
*d* *Railway Board* v. *Chandrima Das*[10], upheld the High Court's direction to pay
Rs 10 lakhs as compensation to the victim, who was a Bangladeshi national.
Further, this Court in *Satya Pal Anand* v. *State of M.P.*[11], vide order dated
5-8-2013, enhanced the interim relief granted by the State Government from
Rs 2 lakhs to 10 lakhs each to two girl victims.

**23.** The Supreme Court of Bangladesh in *State* v. *Mohd. Moinul
*e* *Haque*[12] has interestingly observed that "victims of rape should be
compensated by giving them half of the property of the rapist(s) as
compensation in order to rehabilitate them in the society". If not adopting
this liberal reasoning, we should at least be in a position to provide
substantial compensation to the victims.

**24.** Nevertheless, the obligation of the State does not extinguish on
*f* payment of compensation, rehabilitation of victim is also of paramount
importance. The mental trauma that the victim suffers due to the commission
of such heinous crime, rehabilitation becomes a must in each and every case.

**25.** Mr Anip Sachthey, learned counsel for the State submitted a report by
Mr Sanjay Mitra, Chief Secretary, dated 11-3-2014 on the rehabilitation
*g* measures rendered to the victim. The report is as follows:

6 (2011) 13 SCC 262 : (2012) 1 SCC (Cri) 831
7 (1996) 1 SCC 490 : 1996 SCC (Cri) 133
8 (1995) 1 SCC 14 : 1995 SCC (Cri) 7
9 1994 SCC (Cri) 1163
*h* 10 (2000) 2 SCC 465
11 (2014) 4 SCC 800
12 (2001) 21 BLD 465 (Bangladesh SC)

Case 1:15-cv-00242-SL Document31-1 Filed04/06/15 Page122 of 202
SCC Online Web Edition, Copyright © 2015
Page 115 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

## "GOVERNMENT OF WEST BENGAL
### HOME DEPARTMENT

*Report on the Rehabilitation Measures*

*Reference*: Suo motu Writ Petition No. 24 of 2014

*Subject*: PS Labpur, District Birbhum, West Bengal, Case No. 14 of 2014 dated 22-1-2014 under Sections 376-D/341/506 IPC.

In compliance with the order passed by the Hon'ble Supreme Court during the hearing of the aforesaid case on 4-3-2014, the undersigned has reviewed the progress of rehabilitation measures taken by the State Government agencies. The progress in the matter is placed hereunder for kind perusal.

*1*. A government order has been issued sanctioning an amount of Rs 50,000 to the victim under the Victim Compensation Scheme of the State Government. It is assured that the amount will be drawn and disbursed to the victim within a week.

*2*. Adequate legal aid has been provided to the victim.

*3*. 'Patta' in respect of allotment of a plot of land under 'Nijo Griha Nijo Bhumi Scheme' of the State Government has been issued in favour of the mother of the victim.

*4*. Construction of residential house out of the fund under the scheme 'Amar Thikana' in favour of the mother of victim has been completed.

*5*. Widow pension for the months of January, February and March, 2014 has been disbursed to the mother of the victim.

*6*. Installation of a tube-well near the residential house of the mother of the victim has been completed.

*7*. Construction of sanitary latrine under TSC Fund has been completed.

*8*. The victim has been enrolled under the Social Security Scheme for Construction Worker.

*9*. Antyodaya Anna Yojna Card has been issued in favour of the victim and her mother.

*10*. Relief and government relief articles have been provided to the victim and her family.

The State Government has taken all possible administrative action to provide necessary assistance to the victim which would help her in rehabilitation and reintegration.

(Sanjay Mitra)

Chief Secretary"

**26.** The report of the Chief Secretary indicates the steps taken by the State Government including the compensation awarded. Nevertheless, considering the facts and circumstances of this case, we are of the view that the victim should be given a compensation of at least Rs 5 lakhs for rehabilitation by the State. We, accordingly, direct Respondent 1 (the State of West Bengal through the Chief Secretary) to make a payment of Rs 5 lakhs, in addition to the already sanctioned amount of Rs 50,000, within one month


SCC Online Web Edition, Copyright © 2015
Page 1 of 1 Monday, March 30, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

from today. Besides, we also have some reservation regarding the benefits
*a* being given in the name of the mother of the victim, when the victim herself
is a major (i.e. aged about 20 years). Thus, in our considered view, it would
be appropriate and beneficial to the victim if the compensation and other
benefits are directly given to her and accordingly we order so.

**27.** Further, we also wish to clarify that according to Section 357-B, the
compensation payable by the State Government under Section 357-A shall be
*b* in addition to the payment of fine to the victim under Section 326-A or
Section 376-D IPC. Also, no details have been given as to the measures taken
for security and safety of the victim and her family. Merely providing interim
measure for their stay may protect them for the time being but long-term
rehabilitation is needed as they are all material witnesses and likely to be
socially ostracised. Consequently, we direct the Circle Officer of the area to
*c* inspect the victim's place on day-to-day basis.

***Conclusion***

**28.** The crimes, as noted above, are not only in contravention of domestic
laws, but are also a direct breach of the obligations under the international
law. India has ratified various international conventions and treaties, which
*d* oblige the protection of women from any kind of discrimination. However,
women of all classes are still suffering from discrimination even in this
contemporary society. It will be wrong to blame only the attitude of the
people. Such crimes can certainly be prevented if the State police machinery
works in a more organised and dedicated manner. Thus, we implore upon the
State machinery to work in harmony with each other to safeguard the rights
*e* of women in our country. As per the law enunciated in *Lalita Kumari* v. *State
of U.P.*[13], registration of FIR is mandatory under Section 154 of the Code, if
the information discloses commission of a cognizable offence and the police
officers are duty-bound to register the same.

**29.** Likewise, all hospitals, public or private, whether run by the Central
Government, the State Government, local bodies or any other person, are
*f* statutorily obligated under Section 357-C to provide first aid or medical
treatment, free of cost, to the victims of any offence covered under Sections
326-A, 376, 376-A, 376-B, 376-C, 376-D or Section 376-E IPC.

**30.** We appreciate the able assistance rendered by Mr Sidharth Luthra,
learned ASG, who is appointed as the amicus curiae to represent the cause of
the victim in the present case. With the above directions, we dispose of the
*g* suo motu petition.

————

*h*

13  (2014) 2 SCC 1 : (2014) 1 SCC (Cri) 524 : (2013) 13 Scale 559

# EXHIBIT I



MANU/SC/0506/2001



**Equivalent Citation:** II(2001)ACC540, 2001ACJ1719, AIR2001SC3660, 2001(4)ALLMR(SC)496, 2001 (45) ALR 192, 2001(2)AnWR568, 2001(3)BLJR2294, JT2001(7)SC159, 2002-1-LW491, 2001(5)SCALE610, (2001)8SCC151

## IN THE SUPREME COURT OF INDIA

Decided On: 24.08.2001

Appellants: **M.S. Grewal and anr.**
**vs.**
Respondent: **Deep Chand Sood and ors.**

**Hon'ble Judges/Coram:**
A.P. Misra and U.C. Banerjee, JJ.

**Counsels:**

For Appellants: Vijay Bahuguna an S. Bagga, Sr. Advs., Seeraj Bagga an Ms. S. Bagga, Adv

For Respondents: P.P. Malhotra, Sr. Adv., Anish Kumar Gupta and Shrish Kumar Misra, Advs.

**Subject: Constitution**

**Subject: Civil**

**Acts/Rules/Orders:**
Commission of Inquiry Act, 1952;; Constitution of India - Article 32, Constitution of India - Article 226; Indian Penal Code 1860, (IPC) - Section 304; Motor Vehicles Act, 1939 - Section 110

**Cases Referred:**
C.K. Subramania Iyer and others v. T. Kunhikuttan Nair and Six Others MANU/SC/0011/1969; Franklin v. The South East Railway Company, 157 English Report 3 H & N; Taff Vale Railway Company v. Jenkins, (1913) AC 1; Grand Trunk Railway Company of Canada v. Jennings, 13 AC 800; Ricketts v. Erith Borough Council and another, 1943 (2) All ER 629; Prince and another v. Gregory and another, 1959 (1) WLR 177; Kooragang Investments Pvt. Ltd. v. Richardson & Wrench Ltd., 1982 A.C. 462; Barwick v. English Joint Stock Bank, (1867) L.R. 2 Ex. 259; Nilabati Behera (Smt) alias Lalita Behera (Through the Supreme Court Legal Aid Committee) v. State of Orissa and others MANU/SC/0307/1993; Rudal Sah v. State of Bihar & anr. MANU/SC/0380/1983; D.K. Basu v. State of West Bengal MANU/SC/0157/1997; Hodges v. Harland & Wolff Limited, (1965) 1 ALL ER 1086; Lata Wadhwa and others v. State of Bihar & others, Civil Writ Petition No. MANU/SC/0456/2001; General Manager, Kerala State Road Transport Corporation, Trivandrum v. Susamma Thomas and ors. MANU/SC/0389/1994; Davies v. Powell Duffryn Associated Collieries Ltd., 1942 AC 617; Gobald Motor Service Ltd. v. R.M.K. Veluswami MANU/SC/0016/1961

**Disposition:**
Disposed off

**Citing Reference:**



| | |
|---|---|
| Discussed | 9 |
| Dissented | 3 |
| Mentioned | 3 |
| Relied On | 1 |

**Case Note:**

**Civil - liability - fourteen students met untimely death by drowning in river during school picnic due to negligent act of teachers deputed to look after students - school authorities attributed liability to teachers - High Court rightly held school authorities vicariously liable by reason of factum of teachers being within course of employment of school at time of accident.**

HELD See para 25.

**JUDGMENT**

**Banerjee, J.**

1. A very sad tale concerning fourteen young kids resulting in untimely and unfortunate death of all of them stands out to be the subject matter of the Appeal under consideration. Said tale by reason of the fact that a sheer fun of young ones turned out to be fatal as a consequence of utter and callous neglect of teachers on duty.

2. Adverting to the factual aspects, it appears that on 28.5.1995, 59 boys and 18 girls (totalling 77) students, all in 4th, 5th and 6th classes of Dalhousie Public School, Badhani, Pathankot were brought for a picnic at Tandapatanindora on the bank of river Beas. The Head Master of the School deputed one Shri Surinder Pal Singh and another Shri K. Shanmugham being teachers in the School for escorting and taking due and proper care of the students. Incidentally, the site chosen for the picnic was the same on which the earlier picnic of the School was held on 7th May, 1995.

3. On the contextual facts, it appears that the School concerned has in its activities, a usual picnic for all the students in batches. Some of the students had already been into the picnic and these 77 were chosen for the batch which was scheduled for 28th May, 1992. It has been the version of the School authorities that in true educational institution, extra curricular activities play a dominant role in imparting proper education to the students and outings/picnics thus have been a regular feature in the school; whereas in the event of there being a plan for overnight stay, the School management without parental consent would not permit the concerned student for participation therein though however, the same is not a requirement in a day time outing or picnic.

4. The factual score further reveals that the management of the School organised the picnic on 7th May, 1995 for the student as noticed above and selected the same site on the bank of river Beas which flows from North to South direction having a width of approximately 200 ft. On the fateful day, however (28th May, 1998) the students were accompanied by five teachers, two mess boys, one supplier and the driver of the bus along with two European ladies (GAP students) in the picnic party. The records depict that in the post lunch period, fourteen students alongwith two teachers Shanmugam and S.P. Singh went down the river for a considerable distance with about 14 students and the teachers however discovered a sudden 'dibber' of about 6-8 ft. deep by reason where for the teachers themselves along with the students fell into a great danger - whereas teachers could save themselves up - the students fell a victim of utter neglect of the teachers. The children were allowed to play in the danger zone of the water without any caution or any warning being sounded, the resultant effect of which drowning of



these unfortunate fourteen children - a rather unfortunate sad end and finale to the so-called extra curricular activities of the School.

5. On the further factual score, it appears that the Government of Himachal Pradesh, ordered a judicial inquiry under the Commission of Inquiry Act 1952 by the District and Sessions Judge, Kangra and the State of Punjab also ordered an inquiry by the sub-divisional Magistrate, Pathankot but nothing was forthcoming by reason where for the private respondents on 14th July, 1995, being the parents of the unfortunate children moved a writ petition under Article 226 of the Constitution in the High Court against the Petitioner Nos. 1 and 2 and respondent Nos. 14-16 seeking a relief by way of an inquiry by C.B.I. to find out the causes for the tragedy and fixation of responsibility therefore and punishment to the guilty ones together however, with a prayer for adequate compensation from the School authorities and on 2nd August, 1995, the High Court ordered an Inquiry to be conducted by the Central Bureau of Investigation and the latter upon examination of various witnesses recording the unfortunate incident of drowning of children concluded in paragraph 41 of the report as below:

> "41. The conclude investigations have established that the death of 14 students by drowning was caused by the rash and negligent acts of firstly allowing the students to stray down stream by about 1100 ft. and enter into uncharted waters and secondly, due to direct instigation by Shri Surinder Pal Singh whereby the students in their efforts to catch him and thereafter to race to the bushes on the western river bank down stream, entered into the water of 'Dibber' and were drowned as the depth of the water exceeded their average height. The investigation has thus prima facie established the commission of offence u/s 304A of the Indian Penal Code by S/Shri S.P. Singh, Director Physical Education, Dalhousie Public School and Shri K. Shanmugam, teacher, Dalhousie Public School, Badhani."

6. The Writ Petition, however, came up for final disposal before the High Court on 4th March, 1996 wherein the writ petition was allowed and it was ordered that the Chairman and the Management of the School shall pay a compensation of Rs. 5 lakh to each of the parents of fourteen students who died in the incident and a sum of Rs. 30,000/- to each of the parents of students who suffered due to drowning incident within two months with interest at the rate of 12% per annum from 28th May, 1995 by depositing the same in the registry of the High Court and hence the Special Leave Petition before this Court and the subsequent grant of leave with an order to deposit a sum of Rs. 7 lakhs towards discharge of the liability of the petitioner, if ultimately upheld by the Court to be disbursed in accordance with the orders of the court. Incidentally, the order requiring the petitioner to deposit a sum of Rs. 7 lakhs stands complied with.

7. It is on this factual backdrop Mr. Bahuguna, learned Senior Advocate in support of the Appeal in no uncertain terms stated before the Court that the event that has happened, should not have happened. Strong reliance was placed on the report of the C.B.I. wherein there has been total exoneration of any liability so far as the management of the School are concerned though responsibility has been fixed on to School teaches personally. Mr. Bahuguna with his usual eloquence expressed his deepest sorrow for the incident and on the very first day of the hearing submitted that irrespective of any instruction in the matter, a sum of Rs. 2 lakhs can be termed to be a reasonable figure and his clients should be prepared to pay the same - a good gesture undoubtedly, but since the same does not receive concurrence from mr. Malhotra, the learned Senior Advocate, appearing for the Respondents herein, we refrain ourselves from expressing any opinion thereon. But that as it may, Mr. Bahuguna contended the quantum had been fixed by the High Court at a strangely staggering figure Rs. 5 lakhs without however any basis whatsoever - Acknowledging, however, the fact that no amount of compensation can possibly redress the grievances of the parents in the contextual facts, it has been contended that the law courts also cannot possibly proceed on emotions and sentiments only: the order pertaining to payment of compensation must have its foundation on some finding of fact in the absence of which the order becomes totally untenable. A number of decisions have been cited to depict that the quantum must be realistically realistic having its proper basis rather than assessment thereof on sentiment and anguish. Mr. Bahuguna submitted that the anguish of the Judges of the High Court obviously is understandable but that does not however mean and imply, award of compensation to a staggering amount or Rs. 5 lakhs per student by reason where for the School



stands foisted with the liability of more than one crore. Mr. Bahuguna contended that assessment of compensation must also have a co-relation with the ability of capability to pay. Ability to pay, it was contended is a necessary criteria in regard to the fixation of quantum of compensation in the event of there being an unfortunate event and it is on this score that paragraph 41 of the Report has been taken recourse to - The teachers have been ascribed to be negligent and not a whisper about the conduct of the school and as such conferment of liability on to the school in any event is totally an injudicious discretion of the High Court. True, and as noticed hereinbefore the conclusion of CBI, fixed the entire responsibility upon the two teachers and criminal proceedings stand initiated by reason therefore and the accused persons as a matter of fact also stand convicted under Section 304-A I.P.C. - but what is the affect of such a finding; Needless to record that the CBI's investigation was not in regard to the assessment of the quantum of tort feasor's or joint tort-teasers' liability and as such the report by itself would not be of any assistance to the school authorities in the matter of fixation of monetary liability by reason therefore.

8. Incidentally, this Court in <u>C.K. Subramania Iyer and Others</u> v. <u>T. Kunhikuttan Nair and Six Others</u> MANU/SC/0011/1969 : [1970]2SCR688 while dealing with the matter of fatal accidents laid down certain relevant guidelines for the purpose of assessment of compensation. Paragraph 13 of the report would be relevant on this score and the same is set out hereinbelow:

> "13. The law on the point arising for decision may be summed up thus: Compulsory damages under Section 1-A of the Act for wrongful death must be limited strictly to the pecuniary loss to the beneficiaries and that under Section 2, the measure of damages is the economic loss sustained by the estate. There can be no exact uniform rule for measuring the value of the human life and the measure of damages cannot be arrived at by precise mathematical calculations but the amount recoverable depends on the particular facts and circumstances of each case. The life expectancy of the deceased or of the beneficiaries whichever is shorter is an important factor. Since the elements which go to make up the value of the life of the deceased to the designated beneficiaries are necessarily personal to each case, in the very nature of things, there can be no exact or uniform rule for measuring the value of human life. In assessing damages, the Court must exclude all considerations of matter which rest in speculation or fancy though conjecture to some extent is inevitable. <u>As a general rule parents are entitled to recover the present cash value of the prospective service of the deceased minor child. In addition they may receive compensation for loss of pecuniary benefits reasonably to be expected after the child attains majority. In the matter of ascertainment of damages, the Appellate Court should be slow in disturbing the findings reached by the courts below, if they have taken all the relevant facts into consideration."</u> (Emphasis supplied)

9. The observations as above, undoubtedly lays down the basic guidance for assessment of damage but one redeeming feature ought to be noted that compensation or damages cannot be awarded as a solatium but to assess the same with reference to loss of pecuniary benefits. In the decision last noted MANU/SC/0011/1969 : [1970]2SCR688 : [1970]2SCR688 this Court placed strong reliance on two old decisions of the English Courts to wit: <u>Franklin</u> v. <u>The South East Railway Company</u> (157 English Report 3 H & N, p.448) wherein Pollock, C.B. stated:

> "We do not say that it was necessary that actual benefit should have been derived, a reasonable expectation is enough and such reasonable expectation might well exist, though from the father, not being in need, the son had never done anything for him. On the other hand a jury certainly ought not to make a guess in the matter, but ought to be satisfied that there has been a loss of sensible and appreciable pecuniary benefit, which might have been reasonably expected from the continuance of life."

10. The other decision relates to the case of <u>Taff Vale Railway Company</u> v. <u>Jenkins</u> (1913) AC 1 wherein Atkinson, J. stated the law as below:

> "I think it has been well established by authority that all that is necessary is that a reasonable expectation of pecuniary benefit should be entertained by the person who



sues. It is quite true that the existence of this expectation is an inference of fact - there must be a basis of fact from which the inference can reasonably be drawn, but I wish to express my emphatic dissent from the proposition that it is necessary that two of the facts without which the inference cannot be drawn are, first, that the deceased earned money in the past, and second, that he or she contributed to the support of the plaintiff. These are, no doubt, pregnant pieces of evidence, but they are only pieces of evidence, and the necessary inference can I think be drawn from circumstances other than and different from them."

11. Be it placed on record that in assessing damages, all relevant materials should and ought always be placed before the court so as to enable the Court to come to a conclusion in the matter of affection of pecuniary benefit by reason of the unfortunate death. Though mathematical nicety is not required but a rough and ready estimate can be had from the records claiming damages since award of damages cannot be had without any material evidence; whereas one party is to be compensated, the other party is to compensate and as such there must always be some materials available therefore. It is not a fanciful item of compensation but it is on legitimate expectation of loss of pecuniary benefits. In <u>Grand Trunk Railway Company of Canada</u> v. <u>Jennings</u> 13 AC 800) this well accepted principle stands reiterated as below:

> "In assessing the damages, all circumstances which may be legitimately pleaded in diminution of the damages must be considered. It is not a mere guess work neither it is the resultant effect of a compassionate attitude."

12. As noticed above, a large number of decisions were placed before this Court as regards the quantum of compensation varying between 50,000 to one lakh in regard to unfortunate deaths of young children. We do deem it fit to record that while judicial precedents undoubtedly have some relevance as regards the principles of law, but the quantum of assessment stands dependent on the fact-situation of the matter before the court, than judicial precedents. As regards the quantum no decision as such can be taken to be of binding precedent as such, since each case has to be dealt with on its own peculiar facts and thus compensation is also to be assessed on the basis thereof though however the same can act as a guide: Placement in the society, financial status differ from person to person and as such assessment would also differ. The whole issue is to be judged on the basis of the fact-situation of the matter concerned though however, not on mathematical nicety.

13. On the issue of negligence, the CBI report and subsequent decision the Criminal Court have foisted liability on to the teachers accompanying the students - But what is the effect of such a finding? Significantly, the school authority though claimed to be not liable in any way, in no uncertain terms however blamed the teachers and their utter negligence, resulting in such a tragedy.

14. Negligence in common parlance mean and imply failure to exercise due care, expected of a reasonable prudent person. It is a breach of duty and negligence in law ranging from inadvertence to shameful disregard of safety of others. In most instances, it is caused by heedlessness of inadvertence, by which the negligent party is unaware of the results which may follow from his act. Negligence is thus a breach of duty or lack of proper care in doing something, in short, it is want of attention and doing of something which a prudent and a reasonable man would not do (vide Black's Law Dictionary). Though sometimes, the word 'inadvertence' stands and used as a synonym to negligence, but in effect negligence represents a state of the mind which however is much serious in nature than mere inadvertence. There is thus existing a differentiation between the two expressions - whereas inadvertence is a milder form of negligence, 'negligence' by itself mean and imply a state of mind where there is no regard for duty or the supposed care and attention which one ought to bestow. <u>Clerk & Lindsell on Torts</u> (18th Ed.) sets out four several requirements of the tort of negligence and the same read as below:

> "(1) the existence in law of a duty of care situation, i.e. one in which the law attaches liability to carelessness. There has to be recognition by law that the careless infliction of the kind of damages in suit on the class of person to which the



claimant belongs by the class of person to which the defendant belong is actionable;

(2) breach of the duty of care by the defendant, i.e., that it failed to measure up to the standard set by law;

(3) a casual connection between the defendant's careless conduct and the damage;

(4) that the particular kind of damage to the particular claimant is not so unforeseeable as to be too remote."

15. While the parent owes his child, a duty of care in relation to the child's physical security, a teacher in a School is expected to show such care towards a child under his charge as would be exercised by a reasonably careful parent. In this context, reference may be made to a decision of Tucker, J. In <u>Ricketts</u> v. <u>Erith Borough Council and Another</u> 1943 (2) All ER 629 as also the decision of the Court of Appeal in <u>Prince and Another</u> v. <u>Gregory and Another</u> 1959 (1) WLR 177.

16. Duty of care varies from situation to situation - whereas it would be the duty of the teacher to supervise the children in the playground but the supervision, as the children leave the school, may not be required in the same degree as is in the play-field. While it is true that if the students are taken to another school building for participation in certain games, it is sufficient exercise of diligence to know that the premises are otherwise safe and secure but undoubtedly if the students are taken out to playground near a river for fun and swim, the degree of care required stands at a much higher degree and no derivation therefrom can be had on any count whatsoever. Mere satisfaction that the river is otherwise safe for swim by reason of popular sayings will not be a sufficient compliance. As a matter of fact the degree of care required to be taken specially against the minor children stands at a much higher level than adults: Children need much stricter care.

17. Incidentally, negligence is an independent tort and has its own strict elements specially in the matter of children - the liability is thus absolute vis-a-vis the children. The school authorities in the contextual facts attributed negligence to the two teachers who stand convicted under Section 304A of the Indian Penal Code as noticed above and Mr. Bahuguna appearing in support of the appeal during the course of hearing, however, also in no uncertain terms attributed utter negligence on the part of the teachers and thus conceded on the issue of negligence. Concession, if any, as noticed above, though undoubtedly a good gesture on the part of the school authority, but can the school absolve its responsibility and corresponding culpability in regard to the incident: Would they be termed to be a joint tort feasors or would it be a defence that the school has taken all due care having regard to its duty and it is irrespective thereof by reason of utter neglect and callous conduct on the part of the two of the teachers escorting them that has cause the injury - Mr. Bahuguna contended that the school cannot be made liable under any stretch of imagination by reason of the happening of an event which is not within the school premises and has, in fact, happened by reasons of the neglect of two of the teachers. It is on this score that Mr. Malhotra rather emphatically contended that the liability cannot simply be obliterated by reason of plea of utter neglect on the part of the two of the teachers: School concerned can be said to be liable even as a joint tort-feasor and in any event, Mr. Malhotra contended that applicability of the doctrine of vicarious liability cannot be doubted or be brushed aside, in any way whatsoever and since the issue of vicarious liability has been more emphatic and pronounced than the issue of joint tort-feasor, we deem it expedient to deal with the second of twin issues first as noticed above.

18. Be it noted that the doctrine of 'vicarious liability' has had a fair amount of judicial attention in the English Courts. By the end of 18th century, the idea began to grow up that some special importance ought to be attached to the relationship of master and servant and in 1849 it was officially held that existence of that relationship was essential. Thereafter, though primary liability on the part of anyone could be established on proof of direct participation in the tort, such direct participation was not even theoretically required to make a master liable for his servant's torts. The liability is derived from the relationship and is truly vicarious. At the same time, the phrase 'implied authority' which had been the cornerstone of the master's primary liability gives way gradually to the modern "course of employment". (vide Winfield & Jolwicz on



Tort 15th Ed.).

19. In recent years, the tenancy has been however, towards more liberal protection of third party and so in establishing a particular 'course of employment' the court should not dissect the employees basic task into component parts but should ask in a general sense: What was the job at which he was engaged for his employer? And it is on this perspective Lord Wilberforce in Kooragang Investments Pvt. Ltd. v. Richardson & Wrench Ltd. 1982 A.C. 462 stated:

> "..Negligence is a method of performing an act instead of it being done carefully, it is done negligently. So liability for negligent acts in the course of employment is clear. Cases of fraud present at first sight more difficulty; for if fraudulent acts are not directly forbidden, most relationships would carry an implied prohibition against them. If committed for the benefit of the employer and while doing his business principles and logic demand that the employer should be held liable, and for some time the law rested at this point. The classic judgment of Willes J. in Barwick v. English Joint Stock Bank (1867) L.R. 2 Ex. 259 stated the principle thus:
>
>> "In all these cases it may be said... that the master has not authorised the act. It is true, he has not authorised the particular act but he has put the agent in this place to do that class of acts and he must be answerable for the manner in which the agent has conducted himself in doing the business which it was the act of his master to place him in."
>
> That was a case where the wrong committed for the master's (viz., the bank's) benefit, and Willes J. stated this as an ingredient of liability at p.265:
>
>> "...the master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master be proved."

20. But a sharp distinction has been made as regards the group of cases which is concerned with the use of motor vehicles. These are the case Lord Wilberforce observed:

> "(i) where a servant has, without authority, permitted another person to drive the master's vehicle; (ii) where a servant has, without authority, invited another person on to the vehicle, who suffers injury; (iii) where a servant has embarked on an unauthorised detour, or, as lawyers like to call it, a "frolic of his own." These cases have given rise to a number of fine distinctions, the courts in some cases struggling to find liability, in others to avoid it, which it is not profitable here to examine. It remains true to say that, whatever exceptions or qualifications may be introduced, the underlying principle remains that a servant, even while performing acts of the class which he was authorised, or employed, to do, may so clearly depart from the scope of his employment that his master will not be liable for his wrongful acts."

21. The English law, therefore, takes a softer attitude in cases where motor vehicles are involved in the matter of foisting of liability so far as the employer is concerned - the reason obviously being if the concerned employee acts in a manner contrary to the contrary to the course of employment and on a "frolic of his own" - why should the employer be made responsible. It seems logical - but obviously there are cases and cases on the basis where for the liability of the employer ought to be fixed. The Privy Council in Kooragang Ltd. attributed "frolic of his own" to be the exonerating factor but this frolic has also to be considered from facts to facts in the matter of foisting of liability on to the employer. In any event, we need not devote much of our time to the expected cases, since we have in this country several legislations covering the "expected categories". The recognition of broader approach however, stands undisputed and has also our concurrence herewith.

22. Significantly, however, Mr. Malhotra with all the emphasis at his command and rather strongly commented upon the submissions of Mr. Bahuguna on the issue of award of compensation by reason of specific legislations in the country - in particular reference to Motor



Vehicles Act and on a conjoint reading of the 2nd Schedule thereto, Mr. Malhotra contended that the quantum would be far in excess of the amount awarded by the High Court - submissions seem to be rather attractive: Motor Vehicles Act and the 2nd Schedule thereto cannot but be treated to be a guide in the matter of award of compensation and there cannot possibly be any doubt in regard thereto. We shall however be dealing with the issue slightly later in this judgment.

23. Turning attention however on to the issue of vicarious liability, one redeeming feature ought to be noticed at this juncture that to escort the children was the duty assigned to the two teachers and till such time thus the period of escorting stands over, one cannot but ascribe it to be in the course of employment - the two teachers were assigned to escort the students; the reason obviously being - the children should otherwise be safe and secure and it is the act of utter negligence of the two teachers which has resulted in this unfortunate tragedy and thus it is no gain-said that the teachers were on their own frolic and the school had done all that was possible to be done in the matter - safety of the children obviously were of prime concern so far as the school authorities are concerned and till such time the children return to school, safe and secure after the picnic, the course of employment, in our view continues and thus resultantly, the liability of the school.

24. A profitable re-capitulation of facts depict that the criminal court has already found both the teachers guilty of utter negligence and convicted them under Section 304A IPC (which provides that whoever causes the death of any person by doing any rash or negligence act not amounting to culpable homicide shall be punished with...) We are not inclined to record anything contra, save what stands recorded by the District Court in the criminal proceeding but we are constrained to record our anguish over the conduct of the teachers escorting the students - even a simple rule of discipline and safety would have prompted the teachers not only to go to the river where they went but no where near the river ought to have been the guiding factor - children are children fun and frolic stand ingrained in them and it is School/Teachers deputed for escorting ought to be reasonably careful since entrusted with the safety - this entrustment ought to have infused a sense of duty which should have prompted them to act not in the manner as they have so acted.

25. In view of the above, we are unable to record our concurrence with the submissions of Mr. Bahuguna that the doctrine of 'vicarious liability' cannot in any event be made applicable in the facts of the matter under consideration. Liability of the school, in our view, in the contextual facts cannot be shifted for any reason whatsoever by reason of the factum of teachers being within the course of employment of the school at the time of the tragedy.

26. Next is the issue 'maintainability of the writ petition' before the High Court under Article 226 of the Constitution. The appellant though initially very strongly contended that while the negligence aspect has been dealt with under penal law already, the claim for compensation cannot but be left to be adjudicated by the Civil law and thus the Civil court's jurisdiction ought to have been invoked rather than by way of a writ petition under Article 226 of the Constitution. This plea of non-maintainability of the writ petition though advanced at the initial stage of the submissions but subsequently the same was not pressed and as such we need not detain ourselves on that score, excepting however recording that the law courts exists for the society and they have an obligation to meet the social aspirations of citizens since law courts must also respond to the needs of the people. In this context reference may be made to two decisions of this Court. The first in line, is the decision in <u>Nilabati Behera (Smt) alias Lalita Behera (Through the Supreme Court Legal Aid Committee)</u> v. <u>State of Orissa and Others</u> MANU/SC/0307/1993 : 1993CriLJ2899 wherein this Court relying upon the decision in <u>Rudal Sah</u> (Rudal Sah v. State of Bihar & Anr. MANU/SC/0380/1983 : 1983CriLJ1644 decried the illegality and impropriety in awarding compensation in a proceeding in which court's power under Articles 32 and 226 of the Constitution stand invoked and thus observed that it was a clear case for award of compensation to the petition for custodial death of her son. It is undoubtedly true however that in the present context, there is no infringement of State's obligation unless of course the State can also be termed to be a joint tort-feasor, but since the case of the parties stand restricted and without imparting any liability on the State, we do not deem it expedient to deal with the issue may further except noting the two decisions of this Court as above and without expression of any opinion in regard thereto.



27. The decision of this Court in <u>D.K. Basu</u> vs. <u>State of West Bengal</u> MANU/SC/0157/1997 : 1997CriLJ743 : 1997CriLJ743 comes next. This decision has opened up a new vests in the jurisprudence of the country. The old doctrine of only relegating aggrieved to the remedies available in civil law limits stands extended since Anand, J. (as His Lordship then was) in no uncertain terms observed:

> "The courts have the obligation to satisfy the social aspirations of the citizens because the courts and the law are for the people and expected to respond to their aspirations. A court of law cannot close its consciousness and aliveness to stark realities. Mere punishment of the offender cannot give much solace to the family of the victim - civil action for damages is a long drawn and a cumbersome judicial process. Monetary compensation for redressal by the court finding the infringement of the indefeasible right to life of the citizen is, therefore, useful and at time perhaps the only effective remedy to apply balm to the wounds of the family members of the deceased victim, who may have been the breadwinner of the family."

28. Currently judicial attitude has taken a shift from the old draconian concept and the traditional jurisprudential system - affection of the people has been taken note of rather seriously and the judicial concern thus stands on a footing to provide expeditious relief to an individual when needed rather than taking recourse to the old conservative doctrine of civil courts obligation to award damages. As a matter of fact the decision in **D.K. Basu** has not only dealt with the issue in a manner apposite to the social need of the country but the learned Judge with his usual felicity of expression firmly established the current trend of 'justice oriented approach. Law courts will lose its efficacy if it cannot possibly respond to the need of the society - technicalities there might be many but the justice oriented approach ought not to be thwarted on the basis of such technicality since technicality cannot and ought not to outweigh the course of justice.

29. The only other issue, thus left outstanding in the matter under consideration pertains to the quantum of compensation. It is at this juncture that we record our appreciation for the gesture of Mr. Bahuguna who at the very commencement of the hearing submitted that while the figure of Rs. 5 lacs compensation per child seem to be strangely absurd but he recommended a figure of Rs. 2 lacs per child as monetary compensation for the events that had taken place; compensation there cannot be any, far less monetary compensation, for the unfortunate death of one's own child - it cannot be termed to be a solatium. Unfortunately the situation in the facts of the matter does not warrant us to accept the same as a result of which we wish to deal with the matter in slightly more greater detail.

30. Mr. Bahuguna for the appellant with however strong vehemence contended that the High Court has totally misread and misapplied the principles of law in the matter of awarding compensation and in any event the quantum thereto has been fixed at an absurdly higher figure. The anguish of the High Court, Mr. Bahuguna contended, is understandable by reason of the factual import in the matter but the does not however mean and imply that a court of law would be guided by emotion and allow the sentiments to play a pivotal role in the matter of assessment of damages. It has been the contention of Mr. Bahuguna that there is not an iota of evidence as to the pecuniary loss for pecuniary benefit and as such the assessment of quantum has been totally arbitrary and in utter disregard of the known principles of law.

31. As noticed hereinbefore six several judgments have been cited wherein the quantum of compensation varies between Rs.30,000/- to Rs. 1,50,000/- but in every decision there was a factual basis for such an assessment and there is no denial of the same. But the adaptability of the multiply method and its acceptability without any exception cannot just be given a go by. This Court in a long catena of cases and without mixing word did apply the multiply method to decide the question of compensation in the cases arising out of Motor Vehicles Act. It is in this context the view of British Law Commission may be noticed and which indicates "the multiplier has been, remains and should continue to remain, the ordinary, the best and the only method of assessing the value of a number of future annual sums". The actuarial method of calculation strictly speaking may not have loss its relevance but its applicability cannot but be said to be extremely restricted - said the British Commission. Lord Denning's observations in <u>Hodges</u> vs. <u>Harland & Wolff Limited</u> (1965) 1 ALL ER 1086 also seem to be rather apposite. Lord Denning



observed that multiplier method cannot but be termed to be of universal application and as such it would meet the concept of justice in the event the same method is applied for determining the quantum of compensation. Incidentally in a very recent decision of this Court (Civil Writ Petition No. 232 of 1991 in the matter of <u>Lata Wadhwa and Others</u> vs. <u>State of Bihar & Others</u> [of which one of us (U.C. Banerjee, J.) was a party] wherein a three-Judge Bench of this Court has had the occasion to consider an award of a former Chief Justice Pertaining to the assessment of compensation by reason of a huge accidental fire. Significantly a writ petition was filed in this Court and this Court thought it expedient to have the claims examined by a former Chief Justice of the country and the latter duly and upon adaptation of multiplier method finalised the quantum of compensation which more or less barring some exceptions stands accepted by this Court in the decision noticed above. In Lata Wadhwa's decision factual score records that while 150th Birth Anniversary of Sir Jamshedji Tata, was being celebrated on 3rd March, 1989 within the factory premises at Jamshedpur and a large number of employees, their families including small children had been invited, a devastating fire suddenly engulfed the Pandal and the area surrounding and by the time the fire was extinguished, a number of persons lay dead and many were suffering with burn injuries. The death toll reached 60 and the total number of persons injured were 113. The factual score in Lata Wadhwa's case further depicts that amongst the persons dead, there were 26 children, 25 women and 9 men and Srimati Lata Wadhwa the petitioner in the matter lost here two children, a boy and a girl as also here parents. It is on this score that the learned arbitrator fixed in the absence of any material a uniform amount of Rs. 50,000/- to which again a conventional figure of Rs.25,000/- has been added for determining the total amount of compensation payable. While dealing with the matter this Court (Pattanaik, J. speaking for the Bench) observed:

> "So far as the determination of compensation in death cases are concerned, apart from the three decisions of Andhra Pradesh High Court, which had been mentioned in the order of this Court dated 15th December, 1993, this Court in the case of <u>General Manager, Kerala State Road Transport Corporation, Trivandrum</u> vs. <u>Susamma Thomas and Ors.</u> MANU/SC/0389/1994 : AIR1994SC1631 : AIR1994SC1631 , exhaustively dealt with the question. It has been held in the aforesaid case that for assessment of damages to compensate the dependants, it has to take into account many imponderables, as to the life expectancy of the deceased and the dependents, the amount that the deceased would have earned during the remainder of his life, the amount that he would have contributed to the dependants during that period, the chances that the deceased many not have lived or the dependents may not live up to the estimated remaining period of their life expectancy, the chances that the deceased might have got better employment or income or might have lost his employment or income altogether. The Court further observed that the manner of arriving at the damages is to ascertain the net income of the deceased available for the support of himself and his dependants, and to deduct therefrom such part of his income as the deceased was accustomed to spend upon himself, as regards both self-maintenance and pleasure, and to ascertain what part of his net income the deceased was accustomed to spend for the benefit of the dependants, and thereafter it should be capitalised by multiplying it by a figure representing the proper number of year's purchase. It was also stated that much of the calculation necessarily remains in the realm of hypothesis and in that region arithmetic is a good servant but a bad master, since there are so often many imponderables. In every case, "it is the overall picture that matters", and the Court must try to assess as best as it can, the loss suffered. On the acceptability of the multiplier method, the Court observed:

>> "The multiplier method is logically sound and legally well-established method of ensuring a 'just' compensation which will make for uniformity and certainty of the awards. A departure from this method can only be justified in rare and extraordinary circumstances and very exceptional cases."

32. In the decision of **Susamma Thomas** (supra), this Court in paragraphs 7 & 8 of the report observed:



"7. In a fatal accident action, the accepted measure of damages awarded to the dependants is the pecuniary loss suffered by them as a result of the death. How much has the window and family lost by the father's death? The answer to this lies in the oft-quoted passage from the opinion of Lord Wright in *Davies* v. *Powell Duffryn Associated Collieries Ltd.* 1942 AC 617 which says:

> The starting point is the amount of wages which the deceased was earning, the ascertainment of which to some extent may depend on the regularity of his employment. Then there is an estimate of how much was required or expended for his own personal and living expenses. The balance will give a datum or basis figure which will generally be turned into a lump sum by taking a certain number of years purchase. That sum, however, has to be taxed down by having due regard to uncertainties, for instance, that the widow might have again married and thus ceased to be dependent, and other like matters of speculation and doubt.

8. The measure of damage is the pecuniary loss suffered and is likely to be suffered by each dependent. Thus "except where there is express statutory direction to the contrary, the damages to be awarded to a dependant of a deceased person under the Fatal Accidents Acts must take into account any pecuniary benefit accruing to that dependant in consequence of the death of the deceased. It is the net loss on balance which constitutes the measure of damages. (Per Lord Macmillan and Davies v. Powell) Lord Wright in the same case said. "The actual pecuniary loss of each individual entitled to sue can only be ascertained by balancing on the one hand the loss to him of the future pecuniary benefit, and on the other any pecuniary advantage which from whatever source comes to him by reason of the death". These words of Lord Wright were adopted as the principle applicable also under the Indian Act in Gobald Motor Service Ltd. v. R.M.K. Veluswami MANU/SC/0016/1961 : [1962] 1SCR929 where the Supreme Court stated that the general principle is that the actual pecuniary loss can be ascertained only by balancing on the one hand the loss to the claimants of the future pecuniary benefit and on the other any pecuniary advantage which from whatever source comes to them by reason of the death, that is, the balance of loss and gain to a dependant by the death, must be ascertained."

33. Needless to say that the multiplier method stand accepted by this Court in the decision last noticed and on the acceptability of multiplier method this Court in para 16 had the following to state:

"It is necessary to reiterate that the multiplier method is logically sound and legally well-established. There are some cases which have proceeded to determine the compensation on the basis of aggregating the entire future earning for over the period the life expectancy was lost, deducted a percentage therefrom towards uncertainties of future life and award the resulting sum as compensation. This is clearly unscientific. For instance, if the deceased was, say 25 years of age at the time of death and the life expectancy is 70 years, this method would multiply the loss of dependency for 45 years o virtually adopting a multiplier of 45 - and even if one-third or one-fourth is deducted therefrom towards the uncertainties of future life and for immediate lump sum payment, the effective multiplier would be between 30 and 34. This is wholly impermissible. We are, aware that some decisions of the High Courts and of this Court as well have arrived at compensation on some such basis. These decisions cannot be said to have laid down a settled principle. They are merely instances of particular awards in individual cases. The proper method of computation is the multiplier method. Any departure, except in exceptional and extraordinary cases, would introduce inconsistency of principle, lack of uniformity and an element of unpredictability for the assessment of compensation. Some judgments of the High Court have justified a departure from the multiplier method on the ground that Section 110-B of the Motor Vehicles Act, 1939 insofar as it envisages the compensation to be 'just' compensation would unshackle the exercise from any rigid formula. It must be borne in mind that the multiplier method is the accepted method



of ensuring a 'just' compensation which will make for uniformity and certainty of the awards. We disapprove these decisions of the High Courts which have taken a contrary view. We indicate that the multiplier method is the appropriate method, a departure from which can only be justified in rare and extraordinary circumstances and very exceptional cases."

34. In Lata Wadhwa's case, however, this Court came to a conclusion that upon acceptability of the multiplier method and depending upon the facts situation namely the involvement of TISCO in its tradition that every employee can get one of his child employed in the company and having regard to multiplier 15 the compensation was calculated at Rs. 3.60 lacs with an additional sum of Rs. 50,000/- as conventional figure making the total amount payable at Rs. 4.10 lacs for each of the claimants of the deceased children.

35. The decision in Lata Wadhwa, thus, is definitely a guiding factor in the matter of award of compensation wherein children died under an unfortunate incident as noticed more fully hereinbefore in this judgment.

36. Having considered the matter in its proper perspective and the applicability of multiplier method and without even any further material on record we do feel it expedient to note that though Mr. Bahuguna attributed the quantum granted by the High Court as strangely absurd, we, however, are not in a position to lend our concurrence therewith. It is not that the award of compensation at Rs. 5 lacs can be attributed t be the resultant effect of either emotion or sentiments or the High Court's anguish over the incident. The High Court obviously considered the overall situation as regards social placements of the students. As stated hereinafter the school presently is one of the affluent school in the country and fee structure and other incidentals are so high that it would be a well nigh impossibility to think of admission in the school at even the upper middle class level. Obviously the school caters to the need of upper strata of the society and if the 2nd Schedule of Motor Vehicles Act, can be termed to be any guide, the compensation could have been a much larger sum. Thus in the factual situation award of compensation at Rs. 5 lakhs cannot by any stretch be termed to be excessive. Another redeeming feature of Mr. Bahuguna submissions pertains to the theory of ability to pay: Audited accounts have been produced for the year 1995 depicting a situation, though not of having stringency but the situation truly cannot but be ascribed to be otherwise comfortable to pay as directed by the High Court. The matter, however, prolonged in the law courts in the usual manner and it took nearly six years for its final disposal before this Court - these six years however had rendered the financial stability of the school concerned in a much more stronger situation than that it was in the year 1995. The school as of date stands out to be one of the most affluent schools in the country as such ability to pay cannot be termed to be an issue in the matter and on the wake thereto we are not inclined to deal with the same in any further detail.

37. In the view we have taken as above, we could have awarded a larger sum but judicial propriety deters us from doing so, since in the normal course of events appellate forum ought not to interfere with the award of compensation.

38. In the view, we have taken as noted hereinbefore, we do not feel in inclined to deal with the other issue of the school authority being a joint-tort feasor as submitted before this Court by the respondents. The issue thus is left open.

39. As regards the question of interest as contended by Mr. Malhotra, we feel it inclined to grant 6% simple interest from the date of the judgment of the High Court till payment on the reducing balance. The amount so directed by the High Court together with interest as modified above be paid by eight (8) quarterly installments.

40. The amount deposited in terms of earlier order of this Court inclusive of interest with the Registrar of this Court be made available to the parties pro-rata in terms of this order and the balance, however, be paid as directed above.

41. This appeal thus stands disposed of without any order as to costs.



© Manupatra Information Solutions Pvt. Ltd.

# EXHIBIT J


SCC Online Web Edition, Copyright © 2015
Page 1 of 1 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ
True Print

## 2008 (100) DRJ 43(DB)

HIGH COURT OF DELHI

*LPA No. 2339/2006*

### Shanti Mukand Hospital............Appellant

*Versus*

### Rinchu & Ors.............Respondents

**Dr. Mukundakam Sharma, C.J.**
**Sanjiv Khanna, J.**

**Decided on 07.12.2007**

**Tort**

**Liability of making payment of compensation to victim of rape and grievous injury who lost one eye while being on private duty attending a patient — Additional Chief Metropolitan Magistrate (ACMM) held that there was no criminal negligence on the part of the appellant — Hospital ward boy used criminal force with such intensity that her entire right eye ball got detached from the socket and came out while committing rape on her — No medical treatment was offered to her by an ophthalmologist — Hospital apparently forgot that proper and immediate medical treatment and care was required — Evidence on record would make at best a case of civil liability in the nature of tort — Award of compensation, affirmed.**

**Cases Referred :**

| | |
|---|---|
| Abdul Haque & Ors. v. BSES Yamuna Power Ltd. & Ors. | 142(2007) DLT 526 |
| Bodhisattwa Gautam v. Shubhra Chakraborty (Ms) | (1996) 1 SCC 490 |
| Dwarkanath, Hindu Undivided Family v. Income Tax Officer, Special Circle, Kanpur and Anr. | (1965) 3 SCR 536 |
| M.C. Mehta and Anr. v. Union of India and Ors. | (1987) 1 SCC 395 |
| M.S. Grewal and Anr. v. Deep Chand Sood and Ors. | (2001) 8 SCC 151 |
| Rohtash Industries Ltd. and Anr. v. Rohtas Industries Staff Union and Ors. | (1976) 2 SCC 82 |
| Savita Garg v. Director, National Heart Institute | (2004) 8 SCC 56 |
| SDO, Grid Corporation of Orissa Ltd. and Ors. v. Timudu Oram | (2005) 6 SCC 156 |
| Sunil Mathew v. BSES Rajdhani | (2006) I AD (Delhi) 698 |

*PRESENT :* *Mr. C.N. Srikumar, Advocate with Mr. C. Hari Shankar, Mr. S. Souil and Mr. Rituraj Jagdishan, Advocates for the Petitioner.*

*Mr. Aman Lekhi, Sr. Advocate with Mr. Jaspreet S. Rai, Ms. Meenakshi Lekhi, Mr. Rakesh Kumar and Mr. Rohit Nagpal, Advocates for the Respondent No. 1.*

*Ms. Avnish Ahlawat, Counsel for the Respondent Nos. 2 & 3.*

SCC Online Web Edition, Copyright © 2015
Page 2 : Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ
-----------------------------------------------------------------------------------------------------------------------------------

**Dr. Mukundakam Sharma, C.J.**

1. The issue that arises for consideration in this appeal is whether the appellant Shanti Mukand Hospital could be saddled with a liability of making payment of compensation of an amount of Rs. 5.5 lacs out of the total 7.5 lacs awarded to the respondent No. 1 who became a victim of rape and grievous injury thereby loosing one eye while being on private duty attending a patient at the aforesaid hospital.

2. The writ petition was filed by the respondent No. 1 herein who is a nurse by profession. She was engaged to render her services to a paralytic patient, namely, Mr. S.K. Kaushik, who was an indoor patient at the appellant Shanti Mukand Hospital. On the night between 6-7 September, 2003, she not only became subjected to sexual assault and violence by a ward boy/ sweeper Bhura engaged by the appellant through a contractor but she also lost her right eye. She filed a writ petition seeking for adequate compensation from the respondent No. 2, Government of NCT of Delhi, respondent No. 3, Guru Teg Bahadur Hospital, which is a hospital run by the respondent No. 2 and also from the appellant Shanti Mukand Hospital, which is a nursing home and being run through a licence issued by the respondent No. 2. In the writ petition there was a further prayer seeking direction to the appellant nursing home for making provision for free medical treatment and a suitable job for herself. The aforesaid writ petition was heard after completion of the pleadings of the parties. On consideration of the records placed and the pleadings, the learned Single Judge held that the respondent No. 1 has undergone a horrific violence and trauma apart from violation of her person leaving her psychologically shattered at a young age of 19 years and that she has also been left with a permanent disability on account of loss of her right eye. The learned Single Judge also considered the factor that she has become handicapped which would not only adversely affect her potential as a professional nurse but also would affect her matrimonial prospects in future. Having considered the fact that the respondent No. 2 had given her some relief and succor by providing her a job, it was held that taking all the factors into account, total compensation of Rs. 7.5 lacs should be paid to the respondent No. 1 out of which Rs. 5.5 lacs should be paid by the appellant nursing home and the remaining 2.00 lacs should be paid by the respondent Nos. 2&3 herein. As to how the aforesaid amount is to be disbursed to the respondent No. 1 is also recorded by the learned Single Judge in the aforesaid order. Being aggrieved by the aforesaid order passed by the learned Single Judge, the present appeal is filed on which we have heard the learned counsel appearing for the parties.

3. Counsel appearing for the appellant submitted before us that Bhura who has committed the offence of rape on the respondent No. 1 and inflicted a grievous injury as a consequence of which she lost her right eye is not a direct employee of the appellant and he was employed only through a contractor and, therefore, the appellant could not have been saddled with


SCC Online Web Edition, Copyright © 2015
Page 3 — Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

-----------------------------------------------------------------------------------------------------------------

the aforesaid liability of making payment of compensation to the victim. The next submission of the counsel for the appellant was that in the criminal case the learned Additional Chief Metropolitan Magistrate (ACMM) held that there was no criminal negligence on the part of the appellant in the entire matter and, therefore, the learned Single Judge was wrong in holding that the appellant is liable to pay the aforesaid compensation. Another submission of the learned counsel appearing for the appellant was that disputed questions of fact as to whether or not the respondent No. 1 had suffered any injury and, if so, to what extent, amount of compensation etc., are matters which are required to be proved and established by filing a civil suit and such a disputed question of fact cannot be decided by filing a writ petition. In support of the said contention the counsel for the appellant relied upon two decisions of the Supreme Court to which reference has been made during the course of discussion in this judgment.

4. With regard to the aforesaid submissions raised, we also heard the learned counsel appearing for the respondent No. 2 and 3/Government of NCT of Delhi, GTB Hospital and the respondent No. 1 victim. In order to appreciate the contentions of the parties, it would be relevant to refer to some background facts which led to the filing of the aforesaid writ petition.

5. The respondent No. 1, who is a nurse, was engaged to provide and give nursing care to a private patient, namely, Mr. S.K. Kaushik, a paralytic patient who could neither speak nor move, housed in room No. 208 of the appellant hospital. On the intervening night of 6-7th September, 2003 at about 1.30 A.M. ward boy Bhura who was also on night duty approached the respondent No. 1 and tried to touch her in an undesirable manner. When she protested and screamed and asked Bhura to get out of the room, Bhura, realizing that her loud screams might be heard, held her tight, inserted his hand in her wind pipe in order to choke the voice, clawed her on the throat. It is alleged that he used criminal force with such intensity that her entire right eye ball got detached from the socket and came out. It was also contended in the writ petition by the respondent No. 1 that Bhura hit her hard on the head and threw her against the wall of the room and threatened to kill her and pushed her down and committed rape on her. Thereafter, he lifted the respondent No. 1 and threw her into the bathroom, where she fell down and became unconscious. The respondent No. 1 vomited blood and kept bleeding due to rape as well as due to grievous eye injury.

6. Respondent No. 1 partially regained consciousness at about 6 A.M. when another ward boy came into the room, opened the bathroom door and found her there. Although the hospital came to know of the state of her health at about 6 A.M. in the morning, no medical treatment was provided to her to treat her right eye as also the other injuries that she had suffered, and that she was not even transferred to casualty for over two hours, *i.e.*, upto about 8 A.M. probably on the ground that the medico-legal certificate (in short 'MLC') was not prepared. The time of reporting the offence to the

SCC Online Web Edition, Copyright © 2015
Page 4 — Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

police as recorded in the FIR is 7.55 a.m. The delay in the filing of the FIR is not explained.

7. The evidence brought on record indicate that MLC was prepared only at about 8.15 A.M. and she was examined by a junior gynaecologist and not by a senior consultant. Even thereafter no medical treatment was offered to her by an ophthalmologist on the ground that the Resident Ophthalmologist was not available in the hospital. The appellant hospital apparently forgot that proper and immediate medical treatment and care of the respondent No. 1 was required and if required senior ophthalmologist from another hospital or from outside should be summoned. The medical condition and trauma suffered by the respondent No. 1 was known and doctors were aware that her entire right eye ball had got detached and was hanging. She was sent unattended to GTB Hospital at about 11.30 A.M. where she was not even attended till 1.30 P.M. It is alleged that no treatment was given to her at the G.T.B. Hospital, except bandaging her eye. No senior consultant/doctor examined her. A second year post graduate resident only examined her and she simply had a telephonic consultation with the Reader in the Department. She was shunted from fifth floor to ground floor three times in the hospital. Respondent No. 1 alleged that the respondent No. 3 hospital failed to provide adequate treatment and they sent her back to the appellant hospital on the plea that she had been referred only for opthalmologic examination. Gross negligence and violation of medical ethics and irresponsibility was alleged as against both the appellant hospital and the respondent No. 3 on the basis of which the aforesaid claim was made.

8. The appellant herein took a defence in their counter affidavit contending, *inter alia*, that the respondent No. 1 was not an employee of the appellant hospital and that she was a private attendant of a patient, namely, Mr. S.K. Kaushik. It was also stated that Bhura who had committed the aforesaid offence on the respondent No. 1 was a ward sweeper employed by Baba House Keeping Services, who was given the contract for providing such services at the hospital. They also denied the allegation of any delay and negligence in providing treatment to the respondent No. 1. The appellant pleaded that they came to know of the incident at around 6 A.M. when she was immediately brought to the casualty with the help of other staff. It was alleged that the hospital administrator and the police arrived at 7.30 AM and a case was registered at 8.15 AM. when the eye of the respondent No. 1 was duly bandaged and gynaecological examination was done. It was stated that out of the two Opthalmology Consultants available on call, Dr. Angra was on leave and Dr. Rajiv Ghai was not available and, therefore, she was referred to GTB Hospital for examination of the eye. It was also alleged that she was taken to the hospital in ambulance accompanied by Dr. Sachin Gupta. Further contention was that she was again examined on 9th September, 2003 by Dr. Angra who discovered that the eye ball was still lying outside the orbit on the lids and therefore required to be removed on


SCC Online Web Edition, Copyright © 2015
Page 5 : Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

Case 1:15-cv-00421-SJ Document31-1 Filed04/06/15 Page143 of 202

emergent basis and, consequently, an emergency operation was done to remove the said eye ball.

9. In the light of the aforesaid pleadings and background facts we may now proceed to decide the issues raised before us.

10. At the request of counsel appearing for the appellant, we have perused the copy of the order passed by the Additional Chief Metropolitan Magistrate in the case registered against Bhura under FIR No. 447/2003. The aforesaid case was registered under sections 336/338 IPC. While rendering the aforesaid order, the learned ACMM considered the evidence on record and on appreciation thereof he held that when a patient agreed to go for medical treatment or surgical operation every careless act of the medical man cannot be termed as 'criminal' and that it could be termed 'criminal' only when the medical man exhibits a gross lack of competence or inaction and wanton indifference to his patient's safety and also when it is found to have arisen from gross ignorance or gross negligence. It was held that where a patient's sufferings result merely from error of judgment or an accident, no criminal liability should be attached to it and that mere inadvertence or some degree of want of adequate care and caution might create civil liability but would not suffice to hold him criminally liable. It was also held that from the medical opinions produced by the prosecution this act attributed to the doctors, even if accepted to be true, could be described as negligent act as there was lack of due care and precaution and for such act of negligence, they might be liable in torts but their carelessness or want of due attention and skill could not be described to be so reckless or grossly negligent as to make them criminally liable. It was recorded in the order that from the medical records and medical literature it was clear that approach of Dr. Saurabh Srivastava was callous and pathetic towards the treatment of the patient which amounted to criminal negligence and rashness on her part. It was held that the case under Section 336 IPC was made out against the accused Dr. Saurabh Srivastava. It was held that *prima facie* no criminal case was made out against the accused Dr. S.K. Singh, Dr. O.P. Sharma, Dr. Mayank. Relying on the aforesaid order passed by the learned ACMM, Delhi it was contended by the counsel appearing for the appellant that since it was held that there was no criminal negligence on the part of the doctors of the appellant, therefore, the appellant could not have been saddled with the liability to pay compensation at all.

11. The aforesaid contention, however, is misplaced. What was discussed by the learned ACMM in the aforesaid order is whether or not there is a criminal liability of the doctors. So far civil liability is concerned, the learned ACMM has held that evidence on record would make at best a case of civil liability in the nature of tort and that no case was made out of criminal liability as against the doctors of the appellant. It may also be noted that the appellant hospital being a juristic person is not an accused in the said criminal case.

SCC Online Web Edition, Copyright © 2015
Page 1 of 1 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

12. The contention of the appellant that since the offence was committed by an individual who was not in direct employment of the appellant, is liable to be rejected. One needs to only refer to an earlier decision of this Court in the case of **Sunil Mathew v. BSES Rajdhani Reported in (2006) I AD (Delhi) 698**. In the instant case a motorist died after his vehicle crashed against a mobile crane used for repairing street lights that was left unattended, while the respondent BSES sought to deflect its culpability by contending that the contract for that purpose was given to a third person. This however was not accepted and the respondent-Corporation was directed to pay the compensation. The Court further noted that even if the liability is not direct, it is certainly vicarious in nature. Black's Law Dictionary, 5th edition defined this type of liability as "indirect legal responsibility", for example, "the liability of an employer for the acts of an employee, or, a principal for the torts of its agent." The said view is given further credence by the observations of the Supreme Court in the case of **Savita Garg v. Director, National Heart Institute, (2004) 8 SCC 56**, at page 68:

> "15. ... as per the English decisions also the distinction of "contract of service" and "contract for service", in both the contingencies, the courts have taken the view that the hospital is responsible for the acts of their permanent staff as well as staff whose services are temporarily requisitioned for the treatment of the patients. Therefore, the distinction which is sought to be pressed into service so ably by learned counsel cannot absolve the hospital or the Institute as it is responsible for the acts of its treating doctors who are on the panel and whose services are requisitioned from time to time by the hospital looking to the nature of the diseases. The hospital or the Institute is responsible and no distinction could be made between the two classes of persons *i.e.* the treating doctor who was on the staff of the hospital and the nursing staff and the doctors whose services were temporarily taken for treatment of the patients. ....."

The aforesaid observation made in the context of medical negligence would equally, apply to the present case. Since the hospital for its own convenience had employed the services of workers through a contractor, it cannot escape the legal duty to care on that ground.

13. The facts and the statements made in the pleadings amply make out and prove a case that the appellant hospital was negligent and did not take any follow up and immediate action to provide medical treatment to the patient at least till after 8.15 P.M. although they detected the incident at 6 A.M. They waited for the police to come and register a case of medico-legal certificate and after the said formality was completed then only they provided the patient gynecological treatment and that also was provided through a junior gynecologist. It is also established that her eye was not examined at the appellant hospital and no treatment was given in


SCC Online Web Edition, Copyright © 2015
Page 7 Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

that regard on the pretext that the resident doctor of OPD was not available for which she was sent at about 11.30 AM to the G.T.B. Hospital. Even in the G.T.B. Hospital she was not given proper treatment immediately on her arrival and she had to wait for a pretty long time and then also she was provided only partial treatment. In our considered opinion, therefore, definitely a case of negligence and improper conduct and behavior is made out. The appellant suffered agony and injury while working in the hospital of the appellant. Whatever untoward act and brutality took place within the premises of the hospital of the appellant, the responsibility would have to be borne and owned by the concerned hospital as they are bound to provide proper care and attention to the safety and well being of not only the patient but also of the attendant and nurses working there although engaged privately. The hospital cannot get away by saying that neither the victim was their employee nor the person who committed the offence was directly on their pay roll. A brutal act of violating a professional nurse while on duty was committed. She suffered an injury thereby loosing one of her eyes which would definitely prejudicially affect her in rendering and discharging her professional duties and would also adversely affect her matrimonial prospect. She has become permanently disabled although the respondent No. 2 and 3 had kindly provided her a job so that she can live rest of her life without being a financial burden on others. The act committed in the hospital of the appellant was inhuman and in our considered opinion the appellant is directly and vicariously liable for whatever happened in the hospital and, therefore, there is a civil liability of the appellant as also of the respondent No. 2&3 which stands proved from the documents on record. In view of the aforesaid position the contentions raised that the appellant is not liable for any action of Bhura stand rejected in view of the aforesaid discussion on facts and circumstances of the case.

14. The next issue that is required to be resolved is whether or not in view of the aforesaid negligence on the part of the appellant and the respondent Nos. 2&3 compensation can be claimed by the respondent No. 1 by filing a writ petition and if not whether she should be directed to go through the process of filing a civil suit. Counsel appearing for the appellant, in support of his submission that claim of the aforesaid nature could only be adjudicated upon and decided when a civil suit is filed and not through a writ petition, relied upon the decision of this Court in **Abdul Haque & Ors. v. BSES Yamuna Power Ltd. & Ors., 142(2007) DLT 526**. The counsel appearing for the appellant also referred to the decision of the Supreme Court in **SDO, Grid Corporation of Orissa Ltd. and others v. Timudu Oram, (2005) 6 SCC 156**. A bare perusal of the aforesaid cases would indicate that the said cases arise out of claim for compensation for death due to electrocution. In para 24 of the judgment in **Abdul Haque & Ors.**(supra), the learned Single Judge of this Court held that the approach of the Hon'ble Supreme Court in certain other cases where writ petitions have been filed claiming compensation for constitutional wrongs, involving death or injuries

SCC Online Web Edition, Copyright © 2015
Page 8      Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

not due to electrocution, has been different. The learned Single Judge clearly held that in cases of electrocution involving disputed question of fact a writ petition under Article 226 of the Constitution of India is not maintainable and that in such cases only the approach of the Supreme Court has been different. Consequently, on a reading of the aforesaid decisions it is established that the decisions which are relied upon by the counsel appearing for the appellant were decided on facts relating to claims of compensation due to electrocution which is different from the facts of the present case. Negligence was not established and proved. In para 25 of the aforesaid judgment, the above position is made clear. What was held by the learned Single Judge in para 25 of the said judgment are extracted herein below:-

   "The net result is that in cases involving claim for compensation on account of death due to electrocution, where the facts are disputed, the Hon'ble Supreme Court has held that a writ petition for payment of compensation is not maintainable under Article 226 of the Constitution. The remedy in such cases will obviously be only before the Civil Court."

15. It is pertinent to note that both judgment referred to by the Appellant are in relation to electrocution and the Courts refused to interfere on the ground that the factum of negligence by the electricity authorities had to be shown and the fact was not apparent on record. One has provide the necessary leeway to electricity companies in terms of their operations which are spread over open stretches of public roads/spaces which make the maintenance of strict vigil that much more difficult. Since incidence of wire tapping is an acknowledged fact, the facts of each case have to be examined. We make it clear that we should not be understood as stating that in no case of electrocution, Writ Petition will be maintainable. The Appellant, however, cannot escape responsibility as the offence took place within the premises of the Appellant which purportedly has "high level of security": within the Hospital premises. The entire incident is indeed shocking .The hapless victim remained unnoticed from 1:30 am till 6:20 am. This fact alone puts gapping hole in the so called defence of the Appellant who has gloated about the security measures taken by it.

16. The aforesaid decisions, therefore, would have no application to the facts of the present case. On the other hand, we may appropriately refer to the decision of the Supreme Court in **Rohtash Industries Ltd. and Anr. v. Rohtas Industries Staff Union and Ors., (1976) 2 SCC 82** wherein the amplitude of the power of the High Court under Article 226 was discussed as follows:-

   "The expansive and extraordinary power of the High Court under Article 226 is as wide as the amplitude of the language used indicates and so can affect any person even a private individual and be available for any (other) purpose even one for which another remedy may exist...This Court has spelt out wise and clear restraints on the use of


SCC Online Web Edition, Copyright © 2015
Page 9 - Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

Case 3:15-cv-00421-SI Document31-1 Filed04/06/15 Page147 of 202

this extraordinary remedy and the High Court will not go beyond those wholesome inhibitions except where the monstrosity of the situation or other exceptional circumstances cry of timely judicial interdict or mandate. The mentor of law is justice and a potent drug should be judiciously administered. Speaking in critical retrospect and portentous prospect, the writ power has by and large been the people's sentinel on the qui vive and to cut back on or liquidate that power may cast a peril to human rights."

17. We may also refer to the decision of the Supreme Court in **M.S. Grewal and Anr. v. Deep Chand Sood and Ors., (2001) 8 SCC 151** in which case the Supreme Court while dealing with a claim for grant of compensation in a writ petition under Article 226 and 32 of the Constitution of India, commended adoption of a justice oriented approach. It was a case for compensation against a school, when school children taken on a picnic, had drowned on account of negligence of the teachers. The Supreme Court considered the vicarious liability of the school on account of the negligence of the teachers and observed:-

"..The law courts exist for the society and they have an obligation to met the social aspirations of the citizens since law courts must also respond to the needs of the people.

..Currently judicial attitude has taken a shift from the old draconian concept and the traditional jurisprudential system-affectation of the people has been taken note of rather seriously and judicial concern stands on the footing to provide expeditious relief to an individual when needed rather than taking recourse to old conservative doctrine of the civil court's obligation to award damages... Law courts will lose their efficacy if they cannot respondent to the need of the society-technicalities there might be many but the justice oriented approach ought not to be thwarted on the basis of such technicality since technicality cannot and ought not outweigh the course of justice."

18. Reference can also be made to a decision of the Supreme Court in a case titled as **Dwarkanath, Hindu Undivided Family v. Income Tax Officer, Special Circle, Kanpur and Anr., (1965) 3 SCR 536** in which the Supreme Court observed that:

"It enables the High Court to mould the reliefs to meet the peculiar and complicated requirements of this country. Any attempt to equate the scope of the power of the High Court under Article 226 of the Constitution with that of the English courts to issue prerogative writs is to introduce the unnecessary procedural restrictions grown over the years in a comparatively small country like England with a unitary form of Government into a vast country like India functioning under a federal structure. Such a construction defeats the purpose of the Article itself."

19. We may also refer to another decision of the Supreme Court, which would be very apposite and similar to the facts of the present case. The

SCC Online Web Edition, Copyright © 2015
Page 10 - Thursday, March 19, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: DRJ

decision is **Bodhisattwa Gautam v. Shubhra Chakraborty (Ms), (1996) 1 SCC 490** where the Supreme Court directed the person accused of rape to pay the victim compensation during the course of trial and not just upon conviction. It was accepted in that case that the victim could have invoked the writ jurisdiction of the Courts in the facts of the case, fundamental rights being enforceable even against private bodies and individuals.

20. In the present case, and in terms of the discussion as aforesaid it is established that there is apparent violation of the provisions of Article 21 which guarantees a life to live with dignity. In the present case, protection guaranteed by Article 21 was denied and, therefore, compensation towards damages suffered could be claimed by filing a writ petition on the basis of which the Court can award compensation. In view of the breach and infringement of the Article 21 of the Constitution of India, we hold that in the present case the breach being incontrovertible, the following ratio of the judgment in the case titled as **M.C. Mehta and another v. Union of India and Others, (1987) 1 SCC 395** of the Supreme Court is applicable wherein the Supreme Court held thus:

"If we make a fact analysis of the cases where compensation has been awarded by this Court, we will find that in all cases, the fact of infringement was patent and incontrovertible, the violation was gross and its magnitude was such as to shock the conscience of the Court and it would have been gravely unjust to the persons whose fundamental right was violated, to require him to go to the civil court for claiming compensation."

21. We, therefore, find and hold that the appellant is liable to the extent indicated in the order passed by the learned Single Judge. An amount of Rs. 3.00 lacs, out of Rs. 5.5 lacs, has been deposited by the appellant. They are directed to deposit the balance 2.5 lacs immediately in this Court which shall be deposited within two weeks so as to make up the deficiency of 7.5 lacs inasmuch as a total sum of Rs. 5.00 lacs is lying deposited in fixed deposit. After the said amount of Rs. 2.5 lacs is deposited within a week, the amount deposited so far alongwith the amount of Rs. 2.5 lacs total amounting to Rs. 7.5 lacs would be released in favour of the appellant in terms of the order passed by the learned Single Judge. If in case, the amount of Rs. 2.5 lacs is not deposited within two weeks, the same would carry an interest @ 12% p.a. from the date of the order of the writ petition till the date of payment.

22. In terms of the aforesaid judgment and order, we dismiss this appeal, but without awarding any cost.

# EXHIBIT K



SCC OnLine Web Edition, Copyright © 2015
Page 1      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Constitution of India
### PART 3 — FUNDAMENTAL RIGHTS
#### Right to Freedom
##### Article 21. Protection of life and personal liberty

**21. Protection of life and personal liberty.**—No person shall be deprived of his life or personal liberty except according to procedure established by law.

———

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT L



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

Disclaimer: While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Constitution of India
### PART 6 — THE STATES [1][* * *]
#### CHAPTER V — THE HIGH COURTS IN THE STATES
##### Article [2][226. Power of High Courts to issue certain writs

---

[2][**226. Power of High Courts to issue certain writs.**—(1) Notwithstanding anything in Article 32, [3][* * *] every High Court shall have power, throughout the territories in relation to which it exercises jurisdiction, to issue to any person or authority, including in appropriate cases, any Government, within those territories directions, orders or writs, including [4][writs in the nature of *habeas corpus, mandamus*, prohibition, *quo warranto* and *certiorari*, or any of them, for the enforcement of any of the rights conferred by Part III and for any other purpose.]

(2) The power conferred by clause (1) to issue directions, orders or writs to any Government, authority or person may also be exercised by any High Court exercising jurisdiction in relation to the territories within which the cause of action, wholly or in part, arises for the exercise of such power, notwithstanding that the seat of such Government or authority or the residence of such person is not within those territories.

[5][(3) Where any party against whom an interim order, whether by way of injunction or stay or in any other manner, is made on, or in any proceedings relating to, a petition under clause (1), without—

(a) furnishing to such party copies of such petition and all documents in support of the plea for such interim order; and

(b) giving such party an opportunity of being heard,

makes an application to the High Court for the vacation of such order and furnishes a copy of such application to the party in whose favour such order has been made or the counsel of such party, the High Court shall dispose of the application within a period of two weeks from the date on which it is received or from the date on which the copy of such application is so furnished, whichever is later, or where the High Court is closed on the last day of that period, before the expiry of the next day afterwards on which the High Court is open; and if the application is not so disposed of, the interim order shall, on the expiry of that period, or, as the case may be, the expiry of the said next day, stand vacated.]

[6][(4)] The power conferred on a High Court by this article shall not be in derogation of the power conferred on the Supreme Court by clause (2) of Article 32.]

———

[1.] The words "IN PART A OF THE FIRST SCHEDULE" *omitted* by the Constitution (Seventh Amendment) Act, 1956, S. 29 and Sch.

[2.] *Subs.* by the Constitution (Forty-second Amendment) Act, 1976, S. 38 (w.e.f. 1-2-1977). Prior to substitution it read as:

"226. *Power of High Courts to issue certain writs.*—Notwithstanding anything in Art. 32, every High Court shall have power, throughout the territories in relation to which it exercises jurisdiction, to issue to any person or authority, including in appropriate cases any Government, within those territories directions, orders or writs, including writs in the nature of habeas corpus, mandamus, prohibition, quo warranto and



SCC OnLine Web Edition, Copyright © 2015
Page 2        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
--------------------------------------------------------------------------------------------------------------------------------------

certiorari, or any of them, for the enforcement of any of the rights conferred by Part III and for any other purpose.

\*(1-A) The power conferred by clause (1) to issue directions, orders or writs to any Government, authority or person may also be exercised by any High Court exercising jurisdiction in relation to the territories within which the cause of action, wholly or in part, arises for the exercise of such power, notwithstanding that the seat of such Government or authority or the residence of such person is not within those territories.

(2) The power conferred on a High Court by clause (1) \*[or clause (1-A)] shall not be in derogation of the power conferred on the Supreme Court by clause (2) of Art. 32." [*Ins*. by the Constitution (Fifteenth Amendment) Act, 1963, S. 8(*a*) and S. 8(*b*)].

[3.] The words "but subject to the provisions of Art. 131-A and Art. 226-A" *omitted* by the Constitution (Forty-third Amendment) Act, 1977, S. 7 (assented to on 13-4-1978).

[4.] *Subs.* by the Constitution (Forty-fourth Amendment) Act, 1978, S. 30 (w.e.f. 1-8-1979). Prior to substitution it read as:

"writs in the nature of *habeas corpus, mandamus,* prohibition, *quo warranto* and *certiorari,* or any of them,—

(*a*) for the enforcement of any of the rights conferred by the provisions of Part III; or

(*b*) for the redress of any injury of a substantial nature by reason of the contravention of any other provision of this Constitution or any provision of any enactment or Ordinance or any order, rule, regulation, bye-law or other instrument made thereunder; or

(*c*) for the redress of any injury by reason of any illegality in any proceedings by or before any authority under any provision referred to in sub-clause (*b*) where such illegality has resulted in substantial failure of justice.".

[5.] *Subs.* by the Constitution (Forty-fourth Amendment) Act, 1978, S. 30 for cls. (3) to (6) (w.e.f. 1-8-1979). Prior to substitution they read as:

"(3) No petition for the redress of any injury referred to in sub-clause (*b*) or sub-clause (*c*) of clause (1) shall be entertained if any other remedy for such redress is provided for by or under any other law for the time being in force.

(4) No interim order (whether by way of injunction or stay or in any other manner) shall be made on, or in any proceedings relating to, a petition under clause (1) unless—

(*a*) copies of such petition and of all documents in support of the plea for such interim order are furnished to the party against whom such petition is filed or proposed to be filed; and

(*b*) opportunity is given to such party to be heard in the matter.

(5) The High Court may dispense with the requirements of sub-clauses (*a*) and (*b*) of clause (4) and make an interim order as an exceptional measure if it is satisfied for reasons to be recorded in writing that it is necessary so to do for preventing any loss being caused to the petitioner which cannot be adequately compensated in money but any such interim order shall, if it is not vacated earlier, cease to have effect on the expiry of a period of fourteen days from the date on which it is made unless the said requirements have been complied with before the expiry of that period and the High Court has continued the operation of the interim order.

(6) Notwithstanding anything in clause (4) or clause (5), no interim order (whether by way of injunction or stay or in any other manner) shall be made on, or in any proceedings relating to, a petition under clause (1) where such order will have the effect of delaying any inquiry into a matter of public importance or any investigation or inquiry into an offence punishable with imprisonment or any action for the execution of any work or project of public utility, or the acquisition of any property for such execution, by the Government or any corporation owned or controlled by the Government."

[6.] Cl. (7) *renumbered* by by the Constitution (Forty-fourth Amendment) Act, 1978, S. 30 (w.e.f. 1-8-1979).

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT M



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-------------------------------------------------------------------------------------------------------------

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Consumer Protection Act, 1986
### CHAPTER 3 — CONSUMER DISPUTES REDRESSAL AGENCIES
#### Section 14. Finding of the District Forum
-------------------------------------------------------------------------------------------------------------

**14. Finding of the District Forum.**—(1) If, after the proceeding conducted under Section 13, the District Forum is satisfied that the goods complained against suffer from any of the defects specified in the complaint or that any of the allegations contained in the complaint about the services are proved, it shall issue an order to the opposite party directing him to [1][do] one or more of the following things, namely:

(*a*) to remove the defect pointed out by the appropriate laboratory from the goods in question;

(*b*) to replace the goods with new goods of similar description which shall be free from any defect;

(*c*) to return to the complainant the price, or, as the case may be, the charges paid by the complainant;

(*d*) to pay such amount as may be awarded by it as compensation to the consumer for any loss or injury suffered by the consumer due to the negligence of the opposite party:

[2][Provided that the District Forum shall have the power to grant punitive damages in such circumstances as it deems fit;]

[3][(*e*) to remove the defects [4][in goods] or deficiencies in the services in question;

(*f*) to discontinue the unfair trade practice or the restrictive trade practice or not to repeat them;

(*g*) not to offer the hazardous goods for sale;

(*h*) to withdraw the hazardous goods from being offered for sale;

[5][(*ha*) to cease manufacture of hazardous goods and to desist from offering services which are hazardous in nature;

(*hb*) to pay such sum as may be determined by it, if it is of the opinion that loss or injury has been suffered by a large number of consumers who are not identifiable conveniently:

Provided that the minimum amount of sum so payable shall not be less than five per cent of the value of such defective goods sold or services provided, as the case may be, to such consumers:

Provided further that the amount so obtained shall be credited in favour of such person and utilized in such manner as may be prescribed;

(*hc*) to issue corrective advertisement to neutralize the effect of misleading advertisement at the cost of the opposite party responsible for issuing such misleading advertisement;]

(*i*) to provide for adequate costs to parties.]

[6][(2) Every proceeding referred to in sub-section (1) shall be conducted by the President of the District Forum and at least one member thereof sitting together:

[7][Provided that where a member, for any reason, is unable to conduct a



SCC OnLine Web Edition, Copyright © 2015
Page 2      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-----------------------------------------------------------------------------------------------------------------------------------------

proceeding till it is completed, the President and the other member shall continue the proceeding from the stage at which it was last heard by the previous member.]

(2-A) Every order made by the District Forum under sub-section (1) shall be signed by its President and the member or members who conducted the proceedings:

Provided that where the proceeding is conducted by the President and one member and they differ on any point or points, they shall state the point or points on which they differ and refer the same to the other member for hearing on such point or points and the opinion of the majority shall be the order of the District Forum.]

(3) Subject to the foregoing provisions, the procedure relating to the conduct of the members of the District Forum, its sittings and other matters shall be such as may be prescribed by the State Government.

[1] *Ins.* by Act 62 of 2002, S. 10 (w.e.f. 15-3-2003).

[2] *Ins.* by Act 50 of 1993, S. 12 (w.e.f. 18-6-1993).

[3] *Ins.* by Act 62 of 2002, S. 10 (w.e.f. 15-3-2003).

[4] *Ins.* by Act 62 of 2002, S. 10 (w.e.f. 15-3-2003).

[5] *Subs.* by Act 34 of 1991, S. 2 (w.e.f. 15-6-1991).

[6] *Subs.* by Act 62 of 2002, S. 10 (w.e.f. 15-3-2003). Prior to substitution it read:

> "Provided that where the member, for any reason, is unable to conduct the proceeding till it is completed, the President and the other member shall conduct such proceeding de novo."

[7] *Ins.* by Act 62 of 2002, S. 11 (w.e.f. 15-3-2003).

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT N



SCC OnLine Web Edition, Copyright © 2015
Page 1      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-------------------------------------------------------------------------------------------------------------

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Consumer Protection Act, 1986
### CHAPTER 3 — CONSUMER DISPUTES REDRESSAL AGENCIES
#### Section 21. Jurisdiction of the National Commission
-------------------------------------------------------------------------------------------------------------

**21. Jurisdiction of the National Commission.**—Subject to the other provisions of this Act, the National Commission shall have jurisdiction,—

(*a*) to entertain,—

(*i*) complaints where the value of the goods or services and compensation, if any, claimed exceeds rupees [1][one crore]; and

(*ii*) appeals against the orders of any State Commission; and

(*b*) to call for the records and pass appropriate orders in any consumer dispute which is pending before or has been decided by any State Commission where it appears to the National Commission that such State Commission has exercised a jurisdiction not vested in it by law, or has failed to exercise a jurisdiction so vested, or has acted in the exercise of its jurisdiction illegally or with material irregularity.

[1] *Subs.* for "twenty lakhs" by Act 62 of 2002, S. 19 (w.e.f. 15-3-2003).

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT O



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Consumer Protection Act, 1986
### CHAPTER 3 — CONSUMER DISPUTES REDRESSAL AGENCIES
#### Section 22. Power and procedure applicable to the National Commission

[1][**22. Power and procedure applicable to the National Commission.**—(1) The provisions of Sections 12, 13 and 14 and the rules made thereunder for the disposal of complaints by the District Forum shall, with such modifications as may be considered necessary by the Commission, be applicable to the disposal of disputes by the National Commission.

(2) Without prejudice to the provisions contained in sub-section (1), the National Commission shall have the power to review any order made by it, when there is an error apparent on the face of record.

[1] *Subs.* by Act 62 of 2002, S. 20 (w.e.f. 15-3-2003). Prior to substitution it read:

"22. *Power of and procedure applicable to the National Commission.*—The National Commission shall, in the disposal of any complaints or any proceedings before it, have—

    (*a*) the powers of a civil court as specified in sub-sections (4), (5) and (6) of Section 13;

    (*b*) the power to issue an order to the opposite party directing him to do any one or more of the things referred to in clauses (*a*) to (*i*) of sub-section (1) of Section 14,

and follow such procedure as may be prescribed by the Central Government."

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT P



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Consumer Protection Act, 1986
### CHAPTER 3 — CONSUMER DISPUTES REDRESSAL AGENCIES
#### Section 24-A. Limitation period

[1][**24-A. Limitation period.**—(1) The District Forum, the State Commission or the National Commission shall not admit a complaint unless it is filed within two years from the date on which the cause of action has arisen.

(2) Notwithstanding anything contained in sub-section (1), a complaint may be entertained after the period specified in sub-section (1), if the complainant satisfies the District Forum, the State Commission or the National Commission, as the case may be, that he had sufficient cause for not filing the complaint within such period:

Provided that no such complaint shall be entertained unless the National Commission, the State Commission or the District Forum, as the case may be, records its reasons for condoning such delay.

[1] Ss. 24-A and 24-B ins. by Act 50 of 1993, S. 19 (w.e.f. 18-6-1993). Ordinance 24 of 1993 had specified "one year" in sub-section (1) of S. 24-A.

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT Q



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Civil Procedure Code, 1908
### PART 1 — SUITS IN GENERAL
#### Jurisdiction of the Courts and Res Judicata
##### Section 9. Courts to try all civil suits unless barred

**9. Courts to try all civil suits unless barred.**—The Courts shall (subject to the provisions herein contained) have jurisdiction to try all suits of a civil nature excepting suits of which their cognizance is either expressly or impliedly barred.

*Explanation* [1][*I*].—A suit in which the right to property or to an office is contested is a suit of a civil nature, notwithstanding that such right may depend entirely on the decision of questions as to religious rites or ceremonies.

[2][*Explanation II*.—For the purposes of this section, it is immaterial whether or not any fees are attached to the office referred to in Explanation I or whether or not such office is attached to a particular place.]

_____

### Section 9-A

#### State Amendment

MAHARASHTRA.—In its application to the State of Maharashtra, (the following Section 9-A shall be inserted:

"*9-A. Where at the hearing of application relating to interim relief in a suit, objection to jurisdiction is taken, such issue to be decided by the Court as a preliminary issue.*—(1) Notwithstanding anything contained in this Code or any other law for the time being in force, if, at the hearing of any application for granting or setting aside an order granting any interim relief, whether by way of stay, injunction, appointment of a receiver or otherwise, made in any suit, an objection to the jurisdiction of the Court to entertain such suit is taken by any of the parties to the suit, the Court shall proceed to determine at the hearing of such application the issue as to the jurisdiction as a preliminary issue before granting or setting aside the order granting the interim relief. Any such application shall be heard and disposed of by the Court as expeditiously as possible and shall not in any case be adjourned to the hearing of suit.

(2) Notwithstanding anything contained in sub-section (1), at the hearing of any such application, the Court may grant such interim relief as it may consider necessary, pending determination by it of the preliminary issue as to the jurisdiction." [Maharashtra Act 65 of 1977 (19-12-1977)].

———

[1] Existing Explanation *renumbered* as Explanation I vide Act 104 of 1976, S. 5 (w.e.f. 1-2-1977).

[2] *Ins.* by Act 104 of 1976, S. 5, (w.e.f. 1-2-1977).

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT R



SCC OnLine Web Edition, Copyright © 2015
Page 1      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Civil Procedure Code, 1908
### PART 1 — SUITS IN GENERAL
#### PLACE OF SUING
##### Section 19. Suits for compensation for wrongs to person or movables

**19. Suits for compensation for wrongs to person or movables.**—Where a suit is for compensation for wrong done to the person or to movable property, if the wrong was done within the local limits of the jurisdiction of one Court and the defendant resides, or carries on business, or personally works for gain, within the local limits of the jurisdiction of another Court, the suit may be instituted at the option of the plaintiff in either of the said Courts.

*Illustrations*

(*a*) *A*, residing in Delhi, beats *B* in Calcutta. *B* may sue *A* either in Calcutta or in Delhi.

(*b*) *A*, residing in Delhi, publishes in Calcutta statements defamatory of *B. B* may sue *A* either in Calcutta or in Delhi.

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT S



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

Disclaimer: While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Civil Procedure Code, 1908
### PART 1 — SUITS IN GENERAL
#### PLACE OF SUING
##### Section 20. Other suits to be instituted where defendants reside or cause of action arises

**20. Other suits to be instituted where defendants reside or cause of action arises.**—Subject to the limitations aforesaid, every suit shall be instituted in a Court within the local limits of whose jurisdiction—

      (*a*) the defendant, or each of the defendants where there are more than one, at the time of the commencement of the suit, actually and voluntarily resides, or carries on business, or personally works for gain; or

      (*b*) any of the defendants, where there are more than one, at the time of the commencement of the suit, actually and voluntarily resides, or carries on business, or personally works for gain, provided that in such case either the leave of the Court is given, or the defendants who do not reside, or carry on business, or personally work for gain, as aforesaid, acquiesce in such institution; or

      (*c*) the cause of action, wholly or in part, arises.

[1][* * *]

*Explanation* [2][* * *].—A corporation shall be deemed to carry on business at its sole or principal office in India or, in respect of any cause of action arising at any place where it has also a subordinate office, at such place.

<em>Illustrations</em>

(*a*) *A* is a tradesman in Calcutta. *B* carries on business in Delhi. *B*, by his agent in Calcutta, buys goods of *A* and requests *A* to deliver them to the East Indian Railway Company. *A* delivers the goods accordingly in Calcutta. *A* may sue *B* for the price of the goods either in Calcutta, where the cause of action has arisen, or in Delhi, where *B* carries on business.

(*b*) *A* resides at Simla, *B* at Calcutta and *C* at Delhi. *A*, *B* and *C* being together at Benaras, *B* and *C* make a joint promissory note payable on demand, and deliver it to *A*. *A* may sue *B* and *C* at Benaras, where the cause of action arose. He may also sue them at Calcutta, where *B* resides, or at Delhi, where *C* resides, but in each of these cases, if the non-resident defendant objects, the suit cannot proceed without the leave of the Court.

**Note.**—For provisions as to commencement and application of the Amendments, Repeal and Savings, *see* Section 97(2)(*b*) of the CPC (Amendment) Act, 1976, given in the Appendices.

[1] *Omitted* by Act 104 of 1976, S. 7 (w.e.f. 1-2-1977).

[2] *Omitted* by Act 104 of 1976, S. 7 (w.e.f. 1-2-1977).

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT T



SCC OnLine Web Edition, Copyright © 2015
Page 1        Thursday, April 2, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

**Civil Procedure Code, 1908**
**PART 1 — SUITS IN GENERAL**
**Summons and Discovery**
**Section 30. Power to order discovery and the like**

**30. Power to order discovery and the like.**—Subject to such conditions and limitations as may be prescribed, the Court may, at any time, either of its own motion or on the application of any party,—

(*a*) make such orders as may be necessary or reasonable in all matters relating to the delivery and answering of interrogatories, the admission of documents and facts, and the discovery, inspection, production, impounding and return of documents or other material objects producible as evidence;

(*b*) issue summonses to persons whose attendance is required either to give evidence or to produce documents or such other objects as aforesaid;

(*c*) order any fact to be proved by affidavit.

### High Court Amendment

CALCUTTA.—In clause (*a*) *omit* the words "delivery and answering of interrogatories, the admission of documents and facts, and the discovery" after the words "matters relating to" and before the word "inspection". Cal. Gaz. Pt. I, dt. 20-4-1967.

———

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT U



SCC OnLine Web Edition, Copyright © 2015
Page 1      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Criminal Procedure Code, 1973
### CHAPTER 27 — THE JUDGMENT
#### Section 357. Order to pay compensation

**357. Order to pay compensation.**—(1) When a Court imposes a sentence of fine or a sentence (including a sentence of death) of which fine forms a part, the Court may, when passing judgment, order the whole or any part of the fine recovered to be applied—

> (*a*) in defraying the expenses properly incurred in the prosecution;
>
> (*b*) in the payment to any person of compensation for any loss or injury caused by the offence, when compensation is, in the opinion of the Court, recoverable by such person in a Civil Court;
>
> (*c*) when any person is convicted of any offence for having caused the death of another person or of having abetted the commission of such an offence, in paying compensation to the persons who are, under the Fatal Accidents Act, 1855 (13 of 1855), entitled to recover damages from the person sentenced for the loss resulting to them from such death;
>
> (*d*) when any person is convicted of any offence which includes theft, criminal misappropriation, criminal breach of trust, or cheating, or of having dishonestly received or retained, or of having voluntarily assisted in disposing of, stolen property knowing or having reason to believe the same to be stolen, in compensating any *bona fide* purchaser of such property for the loss of the same if such property is restored to the possession of the person entitled thereto.

(2) If the fine is imposed in a case which is subject to appeal, no such payment shall be made before the period allowed for presenting the appeal has elapsed, or, if an appeal be presented, before the decision of the appeal.

**Corresponding Law**: S. 545 of Act V of 1898.

> (3) When a Court imposes a sentence, of which fine does not form a part, the Court may, when passing judgment, order the accused person to pay, by way of compensation, such amount as may be specified in the order to the person who has suffered any loss or injury by reason of the act for which the accused person has been so sentenced.
>
> (4) An order under this section may also be made by an Appellate Court or by the High Court or Court of Session when exercising its powers of revision.

(5) At the time of awarding compensation in any subsequent civil suit relating to the same matter, the Court shall take into account any sum paid or recovered as compensation under this section.

**Corresponding Law**: S. 546 of Act V of 1898.

### STATE AMENDMENTS

**Andhra Pradesh.**— In the Criminal Procedure Code, 1973 in its application to the State of Andhra Pradesh, in Section 357,—

> (*i*) in sub-section (1), after the words "the Court may", the expression "and where a person against whom an offence is committed belongs to Scheduled



SCC OnLine Web Edition, Copyright © 2015
Page 2      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-----------------------------------------------------------------------------------------------------------------------------------------------

Castes or Scheduled Tribes as defined in clauses (24) and (25) of Article 366 of the Constitution of India, except when both the accused person and the person against whom an offence is committed belong either to such castes or tribes, the Court shall", shall be *inserted*; and

(*ii*) for sub-section (3), the following sub-section shall be *substituted*, namely:—

"When a Court impose a sentence, of which fine does not form a part, the Court may, and where a person against whom an offence is committed belongs to Scheduled Castes or Scheduled Tribes as defined in clauses (24) and (25) of Article 366 of the Constitution of India, the Court shall, when passing judgment order the accused person to pay, by way of compensation, such amount as may be specified in the order to the person who has suffered any loss or injury by reason of the act for which the accused person has been so sentenced:

Provided that the Court may not order the accused person to pay by way of compensation any amount; if both the accused person and the person against whom an offence is committed belong either to the Scheduled Castes or the Scheduled Tribes." (*Vide* A.P. Act 21 of 1993, S. 2, 10-12-1993).

**Bihar.**— In sub-section (1) of Section 357 the following proviso shall be *added* namely for the whole of the State of Bihar:—

"Provided that the person against whom an offence is committed belongs to Scheduled Castes and to Scheduled Tribes as defined under clause (24) and clause (25) to Article 366 of the Constitution, the Court shall at the time of judgment pass order that the entire amount of fine realised or any part of it will be utilised for the benefit of person by way of compensation." Bihar Act 9 of 1985, S. 2. (w.e.f. 13-8-1985)

**Karnataka.**— (1) In Section 357 in sub-section (1), after the words "the Court may", the brackets, figures and words "and where the person against whom an offence is committed belongs to a Scheduled Caste or a Scheduled Tribe as defined in clauses (24) and (25) of Article 366 of the Constitution and the accused person does not belong to a Scheduled Caste or a Scheduled Tribe the Court shall", shall be *inserted*;

(2) for sub-section (3), the following sub-section shall be *substituted*, namely:—

"(3) When a Court imposes a sentence of which fine does not form a part, the Court may, and where a person against whom an offence is committed belongs to a Scheduled Caste or Scheduled Tribe as defined in clauses (24) and (25) of Article 366 of the Constitution and the accused person does not belong to a Scheduled Caste or Scheduled Tribe, the Court shall, when passing judgment, order the accused person to pay, by way of compensation, such amount as may be specified in the order to the person who has suffered any loss or injury by reason of the act for which the accused person has been so sentenced." [*vide* Karnataka Act 27 of 1987, S. 2 (w.e.f. 22-7-1987)]

**Madhya Pradesh.**— In Section 357—

(*i*) in sub-section (1), for the brackets, figure and words "(1) When a Court imposes a sentence of fine or a sentence (including a sentence of death) of which fine forms a part, the Court may, when passing judgment, order the whole or any part of the fine recovered to be applied", the brackets, figure and words "(1) When a Court imposes a sentence of fine or a sentence (including a sentence of death) of which fine forms a part, the Court may, and where a person against whom an offence is committed belongs to Scheduled Castes or Scheduled Tribes as defined in clauses (24) and (25) of



SCC OnLine Web Edition, Copyright © 2015
Page 3      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

Article 366 of the Constitution except when both the accused person and the person against whom an offence is committed belong either to such Castes or Tribes, the Court shall, when passing judgment, order the whole or any part of the fine recovered to be applied—" shall be *substituted*; and

(*ii*) for sub-section (3), the following sub-section shall be *substituted*, namely:

"(3) When a Court imposes a sentence, of which fine does not form a part, the Court may, and where a person against whom an offence is committed belongs to Scheduled Castes or Scheduled Tribes as defined in clauses (24) and (25) of Article 366 of the Constitution, the Court shall, when passing judgment, order the accused person to pay, by way of compensation, such amount as may be specified in the order to the person who has suffered any loss or injury by reason of the act for which the accused person has been so sentenced:

Provided that the Court may not order the accused person to pay by way of compensation any amount, if both the accused person and the person against whom an offence is committed belong either to the Scheduled Castes or the Scheduled Tribes."—(*vide* M.P. Act 29 of 1978, w.e.f. 5-10-1978).

**Rajasthan.**— In its application to the whole of Rajasthan in S. 357—

- (*i*) in sub-section (1), between the expression "the court may" and the expression "when passing judgment", the expression "and where the person against whom the offence is committed belongs to a Scheduled Caste or a Scheduled Tribe but the accused person does not so belong, the court shall", shall be *inserted*; and
- (*ii*) in sub-section (3), between the expression "the court may" and the expression "when passing judgment", the expression "and where the person against whom the offence is committed belongs to a Scheduled Caste or a Scheduled Tribe but the accused person does not so belong, the court shall", shall be *inserted*.—*Vide* Rajasthan Act 3 of 1993, S. 2 (w.e.f. the notified date)

**Uttar Pradesh.**— In Section 357,—

- (*a*) in sub-section (1), after clause (*d*), the following proviso shall be *inserted*, namely:—

"Provided that if a person who may receive compensation under clauses (*b*), (*c*) and (*d*) is a member of the Scheduled Castes or the Scheduled Tribes and the person sentenced is not a member of such Castes or Tribes, the Court shall order the whole or any part of the fine recovered to be applied in payment of such compensation."

- (*b*) for sub-section (3) the following sub-section shall be *substituted*, namely:—

"(3) When a Court imposes a sentence, of which fine does not form a part, the Court may, and where the person who has suffered the loss or injury is a member of the Scheduled Castes or the Scheduled Tribes and the person sentenced is not a member of such Castes or Tribes the Court shall, when passing judgment, order the person sentenced to pay, by way of compensation, such amount as may be specified in the order to the person who has suffered any loss or injury by reason of the act for which the person has been so sentenced."

- (*c*) after sub-section (5), the following Explanation, shall be *inserted*, namely:—

"*Explanation*.—For the purposes of this section expressions "Scheduled Castes" and "Scheduled Tribes" shall have the meanings respectively assigned to

 SCC OnLine Web Edition, Copyright © 2015
Page 4    Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

them in clauses (24) and (25) of Article 366 of the Constitution."—U.P. Act 17 of 1992, S. 2 (w.e.f. a date to be notified).

**West Bengal.**— In Section 357 of the principal Act, —

(*a*) in sub-section (1), for the words and brackets "When a Court imposes a sentence of fine or sentence (including a sentence of death) of which fine forms a part, the Court may, when passing judgment, order the whole or any part of the fine recovered to be applied", the words and brackets "When a Court imposes a sentence of fine or a sentence (including a sentence of death) of which fine forms a part, the Court may, and where the person against whom an offence has been committed belongs to Scheduled Castes or Scheduled Tribes, except when both the accused person and the person against whom an offence has been committed belong either to Scheduled Castes or to Scheduled Tribes, shall, when passing judgment, order the whole or any part of the fine recovered to be applied—" shall be *substituted*;

(*b*) for sub-section (3), the following sub-section shall be *substituted*:

"(3) When a Court imposes a sentence, of which fine does not form a part, the Court may, and where the person against whom an offence has been committed belongs to Scheduled Castes or Scheduled Tribes, shall, when passing judgment, order the accused person to pay, by way of compensation such amount as may be specified in the order to the person who has suffered any loss or injury by reason of the act for which the accused person has been so sentenced:

Provided that the Court may not order the accused person to pay by way of compensation, any amount if both the accused person and the person against whom an offence has been committed belong either to Scheduled Castes or to Scheduled Tribes.";

(*c*) after sub-section (5), the following Explanation shall be *inserted*:

"*Explanation*.—For the purposes of this section, the expression 'Scheduled Castes' and 'Scheduled Tribes' shall have the meanings respectively assigned to them in clauses (24) and (25) of Article 366 of the Constitution of India." W.B. Act 33 of 1985, S. 3, w.e.f. the notified date.

———

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT V



SCC OnLine Web Edition, Copyright © 2015
Page 1        Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Criminal Procedure Code, 1973
### CHAPTER 27 — THE JUDGMENT
#### Section 357-A. Victim compensation scheme

[1][**357-A. Victim compensation scheme.**—(1) Every State Government in co-ordination with the Central Government shall prepare a scheme for providing funds for the purpose of compensation to the victim or his dependents who have suffered loss or injury as a result of the crime and who require rehabilitation.

(2) Whenever a recommendation is made by the Court for compensation, the District Legal Service Authority or the State Legal Service Authority, as the case may be, shall decide the quantum of compensation to be awarded under the scheme referred to in sub-section (1).

(3) If the trial Court, at the conclusion of the trial, is satisfied, that the compensation awarded under Section 357 is not adequate for such rehabilitation, or where the cases end in acquittal or discharge and the victim has to be rehabilitated, it may make recommendation for compensation.

(4) Where the offender is not traced or identified, but the victim is identified, and where no trial takes place, the victim or his dependents may make an application to the State or the District Legal Services Authority for award of compensation.

(5) On receipt of such recommendations or on the application under sub-section (4), the State or the District Legal Service Authority shall, after due enquiry award adequate compensation by completing the enquiry within two months.

(6) The State or the District Legal Services Authority, as the case may be, to alleviate the suffering of the victim, may order for immediate first-aid facility or medical benefits to be made available free of cost on the certificate of the police officer not below the rank of the officer in charge of the police station or a Magistrate of the area concerned, or any other interim relief as the appropriate authority deems fit.

———

[1] *Inserted* by Act 5 of 2009, Section 28 (w.e.f 31-12-2009).

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT W



SCC OnLine Web Edition, Copyright © 2015
Page 1    Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

## Limitation Act, 1963
### THE SCHEDULE

### PERIOD OF LIMITATION
[*See* Sections 2(*j*) and 3]
#### FIRST DIVISION—SUITS
##### PART I—*Suits Relating To Accounts*

| Description of suit | Period of limitation | Time from which period begins to run |
|---|---|---|
| **1.** For the balance due on a mutual, open and current account, where there have been reciprocal demands between the parties. | Three years | The close of the year in which the last item admitted or proved is entered in the account; such year to be computed as in the account. |
| **2.** Against a factor for an acccount. | Three years | When the account is, during the continuance of the agency, demanded and refused or, where no such demand is made, when the agency terminates. |
| **3.** By a principal against his agent for movable property received by the latter and not accounted for. | —do— | When the account is, during the continuance of the agency, demanded and refused or, where no such demand is made, when the agency terminates. |
| **4.** Other suits by principals against agents for neglect or misconduct. | —do— | When the neglect or misconduct becomes known to the plaintiff. |
| **5.** For an account and a share of the profits of a dissolved partnership. | —do— | The date of the dissolution. |

##### PART II—*Suits Relating To Contracts*

| | | |
|---|---|---|
| **6.** For a seaman's wages | Three years | The end of the voyage during which the wages are earned. |
| **7.** For wages in the case of any other person. | —do— | When the wages accrue due. |
| **8.** For the price of food or drink sold by the keeper of a hotel, tavern or lodging-house. | —do— | When the food or drink is delivered. |
| **9.** For the price of lodging. | —do— | When the price becomes payable. |
| **10.** Against a carrier for compensation for losing or injuring goods. | for —do— | When the loss or injury occurs. |



SCC OnLine Web Edition, Copyright © 2015
Page 2      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | |
|---|---|---|
| **11.** Against a carrier for compensation for non-delivery of, or delay in delivering goods. | —do— | When the goods ought to be delivered. |
| **12.** For the hire of animals, vehicles, boats or household furniture. | —do— | When the hire becomes payable. |
| **13.** For the balance of money advanced in payment of goods to be delivered. | —do— | When the goods ought to be delivered. |
| **14.** For the price of goods sold and delivered where no fixed period of credit is agreed upon. | —do— | The date of the delivery of the goods. |
| **15.** For the price of goods sold and delivered to be paid for after the expiry of a fixed period of credit. | —do— | When the period of credit expires. |
| **16.** For the price of goods sold and delivered to be paid for by a bill of exchange, no such bill being given. | —do— | When the period of the proposed bill elapses. |
| **17.** For the price of trees or growing crops sold by the plaintiff to the defendant where no fixed period of credit is agreed upon. | —do— | The date of the sale. |
| **18.** For the price of work done by the plaintiff for the defendant at his request, where no time has been fixed for payment. | Three years | When the work is done. |
| **19.** For money payable for money lent. | —do— | When the loan is made. |
| **20.** Like suit when the lender has given a cheque for the money. | —do— | When the cheque is paid. |
| **21.** For money lent under an agreement that it shall be payable on demand. | —do— | When the loan is made. |
| **22.** For money deposited under an agreement that it shall be payable on demand, including money of a customer in the hands of his banker so payable. | —do— | When the demand is made. |
| **23.** For money payable to the plaintiff for money paid for the defendant. | —do— | When the money is paid. |
| **24.** For money payable by the defendant to the plaintiff for money received by the defendant, for the plaintiff's use. | —do— | When the money is received. |



SCC OnLine Web Edition, Copyright © 2015
Page 3     Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | |
|---|---|---|
| **25.** For money payable for interest upon money due from the defendant to the plaintiff. | —do— | When the interest becomes due. |
| **26.** For money payable to the plaintiff for money found to be due from the defendant to the plaintiff on accounts stated between them. | —do— | When the accounts are stated in writing signed by the defendant or his agent duly authorised in this behalf, unless where the debt is, by a simultaneous agreement in writing signed as aforesaid, made payable at a future time, and then when that time arrives. |
| **27.** For compensation for breach of a promise to do anything at a specified time, or upon the happening of a specified contingency. | —do— | When the time specified arrives or the contingency happens. |
| **28.** On a single bond, where a day is specified for payment. | —do— | The day so specified. |
| **29.** On a single, where no such day is specified. | —do— | The date of executing the bond. |
| **30.** On a bond subject to a condition. | —do— | When the condition is broken. |
| **31.** On a bill of exchange or promissory note payable at a fixed time after date. | —do— | When the bill or note falls due. |
| **32.** On a bill of exchange payable at sight, or after sight, but not at a fixed time. | —do— | When the bill is presented. |
| **33.** On a bill of exchange accepted payable at a particular place. | Three years | When the bill is presented at that place. |
| **34.** On a bill of exchange or promissory note payable at a fixed time after sight or after demand. | —do— | When the fixed time expires. |
| **35.** On a bill of exchange or promissory note payable on demand and not accompanied by any writing, restraining or postponing the right to sue. | —do— | The date of the bill or note. |
| **36.** On a promissory note or bond payable by instalments. | —do— | The expiration of the first term of payment as to the part then payable; and for the other parts, the expiration of the respective terms of payment. |
| **37.** On a promissory note or bond payable by instalments, which provides that, if default be made in payment of one or | —do— | When the default is made, unless the payee or obligee waives the benefit of the provision and then when fresh |


SCC OnLine Web Edition, Copyright © 2015
Page 4      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | |
|---|---|---|
| more instalments, the whole shall be due. | | default is made in respect of which there is no such waiver. |
| **38.** On a promissory note given by the maker to a third person to be delivered to the payee after a certain event should happen. | —do— | The date of the delivery to the payee. |
| **39.** On a dishonoured foreign bill where protest has been made and notice given. | —do— | When the notice is given. |
| **40.** By the payee against the drawer of a bill of exchange, which has been dishonoured by non-acceptance. | —do— | The date of the refusal to accept. |
| **41.** By the acceptor of an accommodation bill against the drawer. | —do— | When the acceptor pays the amount of the bill. |
| **42.** By a surety against the principal debtor. | —do— | When the surety pays the creditor. |
| **43.** By a surety against a co surety. | —do— | When the surety pays anything in excess of his own share. |
| **44.** (*a*) On a policy of insurance when the sum insured is payable after proof of the death has been given to or received by the insurers. | —do— | The date of the death of the deceased, or where the claim on the policy is denied, either partly or wholly, the date of such denial. |
| (*b*) On a policy of insurance when the sum insured is payable after proof of the loss has been given to or received by the insurers. | —do— | The date of the occurrence causing the loss, or where the claim on the policy is denied either partly or wholly, the date of such denial. |
| **45.** By the assured to recover premia paid under a policy voidable at the election of the insurers. | —do— | When the insurers elect to void the policy. |
| **46.** Under the Indian Succession Act, 1925 (93 of 1925), Section 360, or Section 361, to compel a refund by a person to whom an executor or administrator has paid a legacy or distributed assets. | Three years | The date of the payment or distribution. |
| **47.** For money paid upon an existing consideration which afterwards fails. | —do— | The date of the failure. |
| **48.** For contribution by a party who has paid the whole or more than his share of the amount due under a joint decree, or by a sharer in a joint estate who | —do— | The date of the payment in excess of the plaintiff's own share. |



SCC OnLine Web Edition, Copyright © 2015
Page 5      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | |
|---|---|---|
| has paid the whole or more than his share of the amount of revenue due from himself and his co-sharers. | | |
| **49.** By a co-trustee to enforce against the estate of a deceased trustee a claim for contribution. | —do— | When the right to contribution accrues. |
| **50.** By the manager of a joint estate of an undivided family for contribution, in respect of a payment made by him on account of the estate. | —do— | The date of the payment. |
| **51.** For the profits of immovable property belonging to the plaintiff which have been wrongfully received by the defendant. | —do— | When the profits are received. |
| **52.** For arrears of rent. | —do— | When the arrears become due. |
| **53.** By a vendor of immovable property for personal payment of unpaid purchase-money. | —do— | The time fixed for completing the sale, or (where the title is accepted after the time fixed for completion) the date of the acceptance. |
| **54.** For specific performance of a contract. | —do— | The date fixed for the performance, or, if no such date is fixed, when the plaintiff has notice that performance is refused. |
| **55.** For compensation for the breach of any contract, express or implied, not herein specially provided for. | —do— | When the contract is broken or (where there are successive breaches) when the breach in respect of which the suit is instituted occurs or (where the breach is continuing) when it ceases. |

### PART III—*Suits Relating To Declarations*

| | | |
|---|---|---|
| **56.** To declare the forgery of an instrument issued or registered. | Three years | When the issue or registration becomes known to the plaintiff. |
| **57.** To obtain a declaration that an alleged adoption is invalid, or never, in fact, took place. | —do— | When the alleged adoption becomes known to the plaintiff. |
| **58.** To obtain any other declaration. | Three years | When the right to sue first accrues. |

### PART IV—*Suits Relating To Decrees and Instruments*

| | | |
|---|---|---|
| **59.** To cancel or set aside an instrument or decree or for the rescission of a contract. | Three years | When the facts entitling the plaintiff to have the instrument or decree cancelled or set aside or the contract |


SCC OnLine Web Edition, Copyright © 2015
Page 6      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | rescinded first become known to him. |
|---|---|---|
| **60.** To set aside a transfer of property made by the guardian of a ward— | | |
| (*a*) by the ward who has attained majority; | —do— | When the ward attains majority. |
| (*b*) by the ward's legal representative— | | |
| (*i*) when the ward dies within three years from the date of attaining majority; | —do— | When the ward attains majority. |
| (*ii*) when the ward dies before attaining majority. | —do— | When the ward dies. |

### PART V—*Suits Relating To Immovable Property*

| | | |
|---|---|---|
| **61.** By a mortgagor— | | |
| (*a*) to redeem or recover possession of immovable property mortgaged; | Thirty years | When the right to redeem or to recover possession accrues. |
| (*b*) to recover possession of immovable property mortgaged and afterwards transferred by the mortgagee for a valuable consideration; | Twelve years | When the transfer becomes known to the plaintiff. |
| (*c*) to recover surplus collections received by the mortgagee after the mortgage has been satisfied. | Three years | When the mortgagor re-enters on the mortgaged property. |
| **62.** To enforce payment of money secured by a mortgage or otherwise charged upon immovable property. | Twelve years | When the money sued for becomes due. |
| **63.** By a mortgagee— | | |
| (*a*) for foreclosure; | Thirty years | When the money secured by the mortgage becomes due. |
| (*b*) for possession of immovable property mortgaged. | Twelve years | When the mortgagee becomes entitled to possession. |
| **64.** For possession of immovable property based on previous possession and not on title, when the plaintiff while in possession of the property has been dispossessed. | Twelve years | The date of dispossession. |
| **65.** For possession of immovable property or any interest therein based on title. | Twelve years[1] | When the possession of the defendant becomes adverse to the plaintiff. |
| *Explanation*.—For the purposes of this article— | | |
| (*a*) where the suit is by a | | |


SCC OnLine Web Edition, Copyright © 2015
Page 7    Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

remainderman, a reversioner (other than a landlord) or a devisee, the possession of the defendant shall be deemed to become adverse only when the estate of the remainderman, reversioner or devisee, as the case may be, falls into possession;

(*b*) where the suit is by a Hindu or Muslim entitled to the possession of immovable property on the death of a Hindu or Muslim female, the possession of the defendant shall be deemed to become adverse only when the female dies;

(*c*) where the suit is by a purchaser at a sale in execution of a decree when the judgment-debtor was out of possession at the date of the sale, the purchaser shall be deemed to be a representative of the judgment-debtor who was out of possession.

| | | |
|---|---|---|
| **66.** For possession of immovable property when the plaintiff has become entitled to possession by reason of any forfeiture or breach of condition. | Twelve years | When the forfeiture is incurred or the condition is broken. |
| **67.** By a landlord to recover possession from a tenant. | Twelve years | When the tenancy is determined. |

**PART VI—*Suits Relating To Movable Property***

| | | |
|---|---|---|
| **68.** For specific movable property lost, or acquired by theft, or dishonest misappropriation or conversion. | Three years | When the person having the right to the possession of the property first learns in whose possession it is. |
| **69.** For other specific movable property. | —do— | When the property is wrongfully taken. |
| **70.** To recover movable property deposited or pawned from a depositary or pawnee. | —do— | The date of refusal after demand. |
| **71.** To recover movable property deposited or pawned, and afterwards bought from the depositary or pawnee for a valuable consideration. | Three years | When the sale becomes known to the plaintiff. |

**PART VII—*Suits Relating To Torts***


SCC OnLine Web Edition, Copyright © 2015
Page 8      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | |
|---|---|---|
| **72.** For compensation for doing or for omitting to do an act alleged to be in pursuance of any enactment in force for the time being in the territories to which this Act extends. | One year | When the act or omission takes place. |
| **73.** For compensation for false imprisonment. | —do— | When the imprisonment ends. |
| **74.** For compensation for a malicious prosecution. | —do— | When the plaintiff is acquitted or the prosecution is otherwise terminated. |
| **75.** For compensation for libel. | —do— | When the libel is published. |
| **76.** For compensation for slander. | —do— | When the words are spoken, or, if the words are not actionable in themselves, when the special damage complained of results. |
| **77.** For compensation for loss of service occasioned by the seduction of the plaintiff's servant or daughter. | —do— | When the loss occurs. |
| **78.** For compensation for inducing a person to break a contract with the plaintiff. | —do— | The date of the breach. |
| **79.** For compensation for an illegal, irregular or excessive distress. | —do— | The date of the distress. |
| **80.** For compensation for wrongful seizure of movable property under legal process. | —do— | The date of the seizure. |
| **81.** By executors, administrators or representatives under the Legal Representatives' Suits Act, 1855 (12 of 1855). | —do— | The date of the death of the person wronged. |
| **82.** By executors, administrators or representatives under the Indian Fatal Accidents Act, 1855 (13 of 1855). | Three years | The date of the death of the person killed. |
| **83.** Under the Legal Representatives' Suits Act, 1855 (12 of 1855), against an executor, an administrator or any other representative. | —do— | When the wrong complained of is done. |
| **84.** Against one who, having a right to use property for specific purposes, perverts it to other purposes. | —do— | When the perversion first becomes known to the person injured thereby. |
| **85.** For compensation for obstructing a way or a | Three years | The date of the obstruction. |


SCC OnLine Web Edition, Copyright © 2015
Page 9     Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

watercourse.

| | | |
|---|---|---|
| **86.** For compensation for diverting a watercourse. | Three years | The date of the diversion. |
| **87.** For compensation for trespass upon immovable property. | —do— | The date of the trespass. |
| **88.** For compensation for infringing copyright or any other exclusive privilege. | —do— | The date of the infringement. |
| **89.** To restrain waste. | —do— | When the waste begins. |
| **90.** For compensation for injury caused by an injunction wrongfully obtained. | —do— | When the injunction ceases. |
| **91.** For compensation— | | |
| (*a*) for wrongfully taking or detaining any specific movable property lost, or acquired by theft, or dishonest misappropriation or conversion; | —do— | When the person having the right to the possession of the property first learns in whose possession it is. |
| (*b*) for wrongfully taking or injuring or wrongfully detaining any other specific movable property. | —do— | When the property is wrongfully taken or injured, or when the detainer's possession becomes unlawful. |

**PART VIII—*Suits Relating To Trusts and Trust Property***

| | | |
|---|---|---|
| **92.** To recover possession of immovable property conveyed or bequeathed in trust and afterwards transferred by the trustee for a valuable consideration. | Twelve years | When the transfer becomes known to the plaintiff. |
| **93.** To recover possession of movable property conveyed or bequeathed in trust and afterwards transferred by the trustee for a valuable consideration. | Three years | When the transfer becomes known to the plaintiff. |
| **94.** To set aside a transfer of immovable property comprised in a Hindu, Muslim or Buddhist religious or charitable endowment, made by a manager thereof for a valuable consideration. | Twelve years | When the transfer becomes known to the plaintiff. |
| **95.** To set aside a transfer of movable property comprised in a Hindu, Muslim or Buddhist religious or charitable endowment, made by a manager thereof for a valuable consideration. | Three years | When the transfer becomes known to the plaintiff. |


SCC OnLine Web Edition, Copyright © 2015
Page 10      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-----------------------------------------------------------------------------------------------------------------------------------------

**96.** By the manager of a Hindu, Muslim or Buddhist religious or charitable endowment to recover possession of movable or immovable property comprised in the endowment which has been transferred by a previous manager for a valuable consideration.

Twelve years

The date of death, resignation or removal of the transferor or the date of appointment of the plaintiff as manager of the endowment, whichever is later.

## PART IX—*Suits Relating To Miscellaneous Matters*

**97.** To enforce a right of pre-emption whether the right is founded on law or general usage or on special contract.

One year

When the purchaser takes under the sale sought to be impeached, physical possession of the whole or part of the property sold, or, where the subject-matter of the sale does not admit of physical possession of the whole or part of the property, when the instrument of sale is registered.

**98.** By a person against whom [2][an order referred to in Rule 63 or in Rule 103] of Order XXI of the Code of Civil Procedure, 1908 (5 of 1908), or an order under Section 28 of the Presidency Small Cause Courts Act, 1882 (15 of 1882), has been made, to establish the right which he claims to the property comprised in the order.

—do—

The date of the final order.

**99.** To set aside a sale by a civil or revenue court or a sale for arrears of Government revenue or for any demand recoverable as such arrears.

—do—

When the sale is confirmed or would otherwise have become final and conclusive had no such suit been brought.

**100.** To alter or set aside any decision or order of a civil court in any proceeding other than a suit or any act or order of an officer of Government in his official capacity.

—do—

The date of the final decision or order by the court or the date of the act or order of the officer, as the case may be.

**101.** Upon a judgment, including a foreign judgment, or a recognisance.

Three years

The date of the judgment or recognisance.

**102.** For property which the plaintiff has conveyed while insane.

—do—

When the plaintiff is restored to sanity and has knowledge of the conveyance.

**103.** To make good out of the

—do—

The date of the trustee's death


SCC OnLine Web Edition, Copyright © 2015
Page 11      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

| | | |
|---|---|---|
| general estate of a deceased trustee the loss occasioned by a breach of trust. | | or if the loss has not then resulted, the date of the loss. |
| **104.** To establish a periodically recurring right. | —do— | When the plaintiff is first refused the enjoyment of the right. |
| **105.** By a Hindu for arrears of maintenance. | —do— | When the arrears are payable. |
| **106.** For a legacy or for a share of a residue bequeathed by a testator or for a distributive share of the property of an intestate against an executor or an administrator or some other person legally charged with the duty of distributing the estate. | Twelve years | When the legacy or share becomes payable or deliverable. |
| **107.** For possession hereditary office.<br><br>*Explanation.*—A hereditary office is possessed when the properties thereof are usually received, or (if there are no properties) when the duties thereof are usually performed. | Twelve years | When the defendant takes possession of the office adversely to the plaintiff. |
| **108.** Suit during the life of a Hindu or Muslim female by a Hindu or Muslim who, if the female died at the date of instituting the suit, would be entitled to the possession of land, to have an alienation of such land made by the female declared to be void except for her life or until her remarriage. | —do— | The date of the alienation. |
| **109.** By a Hindu governed by Mitakshara law to set aside his father's alienation of ancestral property. | —do— | When the alienee takes possession of the property. |
| **110.** By a person excluded from a joint family property to enforce a right to share therein. | —do— | When the exclusion becomes known to the plaintiff. |
| **111.** By or on behalf of any local authority for possession of any public street or road or any part thereof from which it has been dispossessed or of which it has discontinued the possession. | Thirty years | The date of the dispossession or discontinuance. |
| **112.** Any suit (except a suit before the Supreme Court in | —do— | When the period of limitation would begin to run under this |


SCC OnLine Web Edition, Copyright © 2015
Page 12    Tuesday, March 31, 2015
Printed For:  Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-------------------------------------------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| the exercise of its original jurisdiction) by or on behalf of the Central Government or any State Government, including the Government of the State of Jammu and Kashmir. | | Act against a like suit by a private person. |

### PART X—*Suits for which there is no prescribed period*

| | | |
|---|---|---|
| **113.** Any suit for which no period of limitation is provided elsewhere in this Schedule. | Three years | When the right to sue accrues |

### SECOND DIVISION—APPEALS

| | | |
|---|---|---|
| **114.** Appeals from an order of acquittal— | | |
| (*a*) under sub-section (1) or sub-section (2) of Section 417 of the Code of Criminal Procedure, 1898; | Ninety days | The date of the order appealed from. |
| (*b*) under sub-section (3) of Section 417 of that Code. | Thirty days | The date of the grant of special leave. |
| **115.** Under the Code of Criminal Procedure, 1898— | | |
| (*a*) from a sentence of death passed by a court of session or by a High Court in the exercise of its original criminal jurisdiction; | Thirty days | Time from which period begins to run. |
| (*b*) from any other sentence or any order not being an order of acquittal— | | |
| (*i*) to the High Court | Sixty days | The date of the sentence or order. |
| (*ii*) to any other court | Thirty days | The date of the sentence or order. |
| **116.** Under the Code of Civil Procedure, 1908— | | |
| (*a*) to a High Court from any decree or order; | Ninety days | The date of the decree or order. |
| (*b*) to any other court from any decree or order. | Thirty days | The date of the decree or order. |
| **117.** From a decree or order of any High Court to the same Court. | —do— | The date of the decree or order. |

### THIRD DIVISION—APPLICATIONS
### PART I—*Applications in specified cases*

| | | |
|---|---|---|
| **118.** For leave to appear and defend a suit under summary procedure. | Ten days | When the summons is served. |
| **119.** Under the Arbitration Act, 1940— | | |
| (*a*) for the filing in court of an | Thirty days | The date of service of the |



SCC OnLine Web Edition, Copyright © 2015
Page 13      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

award;

(b) for setting aside an award —do— The date of service of the notice of the filing of the award.
or getting an award remitted for reconsideration.

**120.** Under the Code of Civil Procedure, 1908 to have the legal representative of a deceased plaintiff or appellant or of a deceased defendant or respondent, made a party. — Ninety days — The date of death of the plaintiff, appellant, defendant or respondent, as the case may be.

**121.** Under the same Code for an order to set aside an abatement. — Sixty days — The date of abatement.

**122.** To restore a suit or appeal or application for review or revision dismissed for default of appearance or for want of prosecution or for failure to pay costs of service of process or to furnish security for costs. — Thirty days — The date of dismissal.

**123.** To set aside a decree passed ex parte or to rehear an appeal decreed or heard ex parte. — Thirty days — The date of the decree or where the summons or notice was not duly served, when the applicant had knowledge of the decree.

*Explanation.*—For the purpose of this article, substituted service under Rule 20 of Order V of the Code of Civil Procedure, 1908 (5 of 1908) shall not be deemed to be due service.

**124.** For a review of judgment by a court other than the Supreme Court. — Thirty days — The date of the decree or order.

**125.** To record an adjustment or satisfaction of a decree. — —do— — When the payment or adjustment is made.

**126.** For the payment of the amount of a decree by instalments. — —do— — The date of the decree.

**127.** To set aside a sale in execution of a decree including any such application by a judgment-debtor. — [3][Sixty days] — The date of the sale.

**128.** For possession by one dispossessed of immovable property and disputing the right of the decree-holder or purchaser at a sale in execution of a decree. — Thirty days — The date of dispossession.

notice of the making of the award.



SCC OnLine Web Edition, Copyright © 2015
Page 14     Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com
-----------------------------------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| **129.** For possession after removing resistance or obstruction to delivery of possession of immovable property decreed or sold in execution of a decree. | —do— | The date of resistance or obstruction. |
| **130.** For leave to appeal as a pauper— | | |
| (a) to the High Court; | Sixty days | The date of decree appealed from. |
| (b) to any other court. | Thirty days | The date of decree appealed from. |
| **131.** To any court for the exercise of its powers of revision under the Code of Civil Procedure, 1908 (5 of 1908) or the Code of Criminal Procedure, 1898 (5 of 1898). | Ninety days | The date of the decree or order or sentence sought to be revised. |
| **132.** To the High Court for a certificate of fitness to appeal to the Supreme Court under clause (1) of Article 132, Article 133 or sub-clause (c) of clause (1) of Article 134 of the Constitution or under any other law for the time being in force. | Sixty days | The date of the decree, order or sentence. |
| **133.** To the Supreme Court for special leave to appeal,— | | |
| (a) in a case involving death sentence; | Sixty days | The date of the judgment, final order or sentence. |
| (b) in a case where leave to appeal was refused by the High Court; | —do— | The date of the order of refusal. |
| (c) in any other case. | Ninety days | The date of the judgment or order. |
| **134.** For delivery of possession by a purchaser of immovable property at a sale in execution of a decree. | One year | When the sale becomes absolute. |
| **135.** For the enforcement of a decree granting a mandatory injunction. | Three years | The date of the decree or where a date is fixed for performance, such date. |
| **136.** For the execution of any decree (other than a decree granting a mandatory injunction) or order of any civil court. | Twelve years | [4][When] the decree or order becomes enforceable or where the decree or any subsequent order directs any payment of money or the delivery of any property to be made at a certain date or at recurring periods when default in making the payment or |


SCC OnLine Web Edition, Copyright © 2015
Page 15      Tuesday, March 31, 2015
Printed For: Nakul Dewan
SCC OnLine Web Edition: http://www.scconline.com

delivery in respect of which execution is sought, takes place:

Provided that an application for the enforcement or execution of a decree granting a perpetual injunction shall not be subject to any period of limitation.

**137.** Any other application for which no period of limitation is provided elsewhere in this Division.

Three years

When the right to apply accrues.

———

[1] In Bihar vide Bihar Regn. 1 of 1969, the following words and figures shall be *added* at the end:

"but 30 years in respect of immovable property belonging to a member of the Scheduled Tribes as specified in Part III to Schedule to the Constitution (Scheduled Tribes) Order, 1950."

[2] *Subs.* by Act 52 of 1964, S. 3 and Sch. II.

[3] *Subs.* by Act 104 of 1976, S. 98 for "thirty days" (w.e.f. 1-2-1977). S. 98(2) in this regard provides:

"(2) Where the period specified in Article 127 of Sch. to the Limitation Act, 1963 (36 of 1963), had expired on or before the commencement of this Act viz., (1-2-1977), nothing contained in sub-section (1) shall be construed as enabling such application as is referred to in the said article, to be filled after the commencement of this Act by reason only of the fact that a longer period therefor is specified in the Act aforesaid by reason of the provision if sub-section (1)."

[4] *Subs.* by Act 52 of 1964, S. 3 and Sch. II.

© EBC Publishing Pvt.Ltd., Lucknow.

# EXHIBIT X



# NATIONAL MISSION FOR

# DELIVERY OF JUSTICE AND

# LEGAL REFORM

## "Towards Timely Delivery of Justice to All"

## A BLUEPRINT FOR JUDICIAL REFORMS

Strategic Initiatives

2009 - 2012

# NATIONAL MISSION FOR DELIVERY OF JUSTICE AND LEGAL REFORM

**VISION**

*Timely Delivery of Justice to All*

**MISSION**

*To Strengthen the Judiciary towards reducing pendency and delays*

**OBJECTIVE**

*Reducing the pendency of arrears from 15 years to 3 years by 2012*

**STRATEGY**

The National Mission for Delivery of Justice and Legal Reform proposes the following strategic initiatives to realize its vision:

      I.        Outline Policy changes

      II.       Re-engineer procedures

      III.      Focus on Human Resource Development

      IV.      Leverage ICT technology and tools

The National Mission for Delivery of Justice and Legal Reform will be serviced by a Society registered under The Societies Registration Act, 1860. The said Society will act as a Special Purpose Vehicle ("**SPV")**. The SPV will define and implement an action plan to realize the vision of the National Mission for Delivery of Justice and Legal Reform.

At *the National Consultation for Strengthening the Judiciary towards Reducing Pendency and Delays* held on the 24th and 25th October, the Hon'ble Union Minister for Law and Justice, Dr. M. Veerappa Moily presented the following resolutions to Hon'ble Chief Justice of India, Hon'ble Mr. Justice K.G. Balakrishnan:

# SOCIETY FOR DELIVERY OF JUSTICE AND LAW REFORM
## Charter

1. The Special Purpose Vehicle, (hereafter called the SPV) for the National Mission for Delivery of Justice and Legal Reform will manage and implement the Vision prepared by the National Mission for Delivery of Justice and Legal Reform and also service the Bar Council of India.

2. The SPV will define and implement an action plan to provide "timely justice" to all. It aims to reduce the pendency of cases (arrears) from 15 years to 3 years by means of various innovative strategies, initiatives and definitive action plans. The SPV has a target to eliminate all arrears from the Indian Judicial System by December 31, 2012. All cases pending as on January 1, 2009 will be treated as arrears.

3. The SPV intends to achieve its objective of reducing pendency through a multi-pronged approach which includes Process Reengineering, Human Resource and Institutional Framework Reforms, Infrastructure Development and Information Technology enablement.

4. The SPV will be formed as a Society which will be fully funded by the Central Government. It may also, in the future, be funded from an appropriate tax, say a legal reform cess that will be applicable to all citizens of the country, on the lines of the existing education cess.

5. The SPV will be empowered to seek the involvement of the Supreme Court, all High Courts and Subordinate Courts in charting out a detailed implementation plan. It will be essential for all bodies to provide support to the SPV. The SPV in consultation with Supreme Court and all High Courts will be empowered to suggest modification of existing Acts and Rules if necessary to implement its vision.

6. The SPV's Board of Governors will have appropriate representation from the academia, Government and industry. The chief executive of the SPV will report to the Board of governors of the National Mission for Delivery of Justice and Legal Reform. The SPV will be run professionally by executives who have a management background and extensive specialized experience in managing various functions of an organization.

The SPV will also have engineers, architects and information technology experts as part of its team.

7. The executive team of the SPV will have well defined terms of reference, goals and objectives, mechanism to report progress, issue management and performance management framework. The executive team will have freedom and flexibility to work towards its goals and will report only to the Board of Directors for strategic control and decision making.

8. The SPV will be supported for research and scientific studies on legal matters by different academic and Government bodies such as the National Law Schools, the Law Commission, non-governmental organizations, and private research organizations.

9. The SPV will also steer reforms in the legal education system in line with recommendations of the National Legal Knowledge Council established by the Bar Council of India.

10. The SPV will evolve a mechanism to engage the citizens of the country in this mega reform process. The need is to bring about attitudinal change in the public consciousness towards the judicial system and create awareness on the proposed judicial reforms.

11. The SPV will form partnerships and alliances with the private sector wherever required. It would attempt to outsource operational activities, however will retain control of all strategic policy and management aspects.

a)Trial Courts

b)Appellate Courts including High Courts

c)Supreme Court

The Technology Information, Forecasting and Assessment Council of the Department of Science and Technology, Government of India, is in the process of undertaking a project in relation to e-courts, which aims a higher level of interfacing between science & technology and the judiciary. The said project is set to function in a collaborative mode with the judiciary, investigating agencies, forensic laboratories and science & technology organisations.

## CONCLUSION

The Strategic Initiatives presented in this document provide a means for achieving the major objectives of the National Mission for Delivery of Justice and Legal Reform namely:

- increasing access by reducing delay and arrears in the system, and,
- enhancing accountability through structural changes and by setting performance standards and capacities

As suggested by the Hon'ble Chief Justice of India, the following may be set as the National Minimum Court Performance Standards for us:

- Disposal level of the national system should be raised from 60% of total case load (as at present) to 95%-100% of total case load in three years. This target must be established at the district and State levels.

- Each court to ensure that no more than 5% of the cases in that court should be more than 5 years old (5x5 rule) within the next three years; and in 5 years, to ensure that no more than 1% of the cases should be more than 1 year old (1x1 rule).

Law is an important instrument of social and political change. For the Rule of Law to be a reality, and to maintain the faith of society in the legal system of out country, there is an urgent need to reduce the pendency of cases in courts and also reduce the average life span of litigation. The time for change is now.

34

# EXHIBIT Y



National Consumer Disputes Redressal Commission



→ History
→ Members
→ Bare Act
→ General Information
→ State Commissions
→ District Forums
→ Cause List
→ Consumer Advocate
→ Case Status/ Daily Orders
→ Judgements
→ Right To Information Act, 2005

**Related Links**

→ Confonet
→ Supreme Court of India
→ Deptt. of Consumer Affairs
→ Indian Courts Cause List
→ Judis



**Holiday Circular**



**Contact**

Upbhokta Nyay Bhawan,
'F' Block, GPO Complex,
INA, New Delhi-110 023
Fax No: 011-24651505,
24658505
PBX No : 011-24608801,
24608802, 24608803, 24608804

**Site Managed by NIC**

---

**CONSUMER PROTECTION AND NATIONAL CONSUMER DISPUTES REDRESSAL COMMISSION**

Vacancy Circular For Joint Registrar & Law Clerks.

The Consumer Protection Act, 1986 (in short, 'the Act'), is a benevolent social legislation that lays down the rights of the and provides their for promotion and protection of the rights of the consumers. The first and the only Act of its kind in India, it ordinary consumers to secure less expensive and often speedy redressal of their grievances. By spelling out the rights and the consumers in a market so far dominated by organized manufacturers and traders of goods and providers of various types the Act makes the dictum, *caveat emptor* ('buyer beware') a thing of the past.

The Act mandates establishment of Consumer Protection Councils at the Centre as well as in each State and District to promoting consumer awareness.

The Central Council is headed by Minster, In-charge of the Department of Consumer Affairs in the Central Governm State Councils by the Minister In-charge of the Consumer Affairs in the State Governments. It also provides for a 3-tier str National and State Commissions and District Forums for speedy resolution of consumer disputes.

To provide inexpensive, speedy and summary redressal of consumer disputes, quasi-judicial bodies have been se District and State and at the National level, called the District Forums, the State Consumer Disputes Redressal Commiss National Consumer Disputes Redressal Commission respectively.   At present, there are 629 District Forums and 35 State C with the National Consumer Disputes Redressal Commission (NCDRC) at the apex. NCDRC has its office at Upbhokta Naya Block, GPO Complex, INA, New Delhi-110 023.

Each District Forum is headed by a person who is or has been or is eligible to be appointed as a District Judge and Commission is headed by a person who is or has been a Judge of High Court.

The National Commission was constituted in the year 1988.  It is headed by a sitting or retired Judge of the Supre India.  The National Commission is presently headed by Hon'ble Mr. Justice D. K. Jain, former Judge of the Supreme Cou President and has eleven Members, viz. Hon'ble Mr. Vinay Kumar, Hon'ble Mr. Suresh Chandra, Hon'ble Mr. Justice V.B. Gu Mr. Justice J.M. Malik, Hon'ble Mr. Justice K. S. Chaudhari,  Hon'ble Mr. Justice Ajit Bharihoke, Hon'ble Mrs. Rekha Gupta, H C. Gupta, Hon'ble Dr. S. M. Kantikar, Hon'ble Mr. Justice V.K. Jain & Hon'ble Mrs. M. Shreesha.

The provisions of this Act cover 'goods' as well as 'services'.  The goods are those which are manufactured or produ to consumers through wholesalers and retailers.  The services are in the nature of transport, telephone, electricity, housi insurance, medical treatment, etc.

A written complaint, can be filed before the District Consumer Forum for pecuniary value of upto Rupees twenty Commission for value upto Rupees one crore and the National Commission for value above Rupees one crore, in respect goods and or deficiency in service.  The service can be of any description and the illustrations given above are only indicativ no complaint can be filed for alleged deficiency in any service that is rendered free of charge or under a contract of personal s