1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, | No. 15-cv-00424-SI |
| Plaintiff, | **DECLARATION OF MAARTEN J. DROP IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO (1) FORUM SELECTION CLAUSE; (2) *FORUM NON CONVENIENS*; (3) FED. R. CIV. P. 12(B)(7); AND (4) FED. R. CIV. P. 12(B)(3)** |
| v. | |
| UBER TECHNOLOGIES, INC., | |
| Defendant. | |

Gibson, Dunn &
Crutcher LLP

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

_____

|  |  |  |
|---|---|---|
| | ) | |
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 15-cv-00424-SI |
| | ) | |
| UBER TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

_____

DECLARATION OF MAARTEN J. DROP

I, Maarten J. Drop, declare as follows:

**Qualifications and purpose of declaration**

1.      I am a Dutch national, resident in Amsterdam, and an advocate licensed to practice law in the Netherlands. I specialize in domestic and international litigation and arbitration, often with a focus on conflict of law issues. I submit this Declaration on Dutch law at the request of Uber Technologies, Inc. ("**Uber U.S.**"), the defendant in this matter.

2.      I completed my legal education at the University of Amsterdam in 1992. I have been practicing law in the Netherlands for nearly a quarter of a century. From 1992-2002, I practiced at the law firm of Trenité Van Doorne. In 2002-2003 I was a partner with Van Oosten Urlus Stuivinga at The Hague. Since 2004, I have been a partner of Cleber N.V. (in Amsterdam). Cleber N.V. handles corporate law matters and domestic and international litigation and arbitration disputes.

3.    I have given lectures on Dutch and international procedural law over the past 10 years at multiple conferences. Most recently, I was an intervening speaker at the annual conference of the Dutch Arbitration Association in October 2014 and completed an expert mission in Rabat, Morocco, organized by the Financial Services Volunteer Corps, in New York, providing training to Moroccan and Yemeni judges on international best practices in insolvency procedure in February 2015.

4.    In my career as a Dutch *advocaat*, involved in many international cases, I have served as counsel to clients, and as Dutch co-counsel, and as expert to the court. I have attended numerous hearings in Dutch courts and international and foreign courts. I refer you to my C.V., which is attached hereto as Attachment 1.

5.    The following documents have been provided to me by counsel for Uber U.S. I have reviewed these documents in the process of preparing my report:

     a.    A copy of the Complaint in this case. (Attachment 2).

     b.    A copy of the User Terms Agreement between Uber B.V. and Jane Doe. (Attachment 3).

     c.    A copy of the User Terms Agreement between Uber B.V. and Jane Doe's friend, who is mentioned in the Complaint. (Attachment 4).

     d.    A copy of the Partner Terms Agreement between Uber B.V. and the driver alleged to have sexually assaulted Ms. Doe, named Mr. Shiv Kumar Yadav ("**Yadav**"). (Attachment 5).

6.    I have relied on representations from Uber U.S. that these are the governing Agreements. I have prepared this report based on my general knowledge of Dutch law, including in particular my knowledge of our Civil Code and our Code of Civil Procedure, relevant international regulations and treaties and my familiarity with judicial decisions in our country. I have attached the key Dutch law provisions referenced in my report, which have been translated.

7.    I have been asked by Uber U.S. to provide an opinion regarding two issues of Dutch law and practice. First, I have been asked to interpret the "forum selection clause" that appears in the attached User Terms Agreements. Second, based on the Complaint filed in this case and my knowledge of the Dutch judicial system and practice, I have been asked to address the suitability of Netherlands as a forum for the dispute at issue here.

8.    This report reflects my independent analysis and judgment. I have charged a fee of 12,000 euros to provide this report, on the condition that I am to be paid regardless of whether or not my report advances Uber U.S.'s position. Should it be helpful to the Court, I am available to travel to the U.S. to provide testimony to the Court in person about the matters discussed in this report. In such a situation, I would charge Uber U.S. 335 euros per hour for travel time and the time spent testifying as well as disbursements.

**Summary of my conclusions**

9.     As to the first question, the forum selection clause in the User Terms Agreements attributes exclusive jurisdiction to the competent court in Amsterdam, the Netherlands. The forum selection clause also contains an option: if the user exercises his or her right within one month to demand "*settlement of the dispute, claim or controversy at hand before the relevant court competent by law*", then a "*relevant court competent by law*" can be selected as an alternative forum to the Amsterdam court. As explained below, under Dutch law principles, the common understanding of a "*relevant court competent by law*" would be any other court in the Netherlands that has jurisdiction. From a perspective of Dutch private international law, no court in the United States constitutes a "*relevant court competent by law*" to resolve the dispute at issue.

10.    As to the second question, the Amsterdam District Court always has jurisdiction to hear Ms. Doe's claims against Uber B.V. and could, depending on the merits of Ms. Doe's claim, accept jurisdiction over Uber U.S. or any other Uber entity. Dutch courts will also provide a fair and equitable forum for this suit to be resolved and have the ability to offer redress for Ms. Doe's injuries, depending—as in any other court—on the merit of the allegations of any suit she files in the Netherlands.

**The forum selection clause in the user terms**

11.    The Netherlands is a civil-law jurisdiction in which the power to enact law rests with the legislature, whose legal code is the primary basis of law. Courts, however, verify the validity of contracts and interpret them. Court precedents and in particular interpretative standards set by the Dutch Supreme Court (*Hoge Raad*) are an important source of Dutch law.

12.    Uber U.S. represents to me that neither Ms. Doe nor her friend referenced in the Complaint, contracted with Uber U.S. for Uber app service in India. Instead, they both contracted with Uber B.V. for this service (see Attachments 3 and 4). Uber U.S. also represents to me that a copy of the User Terms Agreement between Uber B.V. and Jane Doe (Attachment 3) remained in effect as the applicable User Terms Agreement on December 5, 2014.

13.    I have verified that Uber B.V. is registered with the Commercial Register of the Chamber of Commerce in Amsterdam as a Dutch corporation with limited liability having its

statutory seat in Amsterdam and its place of business at Vijzelstraat 68, 1017 HL Amsterdam, the Netherlands.[1]

14. Uber U.S. furthermore represents to me that assent to the User Terms were preconditions to Jane Doe and her friend using the Uber App that let Ms. Doe and her friend obtain the transportation services from Mr. Yadav.

15. The attached User Terms Agreements contain identical choice of law and forum selection clauses, which appear in a section entitled "Applicable law and Dispute Resolution." This section provides, in its entirety:

> These User Terms are subject to the laws of the Netherlands. Any dispute, claim or controversy arising out of or relating to these User Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Website, the Service or the Application (collectively, "Disputes") will be settled exclusively by the competent court in Amsterdam, the Netherlands, unless you notify Uber within one month after Uber invoking its right pursuant to this provision to commence court proceedings in Amsterdam, the Netherlands, that you demand settlement of the dispute, claim or controversy at hand before the relevant court competent by law.

16. Below I first explain that the forum selection clause meets the formal requirements set by Article 25 of Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast) ("**Brussels I***bis* **Regulation**"). A copy of the official English language version of the Brussels I*bis* Regulation as published in the Official Journal of the European Union is attached as Attachment 6.

17. Because Uber B.V. and Ms. Doe are residents of different countries, the present dispute contains international elements. Consequently, the Brussels I*bis* Regulation applies, as the dispute meets the following required criteria:

   (a) the present dispute falls within the material scope of the Brussels I*bis* Regulation as it concerns a civil matter as provided for in Article 1(1);

   (b) the present dispute falls within the temporal scope of the Brussels I*bis* Regulation (Article 81); and

   (c) the present dispute falls within the formal scope of the Brussels I*bis* Regulation, since Uber B.V. is domiciled in the Netherlands (Article 4 *juncto* Article 63).

18. Pursuant to Article 25(1)(a) of the Brussels I*bis* Regulation, the forum selection clause quoted in paragraph 15 above is valid if it can be evidenced in writing. Such evidence includes communication by electronic means that provides a durable record of the Agreement (Article 25(2)).

---

[1] Dutch law recognizes the autonomy and separateness of Dutch legal persons as well as of foreign entities, provided these have legal personality under the law of incorporation.

19.     In this respect, Uber U.S. represents to me that Ms. Doe and her friend referenced in the Complaint each concluded an Agreement with Uber B.V. to accept the User Terms.

20.     Pursuant to Article 6:236(n) of the Dutch Civil Code ("**DCC**"), an English translation of which is attached as Attachment 7, a forum selection clause in general terms and conditions consumers (such as the User Terms in the present case) must give consumers an option to bring a proceeding in another court competent by law, other than the court designated in the general terms and conditions. If a consumer wishes to invoke this "opt-out right" the consumer must notify the other party to that effect within one month after the other party invokes the forum selection clause.

21.     The forum selection clause quoted in paragraph 15 above reflects a standard provision in Dutch contracts, designed to comply with Article 6:236(n) DCC. Thus, the forum selection clause provides a consumer (the Uber app user) with the option to notify Uber B.V., within one month after Uber B.V. invokes its right under the forum selection clause to proceed in Amsterdam, that he or she demands settlement of the dispute, claim or controversy at hand before the relevant court competent by law.

22.     This forum selection clause in the User Terms thus complies in my opinion with all requirements of the DCC, and so is valid and not voidable on that ground.[2]

23.     Article 6:236(n) has a limited scope and is not concerned with international jurisdiction. First, it does not apply if the parties agreed to the exclusive jurisdiction of a court outside the Netherlands. This is made very clear in Prof. Hondius's standard commentary on Dutch law on obligations,[3] whose view is endorsed by other relevant legal authors here.[4]

24.     Second, the opt-out right in Article 6:236(n) was not designed to entitle consumers to commence proceedings outside the Netherlands before any court, anywhere in the world, that is willing to assume jurisdiction. It gives consumers the option of selecting another court within the Netherlands. This is supported by the *travaux préparatoires – i.e.* the official legislative history,[5] which is a principle source for the interpretation and construction of Dutch statutory provisions – with respect to Article 6:236(n) DCC. In the explanatory memorandum dealing with this provision the Dutch Minister of Justice clarified that the opt-out right serves as a remedy for contract provisions with consumers that derogate from the rules of relative and absolute competence. Under the Dutch Code

---

[2]     Under the relevant terms of the User Terms Agreements, if Uber B.V. were to notify Ms. Doe that it was selecting to proceed in Amsterdam, the Netherlands, then she would have one month to exercise her right to select an alternative "*relevant court competent by law.*" If she failed to timely exercise her right then the exclusive forum would be in Amsterdam, the Netherlands.

[3]     E.H. Hondius, *GS Verbintenissenrecht* 2013, artikel 6:236, aant. 94, (an English translation of the relevant paragraph is attached as Attachment 9).

[4]     For instance J.W. Westenberg, 'Een scope-rule met een Januskop: Artikel 6.5.2A.13 NBW onder de loep', *NJB* 1987, p. 463.

[5]     The legislative history consists of the background explanation provided by the Dutch Government to the Dutch Parliament, the verbatim records of questions raised by members of Parliament and further written explanations or answers provided by Commissions of Parliament or the Minister of Justice.

of Civil Procedure, the concept of what is called "relative competence" is concerned with the question of which Dutch court has territorial jurisdiction based on a geographical subdivision of the Kingdom of the Netherlands. The "absolute competence" is concerned with the question of before which type of court (*e.g.* the cantonal division of the District Court) a civil matter shall first be brought. The legislative history thus makes clear that Article 6:236(n) DCC should be interpreted to refer to "competent" courts within the Netherlands only as alternatives to the court(s) designated in a forum selection clause.

25.     As the forum selection clause found in the User Terms Agreements (and quoted in paragraph 15 above) is clearly based on and conforms with Article 6:236(n) DCC, it is subject to the same restrictions. Derogation from the jurisdiction of Dutch courts in favor of a court outside the Netherlands is not comprehended within the meaning of the forum selection clause.

26.     Therefore, as interpreted under Dutch law, the contractual right of Ms. Doe to "*demand settlement of the dispute, claim or controversy at hand before the relevant court competent by law*" does not include a right to demand settlement of the present dispute outside the Netherlands, before, for instance, a court in the United States.

27.     Furthermore, from the perspective of Dutch private international law, a court in the United States would not be a "*relevant court competent by law*" for the following reasons:

   (a)     Ms. Doe is not a U.S. citizen;

   (b)     Ms. Doe does not reside in the U.S.;

   (c)     The alleged rape and sexual assault did not transpire in the U.S.;

   (d)     Ms. Doe and the friend she mentions in the Complaint contracted with Uber B.V. for their use of India Uber services and Uber B.V. is not a U.S. entity or resident;

   (e)     The driver who committed the alleged assault is neither a U.S. citizen nor resident and he contracted with Uber B.V., not Uber U.S.; and

   (f)     The contract is not governed by the law of any state of the United States.

28.     Finally, the Amsterdam District Court would also be the relevant forum to settle the dispute, for the following reasons:

   (a)     Ms. Doe contracted with Uber B.V. for the Uber services that led to the incident alleged in the Complaint, as did Ms. Doe's friend referenced in the Complaint;

   (b)     The contract between Ms. Doe and Uber B.V. (and the contract between Ms. Doe's friend and Uber B.V.) is governed by Dutch law and the "opt-out right" does not modify the applicability of Dutch law;

(c)     Matters such as whether the contract has been validly concluded, and whether the User Terms are applicable and have been agreed upon by the parties, are therefore also subject to Dutch law;

(d)     The contract and the User Terms are to be interpreted and construed in accordance with Dutch law;

(e)     The driver at issue, Mr. Yadav, contracted with Uber B.V.; and

(f)     The Dutch courts are best suited to decide on the questions referred to above.

29.     Independent of the User Terms Agreements, and even if this Court should disregard the forum selection clauses, the Netherlands would therefore provide a better forum to resolve this dispute than the U.S.

**Matters relevant to forum non conveniens**

30.     Even if one disregarded the forum selection clause and irrespective of the legal basis of Ms. Doe's claims (*e.g.*, whether based on contract or tort), the Amsterdam District Court would always have jurisdiction to hear a case against Uber B.V., since Uber B.V. is domiciled in Amsterdam. This follows from Article 4 *juncto* Article 63 Brussels I*bis* Regulation in conjunction with Article 99 of the Dutch Code of Civil Procedure ("**DCCP**") – an English translation of this Article is attached as Attachment 8.

31.     Depending on the merits of Ms. Doe's claim, Uber U.S., Uber India and Mr. Yadav could also be sued before the Amsterdam District Court by Jane Doe. I refer to Article 7 (1) DCCP and Article 9 sub (a) DCCP (an English translation of these Articles is attached at Attachment 9-10).

32.     The Netherlands has a centuries-old legal tradition renowned for its wisdom, neutrality and fairness. The Netherlands is also home to many international judicial organizations, such as the International Court of Justice, the International Criminal Court, the United Nations International Criminal Tribunal for the former Yugoslavia, the Permanent Court of Arbitration, the Panel of Recognised International Market Experts in Finance, the Iran-United States Claims Tribunal, the Hague Academy of International Law, and the Hague Conference on Private International law. Many American lawyers, I understand, are, for example, familiar with the Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (one of many "Hague Conventions"), which allows for the gathering of evidence from abroad in civil or commercial matters.

33.     In the Netherlands, there are eleven courts of first instance (called "District Courts"), including the Amsterdam District Court, before whom plaintiffs may commence civil proceedings like Jane Doe's. I refer to Article 42 of the Judicial Organization Act (an English translation is attached as Attachment 11).

34. In accordance with Article 332 DCCP (an English translation is attached as Attachment 12), any party involved in civil proceedings who, for whatever reason, is dissatisfied with a judgment of a court of first instance, barring cases involving a monetary value below 1,750 euros, may lodge appellate proceedings, at the latest upon the final judgment in the first instance court having been rendered, before one of the four Courts of Appeal, such as the Amsterdam Court of Appeal. Appeal proceedings provide the parties with a second chance to present their case in full. Parties are, for example, allowed to present new arguments and additional evidence and to amend their claims.

35. Appellate decisions are open to appeal in cassation before the Dutch Supreme Court. I refer to Article 398 DCCP (an English translation is attached as Attachment 13).

36. Under Article 10:2 DCC (English translation attached as Attachment 14), Dutch courts apply the conflict of law rules *ex officio*, which means that the judge will apply conflict of law rules on his or her own motion, irrespective of the position of the parties. If a Dutch court should find that foreign law is applicable to any of the claims, it must apply that law and the court shall *ex officio* establish the content of that foreign law. Dutch courts are also qualified to apply foreign law, if necessary. In any case, a Dutch court could, for instance, also appoint an independent expert on foreign law, order the parties to provide expert evidence, conduct its own research or make inquiries with (international) institutions.

37. The principle of "equality of arms," including the principle of *audiatur et altera pars*, is the cornerstone of any civil proceeding and is carefully guarded by the Dutch courts. This phrase captures of the civil-law concept that all sides shall have the same opportunities to present their case. Adherence to these principles is what ensures that proceedings in the Netherlands are fair.

38. As one indication of the result, Transparency International ranks the Netherlands in the 97th percentile for Rule of Law. See http://www.transparency.org/country#NLD (attached hereto as Attachment 15). (The United States, by contrast, is in the 91st percentile.) The U.S. State Department recognizes that the Netherlands provides for fair trials enforced by an independent judiciary. See http://www.state.gov/documents/organization/160206.pdf (attached as Attachment 16). In my own experience, too, civil proceedings in the Netherlands are fair and the judiciary is impartial and independent both at an institutional and at a practical level.

39. Proceedings in the Netherlands are also efficient.

40. First, Dutch courts accept the submission of exhibits in English. I refer, for instance, to the decision of the District Court of Arnhem of 12 February 2002, *NIPR* 2003, 265 (quotations of contract in English) and the decision of the District Court of Zwolle of 21 January 2004, *NIPR* 2004, 35 (English translations of Syrian contract used). This means in the present case that all documents available in the English language can be submitted in that language, without translation into Dutch and can be quoted in their original language in

any submission. Particularly in major District Courts, such as in Amsterdam, Rotterdam and the Hague, Dutch judges generally are experienced in handling cases with international or cross-border aspects.

41. Second, Dutch courts guard the speed and swiftness of the proceedings. Unreasonable delays are prevented as much as possible. In average proceedings on the merits before a District Court, a judgment could be entered within six to fourteen months after the commencement of the proceedings. Judgments are often declared enforceable notwithstanding appeal, *i.e.* a party can enforce a judgment even though the opponent is appealing that judgment.

42. Proceedings may in practice take longer in international cases, in which the standard terms for the filing of a motion may be insufficient for either side, or if one of the parties is ordered to provide evidence of certain of its contentions contested by the other party. Under Article 150 DCCP (English translation of this Article attached as Attachment 17), the party relying on the legal consequences of facts or rights it has asserted bears the burden of proof of those facts or rights, unless any special rule or the requirements of reasonableness and fairness would justify a different onus.

43. Parties to a Dutch civil proceeding are, in principle, allowed to prove the asserted facts by all means available. This follows from Article 152 DCCP (English translation of this Article attached as Attachment 18), including testimonial submissions from witnesses. In case a witness resides, for instance, in India or the United States and is unwilling to travel to the Netherlands, or would be unwilling to testify voluntarily (for example, via video conference or in front of a Dutch consul-general), the Dutch courts can request local authorities to order the examination of such witnesses. See Attachments 19-21.

44. Since Ms. Doe alleges that the injury at issue occurred in December 2014, her claims would not be barred under Dutch civil law by any statute of limitations, provided Ms. Doe initiates legal proceedings or otherwise interrupts the statute of limitations within five years after the injury that she claims resulted in her alleged damages occurred.

45. Dutch courts apply the principle of *ius curia novit*, which essentially means that the parties shall only have to present the facts. Courts, in turn, are obliged to apply the proper rules of law (codified law, case law and, where applicable, customary law) *ex officio*. The law in this way is therefore applied mostly independently of the parties' submissions.

46. If Ms. Doe filed a meritorious suit in the Netherlands, Dutch courts would be able to afford adequate relief, including an award of money damages. Dutch courts also have the power to issue proper injunctions where circumstances warrant such injunctions. If Ms. Doe therefore requested a reasonable injunction justifying the issuance of such an injunction or declaratory relief, Dutch courts could afford it.

47. Available monetary damages include, among other things, compensation for financial loss as a consequence of the alleged rape and assault pursuant to Article 6:95 DCC

(English translation of this Article attached as Attachment 22) and compensation for pain and injury as provided for in Article 6:95 DCC in conjunction with Article 6:106 DCC (English translation of this Article attached as Attachment 23).

48.     For the reasons set out above, I believe that the civil courts in the Netherlands provide a fully adequate forum for Ms. Doe to assert her claims. I also believe that a suit in the Netherlands would provide a more suitable forum for this dispute than a United States court.

I declare under penalty of perjury under the laws of the United States of America and under the laws of the State of California that the foregoing is true and correct.

Executed by me in Amsterdam, Netherlands, this 2nd day of April 2015.



Maarten J. Drop

**APPENDIX TO THE DECLARATION OF MAARTEN J. DROP**

TABLE OF CONTENTS
ATTACHMENTS TO DECLARATION OF MAARTEN J. DROP

1.      Curriculum Vitae

2.      Complaint

3.      User Terms Agreement between Uber B.V. and Jane Doe

4.      User Terms Agreement between Uber B.V. and Jane Doe's friend

5.      Partner Terms Agreement between Uber B.V. and Mr. Shiv Kumar Yadav

6.      Brussels I*bis* Regulation

7.      Article 6:236(n) of Dutch Civil Code

8.      Article 99 DCCP

9.      Article 7 (1) DCCP

10.     Article 9 DCCP

11.     Article 42 Judicial Organization Act

12.     Article 332 DCCP

13.     Article 398 DCCP

14.     Article 10:2 DCC

15.     http://www.transparency.org/country#NLD

16.     http://www.state.gov/documents/organization/160206.pdf

17.     Article 150 DCCP

18.     Article 152 DCCP

19.     Article 176 DCCP

20.     The 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters

21.     Overview signatories latter Convention

22.     Article 6:95 DCC

23.     Article 6:106 DCC

# Attachment 1 – Declaration M.J. Drop

(CV)

# CURRICULUM VITAE

| | |
|---|---|
| Name | Maarten J. Drop |
| Date of birth | September 25, 1968 |
| Firm | Cleber N.V. (www.cleber.nl) |
| Office | Herengracht 450, 1017 CA Amsterdam, the Netherlands |
| Tel., fax, email | +31 20 305 8888 / +31 20 305 8889 / drop@cleber.nl |
| Marital status | married with two children |
| Nationality | Dutch |

**Education**

Dutch law, University of Amsterdam (1992); apprenticeships with law firms in Verona, Milan and Herzfeld & Rubin, PC, New York.

**Professional experience**

- associate with Trenité Van Doorne from 1992 – 2002 (in the field of corporate law and subsequently in litigation and arbitration);
- partner with Van Oosten Urlus Stuivinga at The Hague (2003);
- co-founder and partner of Cleber N.V. since 2004, a niche firm in the field of corporate law, corporate litigation and arbitration.

**Languages (legal)**

Fluent: Dutch, English, French, German, Italian
Working knowledge: Spanish, Portuguese

**Expertise**

Domestic and international litigation and arbitration, disputes concerning corporate and financing transactions (e.g. shareholder disputes, balance sheet warranties and other post-acquisition litigation), liability of directors and officers, conflict of law issues

**Cross-border litigation experience**

Involved in numerous and relevant cross-border or international litigation cases, including the representation of Dutch multinational Royal Packaging Industries Van Leer N.V. in French courts (on jurisdiction issues), the representation of the Italian pharmaceutical corporation Bracco SpA and its Dutch subsidiary against Kingsland Holdings, Inc. as Dutch counsel in litigation in Delaware, the Netherlands, Switzerland, Italy and St. Vincent and the Grenadines, acting as Dutch counsel to Gantner Electronic GmbH in the European Court of Justice case C 111/01 on international *lis pendens*, acting as Dutch counsel to Fortis Bank (Nederland) N.V. v. Abu Dhabi Islamic Bank in actions in New York and Amsterdam, the representation of one of the US directors of a number of Dutch Yukos entities in litigation against Rosneft and other entities controlled by the Russian Federation, the representation of a Chinese non-executive director in the

international demise of Fortis Bank, the rendering of an expert opinion in Italian to the *Tribunale di Bolzano*, Italy on service of process in the Netherlands and acting as co-counsel on matters of Dutch law before courts in Moldova.

| | |
|---|---|
| Arbitration experience | Frequently acted as (i) counsel or co-counsel in international (NAI, ICC, LCIA, DIS, AAA, VIAC) and domestic (NAI) arbitrations, (ii) chair, co-arbitrator or sole arbitrator in NAI and CAM administered arbitration cases and as sole arbitrator in *ad hoc* arbitrations; (iii) secretary to arbitral tribunals in national and international arbitration under auspices of the NAI; |
| Memberships | Netherlands Association for Corporate Litigation; International Commission of American Bar Association (ABA); Associazione Internationale Giuristi di Lingua Italiana (AIGLI); Deutsche Institution für Schiedsgerichtsbarkeit (DIS); Extraordinary member German Bar Association (DAV); Vienna International Arbitration Centre (VIAC) ; |
| Speeches, publications and pro bono work | Arbitrator in the international Willem Vis Moot in Vienna (since 2008) |
| | Speaker at a conference of the AIJA held in Atlanta, on "Harmonization of international insolvency litigation" (March 2009) |
| | Co-author of Schieds VZ/German Arbitration Journal "Recognition and Enforcement of Annulled Arbitral Awards", together with Dr. Patricia Nacimiento, Frankfurt (September 2009) |
| | Speaker at an AIJA conference held in Milan, Italy on litigation aspects of M&A transactions (October 2012) |
| | Intervening speaker at the annual forum of the Dutch Arbitration Association on "The future of costs in international arbitration" (October 2014) |
| | Mission as expert in Rabat, Morocco, for the Financial Services Volunteer Corps (FSVC, New York): training of Moroccan judges on international best practices in insolvency procedure (February 2015) |

# Attachment 2 – Declaration M.J. Drop

(Complaint)

1  ERIC F. YUHL (SBN 102051)
2  COLIN A. YUHL (SBN 259196)
   **YUHL CARR LLP**
3  4676 Admiralty Way, Suite 550
   Marina Del Rey, CA 90292
4  Tel.: (310) 827-2800
5  Fax: (310) 827-4200

6  DOUGLAS H. WIGDOR (NY SBN 2609469)
   JEANNE CHRISTENSEN (NY SBN 2622124)
7  TANVIR H. RAHMAN (NY SBN 4921235)
   (All to be admitted *pro hac vice*)
8  **WIGDOR LLP**
9  85 Fifth Avenue
   New York, NY 10003
10 Tel.: (212) 257-6800
11 Fax: (212) 257-6845

12 Attorneys for Plaintiff,
   **JANE DOE**
13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16 JANE DOE,                          Case No.: _____

17            Plaintiff,
                                       **JURY TRIAL DEMAND**
18    vs.
                                       **COMPLAINT FOR NEGLIGENCE**
19 UBER TECHNOLOGIES, INC.            **AND FRAUD**

20            Defendant.

21

22

23        Plaintiff Jane Doe, by and through undersigned counsel Yuhl Carr LLP and Wigdor LLP,

24 as and for her Complaint against Defendant Uber Technologies, Inc. ("Uber," the "Company" or

25 Defendant"), hereby alleges as follows:

26

27

28

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

## PRELIMINARY STATEMENT

1.      Through its relentless marketing efforts, Uber has urged the public to defy common sense and undermine every parent's edict – "don't get in a car with a stranger." Unfortunately, despite its self-proclaimed "commitment to safety," opening the Uber app and setting the pick-up location has proven to be the modern day equivalent of electronic hitchhiking. Buyer beware – we all know how those horror movies end.

2.      Focused more on its bottom-line profit than practical and effective safety measures that could save lives, Uber continues to expand throughout the world, while passengers remain in the dark about the looming threats and potential dangers that lurk behind the veneer of a cutting-edge smartphone app.  While Uber lures customers with promises of a "commitment to safety," its only real commitment is to increase its profits by quickly expanding into the most densely populated markets before its competitors, even where it is well aware that its customers are being put in harm's way.

3.      Through the imposition of a court ordered injunction mandating certain immediate safety measures, this lawsuit seeks to slam the brakes on Uber's reckless worldwide expansion at the unfortunate expense of basic customer safety.

4.      This lawsuit also seeks to compensate Jane Doe for the horrific and brutal rape that she suffered due to Uber's inadequate and disingenuous "commitment to safety."

## NATURE OF THE CLAIMS

5.      Uber, the wildly popular and rapidly expanding transportation company whose smart phone app allows people to order and pay for taxi rides through their phones, which is valued as being worth in the tens of billions of dollars, has, sadly, sacrificed the safety and well-being of its customers, particularly its female riders, for the sake of padding its bottom-line.

*Jane Doe v. Uber Technologies, Inc.*                                          *Complaint for Damages*

Rather than "set the strictest safety standards possible" and "aim to go above and beyond local requirements" to ensure customer security, as the Company purports on its website, Uber has systemically failed to implement and maintain basic safety procedures.

6.    In fact, Uber's claims that customer safety is its #1 priority have proven to be false and hollow, as investigations into its safety measures reveal that the Company routinely fails to have systems in place to adequately monitor and trace Uber trips, and that it does not adequately screen its drivers, thereby regularly employing drivers with known criminal histories, risking the safety of its unbeknownst customers.

7.    Plaintiff Jane Doe is one such former loyal Uber customer who the Company tragically let down and failed to keep safe. Plaintiff was viciously raped and sexually assaulted on December 5, 2014 by an Uber driver named Shiv Kumar Yadav ("Yadav"). Yadav drove Plaintiff to a secluded and off-route area of Delhi, India, after she used the Uber app to arrange a ride from a restaurant to her home.

8.    As detailed herein, Uber's negligence, fraud and other unlawful actions caused Plaintiff's sexual assault, which has humiliated, degraded, violated and robbed Plaintiff of her dignity. The heinous attack on Plaintiff has caused her to suffer both physical and psychological harm, permanent harm to her professional and personal reputations, and severe mental anguish and emotional distress, from which she may never fully recover.

9.    Uber, in line with its slogan of "Expanding Globally," aggressively entered the Indian taxi market. Unfortunately, these attempts at expansion came at the expense of customer safety, as the Company's background check procedures and other safety efforts have proven to be woefully inadequate, and fall well short of what is required for other transportation providers within India.

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

3

10.     Had Uber not sacrificed customer safety for the sake of profit and expansion, and actually cared about who it was employing to drive its cars rather than being preoccupied with claiming its share of the India taxi market, Plaintiff Doe would not have been viciously raped. In fact, a basic background check would have revealed that Yadav had a known propensity for violent and deviant conduct, including numerous arrests for rape and assault, which should have disqualified him from working as an Uber driver.

11.     Moreover, had Uber bothered to review the paperwork and contact information Yadav submitted to become an Uber driver, and applied the slightest level of scrutiny, Uber would have easily discovered that Yadav was providing fraudulent documentation and false information.

12.     Quite simply, Uber breached its duty to protect its customers in exchange for its desire to inflate its bottom-line, resulting in Plaintiff's brutal kidnap and rape at the hands of a known rapist. In fact, following Plaintiff's horrific assault, Uber even publically admitted, that it "must do better," and that it was "conducting a full audit of [its] verification, rider feedback and support processes." In addition, in a December 17, 2014 statement from its recently hired Head of Global Safety Phillip Cardenas, Uber acknowledged that Uber "[had] more work to do" with respect to customer safety, and was "committed to developing new technology tools that improve safety, strengthen and increase the number of cities and countries where background checks are conducted and improve communication with local officials and law enforcement." That a tragic event like Plaintiff's assault had to occur for Uber to finally acknowledge its systemic deficiencies with respect to customer safety is troubling to say the least.

13.     Furthermore, soon after the attack, Uber's Co-Founder and Chief Executive Officer Travis Kalanick issued another statement promising that Uber "will do everything, I

*Jane Doe v. Uber Technologies, Inc.*                                    Complaint for Damages

4

repeat, everything to help bring this perpetrator [of the rape] to justice and to support the victim and her family in her recovery."

14. Unfortunately, Uber has gone back on its word that it would do "everything" to support Plaintiff in her courageous recovery. Despite knowing Ms. Doe's identity and having the means to reach her, Uber has shunned and avoided all contact with Ms. Doe and her family. Furthermore, as a demonstration of the Company's relentless determination to profit at the expense of anything or anyone standing in its way, Uber ignored Plaintiff's request to be consulted with in regard to any safety reforms Uber undertakes in India, and instead, boasted about reopening its business operations in India, despite a governmental ban.

15. To pour salt on Plaintiff's fresh wounds, Uber even taunted Plaintiff by directly sending her an email announcing this news, and outrageously offering her a discount to begin riding again with Uber.

16. This action seeks declaratory and injunctive relief, and to hold Uber accountable for its negligent and other unlawful conduct, so that no person will ever have to undergo the traumatic and harrowing, life-changing ordeal Plaintiff had to endure.

## JURISDICTION AND VENUE

17. The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332, given that Plaintiff is a citizen of India, Defendant is a resident of the United States, and this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.

18. The Court has personal jurisdiction over Defendant because it is headquartered in San Francisco, California, it conducts business in California, and a substantial portion of the events and omissions giving rise to this action took place in San Francisco, California. By way

of only one example supporting the Court's personal jurisdiction over Defendant, Uber's global policies around driver screening and passenger safety are set in San Francisco, California headquarters. All safety protocols governing the events and omissions giving rise to this action were conceived, reviewed, approved and otherwise controlled from Defendant's headquarters in San Francisco, California.

19.     In addition, Defendant routinely communicates with its customers around the world (including with Plaintiff, both prior to and subsequent to her attack) through email communications sent from its San Francisco, California headquarters. These emails conspicuously state that they are being sent from Uber's San Francisco offices, located at 182 Howard Street, #8, San Francisco, California 94105.

20.     By way of example only, in the immediate months prior to the filing of this suit, Plaintiff received email communications from Uber's San Francisco, California offices; (1) announcing that Uber was giving away free rides in Delhi for a week; (2) announcing that Indian users could no longer use Indian issued credit cards directly through the app to request Uber rides but must use a different app; (3) announcing that Uber operations in Delhi were being suspended; and (4) announcing that it was re-launching its Indian operations (despite an ongoing governmental ban).

21.     By way of comparison, at all relevant times, no emails were sent from Uber India (to the extent such an entity even existed), to its customers.

22.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is headquartered in this district, a substantial part of the events and omissions giving rise to this action occurred in this district, and because Defendants have corporate offices that can be found and conduct business in this district.

## PARTIES

23. Plaintiff is an adult woman of Indian descent, who resides in Delhi, India.

24. Defendant Uber Technologies, Inc. is a Delaware Limited Liability Company with its principal place of business in San Francisco, California.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A. Plaintiff Orders an Uber Ride to Take Her Home After She Has Dinner With a Friend; Yadav Picks Her Up.

25. On Friday December 5, 2014, following a long day of work, Plaintiff met a friend for dinner at a restaurant in Gurgaon, India. Following dinner, Plaintiff headed to her home in the northern part of Delhi, India, and rode part of the way back in her friend's car.

26. Plaintiff and her friend eventually arrived at a marketplace in the neighborhood of Vasant Vihar, India, where the friend ordered an Uber ride through the Uber app to come pick Plaintiff up and drive her the rest of the way home.

27. At approximately 11:00 p.m., Yadav arrived. Although Plaintiff's friend had already entered Plaintiff's home address when ordering the car for her, Yadav also asked Plaintiff for her address after she got into his car.

28. While in Yadav's car, Plaintiff spoke with a friend on her cell phone for a while. The ride home was expected to last approximately forty-five (45) minutes to an hour. About half-way to the destination, Yadav stopped at a gas station, and got in line for gas.

29. Plaintiff asked Yadav for water, which he did not have. Soon thereafter, Plaintiff fell asleep.

### B. Plaintiff is Violently and Viciously Sexually Assaulted by Yadav in the Back of His Uber Taxi.

30.     After falling asleep for some time, Plaintiff suddenly awoke to find herself on her back in the backseat of the car, with Yadav on top of her, clutching at her body and clothes. Plaintiff could tell that the car was parked in a remote, secluded area, but could not see or identify anything out of the windows.

31.     Plaintiff desperately tried to open the doors to escape, but they were locked.  She tried several times, to no avail.  To stop her from moving, Yadav slapped Plaintiff on the face several times, and banged his head against her head.

32.     Yadav warned Plaintiff that if she yelled or continued to try to escape, he would insert a metal rod inside of her.  Yadav was outrageously alluding to the fatal December 16, 2012 gang rape, known throughout India as "Nirbhaya," that occurred on a public bus in India, and in which the victim was violated using an iron rod.

33.     Plaintiff, frightened by Yadav's threats, stopped shouting, but continued to resist. Yadav began to strangle her with his bare hands.  This caused Plaintiff to almost lose consciousness, and fear for her life.  Plaintiff told herself that if she cried out or continued to resist, Yadav would surely kill her.

34.     Yadav then made it clear to Plaintiff that if she did not let him have his way with her, he would kill her right then and there.

35.     Plaintiff finally relented, begging Yadav to not kill her.  Thereafter, Yadav proceeded to viciously and violently beat and sexually assault Plaintiff.

36.     At one point, Yadav even bit Plaintiff's lower lip, causing her lip to bleed badly, and all over Yadav's shirt.  Yadav removed Plaintiff's clothes, and proceeded to bite her on her chest, neck, back and breasts, as he raped and sodomized her.

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

8

37.     Plaintiff begged Yadav to stop, and promised that she would not tell anyone, but the vicious attack continued.

38.     Although the assault lasted between 30 and 45 minutes, Uber has yet to provide any explanation as to why such a lengthy detour to a secluded area off the route Yadav was supposed to take, did not raise any alarms or concerns.

39.     After the brutal attack ended, Yadav made Plaintiff answer her phone, which had been vibrating throughout the assault. Plaintiff's mother was on the other end. Plaintiff did not want to alarm her mother, and told her mother that she would be home soon. Plaintiff hung up the phone and begged Yadav to drive her home.

40.     Yadav then snatched Plaintiff's phone and dialed his own number into her phone, so that he had her telephone number. Plaintiff continued to tell Yadav that she would not tell anyone, and implored him to just drop her home. Yadav began to drive.

41.     After some time, Plaintiff, who, until that point, did not know what Yadav intended to do with her, finally saw a metro station near her home that she recognized. She felt relief to know that she was close to her home. Soon thereafter, Yadav dropped Plaintiff off near her home.

42.     As Yadav drove away, Plaintiff went behind the car and bravely took two photos of the license plate.

**A. Plaintiff Immediately Reports Her Rape to the Police; However, Officers Are Unable to Track Yadav Down, in Large Part Because of Uber's Remarkable Inability to Provide Any Information That Could Help Them Find Him.**

43.     As soon as Plaintiff exited the car, and before she had even reached her front door, she called the police to report the rape. At this time, she also sent an email to an Uber

*Jane Doe v. Uber Technologies, Inc.*

email account (support@uber.com) reporting that she had just been raped.  To this day, Uber has not responded to this distressing email from Plaintiff.

44.    Within ten minutes, several police officers arrived.  She told the officers what happened, and showed them the pictures of the license plate she had taken.  The officers took her to the hospital, where she underwent tests and examinations for the next three to four hours.

45.    Madhur Verma, the Deputy Chief of Police of New Delhi, interviewed Plaintiff at the hospital.  Verma had Yadav's name and license plate number, and tried to contact Uber to get an address for Yadav.  However, despite numerous attempts, Verma was unable to locate a contact number, email address or physical address for Uber's office.

46.    Frustrated by the inability to ascertain even basic information about Uber's Indian "corporate headquarters," Verma decided to download the Uber app onto his own phone, open an Uber account, and order an Uber ride.  When an Uber driver arrived, Verma ordered that he be taken to Uber's Delhi headquarters.

47.    At around 7:00 a.m. that December 6, 2014 morning, Verma was finally brought to a hotel named the Signature Hotel, where he was told that two or three rooms on the first floor supposedly served as the "headquarters" for Uber's entire Delhi operations.  However, troublingly, there was not a single Uber employee at the office, let alone anyone who could help Verma track Yadav down.

48.    After multiple calls to Uber offices, at about 8:30 a.m., an Uber employee finally arrived.  However, the employee remarkably told police that he also could not provide the officers with Yadav's address because there were no employee records kept there.  Further, the employee told Verma that this local Uber office also did not have GPS logs of its drivers, and thus could not help the officer track Yadav's whereabouts after the attack.

*Jane Doe v. Uber Technologies, Inc.*                                                  *Complaint for Damages*

10

49.     Shockingly, the officers were told that any information regarding Yadav, including the GPS log details for his activity on December 5, 2014, would have to be retrieved from Uber's operations in the United States, where this information was supposedly stored on a main computer server. Thus, in the immediate critical hours after the Plaintiff's sexual assault, Uber was of literally no help in locating its own driver, Yadav.

50.     It was immediately apparent to the police that all Uber record-keeping was located in the United States and the Delhi "office" was of no assistance.

51.     At last, at around 11:00 a.m. that morning, Uber provided information to the police about Yadav. However, it was soon learned that Uber did not have Yadav's true permanent address, nor had Uber even verified his local address or mobile phone number. In fact, Yadav was using a SIM card that had been obtained using a false name and address.

52.     The police further learned that Yadav's car was not properly equipped with a GPS system, and that following the attack, Yadav had apparently turned off his cell phone, rendering the GPS system on the phone worthless in trying to locate him.

53.     In the meantime, police checked Yadav's background and criminal history, and learned that Yadav had been accused of no less than two previous rapes, along with a host of other sexual assaults and crimes.

54.     Police also quickly determined that Yadav had presented a forged "Character Certificate" to Uber that was supposedly from the Delhi police. A legitimate "Character Certificate" application would have unquestionably revealed Yadav's extensive and disturbing criminal history.

55.     It was also revealed that Yadav never obtained a security badge mandated by the Delhi government for all taxi drivers, which is given only after a police background check. Uber

*Jane Doe v. Uber Technologies, Inc.*                                          *Complaint for Damages*

11

had no answers for why such an obviously dangerous person with a propensity for sexual assaults was employed as a driver.

56.     It was not until late the next day, Sunday December 7, 2014, that Yadav was finally tracked down and taken into custody many miles away in a rural village. Yadav was on the verge of fleeing to Nepal before he was apprehended.

#### D. Uber's Negligent Hiring of Yadav

57.     Uber has violated numerous regulations and ordinances regarding private taxicab drivers imposed by the Delhi and Indian government. Had Uber not flouted these rules, Yadav would not have been hired, and Ms. Doe would not have had to endure a heart-wrenching sexual assault at his hands.

#### (a) Acceptance of Falsified Character Certificate and Contact Information

57.     Uber negligently accepted a forged Character Certificate from Yadav. Specifically, in order to operate his vehicle as a private taxi, Yadav was required to obtain a Character Certificate. To obtain this certificate, an individual's prior criminal history must be produced, and a full background check completed. To obtain the certificate lawfully, the process takes approximately thirty days, and would cost ten (10) Rupees, or about sixteen cents ($.16).

58.     However, Yadav paid another individual two thousand (2000) Rupees to forge a Character Certificate of his behalf. Uber accepted this forged certificate without scrutiny.

59.     It is known throughout India that the practice of forging certificates is widespread. As a result of this, the major taxi companies in Delhi, including Ola Cabs, Mega Cabs and Meru Cabs, regularly and routinely conduct their own background checks on applicants, rather than rely on the government mandated forms. Uber, however, does not conduct its own background checks on applicants.

60.     Yadav not only gave Uber a forged Character Certificate, but also a false address of residence.  This address was never verified by Uber, despite Yadav working for Uber for six months.

61.     Yadav also gave Uber a phone number that was obtained under a different individual's name.  Once again, Uber never verified Yadav's number, despite employing him for six months.

62.     Because of Uber's failure to verify this basic information, the police had no address or accurate phone number for Yadav, leaving him with hours to escape Delhi.

### (b) Uber's Failure to Require a Security Badge

63.     After Nirbhaya, the infamous December 12, 2012 rape of a college student aboard a bus by six men, Indian authorities mandated that all taxi drivers obtain an additional certificate, also called a "security badge," in order to operate a private taxi.  The badge must be kept in the vehicle or on the individual driver at all times.  Operating a private taxi without this security badge is a violation of a number of Indian regulations.

64.     Despite these obligations, Yadav failed to obtain this security badge, and Uber did not require him to obtain one.  There is a nominal cost for this certificate (one hundred to three hundred (100-300) Rupees, or $1.60 to $5.00), and it can be obtained in approximately seven to fifteen days.

65.     Uber's failure to abide by Indian regulations and require that Yadav obtain this badge is significant because, in order to obtain the badge, the government must conduct the background check, and a complete criminal history search is made.  Moreover, according to Delhi police officials, it is highly unlikely that a person could obtain a forged security badge.  Therefore, Yadav's extensive history of sexual and other crimes would have been discovered.

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

66.     In fact, a background check into Yadav would have revealed the following prior criminal arrests, all of which should have disqualified him from being employed as an Uber driver:

      i.    In 2003, Yadav was charged with molestation and assault. He was released on bail, and, though this charge has never been prosecuted, the crimes remain classified as "pending";

      ii.   In 2006, Yadav was arrested for unlawful possession of firearms, a charge still classified as "pending";

      iii.  In 2011, Yadav was arrested for raping a female passenger in a cab in Delhi;

      iv.  In 2013, Yadav was again arrested for robbery and rape, and held for six months before being released on bail.

67.     These are just some of the crimes that Yadav has been charged with. This does not take into account unreported crimes. According to media reports, Yadav's sexual deviance and criminal history is widely known throughout his home village. Had a basic background check of Yadav been conducted by Uber, including talking to people familiar with Yadav, Yadav would surely not have been allowed to work for Uber. In its quest for profit and expansion, Uber disregarded these simple safety measures which could have prevented Plaintiff's horrific attack.

**E. Uber's Negligent Retention of Yadav**

68.     Uber also negligently retained Yadav as an employee. Indeed, as of December 5, 2014, Uber was already on actual notice of Yadav's potential for inappropriate and unprofessional conduct towards female riders.

69.     Specifically, on November 26, 2014, a little over the week before the attack on Ms. Doe, Ms. Nidhi Shah, a female chemical engineer, used Uber for transportation in Delhi. Her driver was Shiv Kumar Yadav. Ms. Shah provided "feedback" to Uber at the end of her

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

14

long cab ride home, giving Yadav one (1) star out of five (5) (there was no option for zero), and describing him as inappropriately "staring" at her.

70.     On December 2, 2014, three days before Plaintiff was raped, Ms. Shah received an email from Uber support in response to her comments regarding Yadav. The email stated that Shah's feedback was being "passed along to the driver operations team, so that they can check in on Shiv."

71.     After hearing about the sexual assault committed against Plaintiff, Ms. Shah went online and confirmed that the man arrested for the rape, Yadav, was her driver on November 26, 2014. Ms. Shah tweeted about her experience, and described his stares as "lecherous" and "creepy," causing her to constantly check her own map to make sure that he was not taking her off course.

72.     Had Uber seriously investigated Ms. Shah's (and possibly others') complaints about Yadav, it is likely that Uber would have discovered Yadav's sordid past and fraudulent documentation, disqualifying Yadav as an Uber driver before he even had the opportunity to rape Plaintiff.

### F.   Uber's Negligent Failure to Meet Basic Safety Standards Regarding Its Indian Drivers

73.     Uber has systemically and woefully failed to implement and maintain procedures to effectively track Uber drivers during transportation of customers, and ensure other basic customer safety measures.

74.     In addition to self-servingly advertising that customer safety is its #1 priority, Uber has also claimed that "in India, Uber exclusively partners with registered for-hire drivers who have undergone the commercial licensing process, hold government issued IDs, state-issued permits, and carry full commercial insurance. Uber also has a GPS trace and record of all trips

*Jane Doe v. Uber Technologies, Inc.*                                          Complaint for Damages

15

1 that occur on the platform – information that has been shared with (Indian) authorities." These

2 claims have been proven to be hollow and false.

3     75.    In fact, the investigation by Delhi police into Plaintiff's rape confirms that Uber

4

5 failed to have *any* system in place to monitor and trace Uber trips. Specifically, there was

6 nothing in the Uber Delhi office that allowed employees to track GPS systems, monitor the

7 movement of vehicles or otherwise provide any oversight to vehicles transporting customers. In

8 fact, the investigation revealed that an Uber driver simply had to turn off his GPS (*i.e.* turn off

9 his cell phone), and he would be off the grid.

10

11     76.    As a result of the Delhi police investigation into Plaintiff's assault, by Uber's own

12 admission, it was revealed that not only was there no tracking system at the Uber Delhi office,

13 but no employee records or other documents were maintained by Uber in Delhi. Rather, all

14 purported GPS tracking and monitoring of drivers was allegedly conducted through Uber's

15 United States offices. As such, the ground floor rooms at the Signature Hotel, containing barely

16

17 more than desks, telephones, and basic computers, merely served as an interface between Indian

18 employees and Uber's main offices in the United States.

19     77.    As a result of these so-called "headquarters," Uber was not able to provide the

20 Delhi police with information about Yadav during the critical first hours of the investigation, and

21 provided information only after New York Uber employees responded.

22

23     78.    Uber also did not monitor and track Yadav after he picked Plaintiff up, given that

24 no alarms were raised in spite of the detour Yadav took, and the long, unaccounted for stop made

25 before the ride was completed during which Plaintiff was attacked.

26     79.    Further, there are no Uber executives in India. Uber has no separate corporate

27 identity in India, nor is Uber registered as a corporation in India. At all relevant times, no emails

28

*Jane Doe v. Uber Technologies, Inc.*           *Complaint for Damages*

16

were ever sent from Uber India (to the extent it even existed) to its customers. The only Uber executive Delhi police have spoken to is Eric Alexander, head of business for Uber Asia-Pacific, whose office is located, upon information and belief, in Singapore.

80. Unquestionably, the decisions and conduct of employees located in Uber's headquarters in the United States were responsible for the reckless disregard of customer safety in India.

81. In addition, since Plaintiff's attack, Uber's has sought to hire a General Manager for its Delhi office, a Director of Public Policy and Community Relations, India, and a Background Check Researcher, India, demonstrating that Uber amazingly lacked employees within these basic and necessary roles in its Indian operations at the time Plaintiff was raped.

82. It is clear that Uber recklessly and unpreparedly entered the Indian taxi market, blinded by the profit potential in this dense part of the world, to the detriment of the its customers' safety and well-being.

## G. Delhi Police File Charges Against Uber

83. On December 9, 2014, Delhi police issued a First Information Report ("FIR") against the Uber detailing multiple negligent acts and misconduct. The FIR specifically alleges against Uber:

> Whereas it has come to notice during the investigation that the company claims to provide various security features on its UBER APP like verification of drivers, background checks, safety pick up and driver profile for peace of mind of commuters. But in the above mentioned case, it has transpired that there was no verification of driver and no appropriate security features provided by company as claimed in their APP, thereby misleading the victim and other commuters resulting in monetary and mental/loss harassment to them.

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

17

84. The FIR also stated that the Delhi Police had determined that Uber violated several Delhi transportation department orders, including: *(a)* that its driver did not display his photograph and driving license on the dashboard of the cab; *(b)* that its driver did not have a public service badge; and *(c)* that the company did not verify the criminal history record of its driver, which would have revealed that the driver was already accused of being involved in at least one other serious rape case.

85. The FIR further accused Uber of a "lack of supervision" of its drivers, and stated that there were many more rules which have been "flouted by the company." The FIR concluded by finding that the "above acts on the part of [UBER] company, through there *(sic)* directors and employees amounts to criminal offenses," and "[h]ence, a case [should] be registered."

86. As a result of the Delhi police investigation, Uber was indefinitely banned from continuing to operate in Delhi and other parts of India.

### H. Uber Brazenly Re-Enters the Delhi Market Without Governmental Approval or Any Consultation With Plaintiff; Uber Taunts Plaintiff Just Weeks After Her Savage Rape at the Hands of One of Its Drivers by Emailing Her With This "News," and Offering Her a Discount.

87. Just weeks after being savagely raped, and as Yadav's criminal trial was ongoing, Uber contacted Plaintiff directly (despite already knowing that she had retained counsel in connection with this matter) to brazenly taunt her by letting her know that Uber was back up and running in Delhi. Uber remarkably told Plaintiff that it was ready to "serve" and "get [her] moving once again," and audaciously offered her a "flat 25% discount."

88. This sick email from Uber (which conspicuously stated that it was coming from Uber's headquarters in San Francisco, California, like the other communications between Uber and Plaintiff), had the subject line "Uber Back to Serve Again in Delhi," and brashly proclaimed

1  that Uber had listened to the "Delhi rider community," and knows that the community "want[s it]

2  back."

3      89.     However, although Uber had earlier promised to do "everything" to support

4
5  Plaintiff in her recovery, it failed to involve Plaintiff in any way with the reintegration of Uber

6  into the Delhi market. Plaintiff by this time had made it clear to Uber that she wished to be a

7  part of the consultation process regarding safety procedures to ensure that no other person

8  became a victim at the hands of an Uber driver. Uber, clearly focused on its bottom-line,

9  decided to not only ignore Plaintiff's sincere requests, but chose to add insult to injury by

10
11 thumbing its nose at Plaintiff, and excluding her from any conversation regarding Uber's

12 attempts to reform its safety procedures in India.

13     90.     However, in spite of Uber's announcement that it was restarting operations in

14 India, the Company was nonetheless still subject to a ban by Indian government officials.

15 Accordingly, Uber's utter disregard for and contemptuous attitude towards India's governmental

16 authorities demonstrates the urgency behind the injunctive relief measures Plaintiff seeks herein.

17

18     **I. Uber's Perpetration of Fraud and Misleading Advertising**

19     91.     Uber has and continues to knowingly mislead the public about the safety and

20 security measures employed by Uber in order to ensure even basic levels of customer safety.

21     92.     Although these failures are likely present in each country where Uber operates,

22
23 specific to India, it is clear that Uber has failed to establish *any* protocols for customer safety, as

24 evidenced by its failure to verify the credentials of its driver applicants (in contrast to the

25 behavior of other major private taxi companies operating in Delhi, including Ola Cabs, Mega

26 Cabs and Meru Cabs), by its failure to require drivers to obtain mandatory security badges prior

27

28

---

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

1   to employment, its failure to have a system in place to track Uber drivers (including failing to

2   maintain employee records in Delhi), and its failure to have supervisory employees in Delhi.

3       93.     Customers, such as Plaintiff, reasonably rely on Uber's representations and

4   promises about its safety and security measures, including its drivers screening and background

5

6   check procedures.  Uber's customers choose to utilize Uber's taxi services as a result of this

7   reliance.

8       94.     However, Uber knows that its representations and promises about customer safety

9   are false and misleading, yet continues to allow its customers to believe in the truth of its

10

11  representations and promises, and to profit from their customers' reliance on such

12  representations and promises.

13      95.     Unsurprisingly, in the United States, despite its proclamations that customer

14  safety is its top priority, Uber has actively pushed back against legislation and other measures

15  requiring strong background checks for its drivers out of the public's view.

16

17      96.     For instance, according to media accounts, in Colorado, Uber persuaded

18  lawmakers to ease drivers' background checks in a bill legalizing ride-sharing companies,

19  including abolishing FBI background checks and fingerprint checks.

20      97.     Similarly, media reports indicate that in Illinois, Uber lobbied Governor Pat

21  Quinn to veto a bill that would have forced Uber to strengthen background checks.

22

23      98.     And in California, Uber is alleged to have helped defeat a law that would have

24  required drivers to undergo a background check by the state's Justice Department, as is required

25  of taxi drivers.

26      99.     In addition, Uber has been repeatedly sued for its deceptive practices regarding

27  background checks.  For instance, the district attorneys of San Francisco and Los Angeles

28

1  recently filed suit against Uber alleging that the Company had misled customers about its

2  background checks by misrepresenting the extent to which Uber screens drivers.

3  100.    Furthermore, a class action lawsuit was filed just weeks ago against Uber alleging

4
5  that the Company misrepresents its $1 "Safe Rides Fee" for UberX rides, as well as the nature of

6  its background checks and safety measures taken on behalf of riders.  The lawsuit alleges that

7  Uber's background checks and other safety measures fall well short of industry standards despite

8  the Company referring to the practices as "industry-leading" on its website.  The suit alleges that,

9
10  unlike many background checks, Uber does not require fingerprints, or even for the applicant to

11  appear in person, and also that the company allows drivers to simply transmit photographs of

12  vehicles rather than performing inspections.

13  **J. Several Recently Reported Incidents of Sexual and Other Assaults by Uber**
    **Drivers Indicate Systemic Deficiencies Regarding Uber's Safety Measures**
14  **Concerning Drivers.**

15  101.    Sadly, Plaintiff's sexual assault was not an isolated attack by an Uber driver on an

16
17  unsuspecting passenger, but just one in a pattern of similar heinous, but avoidable attacks.

18  102.    Also in Washington D.C., in December 2012, an Uber driver allegedly grabbed a

19  20-year old female customer from behind as she exited the car, knocked her to the ground

20  causing her head to hit the concrete, and then raped her.

21  103.    Similarly, on March 24, 2014, a Uber passenger, Hy Vo, filed a lawsuit against

22
23  Uber for an alleged sexual assault committed by an Uber driver in Chicago, who she alleges

24  picked her up,  drove her down side streets, and feigned ignorance of the city's geography until

25  she agreed to sit in the front to give him directions.  At that point, the driver allegedly asked her

26  to dinner and said he wanted to have sex with her.  According to the complaint, when she refused

27
28

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

21

his advances, the driver locked the car door and groped her breast, legs, and groin. Eventually Ho threatened to call the police and the driver let her out.

104. Similarly, in June 2014, an Uber driver in Los Angeles named Frederick Dencer was arrested for allegedly kidnapping a female passenger who awoke in a motel room and found Dencer shirtless. The passenger accused Dencer, who had been hanging out in front of the nightclub the passenger came come out of after dropping off another fare, of fondling her through her clothes.

105. Furthermore, on August 14, 2014, an Uber driver in Washington D.C. was accused of sexually assaulting a passenger in the back of his Uber car. The passenger accused the driver of touching her while she was asleep in the car.

106. Likewise, in September 2014, an Uber driver in Orlando, Florida was arrested after a female passenger accused him of grabbing her breast and fondling it in an aggressive manner. The driver was accused of repeatedly commenting on her appearance before stopping the car and shoving his hand in her tank top to fondle her breast.

107. Likewise, on November 16, 2014, between 3:00 and 4:00 a.m. in Chicago, Illinois, Uber driver Maxime Fohounhedo allegedly raped a 22-year-old female passenger that he picked up inside his vehicle. The passenger allegedly fell asleep in Fohounhedo's car before being sexually assaulted in the vehicle. She then allegedly passed out again, and eventually woke up in the suspect's apartment, where she was raped once more.

108. In a remarkably analogous incident, at approximately 7:30 p.m. on December 6, 2014 in Boston, Massachusetts, Uber driver Alejandro Done allegedly pulled up to a residence and picked up a young woman waiting for the pre-arranged driver. The woman had been out with friends and decided to use a car service to get home. Done picked up the woman and

allegedly drove to a location that she was not familiar with, pulled over to a secluded area and jumped in the backseat, struck her with his hands, strangled her, locked the car doors so that she could not escape, and sexually assaulted the woman.

109. Moreover, in January 2015, an Uber driver from Chicago named Adnan Nafasat, was accused of sexually assaulting a 21-year old male, who he allegedly overpowered and choked after also asking him to sit in the front of his car. Nafasat allegedly told the man that he was not going home, and that nobody knew where he was, before grabbing the man and touching his penis over his pants, and forcing his tongue and finger into the man's mouth. Nafasat allegedly held the man's throat so tight that he almost lost consciousness. When Nafasat stopped the car, he unzipped his pants and allegedly tried to force the man's head onto his groin.

110. Upon information and belief, in addition to these reported cases in the U.S., similar sexual assaults by Uber drivers have occurred in other countries where Uber operates.

111. Numerous other accusations of violent assaults and kidnappings by Uber drivers against customers have surfaced.

112. In March 2013, a Washington D.C. Uber driver named Hamza Abu Shariah was sued for spitting in the face of and slapping a customer after ranting and yelling about how he hates Americans and homosexuals and a number of other derogatory comments.

113. In September 2013, a Washington D.C. Uber driver was accused by Bridget Todd, a writer, activist and former lecturer at Howard University, of grabbing her out of his car by the throat and choking her. In emails to Uber employees in response to this incident, Uber CEO Travis Kalanick apparently blamed the media for thinking that Uber is "somehow liable for these incidents that aren't even real in the first place," but stressed that Uber needed to "make sure these writers don't come away thinking we are responsible even when things do go bad."

*Jane Doe v. Uber Technologies, Inc.*                                                    *Complaint for Damages*

23

114.     Moreover, in November 2013, an Uber customer named James Alva accused a San Francisco Uber driver, whose vehicle license plate did not match the plate of the car that appeared on Alva's Uber app, of assaulting him after hurling homophobic and racist slurs. When asked about this incident, Uber spokesperson Andrew Noyes confirmed that the driver in question was in fact an Uber driver, but insisted that "[Uber is] a technology platform that connects riders and providers, so it's not our job to investigate."

115.     For instance, in June 2014, a San Francisco Uber driver named Daveea Whitmire was charged with battery stemming from a fight he had with a passenger in which Whitmire allegedly punched a passenger in the head and elbowed him in the chest. Surprisingly, it was later revealed that Whitmire should not have even been driving for Uber given the Company's "zero-tolerance" policy for alcohol and drug-related offenses and his 2009 felony conviction for selling marijuana, 2012 felony charge for selling cocaine, and battery charge that he was on probation for at the time he was working for Uber.

116.     Likewise, in September 2014, a San Francisco man was attacked in the face with a hammer by an Uber driver named Patrick Karajah. Karajah was charged with two felony counts of assault and battery. The victim needed reconstructive surgery after his skull was fractured, and was in serious danger of losing an eye.

117.     Furthermore, in September 2014, an Uber driver in Atlanta, Georgia was accused of pulling a gun on a valet parking attendant, pointing the gun at the attendant, and threatening to kill him.

118.     The above examples are just a sampling of the number of accusations of violent and aggressive behavior made against Uber drivers by unsuspecting customers, which are no

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

surprise given Uber's hollow commitment to customer safety, as exemplified by Plaintiff Doe's harrowing ordeal.

### K. Plaintiff Seeks Immediate Injunctive Relief Ordering Uber to Affirmatively Overhaul Its Woefully Inadequate Safety Measures, So That No Woman Has to Ever Endure What She Has Had to Unfortunately Experience.

119.    The foregoing negligent and fraudulent behavior on the part of Uber demonstrates that the Company must take immediate action to improve the safety of its customers, which has sadly played second-fiddle thus far in the Company's quest to "expand" globally and reap profits.

120.    Accordingly, Uber must promptly implement the following improved safety measures:

(a) Open dedicated, full-service 24/7 customer support centers in every city Uber operates, which will have ready access to all Uber employee records and Uber ride tracking information;

(b) Require all Uber drivers worldwide to install GPS tracking systems in their cars, which immediately trigger alarms if they are deactivated or malfunction;

(c) Install tamper-proof video cameras in all Uber cars which immediately set off alarms if they are disabled or malfunction;

(d) Provide customers with the option of requesting a female Uber driver;

(e) Periodic and annual national criminal background checks of all drivers;

(f) Perform thorough character checks on prospective drivers that go beyond mere criminal background checks, such as by interacting with people who may personally know an applicant, in order to learn about the person's reputation and background;

(g) Make driver photos available for all customers worldwide to view on their phones to guard against identity fraud;

(h) Engage professional, trained, third-party investigators to perform audits of all current driver employment applications and other required documentation to identify inaccurate, outdated or forged information;

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

25

(i) In the U.S., utilize the Live Scan, fingerprint-based background checks for drivers administered through the Department of Justice and FBI databases for all current and prospective Uber drivers;

(j) Bar registered sex offenders or individuals with assault or rape convictions (no time limit) from becoming Uber drivers;

(k) In-app panic buttons that send messages to Uber customer support, local police, and a designated safety contact to quickly report an escalating safety situation, such as aggressive driving, a possible abduction, or an assault;

(l) Employ teams of experts dedicated to investigating complaints against Uber drivers of a violent or sexual nature;

(m) Create a separate online form to report complaints of a violent or sexual nature against Uber drivers.

121.    These proposed safety measures are reasonable and necessary, and many would likely have prevented Plaintiff's vicious sexual assault. As such, these changes must be implemented without delay, so that Plaintiff's harrowing ordeal is never repeated.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE, NEGLIGENT HIRING, NEGLIGENT SUPERVISION, AND NEGLIGENT RETENTION)

122.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

123.    Uber owed Plaintiff and the general public a duty of reasonable care in the hiring, training and supervision of its drivers.

124.    Uber did breach that duty of care in the hiring, retention and/or supervision of Yadav, who was unfit to be a provider of transportation, and who was not adequately trained or supervised in his driving and conduct with customers. Uber knew or should have known that Yadav would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on December 5, 2014.

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

26

125.     As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Defendant, Plaintiff sustained severe and serious injury to her person.

126.     Defendant had advanced knowledge of the unfitness of Yadav, and employed him with a conscious disregard of the rights or safety of others, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

127.     The conduct of Defendant Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

128.     Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (FRAUD)

129.     Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein

130.     Defendant made intentional misrepresentations of fact to Plaintiff known by Defendant to be false on December 5, 2014, to wit, that Plaintiff would be safely taking an Uber ride with a driver whose background had been screened by Uber, and who would provide her with safe passage, but who, in reality, Defendant had not screened, was a grave threat to Plaintiff's safety and well-being, and who had a known propensity for engaging in sexual misconduct and other violent and unlawful behavior.

131.     Defendant made these misrepresentations to Plaintiff despite knowing that they had not adequately screened her driver, Yadav, but rather, knowing that he was a threat to Plaintiff's safety.

*Jane Doe v. Uber Technologies, Inc.*                                                    *Complaint for Damages*

27

132. Defendant further fraudulently misrepresented to Plaintiff that the Company had the ability to and would in fact, accurately track Yadav's transport of Plaintiff from Vasant Vihar, India where she was picked up, to Plaintiff's residence. In fact, Uber not only failed to have a tracking system in place at its Delhi office, but recklessly permitted Yadav to use a SIM card obtained with a false name and address.

133. In addition to false representations that her transport was monitored, Uber fraudulently concealed the fact that its drivers, including Yadav, had the ability to go off-grid simply by turning off the cellular phone in use.

134. These false statements were made knowingly, or with a willful, wanton and reckless disregard for the truth, and intended to deceive and defraud Plaintiff into agreeing to utilize Uber's services.

135. Defendant made these misrepresentations with the intent to cause Plaintiff to rely on this false information and induce her into utilizing Uber's services, in spite of the concerns Plaintiff had about her safety.

136. Plaintiff actually and reasonably relied on the false facts and misrepresentations provided by Defendant when she agreed to utilize Uber's services, after being told that Uber had screened Yadav and that he would provide her with safe passage.

137. As a result of Defendant's deliberate misrepresentations of material facts, Plaintiff suffered significant damages.

138. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

*Jane Doe v. Uber Technologies, Inc.*                    Complaint for Damages

## THIRD CAUSE OF ACTION
## (BATTERY)

139.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

140.    The violent acts committed against Plaintiff by Defendant's employee Yadav while he was performing his job duties, including his sexual assault of Plaintiff, amounted to a series of harmful and offensive contacts to Plaintiff's person, all of which were done intentionally by Yadav without Plaintiff's consent.

141.    Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior.*  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business.  Defendants breached their duty of care in its actions towards Plaintiff.

142.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

143.    As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages and is obligated to expend sums of money for medical care and attention in an effort to alleviate her pain and suffering, emotional

*Jane Doe v. Uber Technologies, Inc.*                    Complaint for Damages

29

distress, mental anguish, embarrassment and humiliation. She was unable, and continues to be unable to pursue her usual activities and employment, due to her psychological and emotional injuries and damage.

144. The conduct of Defendant Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

145. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (ASSAULT)

146. Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

147. The violent acts committed against Plaintiff by Defendants' employee Yadav while he was performing his job duties, including his sexual assault of Plaintiff and death threats, amounted to a series of events creating a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person, all of which were done intentionally by Yadav and without Plaintiff's consent.

148. Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*. Defendant is a common carrier who must carry passengers safely. As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and have the vigilance of a very cautious person. They must do all that human care, vigilance and foresight reasonably can do

*Jane Doe v. Uber Technologies, Inc.*                          Complaint for Damages

30

1  under the circumstances to avoid harm to passengers. While a common carrier does not

2  guarantee the safety of its passengers, it must use reasonable skill to provide everything

3  necessary for safe transportation, in view of the transportation used and practical operation of the

4
5  business. Defendants breached their duty of care in its actions towards Plaintiff.

6  149.  As a direct and proximate result of the aforementioned conduct, Plaintiff has

7  sustained and will sustain physical injury, pain and suffering, serious psychological and

8  emotional distress, mental anguish, embarrassment and humiliation.

9  150.  As a direct and proximate result of the aforementioned conduct, Plaintiff has

10
11  incurred medical expenses and other economic damages and is obligated to expend sums of

12  money for medical care and attention in an effort to alleviate her pain and suffering, emotional

13  distress, mental anguish, embarrassment and humiliation. She was unable, and continues to be

14  unable to pursue her usual activities and employment, due to her psychological and emotional

15  injuries and damage.

16
17  151.  The conduct of Defendant Uber was engaged in with fraud, oppression and/or

18  malice, and was in conscious disregard of the rights and safety of others, including, but not

19  limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to

20  California Civil Code Section 3294.

21  152.  Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be

22
23  determined at trial.

24  ### FIFTH CAUSE OF ACTION
       ### (FALSE IMPRISONMENT)

25
26  153.  Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set

27  forth herein.

28

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

31

154.     Defendant's employee Yadav, while he was performing his job duties, would not let Plaintiff exit his car despite repeated requests. As a result, Plaintiff was confined in a car by Yadav without her consent and against her will for a significant period of time.

155.     During her confinement, Plaintiff feared for her safety.

156.     Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*. Defendant is a common carrier who must carry passengers safely. As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Defendants breached their duty of care in its actions towards Plaintiff.

157.     As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

158.     As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages and is obligated to expend sums of money for medical care and attention in an effort to alleviate her pain and suffering, emotional distress, mental anguish, embarrassment and humiliation. She was unable, and continues to be unable to pursue her usual activities and employment, due to her psychological and emotional injuries and damage.

159.    The conduct of Defendant Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

160.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

161.    Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

162.    Defendant's employee Yadav, while carrying out his job duties, engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society, namely, he violently sexually attacked an innocent woman inside his Uber taxi.

163.    Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*. Defendant is a common carrier who must carry passengers safely. As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Defendants breached their duty of care in its actions towards Plaintiff.

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

33

164. By his actions and conduct, Defendant's employee Yadav intended to and did intentionally and recklessly cause Plaintiff to suffer severe emotional distress.

165. As a direct and proximate result of Defendant's employee Yadav's conduct, Plaintiff has suffered, and continues to suffer, severe emotional distress, for which she is entitled to an award of damages.

166. The conduct of Defendant Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

167. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

168. Plaintiff realleges and reasserts each of the preceding paragraphs as if fully set forth herein.

169. Defendant's conduct was extreme and outrageous, taken with the intent to cause or in disregard of a substantial probability of causing severe emotional distress to Plaintiff, and in fact did cause her severe emotional distress.

170. The aforementioned events took place due to the negligent acts and/or omissions of Defendant and its agents, servants, employees, and or licensees, all of whom were acting within the scope of their authority, within the scope of and in furtherance of their employment, and in furtherance of their agency.

171. By reason of Defendant's negligent conduct, Plaintiff suffered pain, shock, mental anguish and serious emotional distress. These injuries and their effects will be permanent.

*Jane Doe v. Uber Technologies, Inc.*                    *Complaint for Damages*

34

172. As a result of Defendant's negligent conduct, Plaintiff has suffered and continues to suffer injuries and damages.

173. The conduct of Defendant was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

174. Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of California;

B. An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C. Enter a permanent injunction directing that Uber take all affirmative steps necessary to remedy the effects of the unlawful conduct alleged in this Complaint, and to prevent repeated occurrences in the future;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all physical, monetary and/or economic harm; for harm to her professional and personal reputations and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries; all other monetary and/or non-monetary losses suffered by Plaintiff;

*Jane Doe v. Uber Technologies, Inc.*                                    *Complaint for Damages*

35

E.   An award of punitive damages;

F.   An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's

reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

G.   Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 2̸, 2015

Los Angeles, California                    Respectfully submitted,

                                           YUHL CARR LLP

                                           By: __/s/ Colin A. Yuhl_____
                                               Eric F. Yuhl
                                               Colin A. Yuhl

                                           4676 Admiralty Way, Suite 550
                                           Marina Del Rey, CA 90292
                                           Telephone: (310) 827-2800
                                           Facsimile:  (310) 827-4200
                                           eyuhl@yuhlcarr.com
                                           cyuhl@yuhlcarr.com


                                           WIGDOR LLP


                                           By: _____/s/_____
                                               Douglas H. Wigdor
                                               Jeanne M. Christensen
                                               Tanvir H. Rahman

                                           85 Fifth Avenue
                                           New York, NY 10003
                                           Telephone: (212) 257-6800
                                           Facsimile: (212) 257-6845
                                           dwigdor@wigdorlaw.com
                                           jchristensen@wigdorlaw.com
                                           trahman@wigdorlaw.com

# Attachment 3 – Declaration M.J. Drop

(User Terms Agreement between Uber B.V. and Jane Doe)

<% include ../header.html %>

## USER TERMS

21 March 2013

<% include ../country-picker-terms.html %>

These terms and conditions ("**User Terms**") apply to your visit to and your use of our website at **www.uber.com** (the "**Website**"), the Service and the Application (as defined below), as well as to all information, recommendations and/or services provided to you on or through the Website, the Service and the Application.

PLEASE READ THESE USER TERMS CAREFULLY BEFORE DOWNLOADING OUR APPLICATION AND/OR USING OUR SERVICE.

**Uber**

Your contracting partner is Uber B.V., a private limited liability company established in the Netherlands, having its offices at Barbara Strozzilaan 101, 1083 HN Amsterdam, the Netherlands, registered at the Chamber of Commerce under number 55808646 ("**Uber**").

**What services does Uber provide?**

Uber offers information and a means to obtain transportation services offered by third party transportation providers, drivers or vehicle operators (the "**Transportation Provider**"), which may be requested through the use of an application supplied by Uber and downloaded and installed by you on your single mobile device (smart phone) (the "**Application**"). All services provided by Uber to you by means of your use of the Application are hereafter referred to as the "**Service**".

**How is a contract concluded between Uber and you?**

By using the Application or the Service, you enter into a contract with Uber (the "**Contract**"). In order to be able to use the Application or Service, you first need to sign up with Uber. When signing up, you are obligated to provide Uber with your personal information, mobile telephone number and credit card data. Upon successful completion of your signing up with Uber, Uber will provide you with a personal account, accessible for you with a password of your choice.

You have to be 18 years of age or older to use the Service or Application. If you reside in a jurisdiction that restricts the use of the Service or Application because of age, or restricts the ability to enter into contracts such as this one due to age, you must abide by such age limits and you must not use the Service and the Application. You represent that if you are an individual, you are of legal age to enter into a binding contract, or that if you are registering on behalf of a legal entity, that you are authorized to enter into, and bind the entity to, these User Terms and register for the Service and the Application.

**How to use the Service and the Application**

The Application allows you to send a request for transportation service to a Transportation Provider. The GPS receiver - which should be installed on the mobile device (smart phone) on which you have downloaded the Application - detects your location and sends your location information to the relevant Transportation Provider. The Transportation Provider has sole and complete discretion to accept or reject each request for transportation service. The Transportation Provider also has sole and complete discretion over whether to use the Application to receive the leads generated through the Application. If the Transportation Provider accepts a request, the Application notifies you and provides

information regarding the Transportation Provider - including its name, vehicle license number, and customer service rating - and the ability to contact the Transportation Provider by telephone. The Application also allows you to view the Transportation Provider's progress towards the pick-up point, in real time.

Uber shall procure reasonable efforts to bring you into contact with a Transportation Provider in order to obtain transportation services, subject to the availability of Transportation Providers in or around your location at the moment of your request for transportation services.

For the avoidance of doubt: Uber itself does not provide transportation services, and Uber is not a transportation carrier. It is up to the Transportation Provider to offer transportation services, which may be requested through the use of the Application and/or the Service. Uber only acts as intermediary between you and the Transportation Provider. The provision of the transportation services by the Transportation Provider to you is therefore subject to the agreement (to be) entered into between you and the Transportation Provider. Uber shall never be a party to such agreement.

**Your use of the Application or the Service**

You warrant that the information you provide to Uber is accurate and complete. Uber is entitled at all times to verify the information that you have provided and to refuse the Service or use of the Application without providing reasons.

You may only access the Service using authorized means. It is your responsibility to check to ensure you download the correct Application for your device. Uber is not liable if you do not have a compatible mobile device or if you download the wrong version of the Application for your mobile device. Uber reserves the right to terminate the Service and the use of the Application should you be using the Service or Application with an incompatible or unauthorized device.

By using the Application or the Service, you further agree that:

1. You will only use the Service or download the Application for your sole, personal use and will not resell it to a third party;
2. You will not authorize others to use your account;
3. You will not assign or otherwise transfer your account to any other person or legal entity;
4. You will not use an account that is subject to any rights of a person other than you without appropriate authorization;
5. You will not use the Service or Application for unlawful purposes, including but not limited to sending or storing any unlawful material or for fraudulent purposes;
6. You will not use the Service or Application to cause nuisance, annoyance or inconvenience;
7. You will not impair the proper operation of the network;
8. You will not try to harm the Service or Application in any way whatsoever;
9. You will not copy, or distribute the Application or other Uber Content without written permission from Uber;
10. You will keep secure and confidential your account password or any identification we provide you which allows access to the Service and the Application;
11. You will provide us with whatever proof of identity we may reasonably request;
12. You will only use an access point or 3G data account (AP) which you are authorized to use;
13. You are aware that when requesting transportation services by SMS (if available in your jurisdiction), standard messaging charges will apply;
14. You will not use the Service or Application with an incompatible or unauthorized device;
15. You will comply with all applicable law from your home nation, the country, state and/or city in which you are present while using the Application or Service.
    Uber reserves the right to immediately terminate the Service and the use of the Application should you not comply with any of the above rules.

**Payment**

The use of the Application and the Service is free of charge. Uber reserves the right to introduce a fee for the use

of the Application and/or the Service. If Uber decides to introduce such a fee, Uber shall inform you accordingly and allow you to either continue or terminate the Contract.

The rates that apply for the transportation services by the Transportation Provider can be found on the Website and through the Application. These may be modified or updated by Uber from time to time. It is your own responsibility to remain informed about the current rates for the transportation services.

Uber shall charge you for the transportation services provided to you by the Transportation Provider on behalf of the Transportation Provider. You agree that you will pay for all transportation services you purchase from the Transportation Provider, and that Uber may charge your credit card account as provided by you when registering for the Service for the transportation services (including any taxes and late fees, as applicable) that may be accrued by or in connection with your account. You are responsible for the timely payment of all fees and for providing Uber with a valid credit card account for payment of all fees at all times. Any payment made is non-refundable.

Uber uses a third-party payment processor (the "**Payment Processor**") to link your credit card account to the Application and Service. The processing of payments or credits, as applicable, in connection with your use of the Application and Service will be subject to the terms, conditions and privacy policies of the Payment Processor and your credit card issuer in addition to these User Terms. Uber is not responsible for any errors by the Payment Processor. In connection with your use of the Services, Uber will obtain certain transaction details, which Uber will use solely in accordance with its Privacy and Cookie Notice.

### Indemnification

By accepting these User Terms and using the Application or Service, you agree that you shall defend, indemnify and hold Uber, its affiliates, its licensors, and each of their officers, directors, other users, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with:

   a. your violation or breach of any term of these User Terms or any applicable law or regulation, whether or not referenced herein;
   b. your violation of any rights of any third party, including Transportation Providers arranged via the Application, or
   c. your use or misuse of the Application or Service.

### Liability

The information, recommendations and/or services provided to you on or through the Website, the Service and the Application is for general information purposes only and does not constitute advice. Uber will reasonably keep the Website and the Application and its contents correct and up to date but does not guarantee that (the contents of) the Website and/or Application are free of errors, defects, malware and viruses or that the Website and/or Application are correct, up to date and accurate.

Uber shall not be liable for any damages resulting from the use of (or inability to use) the Website or Application (but to the exclusion of death or personal injury), including damages caused by malware, viruses or any incorrectness or incompleteness of the Information or the Website or Application, unless such damage is the result of any wilful misconduct or from gross negligence on the part of Uber.

Uber shall further not be liable for damages resulting from the use of (or the inability to use) electronic means of communication with the Website or the Application, including — but not limited to — damages resulting from failure or delay in delivery of electronic communications, interception or manipulation of electronic communications by third parties or by computer programs used for electronic communications and transmission of viruses.

Without prejudice to the foregoing, and insofar as allowed under mandatory applicable law, Uber's aggregate liability shall in no event exceed an amount of EUR 500 or, where applicable, the equivalent of that amount in the currency used by you for the payment of the transportation services to the Transportation Provider.

The quality of the transportation services requested through the use of the Application or the Service is entirely the responsibility of the Transportation Provider who ultimately provides such transportation services to you. Uber under no circumstance accepts liability in connection with and/or arising from the transportation services provided by the Transportation Provider or any acts, actions, behaviour, conduct, and/or negligence on the part of the Transportation Provider. Any complaints about the transportation services provided by the Transportation Provider should therefore be submitted to the Transportation Provider.

### License Grant, Restrictions and Copyright Policy

For the purpose of this User Term, the following definitions apply:

"**Content**" means all content featured or displayed, including, but not limited to, logos, icons, trademarks, text, graphics text, graphics, photographs, images, moving images, sound, illustrations, music, software (excluding the Application), opinions, remarks, comments, artwork, links, questions, suggestions, information or other materials.
"**Uber Content**" means Content owned or used by Uber, its affiliates or licensors and made available through the Website, Service or Application, including any Content licensed from a third party, but excluding User Content.
"**User**" means a person who accesses or uses the Service or Application.
"**User Content**" means Content that a User posts, uploads, publishes, submits or transmits to be made available on the Website or through the Service or Application.
"**Collective Content**" means, collectively, Uber Content and User Content.

Subject to your compliance with these User Terms, Uber grants you a limited, non-exclusive, non-transferable license:

   i. to view, download and print any Uber Content solely for your personal and non-commercial purposes; and
  ii. to view any User Content to which you are permitted access solely for your personal and non-commercial purposes.

You have no right to sublicense the license rights granted in this section.

You may not use, copy, adapt, modify, create derivative works from, distribute, license, sell, transfer, publicly display, publicly perform, reproduce, transmit, stream, broadcast or otherwise exploit the Website, Service, Application or Collective Content, except as expressly permitted in these User Terms. You may not reuse any Collective Content without first obtaining the written consent of Uber. No licenses or rights are granted to you by implication or otherwise under any intellectual property rights owned or controlled by Uber or its licensors, except for the licenses and rights expressly granted in these User Terms.

### License Granted by User

We may, in our sole discretion, permit Users to post, upload, publish, submit or transmit User Content on the Website or through the Service or Application. User Content will be deemed non-confidential and non-proprietary. Accordingly, Uber shall have the non-exclusive, royalty-free, right to use, copy, distribute and disclose to third parties any User Content for any purpose, in any medium and throughout the world ("**License Grant**").

You acknowledge that Uber only acts as a passive conduit for the distribution of the User Content and is not responsible or liable to you or to any third party for the content or accuracy of the User Content. Uber shall not be continuously monitoring User Content published by you or moderating between Users, nor shall Uber be under an obligation to do so. Without limiting the foregoing, you acknowledge and agree that any remarks, opinions, comments, suggestions and other information expressed or included in the User Content do not

necessarily represent those of Uber.

Any use by you of the User Content is entirely at your own risk. You represent and warrant that any User Content posted or transmitted by you is original to you and does not copy the work of any third party or otherwise infringe any third party intellectual property rights, rights of privacy or personality rights and does not contain any defamatory or disparaging statements. Furthermore, you represent and warrant that you have the capacity to grant the license as stipulated in this paragraph.

You agree to indemnify and keep Uber, its affiliates and licensors indemnified against all costs, expenses, damages, losses and liabilities incurred or suffered by Uber or its affiliated companies related to any User Content posted or transmitted by you or your other use of the Website, the Service or the Application.

Uber reserves the right at its sole discretion to block or remove (in whole or in part) any User Content posted or transmitted by you and which Uber believes is not in accordance with these User Terms (including materials which infringe or may infringe third party intellectual property rights, rights of privacy or personality rights), or is otherwise unacceptable to Uber.

You agree to promptly notify Uber in writing of any User Content which breaches these User Terms. You agree to provide to Uber sufficient information to enable Uber to investigate whether such User Content breaches these User Terms. Uber agrees to make good faith efforts to investigate such complaint and shall take such action as Uber in its sole discretion decides. However, Uber does not warrant or represent that it will block or remove (in whole or in part) such user Content.

**Application License**

Subject to your compliance with these User Terms, Uber grants you a limited non-exclusive, non-transferable license to download and install a copy of the Application on a single mobile device that you own or control and to run such copy of the Application solely for your own personal use.

**You shall not**

   i. license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party the Service or Application in any way;
  ii. modify or make derivative works based upon the Service or Application;
 iii. create Internet "links" to the Service or "frame" or "mirror" any Application on any other server or wireless or Internet-based device;
  iv. reverse engineer or access the Application in order to
       a. design or build a competitive product or service,
       b. design or build a product using similar ideas, features, functions or graphics of the Service or Application, or
       c. copy any ideas, features, functions or graphics of the Service or Application, or
   v. launch an automated program or script, including, but not limited to, web spiders, web crawlers, web robots, web ants, web indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burdens or hinders the operation and/or performance of the Service or Application.

**You shall not:**

   i. send spam or otherwise duplicative or unsolicited messages in violation of applicable laws;
  ii. send or store infringing, obscene, threatening, libellous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights;
 iii. send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs;

    iv.  interfere with or disrupt the integrity or performance of the Website, the Application or Service or the data contained therein; or

    v.  attempt to gain unauthorized access to the Website, the Application or Service or its related systems or networks.

Uber will have the right to investigate and prosecute violations of any of the above to the fullest extent of the law. Uber may involve and cooperate with law enforcement authorities in prosecuting users who violate these User Terms. You acknowledge that Uber has no obligation to monitor your access to or use of the Website, Service, Application or Collective Content or to review or edit any Collective Content, but has the right to do so for the purpose of operating the Website, the Application and Service, to ensure your compliance with these User Terms, or to comply with applicable law or the order or requirement of a court, administrative agency or other governmental body. Uber reserves the right, at any time and without prior notice, to remove or disable access to any Collective Content that Uber, at its sole discretion, considers to be in violation of these User Terms or otherwise harmful to the Website, the Service or Application.

**Copyright Policy**

Uber respects copyright law and expects its users to do the same. It is Uber's policy to terminate in appropriate circumstances Users or other account holders who (repeatedly) infringe or are believed to be (repeatedly) infringing the rights of copyright holders. Please see Uber's Copyright Policy at https://www.uber.com/legal/copyright, for further information.

**Intellectual Property Ownership**

Uber alone (and its licensors, where applicable) shall own all right, title and interest, including all related intellectual property rights, in and to the Website, Application and the Service and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any other party relating to the Website, Application or the Service.

These User Terms do not constitute a sale and do not convey to you any rights of ownership in or related to the Website, the Application or the Service, or any intellectual property rights owned by Uber. Uber's name, logo, and the product names associated with the Application and Service are trademarks of Uber, its affiliated companies or third parties, and no right or license is granted to use them.

**App Store Sourced Application**

With respect to any Application accessed through or downloaded from the Apple App Store ("**App Store Sourced Application**"), you will use the App Store Sourced Application only:

    i.  on an Apple-branded product that runs iOS (Apple's proprietary operating system software); and

    ii.  as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Uber reserves all rights in and to the Application not expressly granted to you under these User Terms.

**You acknowledge and agree that**

    i.  these User Terms are valid between you and Uber only, and not Apple, and

    ii.  Uber, not Apple, is solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

In the event of any failure of the App Store Sourced Application to conform to any applicable warranty,

you may notify Apple, and Apple will, where applicable, refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Uber and Apple, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Uber.

You and Uber acknowledge that, as between Uber and Apple, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to:

   i. product liability claims;
   ii. any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and
   iii. claims arising under consumer protection or similar legislation.

You and Uber acknowledge that, in the event of any third party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Uber and Apple, Uber, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by this Agreement.

You and Uber acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries relating to your license of the App Store Sourced Application, and that, upon your acceptance of these User Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the rights under these User Terms as related to your license of the App Store Sourced Application against you as a third party beneficiary thereof.

Without limiting any other provisions of these User Terms, you must comply with all applicable third party terms of agreement when using the App Store Sourced Application.

**Third Party Interactions**

During the use of the Website, the Application and the Service, links to websites that are owned and controlled by third parties may be provided from time to time in order to enter into correspondence with, purchase goods or services from, participate in promotions of third parties. These links take you off the Website, the Application and the Service and are beyond Uber's control.

During use of the Website, the Application and the Service, you may enter into correspondence with, purchase goods and/or services from, or participate in promotions of third party service providers, advertisers or sponsors showing their goods and/or services through a link on the Website or through the Application or Service. These links take you off the Website, the Application and the Service and are beyond Uber's control. The websites you can link to have their own separate terms and conditions as well as a privacy policy. Uber is not responsible and cannot be held liable for the content and activities of these websites. You therefore visit or access these websites entirely at your own risk.

Please note that these other websites may send their own cookies to users, collect data or solicit personal information, and you are therefore advised to check the terms of use or privacy policies on those websites prior to using them.

**Term and termination of the contract**

The Contract between Uber and you is concluded for an indefinite period.

You are entitled to terminate the Contract at all times by permanent deletion of the Application installed on

your smart phone, thus disabling the use by you of the Application and the Service. You can close your user account at any time by following the instructions on Uber's website.

Uber is entitled to terminate the Contract at all times and with immediate effect (by disabling your use of the Application and the Service) if you:

a. violate or breach any term of these User Terms, or
b. in the opinion of Uber, misuse the Application or the Service. Uber is not obliged to give notice of the termination of the Contract in advance. After termination Uber will give notice thereof in accordance with these User Terms.

**Invalidity of one or more provisions**

The invalidity of any term of these User Terms shall not affect the validity of the other provisions of these User Terms.

If and to the extent that any provision of these User Terms is invalid, or is unacceptable in the given circumstances according to the criteria of reasonableness and fairness, a provision shall apply between the parties instead that is acceptable considering all the circumstances and which corresponds with the provisions of the void part as much as possible, taking into account the content and the purpose of these User Terms.

**Modification of the Service and User Terms**

Uber reserves the right, at its sole discretion, to modify or replace any of these User Terms, or change, suspend, or discontinue the Service or Application (including without limitation, the availability of any feature, database, or content) at any time by posting a notice on the Website or by sending you notice through the Service, Application or via email. Uber may also impose limits on certain features and services or restrict your access to parts or all of the Service without notice or liability.

**Notice**

Uber may give notice by means of a general notice on the Service or Application, or by electronic mail to your email address on record in Uber's account information, or by written communication sent by regular mail to your address on record in Uber's account information.

**Assignment**

You may not assign your rights under these User Terms without prior written approval of Uber.

**Privacy and Cookie Notice**

Uber collects and processes the personal data of the visitors of the Website and users of the Application according to the Privacy and Cookie Notice **uber.com/privacy**.

**Applicable law and Dispute Resolution**

These User Terms are subject to the laws of the Netherlands. Any dispute, claim or controversy arising out of or relating to these User Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Website, the Service or the Application (collectively, "Disputes") will be settled exclusively by the competent court in Amsterdam, the Netherlands, unless you notify Uber within one month after Uber invoking its right pursuant to this provision to commence court proceedings in

Amsterdam, the Netherlands, that you demand settlement of the dispute, claim or controversy at hand before the relevant court competent by law.

**Final provision**

The English text of these User Terms constitutes the sole authentic text. In the event of any discrepancy between the English text and a translation into a foreign language, the English text shall prevail.

<% include ../footer.html %>

# Attachment 4 – Declaration M.J. Drop

(User Terms Agreement between Uber B.V. and Jane Doe's friend)

<% include ../header.html %>

**Terms and Conditions**

May 6, 2013

<% include ../country-picker-terms.html %>

These terms and conditions (**"User Terms"**) apply to your visit to and your use of our website at www.uber.com (the **"Website"**), the Service and the Application (as defined below), as well as to all information, recommendations and or services provided to you on or through the Website, the Service and the Application.

PLEASE READ THESE USER TERMS CAREFULLY BEFORE DOWNLOADING OUR APPLICATION AND/OR USING OUR SERVICE.

**Uber**

Your contracting partner is Uber B.V., a private limited liability company established in the Netherlands, having its offices at Barbara Strozzilaan 101, 1083 HN Amsterdam, the Netherlands, registered at the Chamber of Commerce under number 55808646 (**"Uber"**).

**What services does Uber provide?**

Uber offers information and a means to obtain transportation services offered by third party transportation providers, drivers or vehicle operators (the **"Transportation Provider"**), which may be requested through the use of an application supplied by Uber and downloaded and installed by you on your single mobile device (smart phone) (the **"Application"**). All services provided by Uber to you by means of your use of the Application are hereafter referred to as the **"Service"**.

**How is a contract concluded between Uber and you?**

By using the Application or the Service, you enter into a contract with Uber (the **"Contract"**). In order to be able to use the Application or Service, you first need to sign up with Uber. When signing up, you are obligated to provide Uber with your personal information, mobile telephone number and credit card data. Upon successful completion of your signing up with Uber, Uber will provide you with a personal account, accessible for you with a password of your choice.

You have to be 18 years of age or older to use the Service or Application. If you reside in a jurisdiction that restricts the use of the Service or Application because of age, or restricts the ability to enter into contracts such as this one due to age, you must abide by such age limits and you must not use the Service and the Application. You represent that if you are an individual, you are of legal age to enter into a binding contract, or that if you are registering on behalf of a legal entity, that you are authorized to enter into, and bind the entity to, these User Terms and register for the Service and the Application.

**How to use the Service and the Application**

The Application allows you to send a request for transportation service to a Transportation Provider. The GPS receiver - which should be installed on the mobile device (smart phone) on which you have downloaded the Application - detects your location and sends your location information to the relevant Transportation Provider. The Transportation Provider has sole and complete discretion to accept or reject each request for transportation service. The Transportation Provider also has sole and complete discretion over whether to use the Application to receive the leads generated through the Application. If the Transportation Provider accepts a request, the Application notifies you and provides

information regarding the Transportation Provider - including its name, vehicle license number, and customer service rating - and the ability to contact the Transportation Provider by telephone. The Application also allows you to view the Transportation Provider's progress towards the pick-up point, in real time.

Uber shall procure reasonable efforts to bring you into contact with a Transportation Provider in order to obtain transportation service, subject to the availability of Transportation Providers in or around your location at the moment of your request for transportation services.

For the avoidance of doubt: Uber itself does **not** provide transportation services, and Uber is not a transportation carrier. It is up to the Transportation Provider to offer transportation services, which may be requested through the use of the Application and/or the Service. Uber only acts as intermediary between you and the Transportation Provider. The provision of the transportation services by the Transportation Provider to you is therefore subject to the agreement (to be) entered into between you and the Transportation Provider. Uber shall never be a party to such agreement.

**Your use of the Application or the Service**

You warrant that the information you provide to Uber is accurate and complete. Uber is entitled at all times to verify the information that you have provided and to refuse the Service or use of the Application without providing reasons.

You may only access the Service using authorized means. It is your responsibility to check to ensure you download the correct Application for your device. Uber is not liable if you do not have a compatible mobile device or if you download the wrong version of the Application for your mobile device. Uber reserves the right to terminate the Service and the use of the Application should you be using the Service or Application with an incompatible or unauthorized device.

By using the Application or the Service, you further agree that:

- You will only use the Service or download the Application for your sole, personal use and will not resell it to a third party;
- You will not authorize others to use your account;
- You will not assign or otherwise transfer your account to any other person or legal entity;
- You will not use an account that is subject to any rights of a person other than you without appropriate authorization;
- You will not use the Service or Application for unlawful purposes, including but not limited to sending or storing any unlawful material or for fraudulent purposes;
- You will not use the Service or Application to cause nuisance, annoyance or inconvenience;
- You will not impair the proper operation of the network;
- You will not try to harm the Service or Application in any way whatsoever;
- You will not copy, or distribute the Application or other Uber Content without written permission from Uber;
- You will keep secure and confidential your account password or any identification we provide you which allows access to the Service and the Application;
- You will provide us with whatever proof of identity we may reasonably request;
- You will only use an access point or 3G data account (AP) which you are authorized to use;
- You are aware that when requesting transportation services by SMS if available in your jurisdiction), standard messaging charges will apply;
- You will not use the Service or Application with an incompatible or unauthorized device;
- You will comply with all applicable law from your home nation, the country, state and/or city in which you are present while using the Application or Service.

Uber reserves the right to immediately terminate the Service and the use of the Application should you not comply with any of the above rules.

**Payment**

The use of the Application and the Service is free of charge. Uber reserves the right to introduce a fee for the use of the Application and/or the Service. If Uber decides to introduce such a fee, Uber shall inform you accordingly and allow you to either continue or terminate the Contract.

The rates that apply for the transportation services by the Transportation Provider can be found on the Website and through the Application. These may be modified or updated by Uber from time to time. It is your own responsibility to remain informed about the current rates for the transportation services.

Uber shall charge you for the transportation services provided to you by the Transportation Provider on behalf of the Transportation Provider. You agree that you will pay for all transportation services you purchase from the Transportation Provider, and that Uber may charge your credit card account as provided by you when registering for the Service for the transportation services including any taxes and late fees, as applicable) that may be accrued by or in connection with your account. You are responsible for the timely payment of all fees and for providing Uber with a valid credit card account for payment of all fees at all times. Any payment made is non-refundable.

Uber uses a third-party payment processor (the **"Payment Processor"**) to link your credit card account to the Application and Service. The processing of payments or credits, as applicable, in connection with your use of the Application and Service will be subject to the terms, conditions and privacy policies of the Payment Processor and your credit card issuer in addition to these User Terms. Uber is not responsible for any errors by the Payment Processor. In connection with your use of the Service, Uber will obtain certain transaction details, which Uber will use solely in accordance with its Privacy and Cookie Notice.

## Indemnification

By accepting these User Terms and using the Application or Service, you agree that you shall defend, indemnify and hold Uber, its affiliates, its licensors, and each of their officers, directors, other users, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with: (a) your violation or breach of any term of these User Terms or any applicable law or regulation, whether or not referenced herein; (b) your violation of any rights of any third party, including Transportation Providers arranged via the Application, or (c) your use or misuse of the Application or Service.

## Liability

The information, recommendations and/or services provided to you on or through the Website, the Service and the Application is for general information purposes only and does not constitute advice. Uber will reasonably keep the Website and the Application and its contents correct and up to date but does not guarantee that (the contents of) the Website and/or Application are free of errors, defects, malware and viruses or that the Website and/or Application are correct, up to date and accurate.

Uber shall not be liable for any damages resulting from the use of or inability to use) the Website or Application (but to the exclusion of death or personal injury), including damages caused by malware, viruses or any incorrectness or incompleteness of the Information or the Website or Application, unless such damage is the result of any wilful misconduct or from gross negligence on the part of Uber.

Uber shall further not be liable for damages resulting from the use of (or the inability to use) electronic means of communication with the Website or the Application, including â€" but not limited to â€" damages resulting from failure or delay in delivery of electronic communications, interception or manipulation of electronic communications by third parties or by computer programs used for electronic communications and transmission of viruses.

Without prejudice to the foregoing, and insofar as allowed under mandatory applicable law, Uber's aggregate liability shall in no event exceed an amount of EUR 500 or, where applicable, the equivalent of that amount in the currency used by you for the payment of the transportation services to the Transportation Provide.

The quality of the transportation services requested through the use of the Application or the Service is entirely the responsibility of the Transportation Provider who ultimately provides such transportation services to you. Uber under no circumstance accepts liability in connection with and/or arising from the transportation services provided by the Transportation Provider or any acts, action, behaviour, conduct, and/or negligence on the part of the Transportation Provider. Any complaints about the transportation services provided by the Transportation Provider should therefore be submitted to the Transportation Provider.

## License Grant, Restrictions and Copyright Policy

For the purpose of this User Term, the following definitions apply:

**"Content"** means all content featured or displayed, including, but not limited to, logos, icons, trademarks, text, graphics text, graphics, photographs, images, moving images, sound, illustrations, music, software (excluding the Application), opinion, remarks, comments, artwork, links, questions, suggestions, information or other materials.

**"Uber Content"** means Content owned or used by Uber, its affiliates or licensors and made available through the Website, Service or Application, including any Content licensed from a third party, but excluding User Content.

**"User"** means a person who accesses or uses the Service or Application.

**"User Content"** means Content that a User posts, uploads, publishes, submits or transmits to be made available on the Website or through the Service or Application.

**"Collective Content"** means, collectively, Uber Content and User Content.

Subject to your compliance with these User Terms, Uber grants you a limited, non-exclusive, non-transferable license:

- (i) to view, download and print any Uber Content solely for your personal and non-commercial purposes; and
- (ii) to view any User Content to which you are permitted access solely for your personal and non-commercial purposes.

You have no right to sublicense the license rights granted in this section.

You may not use, copy, adapt, modify, create derivative works from, distribute, license, sell, transfer, publicly display, publicly perform, reproduce, transmit, stream, broadcast or otherwise exploit the Website, Service, Application or Collective Content, except as expressly permitted in these User Terms. You may not reuse any Collective Content without first obtaining the written consent of Uber. No licenses or rights are granted to you by implication or otherwise under any intellectual property rights owned or controlled by Uber or its licensors, except for the licenses and rights expressly granted in these User Terms.

### License Granted by User

We may, in our sole discretion, permit Users to post, upload, publish, submit or transmit User Content on the Website or through the Service or Application. User Content will be deemed non-confidential and non-proprietary. Accordingly, Uber shall have the non-exclusive, royalty-free, right to use, copy, distribute and disclose to third parties any User Content for any purpose, in any medium and throughout the world (**"License Grant"**).

You acknowledge that Uber only acts as a passive conduit for the distribution of the User Content and is not responsible or liable to you or to any third party for the content or accuracy of the User Content. Uber shall not be continuously monitoring User Content published by you or moderating between Users, nor shall Uber be under an obligation to do so. Without limiting the foregoing, you acknowledge and agree that any remarks, opinions, comments, suggestions and other information expressed or included in the User Content do not necessarily represent those of Uber.

Any use by you of the User Content is entirely at your own risk. You represent and warrant that any User Content

posted or transmitted by you is original to you and does not copy the work of any third party or otherwise infringe any third party intellectual property rights, rights of privacy or personality rights and does not contain any defamatory or disparaging statements. Furthermore, you represent and warrant that you have the capacity to grant the license as stipulated in this paragraph.

You agree to indemnify and keep Uber, its affiliates and licensors indemnified against all costs, expenses, damages, losses and liabilities incurred or suffered by Uber or its affiliated companies related to any User Content posted or transmitted by you or your other use of the Website, the Service or the Application.

Uber reserves the right at its sole discretion to block or remove (in whole or in part) any User Content posted or transmitted by you and which Uber believes is not in accordance with these User Terms (including materials which infringe or may infringe third party intellectual property rights, rights of privacy or personality rights), or is otherwise unacceptable to Uber.

You agree to promptly notify Uber in writing of any User Content which breaches these User Terms. You agree to provide to Uber sufficient information to enable Uber to investigate whether such User Content breaches these User Terms. Uber agrees to make good faith efforts to investigate such complaint and shall take such action as Uber in its sole discretion decides. However, Uber does not warrant or represent that it will block or remove (in whole or in part) such user Content.

**Application License**

Subject to your compliance with these User Terms, Uber grants you a limited non-exclusive, non-transferable license to download and install a copy of the Application on a single mobile device that you own or control and to run such copy of the Application solely for your own personal use.

You shall not (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party the Service or Application in any way; (ii) modify or make derivative works based upon the Service or Application; (iii) create Internet "links" to the Service or "frame" or "mirror" any Application on any other server or wireless or Internet-based device; (iv) reverse engineer or access the Application in order to (a) design or build a competitive product or service, (b) design or build a product using similar ideas, features, functions or graphics of the Service or Application, or (c) copy any ideas, features, functions or graphics of the Service or Application, or (v) launch an automated program or script, including, but not limited to, web spiders, web crawlers, web robots, web ants, web indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burdens or hinders the operation and/or performance of the Service or Application.

You shall not: (i) send spam or otherwise duplicative or unsolicited messages in violation of applicable laws; (ii) send or store infringing, obscene, threatening, libellous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights; (iii) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs; (iv) interfere with or disrupt the integrity or performance of the Website, the Application or Service or the data contained therein; or (v) attempt to gain unauthorized access to the Website, the Application or Service or its related systems or networks.

Uber will have the right to investigate and prosecute violations of any of the above to the fullest extent of the law. Uber may involve and cooperate with law enforcement authorities in prosecuting users who violate these User Terms. You acknowledge that Uber has no obligation to monitor your access to or use of the Website, Service, Application or Collective Content or to review or edit any Collective Content, but has the right to do so for the purpose of operating the Website, the Application and Service, to ensure your compliance with these User Terms, or to comply with applicable law or the order or requirement of a court, administrative agency or other governmental body. Uber reserves the right, at any time and without prior notice, to remove or disable access to any Collective Content that Uber, at its sole discretion, considers to be in violation of these User Terms or otherwise harmful to the Website, the Service or Application.

**Copyright Policy**

Uber respects copyright law and expects its users to do the same. It is Uber's policy to terminate in appropriate circumstances Users or other account holders who (repeatedly) infringe or are believed to be (repeatedly) infringing the rights of copyright holders. Please see Uber's Copyright Policy at https://www.uber.com/legal/copyright, for further information.

## Intellectual Property Ownership

Uber alone (and its licensors, where applicable) shall own all right, title and interest, including all related intellectual property rights, in and to the Website, Application and the Service and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any other party relating to the Website, Application or the Service.

These User Terms do not constitute a sale and do not convey to you any rights of ownership in or related to the Website, the Application or the Service, or any intellectual property rights owned by Uber. Uber's name, logo, and the product names associated with the Application and Service are trademarks of Uber, its affiliated companies or third parties, and no right or license is granted to use them.

## App Store Sourced Application

With respect to any Application accessed through or downloaded from the Apple App Store (**"App Store Sourced Application"**), you will use the App Store Sourced Application only: (i) on an Apple-branded product that runs iOS (Apple's proprietary operating system software); and (ii) as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Uber reserves all rights in and to the Application not expressly granted to you under these User Terms.

You acknowledge and agree that (i) these User Terms are valid between you and Uber only, and not Apple, and (ii) Uber, not Apple, is solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

In the event of any failure of the App Store Sourced Application to conform to any applicable warranty, you may notify Apple, and Apple will, where applicable, refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Uber and Apple, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Uber.

You and Uber acknowledge that, as between Uber and Apple, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to: (i) product liability claims; (ii) any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation.

You and Uber acknowledge that, in the event of any third party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Uber and Apple, Uber, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by this Agreement.

You and Uber acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries relating to your license of the App Store Sourced Application, and that, upon your acceptance of these User Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the rights under these User Terms as related to your

license of the App Store Sourced Application against you as a third party beneficiary thereof.

Without limiting any other provisions of these User Terms, you must comply with all applicable third party terms of agreement when using the App Store Sourced Application.

## Third Party Interactions

During the use of the Website, the Application and the Service, links to websites that are owned and controlled by third parties may be provided from time to time in order to enter into correspondence with, purchase goods or services from, participate in promotions of third parties. These links take you off the Website, the Application and the Service and are beyond Uber's control.

During use of the Website, the Application and the Service, you may enter into correspondence with, purchase goods and/or services from, or participate in promotions of third party service providers, advertisers or sponsors showing their goods and/or services through a link on the Website or through the Application or Service. These links take you off the Website, the Application and the Service and are beyond Uber's control. The websites you can link to have their own separate terms and conditions as well as a privacy policy. Uber is not responsible and cannot be held liable for the content and activities of these websites. You therefore visit or access these websites entirely at your own risk.

Please note that these other websites may send their own cookies to users, collect data or solicit personal information, and you are therefore advised to check the terms of use or privacy policies on those websites prior to using them.

## Term and termination of the contract

The Contract between Uber and you is concluded for an indefinite period.

You are entitled to terminate the Contract at all times by permanent deletion of the Application installed on your smart phone, thus disabling the use by you of the Application and the Service. You can close your user account at any time by following the instructions on Uber's website.

Uber is entitled to terminate the Contract at all times and with immediate effect (by disabling your use of the Application and the Service) if you: (a) violate or breach any term of these User Terms, or (b) in the opinion of Uber, misuse the Application or the Service. Uber is not obliged to give notice of the termination of the Contract in advance. After termination Uber will give notice thereof in accordance with these User Terms.

## Invalidity of one or more provisions

The invalidity of any term of these User Terms shall not affect the validity of the other provisions of these User Terms.

If and to the extent that any provision of these User Terms is invalid, or is unacceptable in the given circumstances according to the criteria of reasonableness and fairness, a provision shall apply between the parties instead that is acceptable considering all the circumstances and which corresponds with the provisions of the void part as much as possible, taking into account the content and the purpose of these User Terms.

## Modification of the Service and User Terms

Uber reserves the right, at its sole discretion, to modify or replace any of these User Terms, or change, suspend, or discontinue the Service or Application (including without limitation, the availability of any feature, database, or content) at any time by posting a notice on the Website or by sending you notice through the Service, Application or via email. Uber may also impose limits on certain features and services or restrict your access to parts or all of the Service without notice or liability.

## Notice

Uber may give notice by means of a general notice on the Service or Application, or by electronic mail to your email address on record in Uber's account information, or by written communication sent by regular mail to your address on record in Uber's account information.

## Assignment

You may not assign your rights under these User Terms without prior written approval of Uber.

## Privacy and Cookie Notice

Uber collects and processes the personal data of the visitors of the Website and users of the Application according to the Privacy and Cookie Notice.

## Applicable law and Dispute Resolution

These User Terms are subject to the laws of the Netherlands. Any dispute, claim or controversy arising out of or relating to these User Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Website, the Service or the Application (collectively, **"Disputes"**) will be settled exclusively by the competent court in Amsterdam, the Netherlands, unless you notify Uber within one month after Uber invoking its right pursuant to this provision to commence court proceedings in Amsterdam, the Netherlands, that you demand settlement of the dispute, claim or controversy at hand before the relevant court competent by law.

## Final provision

The English text of these User Terms constitutes the sole authentic text. In the event of any discrepancy between the English text and a translation into a foreign language, the English text shall prevail.

<% include ../footer.html %>

## Attachment 5 – Declaration M.J. Drop

(Partner Terms Agreement between Uber B.V. and Mr. Shiv Kumar Yadav)



**PARTNER TERMS**

**BY REGISTERING AND SIGNING THE PARTNER REGISTRATION FORM, THE PARTNER HEREBY ACKNOWLEDGES, ACCEPTS AND AGREES TO THE FOLLOWING TERMS AND CONDITIONS ("PARTNER TERMS"):**

**1.     DEFINITIONS, INTERPRETATION, SCOPE AND CHANGE OF THE PARTNER TERMS**
1.1     Definitions and interpretation
1.1.1   In addition to the terms defined elsewhere in these Partner Terms, the following definitions apply, unless the contrary intention appears:

"**Affiliated Company**" means a company that directly or indirectly is under control of or controls that relevant Party, by having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights.

"**App**" means the software application owned, controlled, managed, maintained, hosted, licensed and/or designed by Uber (or its Affiliated Companies) to run on smartphones, tablet computers and/or other devices, through which the Service is made available.

"**Change Notice**" has the meaning as set out in Clause 5.4.

"**City**" means the state, city, municipality, place, region or territory as set out in the PRF in which the Driving Service shall be made available by the Partner.

"**Commission**" means the remuneration for the Service provided by Uber to the Partner.

"**Customer**" means a person who has signed up and is registered with Uber for the use of the App and/or the Service.

"**Data**" means all data with regard to or transmitted using the Device, the App, the Driver App, the Service or the Driver ID, or data relating to the Customer and/or the Ride.

"**Device**" means the relevant smartphone or such other device as made available by Uber (in its sole discretion) to the Driver in order to use and have (limited) access to the Service and enable and provide the Driving Service to the Customers.

"**Driver**" means the person who is an employee or business partner of, or otherwise retained by the Partner and who shall render the Driving Service of whom the relevant (contact) details (including copy of the driver's license) are provided to Uber.

"**Driver App**" means the software application owned, controlled, managed, maintained, hosted, licensed and/or designed by Uber (or its Affiliated Companies) to run on the Device.

"**Driver ID**" means the identification and password key allotted by Uber to a Driver by which the Driver can access and use the Driver App and Device.

"**Driving Service**" means the driving transportation service as provided, made available or rendered by the Partner (through the Driver (as applicable) with the Vehicle) upon request of the Customer.

"**Fare**" means the amount (including applicable Taxes and Fees) that the Partner is entitled to charge the Customer for the Ride, based on the recommended fares for the City as set out on www.uber.com, on the App or in the PRF.

"**Indirect Taxes**" means VAT, GST, or any other consumption, sales or use tax or any other similar transaction taxes.

"**Intellectual Property Right**" means any patent, copyright, invention, database right, design right, registered design, trade mark, trade name, brand, logo, slogan, service mark, know-how, utility model, unregistered design or, where relevant, any application for any such right, know-how, trade or business name, domain name (under whatever extension, e.g. .com, .nl, .fr, .eu, etc.) or other similar right or obligation whether registered or unregistered or other industrial or intellectual property right subsisting in any territory or jurisdiction anywhere in the world.

"**Party**" means the Partner or Uber (collectively the "**Parties**").

"**Partner**" means the party having sole responsibility for the Driving Service as set out in the PRF.

"**Partner Agreement**" means the PRF, the Partner Terms (as amended from time to time) and any appendixes, schedules and annexes thereto.

"**PRF**" means Partner Registration Form.



**"Ride"** means the transportation of the Customer by the Driver from the point of pick-up of the Customer until the point of drop-off of the Customer.

**"Service"** means the on-demand, intermediary service through the App, SMS (text messaging), web based requests or such other platforms, communication media or channels as –from time to time– operated and made available by or on behalf of Uber that allows a Customer to request Driving Service from such a Driver (who shall render the Driving Service on behalf of the Partner) as available to and accepted by the Customer.

**"Taxes and Fees"** means VAT or sales taxes (as applicable) and such other applicable national, governmental, provincial, state, municipal, local or other applicable taxes, levies, tax-like assessments, (waiting) fees, Toll Charges (including surcharges thereon) or any other charges levied by any competent authority or agency in relation to the Driving Service.

**"Toll Charges"** means any and all road, bridge, ferry, tunnel and airport toll charges, including inner-city congestion, environmental or similar charges.

**"Uber"** means Uber B.V., a private limited liability company incorporated under the laws of the Netherlands, with its registered seat in Amsterdam, the Netherlands.

**"Vehicle"** means any motorized vehicle (whether powered by an internal combustion or an electrical engine) that is in safe and cleanly condition and fit for passenger transportation as required by applicable laws and regulations and that has been approved by Uber for the provision of the Driving Service.

**"Website"** means the Uber website www.uber.com.

1.1.2   These Partner Terms (as amended from time to time) form an integral part of the PRF and must be read in conjunction with the PRF (including all appendixes, schedules and annexes). Uber – acting reasonably and giving reasonable (not less than seven (7) days') prior notice to the Partner – reserves the right to modify the Partner Terms (including the appendixes, schedules and annexes) or its policies relating to the Service, the App, the Driver App or the Device by posting an updated version of this Partner Agreement through the Service, the Driver App or the Device or by providing the Partner with a copy of the amended Partner Terms.

## 2      SCOPE
2.1      Role of Uber
2.1.1   Partner acknowledges and agrees that Uber does not provide any transportation services, and that Uber is not a transportation or passenger carrier.  Uber offers information and a tool to connect Customers seeking Driving Services to Drivers who can provide the Driving Service, and it does not and does not intend to provide transportation or act in any way as a transportation or passenger carrier. Uber has no responsibility or liability for any driving or transportation services provided by the Partner or the Drivers to third parties (including the Customers). The Partner and/or the Drivers will be solely responsible for any and all liability which results or is alleged to be as a result of the operation of the Vehicle(s) and/or the driving or transportation service, including, but not limited to personal injuries, death and property damage. Partner agrees to indemnify, defend and hold Uber harmless from and against any (potential) claims or (potential) damages incurred by any third party, including the Customer or the Driver, raised on account of the provision of the Driving Service. By providing the Driving Service to the Customer, the Partner accepts, agrees and acknowledges that a direct legal relationship is created and assumed solely between the Partner and the Customer. Uber shall not be responsible or liable for the actions, omissions and behaviour of the Customer in or in relation to the Partner, the Driver and the Vehicle. The Drivers are solely responsible for taking reasonable and appropriate precautions in relation to any third party with which they interact in connection with the Driving Service. Where this allocation of the Parties' mutual responsibilities may be ineffective under applicable law, the Partner undertakes to indemnify, defend and hold Uber harmless from and against any claims that may be brought against Uber in relation to the Partner's provision of the Driving Service under such applicable law.

2.2      Relationship with Partner/Drivers



2.2.1 Notwithstanding the Partner's right, if applicable, to take recourse against the Driver, the Partner acknowledges and agrees that he is at all times responsible and liable for the acts and omissions of the Driver(s) vis-à-vis the Customer and Uber, even where such vicarious liability may not be mandated under applicable law. The Partner represents and undertakes to procure that the Driver shall comply with, adhere to and observe the Partner Terms and all applicable laws, regulations, rules, statutes or ordinances governing or otherwise relating to the Driving Service. To the extent required, the Partner hereby agrees and procures that the rights, covenants, undertakings, representations and obligations of the Driver as set out in this Agreement shall apply to, and be assumed, accepted and taken over by the Driver. The Partner acknowledges and agrees that he will retain and, where necessary exercise, sole control over the Driver and comply with all applicable laws and regulations (incl. tax, social security and employment laws) governing or otherwise applicable to his relationship with the Driver. Uber does not and does not intend to exercise any control over the Driver (or the Partner's) actions or the operation or physical condition of the Vehicle – except as provided under the Agreement - and nothing in the Agreement shall create an employment relationship between Uber and the Partner and/or the Driver or create either of them an agent of Uber. The Partner acknowledges and agrees that he has no authority to bind Uber and undertakes not to hold himself out and to procure that the Driver does not hold himself out, as an agent or authorized representative of Uber. Where, by implication of mandatory law or otherwise, the Driver and/or the Partner may be deemed an agent, employee or representative of Uber, the Partner undertakes and agrees to indemnify, defend and hold Uber harmless from and against any claims by any person or entity based on such implied employment or agency relationship.

## 3. PARTNER RIGHTS AND OBLIGATIONS
### 3.1 Use of and access to the Driver App

3.1.1 Uber (and its Affiliated Companies and licensors, where applicable) shall own and have all rights (including Intellectual Property Rights) in and to the Device, the App, the Driver App, the Service, the Driver ID and the Data. Insofar the Partner and/or Driver may, by operation of applicable law or otherwise, obtain any rights (including Intellectual Property Rights) in relation thereto, these rights shall be and are hereby transferred (insofar permitted under the applicable law, in advance) to Uber (rights obtained by any Driver should be transferred via the Partner). Where a transfer may not be permissible under the applicable mandatory law, the Partner hereby undertakes to grant and to procure that the Driver grants Uber a perpetual, exclusive (exclusive also with regard to Partner and/or Driver), world-wide and transferable right and license under any such non-transferable rights.

3.1.2 Uber hereby grants the Partner (and to the extent required, the Driver) a limited, revocable, non-exclusive, royalty free, non-transferable and non-assignable right to use the Driver App and the Device during the term of this Agreement solely for the purpose of having (limited) access to the Service with the sole purpose to provide and render the Driving Service in and/or from within the City to and for the benefit of the Customers. All rights not expressly granted to the Partner are reserved by Uber, its Affiliated Companies or its licensors (as the case may be).

3.1.3 Partner undertakes that it will, and that it will ensure that its Driver(s) will, safeguard, protect and keep the Driver ID at all times confidential and safely stored and shall not disclose it to any person other than those who need to have access to the Driver ID in order to render and/or provide the Driving Service. The Partner shall immediately notify Uber of any (suspected) security breach or improper use of the Driver ID.

3.1.4 The Partner undertakes that it will not and that it will ensure that the Driver does not (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit, dispose of or make available to any third party the Service, the Device, the Driver App or App in any way, (ii) modify or make derivative works based upon the Service, the Device, the Driver App or App, (iii) for other purposes of the provision of the Service under the terms of this Agreement and the instructions of Uber or (iv) modify, decompile, reverse engineering or disassemble, except as allowed under the applicable mandatory law.



3.1.5    The Partner will immediately notify a (suspected) security breach or improper use of the Device, the Driver App or the Data to Uber.

3.1.6    The Partner acknowledges and agrees that the App, the Driver App or the Service may, from time to time, be unavailable (e.g. due to scheduled maintenance or system upgrades) and that Uber cannot, and does not, guarantee an specific or minimum availability of the App, the Driver App or the Service.

## 4.    UBER RIGHTS AND OBLIGATIONS
### 4.1    Driver ID
4.1.1    Uber will issue a Driver ID per Driver to the Partner to enable Partner and/or the Driver (as applicable) to access and use the Driver App and the Device in accordance with the Partner Terms. Uber will have the right, at all times and at Uber' sole discretion, to reclaim, prohibit, limit or otherwise restrict the Partner and/or the Driver from accessing or using the Driver App or the Device. Uber may charge a fee for the use of the Device or request a retainer fee and/or a security deposit per Device before issuing the Partner with a Device per Driver.

### 4.2    Transportation
4.2.1    Uber will provide information to the Driver via the Driver App indicating the location of Customer (**"A"**). The Customer shall inform the Driver of the destination (**"B"**). Partner acknowledges and agrees that Uber may provide further specific information regarding the Partner with regard to the Driving Service.

4.2.2    The Partner acknowledges and agrees that he and the Driver are solely responsible for taking such precautions as may be reasonable and proper (including taking out adequate insurance in conformity with standard market practice and in conformance with any applicable regulations or other licensing requirements) regarding any acts or omissions of the Customer.

### 4.3    Driver and Customer review
4.3.1    Customers who have used the Driving Service will be asked by Uber to comment on the Driving Service and to provide a score for the Driving Service and the Driver. Uber reserves the right to post these comments and scores on the App or the Website (or such other platforms as owned, managed, controlled or managed by Uber). Uber shall also request the Partner and/or the Driver to comment on and to provide a score for the Customer on the Driver App. Partner will and will procure that its Drivers will provide accurate and objective feedback that does not violate any applicable laws and regulations.

4.3.2    The Partner acknowledges that Uber is a distributor (without any obligation to verify) and not a publisher of these comments and scores. Uber reserves the right to refuse, edit or remove unfavourable reviews in the event that such reviews include obscenities or mention an individual's name or violate any privacy laws or any other applicable laws and regulations. Beyond the legal and regulatory requirements, Uber shall not have and hereby disclaims any liability and responsibility for the content and consequences of (the publication or distribution of) any comments, scores or reviews howsoever or whatsoever.

4.3.3    In case of a complaint, dispute or conflict between the Partner or the Driver on the one hand and the Customer on the other hand or in other appropriate instances where a legitimate reason for such disclosure exists, Uber may, but shall not be required to, – to the extent permitted by applicable laws and regulations – provide the Customer, Partner, the Driver and/or the relevant authorities the relevant data (including personal data) of the Partner, the Driver or the Customer.

4.3.4    The Partner will, and will procure that the Driver will:
          a.    support Uber in all communications;
          b.    if requested by Uber, actively engage other Partners or Drivers;

 **UBER**

    c.    refrain from speaking negatively on Uber's business and business concept in public.

## 5.    COMPENSATION AND PAYMENT

5.1    Fares

5.1.1    The Fare for the Driver Service can be found at www.uber.com, or on the App or can at any time be communicated to the Partner by Uber. These Fares are inclusive of Indirect Taxes, which Indirect Taxes will be due and will have to be paid by the Partner at the applicable Indirect Tax rate of the country in which the Driving Service takes place. The Fares are recommended, maximum fares. The Partner is free to charge lower fares to the Customer.

5.1.2    The Fare is generally paid for by the Customer by credit card. The Partner authorizes Uber to use the credit card information of the Customer to process payment of the Fare for and on his behalf.

5.2    Commission

5.2.1    Uber will be paid the Commission per Ride at a percentage as agreed in the PRF. The Commission is calculated as a percentage of the Fare including Indirect Taxes, irrespective of a lower fare as may be agreed between the Partner/Driver on the one hand and the Customer on the other hand for a Ride. The Fare (or the lower fare as agreed with the Customer) will be collected by Uber for and on behalf of the Partner. The Commission will be paid by the Partner by way of deduction from the Fare (or the lower fare) upon collection of the Fare by Uber for and on behalf of the Partner. The Commission will at all times be based on the Fare (irrespective of any lower fare granted by the Partner to the Customer pursuant to Clause 5.1.1). The Partner agrees and undertakes to pay to Uber the Commission on all Fares payable in connection with the Driving Service.

5.2.2    The Commission calculated on the basis of Clause 5.2.1. will be exclusive of Indirect Taxes. For the Netherlands, Indirect Taxes will be calculated on top of the Commission at the general Indirect Taxes rate of 21%. For all other EU countries the Service rendered by Uber is considered taxable for Indirect Taxes in the EU country in which the Partner has established his business or has a permanent establishment to which the Service is rendered. The Indirect Taxes will be due by and will have to be paid by the Partner, on the basis of the so-called 'reverse charge mechanism' to which Uber's invoices will refer.

5.2.3    For all non-EU countries the Service rendered by Uber may be considered taxable for Indirect Taxes in the non- EU country in which the Partner has established his business or has a permanent establishment to which the Service is rendered. If any Indirect Taxes are required to be charged by Uber to the Partner, the Partner will pay Uber the Indirect Taxes in addition to the Commission amount. If under local tax law any Indirect Taxes are payable by the Partner, the Partner shall be responsible for paying the Indirect Taxes without recourse to Uber.

5.3    Change Agreement, Commission and Partner Fee

    Uber may at any time or times notify the Partner of a proposed amendment of or change to the Partner Terms, the agreed Commission (a "**Change Notice**"). If the Partner does not object to such Change Notice within seven (7) days after receipt thereof, he shall be deemed to have accepted the changes comprised in the Change Notice. If Partner objects to the changes/amendments comprised in the Change Notice, Uber may terminate the Partner Agreement with Partner for cause, with immediate effect and without having to compensate Partner in any way.



5.4     Invoicing and payment terms
5.4.1   Payment of the Commission shall be made in accordance with the payment method as mutually agreed upon by Parties.

5.4.2   Uber operates, and the Partner accepts, a system for receipts being issued by Uber for and on behalf of the Partner to the Customer. The receipts, which are issued by Uber for and on behalf of the Partner to the Customer shall be sent in copy by email or made available online to the Partner. The Partner ensures that the Driver checks the correctness of the receipts to the Customer within three (3) business days after each Ride. After this term Uber is not liable for any mistakes in the invoices.

5.4.3   Uber, as an agent of the Partner, is in no circumstances liable for any Indirect Taxes that the Partner has to pay to the authorities in case an incorrect Indirect Tax rate has been applied to the Fare for the Ride.

5.5     Tax gross-up
5.5.1   All payments to be made by the Partner under this Agreement shall be made in cleared funds, without any deduction or set-off and free and clear of and without deduction for or on account of any taxes, levies, imports, duties, charges, fees and withholdings of any nature now or hereafter imposed by any governmental, fiscal or other authority. If the Partner is compelled to make any such deduction or withholding, it will pay to Uber such additional amounts as are necessary to ensure receipt by Uber of the full (net) amount as set out in the invoice which Uber would have received but for the deduction. The Partner is responsible and liable for the payment and remittance of any taxes, levies, imports, duties, charges, fees and withholdings over and above the full (net) payment due by the Partner to Uber.

# 6.     REPRESENTATIONS
6.1     Partner/Driver representations
6.1.1   The Partner represents and shall procure that the Driver shall represent, to Uber that for the term of this Agreement:
   (i) they hold, comply and shall continue to hold and comply with all permits, licenses and other governmental authorisations necessary for conducting, carrying out and continuing their activities, operations and business in general and the Driving Service in particular;
   (ii) they shall comply with all local laws and regulations, including the laws related to the operation of a taxi/passenger delivery, driving service or transportation service and will be solely responsible for any violations of such local laws and regulations;
   (iii) the Driver has a valid driver's license and is authorized to operate the Vehicle as set out in the PRF and has all the appropriate licenses, approvals and authority to provide transportation for hire to third parties in the City where the Driving Service is rendered or performed;
   (iv) they have appropriate and up-to-date level of expertise and experience to enable and provide the Driving Service and the Driving Service will be supplied, provided and supported by appropriately qualified and trained Drivers acting with due skill, care and diligence;
   (v) the Partner and the Driver have and maintain a valid policy for the appropriate (transportation, personal injury, third party or general) liability insurance and such other insurances as are considered market practice (all in industry-standard coverage amounts) for the operation of the Vehicle and/or business insurance to cover any anticipated risks, damages and losses related to the operation of a taxi/passenger delivery, driving service or transportation services (including the Driving Service). The Partner shall upon first request of Uber provide Uber with a copy of the insurance certificates;
   (vi) the Vehicle is kept in a clean condition at all times, such Vehicle is in good operating condition and meets the industry safety standards for a Vehicle of its kind;

 UBER

(vii) the Driver and the Vehicle comply at all times with the quality standards set by Uber, which quality standards have been made available or upon request can be made available to Partner and/or the Driver.

6.2     Disclaimer
6.2.1   Uber provides, and the Partner and Driver accept, the Service, the Device and Driver App on an "as is" and "as available" basis. Uber does not warrant or guarantee that the Partner, the Driver or the Customer's access to or use of the Service, the Website, the Device, the App or the Driver App will be uninterrupted or error free.

6.3     Partner/ Driver indemnifications
6.3.1   The Partner agrees and undertakes and procures that the Driver will indemnify, defend and hold Uber (and its Affiliated Companies and employees and, at the request of Uber, Uber's licensors, suppliers, officers, directors and subcontractors) harmless from and against any and all claims, demands, expenses (including legal fees), damages, penalties, fines, social contributions and taxes by a third party (including Customers, regulators and governmental authorities) directly or indirectly related to this Agreement, except where such claims relate to a culpable breach of Uber's obligations under this Agreement.

6.3.2.  The Parties expressly agree that this Agreement cannot be regarded as an employment agreement or employment relationship and that Uber is an agent of the Partner or the Driver, exclusively providing an intermediary service to the Partner in return for a Commission.

6.3.3.  In all other cases than Clause 6.3.2, Uber is entitled to withhold employer taxes and social security premiums on all payments to be made to the Partner. In that case, all past, present and future payments to the Partner pursuant to this Agreement shall be regarded as gross salary payments subject to employer taxes and social security premiums. The Partner shall indemnify and hold Uber harmless for all taxes and contributions in that respect, plus interest, penalties and costs, payable within 14 days after of a written request to that extent by Uber.

7.      LIABILITY
7.1     Uber is not responsible for, and excludes any and all liability for any type of damages, losses (including direct, indirect, consequential, punitive, special damages or losses, etc), claims, demands, expenses (including legal fees), damages, penalties and fines (including third party) directly or indirectly related to the Partner Agreement, including for: (i) the Device, the App, the Driver App, the Service and the Data, (ii) the Service, the Ride and the Vehicle, (iii) any damages or dangers associated with the execution of the Partner Agreement, (iv) acts or omissions of the Customer (including payment), (v) the content and consequences of (the publication or distribution of) any comments, ratings or reviews about the Partner or the Driver and (vi) the termination of the Partner Agreement for any reason whatsoever.

7.2     If the disclaimer of liability by Uber as set out in Clause 7.1 shall, for some reason, not have any effect, the maximum aggregate liability of Uber vis-a-vis the Partner and its Drivers collectively, is limited to 50% of the total amount of the Commission paid to Uber by the Partner in the year (12 months) preceding the event that led to the liability.

7.3     All defenses (including limitations and exclusions of liability) in favour of Uber apply (i) regardless of the ground upon which a liability is based (whether default, tort or otherwise), (ii) irrespective of the type of breach of obligations (guarantees, contractual obligations or otherwise), (iii) for all events and all agreements together, (iv) insofar no event of willful misconduct or gross negligence of Uber or its management has occurred, and (v) also for the benefit of its Affiliated Companies and employees and, at the request of Uber, Uber's licensors, suppliers and subcontractors.

8.      TERM, TERMINATION AND SUSPENSION



8.1     This Partner Agreement shall commence on the date specified in the PRF, for an indefinite period of time, unless terminated by either Party by written notice with due observance of a notice period of seven (7) calendar days. The Partner Agreement terminates automatically, without any notice requirement, at such moment when the Partner and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle.

8.2     Each Party may terminate the Partner Agreement or suspend the Partner Agreement in respect of the other Party, with immediate effect and without a notice of default being required in case of:
        (a) a material breach by the other Party of any term of the Partner Agreement (e.g. breach of representations, insolvency or receipt of a significant number of Customer complaints); or
        (b) (filing or submission of request for) bankruptcy or suspension of payment (or similar action or event) in respect of the other Party.

8.3     Upon termination of the Partner Agreement, the Partner and/ or the Driver shall promptly return all Data provided to either of them by Uber without withholding a copy thereof.

## 9.     CONFIDENTIALITY

9.1     Parties understand and agree that in the performance of this Partner Agreement, each Party may have access to or may be exposed to, directly or indirectly, confidential information of the other Party (the **"Confidential Information"**). Confidential Information includes Data, transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information that either a disclosing Party designates as being private or confidential or of which a receiving Party should reasonably know that it should be treated as private and confidential.

9.2     Each Party agrees that: (a) all Confidential Information shall remain the exclusive property of the disclosing Party and receiving Party shall not use any Confidential Information for any purpose except in furtherance of this Agreement; (b) it shall maintain, and shall use prudent methods to cause its employees, officers, representatives, contracting parties and agents (the **"Permitted Persons"**) to maintain, the confidentiality and secrecy of the Confidential Information; (c) it shall disclose Confidential Information only to those Permitted Persons who need to know such information in furtherance of this Partner Agreement; (d) it shall not, and shall use prudent methods to ensure that the Permitted Persons do not, copy, publish, disclose to others or use (other than pursuant to the terms hereof) the Confidential Information; and (e) it shall return or destroy all ((hard and soft) copies of) Confidential Information upon written request of the other Party.

9.3     Notwithstanding the foregoing, (a) Confidential Information shall not include any information to the extent it (i) is or becomes part of the public domain through no act or omission on the part of the receiving Party, (ii) was possessed by the receiving Party prior to the date of this Partner Agreement, (iii) is disclosed to the receiving Party by a third party having no obligation of confidentiality with respect thereto, or (iv) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, and (b) nothing in this Agreement shall prevent, limit or restrict a Party from disclosing this Partner Agreement (including the any technical, operational, performance and financial data (but excluding any Customer Data)) in confidence to an Affiliated Company.

9.4     For the purpose of rendering the Service, the Partner explicitly agrees and acknowledges, and procures that the Driver agrees and acknowledges, that the Driver who is available for the Driving Service or performing the Driving Service shall be monitored and traced through the Driver App via GPS tracking. The Device and the relevant details of the Driver and the Ride and the position of the Driver shall be disclosed to the Customer on the App. The Data relating to the Ride are monitored and retained by Uber for complaints by Customers or Drivers, as well as for analytical-, marketing- and commercial purposes of Uber.



## 10. MISCELLANEOUS

10.1 If any provision of this Agreement is or becomes invalid or non-binding, the Parties shall remain bound by all other provisions hereof. In that event, the Parties shall replace the invalid or non-binding provision by provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

10.2 Neither Party shall be entitled to assign, transfer, encumber any of its rights and/or the obligations under this Agreement without the prior written consent of the other Party, provided that Uber may assign, transfer, encumber any of its rights and/or the obligations under this Agreement (in whole or in part or from time to time) to an Affiliated Company without the prior written consent of the Partner or the Driver.

10.3 This Agreement (including the schedules, annexes and appendixes, which form an integral part of this Agreement) constitutes the entire agreement and understanding of the Parties with respect to its subject matter and replaces and supersedes all prior agreements, arrangements, ((non) binding) offers, undertakings or statements regarding such subject matter.

10.4 The original English version of these Partner Terms may have been translated into other languages. The translated version of the English Partner Terms is a courtesy and office translation only and the Partner and/or the Driver cannot derive any rights from the translated version. In the event of a dispute about the contents or interpretation of these terms and conditions of this Partner Agreement or in the event of a conflict, ambiguity, inconsistency or discrepancy between the English version and any other language version of these Partner Terms, the English language version shall prevail, apply and be binding and conclusive. The English version shall be used in legal proceedings. The English version shall be sent to you upon written request.

## 11. GOVERNING LAW AND JURISDICTION

Save as set out otherwise in this Agreement, this Agreement shall be exclusively governed by and construed in accordance with the laws of the Netherlands, excluding its rules on conflicts of laws. The Vienna Convention on the International Sale of Goods of 1980 (CISG) shall not apply. Any dispute, conflict or controversy, howsoever arising out of or broadly in connection with or relating to this Partner Agreement, including but not limited to those relating to its validity, its construction or its enforceability, shall be first mandatorily submitted to settlement proceedings under the International Chamber of Commerce Amicable Dispute Resolution Rules (ICC ADR Rules). If the said dispute has not been settled within 60 days after a request for Amicable Dispute Resolution has been submitted under the said ICC ADR Rules, such dispute shall be exclusively and finally resolved by arbitration under the Rules of Arbitration of the International Chamber of Commerce (ICC Arbitration Rules). The ICC Rules' Emergency Arbitrator provisions are excluded. The dispute shall be resolved by one arbitrator to be appointed in accordance with the ICC Rules. The place of arbitration shall be Amsterdam, The Netherlands. The language of the arbitration shall be English.

# Attachment 6 – Declaration M.J. Drop

(Brussels I*bis* Regulation)

# I

*(Legislative acts)*

# REGULATIONS

**REGULATION (EU) No 1215/2012 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL**

**of 12 December 2012**

**on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters**

**(recast)**

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 67(4) and points (a), (c) and (e) of Article 81(2) thereof,

Having regard to the proposal from the European Commission,

After transmission of the draft legislative act to the national parliaments,

Having regard to the opinion of the European Economic and Social Committee [1],

Acting in accordance with the ordinary legislative procedure [2],

Whereas:

(1) On 21 April 2009, the Commission adopted a report on the application of Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters [3]. The report concluded that, in general, the operation of that Regulation is satisfactory, but that it is desirable to improve the application of certain of its provisions, to further facilitate the free circulation of judgments and to further enhance access to justice. Since a number of amendments are to be made to that Regulation it should, in the interests of clarity, be recast.

(2) At its meeting in Brussels on 10 and 11 December 2009, the European Council adopted a new multiannual programme entitled 'The Stockholm Programme – an open and secure Europe serving and protecting citizens' [4]. In the Stockholm Programme the European Council considered that the process of abolishing all intermediate measures (the exequatur) should be continued during the period covered by that Programme. At the same time the abolition of the exequatur should also be accompanied by a series of safeguards.

(3) The Union has set itself the objective of maintaining and developing an area of freedom, security and justice, inter alia, by facilitating access to justice, in particular through the principle of mutual recognition of judicial and extra-judicial decisions in civil matters. For the gradual establishment of such an area, the Union is to adopt measures relating to judicial cooperation in civil matters having cross-border implications, particularly when necessary for the proper functioning of the internal market.

(4) Certain differences between national rules governing jurisdiction and recognition of judgments hamper the sound operation of the internal market. Provisions to unify the rules of conflict of jurisdiction in civil and commercial matters, and to ensure rapid and simple recognition and enforcement of judgments given in a Member State, are essential.

(5) Such provisions fall within the area of judicial cooperation in civil matters within the meaning of Article 81 of the Treaty on the Functioning of the European Union (TFEU).

---

[1] OJ C 218, 23.7.2011, p. 78.

[2] Position of the European Parliament of 20 November 2012 (not yet published in the Official Journal) and decision of the Council of 6 December 2012.

[3] OJ L 12, 16.1.2001, p. 1.

[4] OJ C 115, 4.5.2010, p. 1.

L 351/2    EN    Official Journal of the European Union    20.12.2012

(6) In order to attain the objective of free circulation of judgments in civil and commercial matters, it is necessary and appropriate that the rules governing jurisdiction and the recognition and enforcement of judgments are governed by a legal instrument of the Union which is binding and directly applicable.

(7) On 27 September 1968, the then Member States of the European Communities, acting under Article 220, fourth indent, of the Treaty establishing the European Economic Community, concluded the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, subsequently amended by conventions on the accession to that Convention of new Member States ([1]) ('the 1968 Brussels Convention'). On 16 September 1988, the then Member States of the European Communities and certain EFTA States concluded the Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters ([2]) ('the 1988 Lugano Convention'), which is a parallel convention to the 1968 Brussels Convention. The 1988 Lugano Convention became applicable to Poland on 1 February 2000.

(8) On 22 December 2000, the Council adopted Regulation (EC) No 44/2001, which replaces the 1968 Brussels Convention with regard to the territories of the Member States covered by the TFEU, as between the Member States except Denmark. By Council Decision 2006/325/EC ([3]), the Community concluded an agreement with Denmark ensuring the application of the provisions of Regulation (EC) No 44/2001 in Denmark. The 1988 Lugano Convention was revised by the Convention on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters ([4]), signed at Lugano on 30 October 2007 by the Community, Denmark, Iceland, Norway and Switzerland ('the 2007 Lugano Convention').

(9) The 1968 Brussels Convention continues to apply to the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 355 of the TFEU.

(10) The scope of this Regulation should cover all the main civil and commercial matters apart from certain well-defined matters, in particular maintenance obligations, which should be excluded from the scope of this Regulation following the adoption of Council Regulation (EC)

No 4/2009 of 18 December 2008 on jurisdiction, applicable law, recognition and enforcement of decisions and cooperation in matters relating to maintenance obligations ([5]).

(11) For the purposes of this Regulation, courts or tribunals of the Member States should include courts or tribunals common to several Member States, such as the Benelux Court of Justice when it exercises jurisdiction on matters falling within the scope of this Regulation. Therefore, judgments given by such courts should be recognised and enforced in accordance with this Regulation.

(12) This Regulation should not apply to arbitration. Nothing in this Regulation should prevent the courts of a Member State, when seised of an action in a matter in respect of which the parties have entered into an arbitration agreement, from referring the parties to arbitration, from staying or dismissing the proceedings, or from examining whether the arbitration agreement is null and void, inoperative or incapable of being performed, in accordance with their national law.

A ruling given by a court of a Member State as to whether or not an arbitration agreement is null and void, inoperative or incapable of being performed should not be subject to the rules of recognition and enforcement laid down in this Regulation, regardless of whether the court decided on this as a principal issue or as an incidental question.

On the other hand, where a court of a Member State, exercising jurisdiction under this Regulation or under national law, has determined that an arbitration agreement is null and void, inoperative or incapable of being performed, this should not preclude that court's judgment on the substance of the matter from being recognised or, as the case may be, enforced in accordance with this Regulation. This should be without prejudice to the competence of the courts of the Member States to decide on the recognition and enforcement of arbitral awards in accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York on 10 June 1958 ('the 1958 New York Convention'), which takes precedence over this Regulation.

This Regulation should not apply to any action or ancillary proceedings relating to, in particular, the establishment of an arbitral tribunal, the powers of arbitrators, the conduct of an arbitration procedure or any other aspects of such a procedure, nor to any action or judgment concerning the annulment, review, appeal, recognition or enforcement of an arbitral award.

([1]) OJ L 299, 31.12.1972, p. 32, OJ L 304, 30.10.1978, p. 1, OJ L 388, 31.12.1982, p. 1, OJ L 285, 3.10.1989, p. 1, OJ C 15, 15.1.1997, p. 1. For a consolidated text, see OJ C 27, 26.1.1998, p. 1.
([2]) OJ L 319, 25.11.1988, p. 9.
([3]) OJ L 120, 5.5.2006, p. 22.
([4]) OJ L 147, 10.6.2009, p. 5.

([5]) OJ L 7, 10.1.2009, p. 1.

(13)   There must be a connection between proceedings to which this Regulation applies and the territory of the Member States. Accordingly, common rules of jurisdiction should, in principle, apply when the defendant is domiciled in a Member State.

(14)   A defendant not domiciled in a Member State should in general be subject to the national rules of jurisdiction applicable in the territory of the Member State of the court seised.

However, in order to ensure the protection of consumers and employees, to safeguard the jurisdiction of the courts of the Member States in situations where they have exclusive jurisdiction and to respect the autonomy of the parties, certain rules of jurisdiction in this Regulation should apply regardless of the defendant's domicile.

(15)   The rules of jurisdiction should be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile. Jurisdiction should always be available on this ground save in a few well-defined situations in which the subject-matter of the dispute or the autonomy of the parties warrants a different connecting factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

(16)   In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close connection between the court and the action or in order to facilitate the sound administration of justice. The existence of a close connection should ensure legal certainty and avoid the possibility of the defendant being sued in a court of a Member State which he could not reasonably have foreseen. This is important, particularly in disputes concerning non-contractual obligations arising out of violations of privacy and rights relating to personality, including defamation.

(17)   The owner of a cultural object as defined in Article 1(1) of Council Directive 93/7/EEC of 15 March 1993 on the return of cultural objects unlawfully removed from the territory of a Member State ([1]) should be able under this Regulation to initiate proceedings as regards a civil claim for the recovery, based on ownership, of such a cultural object in the courts for the place where the cultural object is situated at the time the court is seised. Such proceedings should be without prejudice to proceedings initiated under Directive 93/7/EEC.

(18)   In relation to insurance, consumer and employment contracts, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules.

(19)   The autonomy of the parties to a contract, other than an insurance, consumer or employment contract, where only limited autonomy to determine the courts having jurisdiction is allowed, should be respected subject to the exclusive grounds of jurisdiction laid down in this Regulation.

(20)   Where a question arises as to whether a choice-of-court agreement in favour of a court or the courts of a Member State is null and void as to its substantive validity, that question should be decided in accordance with the law of the Member State of the court or courts designated in the agreement, including the conflict-of-laws rules of that Member State.

(21)   In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in different Member States. There should be a clear and effective mechanism for resolving cases of *lis pendens* and related actions, and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation, that time should be defined autonomously.

(22)   However, in order to enhance the effectiveness of exclusive choice-of-court agreements and to avoid abusive litigation tactics, it is necessary to provide for an exception to the general *lis pendens* rule in order to deal satisfactorily with a particular situation in which concurrent proceedings may arise. This is the situation where a court not designated in an exclusive choice-of-court agreement has been seised of proceedings and the designated court is seised subsequently of proceedings involving the same cause of action and between the same parties. In such a case, the court first seised should be required to stay its proceedings as soon as the designated court has been seised and until such time as the latter court declares that it has no jurisdiction under the exclusive choice-of-court agreement. This is to ensure that, in such a situation, the designated court has priority to decide on the validity of the agreement and on the extent to which the agreement applies to the dispute pending before it. The designated court should be able to proceed irrespective of whether the non-designated court has already decided on the stay of proceedings.

([1]) OJ L 74, 27.3.1993, p. 74.

This exception should not cover situations where the parties have entered into conflicting exclusive choice-of-court agreements or where a court designated in an exclusive choice-of-court agreement has been seised first. In such cases, the general *lis pendens* rule of this Regulation should apply.

(23) This Regulation should provide for a flexible mechanism allowing the courts of the Member States to take into account proceedings pending before the courts of third States, considering in particular whether a judgment of a third State will be capable of recognition and enforcement in the Member State concerned under the law of that Member State and the proper administration of justice.

(24) When taking into account the proper administration of justice, the court of the Member State concerned should assess all the circumstances of the case before it. Such circumstances may include connections between the facts of the case and the parties and the third State concerned, the stage to which the proceedings in the third State have progressed by the time proceedings are initiated in the court of the Member State and whether or not the court of the third State can be expected to give a judgment within a reasonable time.

That assessment may also include consideration of the question whether the court of the third State has exclusive jurisdiction in the particular case in circumstances where a court of a Member State would have exclusive jurisdiction.

(25) The notion of provisional, including protective, measures should include, for example, protective orders aimed at obtaining information or preserving evidence as referred to in Articles 6 and 7 of Directive 2004/48/EC of the European Parliament and of the Council of 29 April 2004 on the enforcement of intellectual property rights (¹). It should not include measures which are not of a protective nature, such as measures ordering the hearing of a witness. This should be without prejudice to the application of Council Regulation (EC) No 1206/2001 of 28 May 2001 on cooperation between the courts of the Member States in the taking of evidence in civil or commercial matters (²).

(26) Mutual trust in the administration of justice in the Union justifies the principle that judgments given in a Member State should be recognised in all Member States without

the need for any special procedure. In addition, the aim of making cross-border litigation less time-consuming and costly justifies the abolition of the declaration of enforceability prior to enforcement in the Member State addressed. As a result, a judgment given by the courts of a Member State should be treated as if it had been given in the Member State addressed.

(27) For the purposes of the free circulation of judgments, a judgment given in a Member State should be recognised and enforced in another Member State even if it is given against a person not domiciled in a Member State.

(28) Where a judgment contains a measure or order which is not known in the law of the Member State addressed, that measure or order, including any right indicated therein, should, to the extent possible, be adapted to one which, under the law of that Member State, has equivalent effects attached to it and pursues similar aims. How, and by whom, the adaptation is to be carried out should be determined by each Member State.

(29) The direct enforcement in the Member State addressed of a judgment given in another Member State without a declaration of enforceability should not jeopardise respect for the rights of the defence. Therefore, the person against whom enforcement is sought should be able to apply for refusal of the recognition or enforcement of a judgment if he considers one of the grounds for refusal of recognition to be present. This should include the ground that he had not had the opportunity to arrange for his defence where the judgment was given in default of appearance in a civil action linked to criminal proceedings. It should also include the grounds which could be invoked on the basis of an agreement between the Member State addressed and a third State concluded pursuant to Article 59 of the 1968 Brussels Convention.

(30) A party challenging the enforcement of a judgment given in another Member State should, to the extent possible and in accordance with the legal system of the Member State addressed, be able to invoke, in the same procedure, in addition to the grounds for refusal provided for in this Regulation, the grounds for refusal available under national law and within the time-limits laid down in that law.

The recognition of a judgment should, however, be refused only if one or more of the grounds for refusal provided for in this Regulation are present.

(¹) OJ L 157, 30.4.2004, p. 45.
(²) OJ L 174, 27.6.2001, p. 1.

(31) Pending a challenge to the enforcement of a judgment, it should be possible for the courts in the Member State addressed, during the entire proceedings relating to such a challenge, including any appeal, to allow the enforcement to proceed subject to a limitation of the enforcement or to the provision of security.

(32) In order to inform the person against whom enforcement is sought of the enforcement of a judgment given in another Member State, the certificate established under this Regulation, if necessary accompanied by the judgment, should be served on that person in reasonable time before the first enforcement measure. In this context, the first enforcement measure should mean the first enforcement measure after such service.

(33) Where provisional, including protective, measures are ordered by a court having jurisdiction as to the substance of the matter, their free circulation should be ensured under this Regulation. However, provisional, including protective, measures which were ordered by such a court without the defendant being summoned to appear should not be recognised and enforced under this Regulation unless the judgment containing the measure is served on the defendant prior to enforcement. This should not preclude the recognition and enforcement of such measures under national law. Where provisional, including protective, measures are ordered by a court of a Member State not having jurisdiction as to the substance of the matter, the effect of such measures should be confined, under this Regulation, to the territory of that Member State.

(34) Continuity between the 1968 Brussels Convention, Regulation (EC) No 44/2001 and this Regulation should be ensured, and transitional provisions should be laid down to that end. The same need for continuity applies as regards the interpretation by the Court of Justice of the European Union of the 1968 Brussels Convention and of the Regulations replacing it.

(35) Respect for international commitments entered into by the Member States means that this Regulation should not affect conventions relating to specific matters to which the Member States are parties.

(36) Without prejudice to the obligations of the Member States under the Treaties, this Regulation should not affect the application of bilateral conventions and agreements between a third State and a Member State concluded before the date of entry into force of Regulation (EC) No 44/2001 which concern matters governed by this Regulation.

(37) In order to ensure that the certificates to be used in connection with the recognition or enforcement of judgments, authentic instruments and court settlements under this Regulation are kept up-to-date, the power to adopt acts in accordance with Article 290 of the TFEU should be delegated to the Commission in respect of amendments to Annexes I and II to this Regulation. It is of particular importance that the Commission carry out appropriate consultations during its preparatory work, including at expert level. The Commission, when preparing and drawing up delegated acts, should ensure a simultaneous, timely and appropriate transmission of relevant documents to the European Parliament and to the Council.

(38) This Regulation respects fundamental rights and observes the principles recognised in the Charter of Fundamental Rights of the European Union, in particular the right to an effective remedy and to a fair trial guaranteed in Article 47 of the Charter.

(39) Since the objective of this Regulation cannot be sufficiently achieved by the Member States and can be better achieved at Union level, the Union may adopt measures in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty on European Union (TEU). In accordance with the principle of proportionality, as set out in that Article, this Regulation does not go beyond what is necessary in order to achieve that objective.

(40) The United Kingdom and Ireland, in accordance with Article 3 of the Protocol on the position of the United Kingdom and Ireland, annexed to the TEU and to the then Treaty establishing the European Community, took part in the adoption and application of Regulation (EC) No 44/2001. In accordance with Article 3 of Protocol No 21 on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, annexed to the TEU and to the TFEU, the United Kingdom and Ireland have notified their wish to take part in the adoption and application of this Regulation.

(41) In accordance with Articles 1 and 2 of Protocol No 22 on the position of Denmark annexed to the TEU and to the TFEU, Denmark is not taking part in the adoption of this Regulation and is not bound by it or subject to its application, without prejudice to the possibility for Denmark of applying the amendments to Regulation (EC) No 44/2001 pursuant to Article 3 of the Agreement of 19 October 2005 between the European Community and the Kingdom of Denmark on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (¹),

_____
(¹) OJ L 299, 16.11.2005, p. 62.

HAVE ADOPTED THIS REGULATION:

## CHAPTER I

### SCOPE AND DEFINITIONS

#### Article 1

1. This Regulation shall apply in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters or to the liability of the State for acts and omissions in the exercise of State authority (*acta iure imperii*).

2. This Regulation shall not apply to:

(a) the status or legal capacity of natural persons, rights in property arising out of a matrimonial relationship or out of a relationship deemed by the law applicable to such relationship to have comparable effects to marriage;

(b) bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings;

(c) social security;

(d) arbitration;

(e) maintenance obligations arising from a family relationship, parentage, marriage or affinity;

(f) wills and succession, including maintenance obligations arising by reason of death.

#### Article 2

For the purposes of this Regulation:

(a) 'judgment' means any judgment given by a court or tribunal of a Member State, whatever the judgment may be called, including a decree, order, decision or writ of execution, as well as a decision on the determination of costs or expenses by an officer of the court.

For the purposes of Chapter III, 'judgment' includes provisional, including protective, measures ordered by a court or tribunal which by virtue of this Regulation has jurisdiction as to the substance of the matter. It does not include a provisional, including protective, measure which is ordered by such a court or tribunal without the defendant being summoned to appear, unless the judgment containing the measure is served on the defendant prior to enforcement;

(b) 'court settlement' means a settlement which has been approved by a court of a Member State or concluded before a court of a Member State in the course of proceedings;

(c) 'authentic instrument' means a document which has been formally drawn up or registered as an authentic instrument in the Member State of origin and the authenticity of which:

(i) relates to the signature and the content of the instrument; and

(ii) has been established by a public authority or other authority empowered for that purpose;

(d) 'Member State of origin' means the Member State in which, as the case may be, the judgment has been given, the court settlement has been approved or concluded, or the authentic instrument has been formally drawn up or registered;

(e) 'Member State addressed' means the Member State in which the recognition of the judgment is invoked or in which the enforcement of the judgment, the court settlement or the authentic instrument is sought;

(f) 'court of origin' means the court which has given the judgment the recognition of which is invoked or the enforcement of which is sought.

#### Article 3

For the purposes of this Regulation, 'court' includes the following authorities to the extent that they have jurisdiction in matters falling within the scope of this Regulation:

(a) in Hungary, in summary proceedings concerning orders to pay (fizetési meghagyásos eljárás), the notary (közjegyző);

(b) in Sweden, in summary proceedings concerning orders to pay (betalningsföreläggande) and assistance (handräckning), the Enforcement Authority (Kronofogdemyndigheten).

CHAPTER II

**JURISDICTION**

SECTION 1

*General provisions*

*Article 4*

1.    Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.

2.    Persons who are not nationals of the Member State in which they are domiciled shall be governed by the rules of jurisdiction applicable to nationals of that Member State.

*Article 5*

1.    Persons domiciled in a Member State may be sued in the courts of another Member State only by virtue of the rules set out in Sections 2 to 7 of this Chapter.

2.    In particular, the rules of national jurisdiction of which the Member States are to notify the Commission pursuant to point (a) of Article 76(1) shall not be applicable as against the persons referred to in paragraph 1.

*Article 6*

1.    If the defendant is not domiciled in a Member State, the jurisdiction of the courts of each Member State shall, subject to Article 18(1), Article 21(2) and Articles 24 and 25, be determined by the law of that Member State.

2.    As against such a defendant, any person domiciled in a Member State may, whatever his nationality, avail himself in that Member State of the rules of jurisdiction there in force, and in particular those of which the Member States are to notify the Commission pursuant to point (a) of Article 76(1), in the same way as nationals of that Member State.

SECTION 2

*Special jurisdiction*

*Article 7*

A person domiciled in a Member State may be sued in another Member State:

(1) (a) in matters relating to a contract, in the courts for the place of performance of the obligation in question;

   (b) for the purpose of this provision and unless otherwise agreed, the place of performance of the obligation in question shall be:

— in the case of the sale of goods, the place in a Member State where, under the contract, the goods were delivered or should have been delivered,

— in the case of the provision of services, the place in a Member State where, under the contract, the services were provided or should have been provided;

   (c) if point (b) does not apply then point (a) applies;

(2) in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur;

(3) as regards a civil claim for damages or restitution which is based on an act giving rise to criminal proceedings, in the court seised of those proceedings, to the extent that that court has jurisdiction under its own law to entertain civil proceedings;

(4) as regards a civil claim for the recovery, based on ownership, of a cultural object as defined in point 1 of Article 1 of Directive 93/7/EEC initiated by the person claiming the right to recover such an object, in the courts for the place where the cultural object is situated at the time when the court is seised;

(5) as regards a dispute arising out of the operations of a branch, agency or other establishment, in the courts for the place where the branch, agency or other establishment is situated;

(6) as regards a dispute brought against a settlor, trustee or beneficiary of a trust created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, in the courts of the Member State in which the trust is domiciled;

(7) as regards a dispute concerning the payment of remuneration claimed in respect of the salvage of a cargo or freight, in the court under the authority of which the cargo or freight in question:

   (a) has been arrested to secure such payment; or

   (b) could have been so arrested, but bail or other security has been given;

provided that this provision shall apply only if it is claimed that the defendant has an interest in the cargo or freight or had such an interest at the time of salvage.

EN

## Article 8

A person domiciled in a Member State may also be sued:

(1) where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

(2) as a third party in an action on a warranty or guarantee or in any other third-party proceedings, in the court seised of the original proceedings, unless these were instituted solely with the object of removing him from the jurisdiction of the court which would be competent in his case;

(3) on a counter-claim arising from the same contract or facts on which the original claim was based, in the court in which the original claim is pending;

(4) in matters relating to a contract, if the action may be combined with an action against the same defendant in matters relating to rights *in rem* in immovable property, in the court of the Member State in which the property is situated.

## Article 9

Where by virtue of this Regulation a court of a Member State has jurisdiction in actions relating to liability arising from the use or operation of a ship, that court, or any other court substituted for this purpose by the internal law of that Member State, shall also have jurisdiction over claims for limitation of such liability.

### SECTION 3

### Jurisdiction in matters relating to insurance

## Article 10

In matters relating to insurance, jurisdiction shall be determined by this Section, without prejudice to Article 6 and point 5 of Article 7.

## Article 11

1.    An insurer domiciled in a Member State may be sued:

(a) in the courts of the Member State in which he is domiciled;

(b) in another Member State, in the case of actions brought by the policyholder, the insured or a beneficiary, in the courts for the place where the claimant is domiciled; or

(c) if he is a co-insurer, in the courts of a Member State in which proceedings are brought against the leading insurer.

2.    An insurer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

## Article 12

In respect of liability insurance or insurance of immovable property, the insurer may in addition be sued in the courts for the place where the harmful event occurred. The same applies if movable and immovable property are covered by the same insurance policy and both are adversely affected by the same contingency.

## Article 13

1.    In respect of liability insurance, the insurer may also, if the law of the court permits it, be joined in proceedings which the injured party has brought against the insured.

2.    Articles 10, 11 and 12 shall apply to actions brought by the injured party directly against the insurer, where such direct actions are permitted.

3.    If the law governing such direct actions provides that the policyholder or the insured may be joined as a party to the action, the same court shall have jurisdiction over them.

## Article 14

1.    Without prejudice to Article 13(3), an insurer may bring proceedings only in the courts of the Member State in which the defendant is domiciled, irrespective of whether he is the policyholder, the insured or a beneficiary.

2.    The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

## Article 15

The provisions of this Section may be departed from only by an agreement:

(1) which is entered into after the dispute has arisen;

(2) which allows the policyholder, the insured or a beneficiary to bring proceedings in courts other than those indicated in this Section;

(3) which is concluded between a policyholder and an insurer, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which has the effect of conferring jurisdiction on the courts of that Member State even if the harmful event were to occur abroad, provided that such an agreement is not contrary to the law of that Member State;

(4) which is concluded with a policyholder who is not domiciled in a Member State, except in so far as the insurance is compulsory or relates to immovable property in a Member State; or

(5) which relates to a contract of insurance in so far as it covers one or more of the risks set out in Article 16.

### Article 16

The following are the risks referred to in point 5 of Article 15:

(1) any loss of or damage to:

    (a) seagoing ships, installations situated offshore or on the high seas, or aircraft, arising from perils which relate to their use for commercial purposes;

    (b) goods in transit other than passengers' baggage where the transit consists of or includes carriage by such ships or aircraft;

(2) any liability, other than for bodily injury to passengers or loss of or damage to their baggage:

    (a) arising out of the use or operation of ships, installations or aircraft as referred to in point 1(a) in so far as, in respect of the latter, the law of the Member State in which such aircraft are registered does not prohibit agreements on jurisdiction regarding insurance of such risks;

    (b) for loss or damage caused by goods in transit as described in point 1(b);

(3) any financial loss connected with the use or operation of ships, installations or aircraft as referred to in point 1(a), in particular loss of freight or charter-hire;

(4) any risk or interest connected with any of those referred to in points 1 to 3;

(5) notwithstanding points 1 to 4, all 'large risks' as defined in Directive 2009/138/EC of the European Parliament and of the Council of 25 November 2009 on the taking-up and pursuit of the business of Insurance and Reinsurance (Solvency II) ($^1$).

_____
($^1$) OJ L 335, 17.12.2009, p. 1.

## SECTION 4

### Jurisdiction over consumer contracts

### Article 17

1. In matters relating to a contract concluded by a person, the consumer, for a purpose which can be regarded as being outside his trade or profession, jurisdiction shall be determined by this Section, without prejudice to Article 6 and point 5 of Article 7, if:

(a) it is a contract for the sale of goods on instalment credit terms;

(b) it is a contract for a loan repayable by instalments, or for any other form of credit, made to finance the sale of goods; or

(c) in all other cases, the contract has been concluded with a person who pursues commercial or professional activities in the Member State of the consumer's domicile or, by any means, directs such activities to that Member State or to several States including that Member State, and the contract falls within the scope of such activities.

2. Where a consumer enters into a contract with a party who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, that party shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

3. This Section shall not apply to a contract of transport other than a contract which, for an inclusive price, provides for a combination of travel and accommodation.

### Article 18

1. A consumer may bring proceedings against the other party to a contract either in the courts of the Member State in which that party is domiciled or, regardless of the domicile of the other party, in the courts for the place where the consumer is domiciled.

2. Proceedings may be brought against a consumer by the other party to the contract only in the courts of the Member State in which the consumer is domiciled.

3. This Article shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

*Article 19*

The provisions of this Section may be departed from only by an agreement:

(1) which is entered into after the dispute has arisen;

(2) which allows the consumer to bring proceedings in courts other than those indicated in this Section; or

(3) which is entered into by the consumer and the other party to the contract, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which confers jurisdiction on the courts of that Member State, provided that such an agreement is not contrary to the law of that Member State.

SECTION 5

***Jurisdiction over individual contracts of employment***

*Article 20*

1.   In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 6, point 5 of Article 7 and, in the case of proceedings brought against an employer, point 1 of Article 8.

2.   Where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

*Article 21*

1.   An employer domiciled in a Member State may be sued:

(a) in the courts of the Member State in which he is domiciled; or

(b) in another Member State:

   (i) in the courts for the place where or from where the employee habitually carries out his work or in the courts for the last place where he did so; or

   (ii) if the employee does not or did not habitually carry out his work in any one country, in the courts for the place where the business which engaged the employee is or was situated.

2.   An employer not domiciled in a Member State may be sued in a court of a Member State in accordance with point (b) of paragraph 1.

*Article 22*

1.   An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

2.   The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

*Article 23*

The provisions of this Section may be departed from only by an agreement:

(1) which is entered into after the dispute has arisen; or

(2) which allows the employee to bring proceedings in courts other than those indicated in this Section.

SECTION 6

***Exclusive jurisdiction***

*Article 24*

The following courts of a Member State shall have exclusive jurisdiction, regardless of the domicile of the parties:

(1) in proceedings which have as their object rights *in rem* in immovable property or tenancies of immovable property, the courts of the Member State in which the property is situated.

   However, in proceedings which have as their object tenancies of immovable property concluded for temporary private use for a maximum period of six consecutive months, the courts of the Member State in which the defendant is domiciled shall also have jurisdiction, provided that the tenant is a natural person and that the landlord and the tenant are domiciled in the same Member State;

(2) in proceedings which have as their object the validity of the constitution, the nullity or the dissolution of companies or other legal persons or associations of natural or legal persons, or the validity of the decisions of their organs, the courts of the Member State in which the company, legal person or association has its seat. In order to determine that seat, the court shall apply its rules of private international law;

(3) in proceedings which have as their object the validity of entries in public registers, the courts of the Member State in which the register is kept;

(4) in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, irrespective of whether the issue is raised by way of an action or as a defence, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of an instrument of the Union or an international convention deemed to have taken place.

Without prejudice to the jurisdiction of the European Patent Office under the Convention on the Grant of European Patents, signed at Munich on 5 October 1973, the courts of each Member State shall have exclusive jurisdiction in proceedings concerned with the registration or validity of any European patent granted for that Member State;

(5) in proceedings concerned with the enforcement of judgments, the courts of the Member State in which the judgment has been or is to be enforced.

## SECTION 7

### Prorogation of jurisdiction

### Article 25

1.    If the parties, regardless of their domicile, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction, unless the agreement is null and void as to its substantive validity under the law of that Member State. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. The agreement conferring jurisdiction shall be either:

(a) in writing or evidenced in writing;

(b) in a form which accords with practices which the parties have established between themselves; or

(c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned.

2.    Any communication by electronic means which provides a durable record of the agreement shall be equivalent to 'writing'.

3.    The court or courts of a Member State on which a trust instrument has conferred jurisdiction shall have exclusive jurisdiction in any proceedings brought against a settlor, trustee or beneficiary, if relations between those persons or their rights or obligations under the trust are involved.

4.    Agreements or provisions of a trust instrument conferring jurisdiction shall have no legal force if they are contrary to Articles 15, 19 or 23, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 24.

5.    An agreement conferring jurisdiction which forms part of a contract shall be treated as an agreement independent of the other terms of the contract.

The validity of the agreement conferring jurisdiction cannot be contested solely on the ground that the contract is not valid.

### Article 26

1.    Apart from jurisdiction derived from other provisions of this Regulation, a court of a Member State before which a defendant enters an appearance shall have jurisdiction. This rule shall not apply where appearance was entered to contest the jurisdiction, or where another court has exclusive jurisdiction by virtue of Article 24.

2.    In matters referred to in Sections 3, 4 or 5 where the policyholder, the insured, a beneficiary of the insurance contract, the injured party, the consumer or the employee is the defendant, the court shall, before assuming jurisdiction under paragraph 1, ensure that the defendant is informed of his right to contest the jurisdiction of the court and of the consequences of entering or not entering an appearance.

## SECTION 8

### Examination as to jurisdiction and admissibility

### Article 27

Where a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 24, it shall declare of its own motion that it has no jurisdiction.

### Article 28

1.    Where a defendant domiciled in one Member State is sued in a court of another Member State and does not enter an appearance, the court shall declare of its own motion that it has no jurisdiction unless its jurisdiction is derived from the provisions of this Regulation.

L  351/12          EN          Official Journal of the European Union          20.12.2012

2.    The court shall stay the proceedings so long as it is not shown that the defendant has been able to receive the document instituting the proceedings or an equivalent document in sufficient time to enable him to arrange for his defence, or that all necessary steps have been taken to this end.

3.    Article 19 of Regulation (EC) No 1393/2007 of the European Parliament and of the Council of 13 November 2007 on the service in the Member States of judicial and extra-judicial documents in civil or commercial matters (service of documents) (¹) shall apply instead of paragraph 2 of this Article if the document instituting the proceedings or an equivalent document had to be transmitted from one Member State to another pursuant to that Regulation.

4.    Where Regulation (EC) No 1393/2007 is not applicable, Article 15 of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters shall apply if the document instituting the proceedings or an equivalent document had to be transmitted abroad pursuant to that Convention.

SECTION 9

**Lis pendens — related actions**

Article 29

1.    Without prejudice to Article 31(2), where proceedings involving the same cause of action and between the same parties are brought in the courts of different Member States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established.

2.    In cases referred to in paragraph 1, upon request by a court seised of the dispute, any other court seised shall without delay inform the former court of the date when it was seised in accordance with Article 32.

3.    Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

Article 30

1.    Where related actions are pending in the courts of different Member States, any court other than the court first seised may stay its proceedings.

2.    Where the action in the court first seised is pending at first instance, any other court may also, on the application of

one of the parties, decline jurisdiction if the court first seised has jurisdiction over the actions in question and its law permits the consolidation thereof.

3.    For the purposes of this Article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

Article 31

1.    Where actions come within the exclusive jurisdiction of several courts, any court other than the court first seised shall decline jurisdiction in favour of that court.

2.    Without prejudice to Article 26, where a court of a Member State on which an agreement as referred to in Article 25 confers exclusive jurisdiction is seised, any court of another Member State shall stay the proceedings until such time as the court seised on the basis of the agreement declares that it has no jurisdiction under the agreement.

3.    Where the court designated in the agreement has established jurisdiction in accordance with the agreement, any court of another Member State shall decline jurisdiction in favour of that court.

4.    Paragraphs 2 and 3 shall not apply to matters referred to in Sections 3, 4 or 5 where the policyholder, the insured, a beneficiary of the insurance contract, the injured party, the consumer or the employee is the claimant and the agreement is not valid under a provision contained within those Sections.

Article 32

1.    For the purposes of this Section, a court shall be deemed to be seised:

(a) at the time when the document instituting the proceedings or an equivalent document is lodged with the court, provided that the claimant has not subsequently failed to take the steps he was required to take to have service effected on the defendant; or

(b) if the document has to be served before being lodged with the court, at the time when it is received by the authority responsible for service, provided that the claimant has not subsequently failed to take the steps he was required to take to have the document lodged with the court.

The authority responsible for service referred to in point (b) shall be the first authority receiving the documents to be served.

(¹) OJ L 324, 10.12.2007, p. 79.

2. The court, or the authority responsible for service, referred to in paragraph 1, shall note, respectively, the date of the lodging of the document instituting the proceedings or the equivalent document, or the date of receipt of the documents to be served.

### Article 33

1. Where jurisdiction is based on Article 4 or on Articles 7, 8 or 9 and proceedings are pending before a court of a third State at the time when a court in a Member State is seised of an action involving the same cause of action and between the same parties as the proceedings in the court of the third State, the court of the Member State may stay the proceedings if:

(a) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and

(b) the court of the Member State is satisfied that a stay is necessary for the proper administration of justice.

2. The court of the Member State may continue the proceedings at any time if:

(a) the proceedings in the court of the third State are themselves stayed or discontinued;

(b) it appears to the court of the Member State that the proceedings in the court of the third State are unlikely to be concluded within a reasonable time; or

(c) the continuation of the proceedings is required for the proper administration of justice.

3. The court of the Member State shall dismiss the proceedings if the proceedings in the court of the third State are concluded and have resulted in a judgment capable of recognition and, where applicable, of enforcement in that Member State.

4. The court of the Member State shall apply this Article on the application of one of the parties or, where possible under national law, of its own motion.

### Article 34

1. Where jurisdiction is based on Article 4 or on Articles 7, 8 or 9 and an action is pending before a court of a third State at the time when a court in a Member State is seised of an action which is related to the action in the court of the third State, the court of the Member State may stay the proceedings if:

(a) it is expedient to hear and determine the related actions together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

(b) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and

(c) the court of the Member State is satisfied that a stay is necessary for the proper administration of justice.

2. The court of the Member State may continue the proceedings at any time if:

(a) it appears to the court of the Member State that there is no longer a risk of irreconcilable judgments;

(b) the proceedings in the court of the third State are themselves stayed or discontinued;

(c) it appears to the court of the Member State that the proceedings in the court of the third State are unlikely to be concluded within a reasonable time; or

(d) the continuation of the proceedings is required for the proper administration of justice.

3. The court of the Member State may dismiss the proceedings if the proceedings in the court of the third State are concluded and have resulted in a judgment capable of recognition and, where applicable, of enforcement in that Member State.

4. The court of the Member State shall apply this Article on the application of one of the parties or, where possible under national law, of its own motion.

### SECTION 10

### Provisional, including protective, measures

### Article 35

Application may be made to the courts of a Member State for such provisional, including protective, measures as may be available under the law of that Member State, even if the courts of another Member State have jurisdiction as to the substance of the matter.

CHAPTER III

**RECOGNITION AND ENFORCEMENT**

SECTION 1

**_Recognition_**

Article 36

1.    A judgment given in a Member State shall be recognised in the other Member States without any special procedure being required.

2.    Any interested party may, in accordance with the procedure provided for in Subsection 2 of Section 3, apply for a decision that there are no grounds for refusal of recognition as referred to in Article 45.

3.    If the outcome of proceedings in a court of a Member State depends on the determination of an incidental question of refusal of recognition, that court shall have jurisdiction over that question.

Article 37

1.    A party who wishes to invoke in a Member State a judgment given in another Member State shall produce:

(a) a copy of the judgment which satisfies the conditions necessary to establish its authenticity; and

(b) the certificate issued pursuant to Article 53.

2.    The court or authority before which a judgment given in another Member State is invoked may, where necessary, require the party invoking it to provide, in accordance with Article 57, a translation or a transliteration of the contents of the certificate referred to in point (b) of paragraph 1. The court or authority may require the party to provide a translation of the judgment instead of a translation of the contents of the certificate if it is unable to proceed without such a translation.

Article 38

The court or authority before which a judgment given in another Member State is invoked may suspend the proceedings, in whole or in part, if:

(a) the judgment is challenged in the Member State of origin; or

(b) an application has been submitted for a decision that there are no grounds for refusal of recognition as referred to in Article 45 or for a decision that the recognition is to be refused on the basis of one of those grounds.

SECTION 2

**_Enforcement_**

Article 39

A judgment given in a Member State which is enforceable in that Member State shall be enforceable in the other Member States without any declaration of enforceability being required.

Article 40

An enforceable judgment shall carry with it by operation of law the power to proceed to any protective measures which exist under the law of the Member State addressed.

Article 41

1.    Subject to the provisions of this Section, the procedure for the enforcement of judgments given in another Member State shall be governed by the law of the Member State addressed. A judgment given in a Member State which is enforceable in the Member State addressed shall be enforced there under the same conditions as a judgment given in the Member State addressed.

2.    Notwithstanding paragraph 1, the grounds for refusal or of suspension of enforcement under the law of the Member State addressed shall apply in so far as they are not incompatible with the grounds referred to in Article 45.

3.    The party seeking the enforcement of a judgment given in another Member State shall not be required to have a postal address in the Member State addressed. Nor shall that party be required to have an authorised representative in the Member State addressed unless such a representative is mandatory irrespective of the nationality or the domicile of the parties.

Article 42

1.    For the purposes of enforcement in a Member State of a judgment given in another Member State, the applicant shall provide the competent enforcement authority with:

(a) a copy of the judgment which satisfies the conditions necessary to establish its authenticity; and

(b) the certificate issued pursuant to Article 53, certifying that the judgment is enforceable and containing an extract of the judgment as well as, where appropriate, relevant information on the recoverable costs of the proceedings and the calculation of interest.

2.    For the purposes of enforcement in a Member State of a judgment given in another Member State ordering a provisional, including a protective, measure, the applicant shall provide the competent enforcement authority with:

(a) a copy of the judgment which satisfies the conditions necessary to establish its authenticity;

(b) the certificate issued pursuant to Article 53, containing a description of the measure and certifying that:

  (i) the court has jurisdiction as to the substance of the matter;

  (ii) the judgment is enforceable in the Member State of origin; and

(c) where the measure was ordered without the defendant being summoned to appear, proof of service of the judgment.

3.    The competent enforcement authority may, where necessary, require the applicant to provide, in accordance with Article 57, a translation or a transliteration of the contents of the certificate.

4.    The competent enforcement authority may require the applicant to provide a translation of the judgment only if it is unable to proceed without such a translation.

### Article 43

1.    Where enforcement is sought of a judgment given in another Member State, the certificate issued pursuant to Article 53 shall be served on the person against whom the enforcement is sought prior to the first enforcement measure. The certificate shall be accompanied by the judgment, if not already served on that person.

2.    Where the person against whom enforcement is sought is domiciled in a Member State other than the Member State of origin, he may request a translation of the judgment in order to contest the enforcement if the judgment is not written in or accompanied by a translation into either of the following languages:

(a) a language which he understands; or

(b) the official language of the Member State in which he is domiciled or, where there are several official languages in that Member State, the official language or one of the official languages of the place where he is domiciled.

Where a translation of the judgment is requested under the first subparagraph, no measures of enforcement may be taken other than protective measures until that translation has been provided to the person against whom enforcement is sought.

This paragraph shall not apply if the judgment has already been served on the person against whom enforcement is sought in one of the languages referred to in the first subparagraph or is accompanied by a translation into one of those languages.

3.    This Article shall not apply to the enforcement of a protective measure in a judgment or where the person seeking enforcement proceeds to protective measures in accordance with Article 40.

### Article 44

1.    In the event of an application for refusal of enforcement of a judgment pursuant to Subsection 2 of Section 3, the court in the Member State addressed may, on the application of the person against whom enforcement is sought:

(a) limit the enforcement proceedings to protective measures;

(b) make enforcement conditional on the provision of such security as it shall determine; or

(c) suspend, either wholly or in part, the enforcement proceedings.

2.    The competent authority in the Member State addressed shall, on the application of the person against whom enforcement is sought, suspend the enforcement proceedings where the enforceability of the judgment is suspended in the Member State of origin.

### SECTION 3

### Refusal of recognition and enforcement

#### S u b s e c t i o n  1

#### R e f u s a l   o f   r e c o g n i t i o n

### Article 45

1.    On the application of any interested party, the recognition of a judgment shall be refused:

(a) if such recognition is manifestly contrary to public policy (ordre public) in the Member State addressed;

(b) where the judgment was given in default of appearance, if the defendant was not served with the document which instituted the proceedings or with an equivalent document in sufficient time and in such a way as to enable him to arrange for his defence, unless the defendant failed to commence proceedings to challenge the judgment when it was possible for him to do so;

(c) if the judgment is irreconcilable with a judgment given between the same parties in the Member State addressed;

(d) if the judgment is irreconcilable with an earlier judgment given in another Member State or in a third State involving the same cause of action and between the same parties, provided that the earlier judgment fulfils the conditions necessary for its recognition in the Member State addressed; or

(e) if the judgment conflicts with:

(i) Sections 3, 4 or 5 of Chapter II where the policyholder, the insured, a beneficiary of the insurance contract, the injured party, the consumer or the employee was the defendant; or

(ii) Section 6 of Chapter II.

2.    In its examination of the grounds of jurisdiction referred to in point (e) of paragraph 1, the court to which the application was submitted shall be bound by the findings of fact on which the court of origin based its jurisdiction.

3.    Without prejudice to point (e) of paragraph 1, the jurisdiction of the court of origin may not be reviewed. The test of public policy referred to in point (a) of paragraph 1 may not be applied to the rules relating to jurisdiction.

4.    The application for refusal of recognition shall be made in accordance with the procedures provided for in Subsection 2 and, where appropriate, Section 4.

### S u b s e c t i o n  2
### R e f u s a l  o f  e n f o r c e m e n t

#### Article 46

On the application of the person against whom enforcement is sought, the enforcement of a judgment shall be refused where one of the grounds referred to in Article 45 is found to exist.

#### Article 47

1.    The application for refusal of enforcement shall be submitted to the court which the Member State concerned has communicated to the Commission pursuant to point (a) of Article 75 as the court to which the application is to be submitted.

2.    The procedure for refusal of enforcement shall, in so far as it is not covered by this Regulation, be governed by the law of the Member State addressed.

3.    The applicant shall provide the court with a copy of the judgment and, where necessary, a translation or transliteration of it.

The court may dispense with the production of the documents referred to in the first subparagraph if it already possesses them or if it considers it unreasonable to require the applicant to provide them. In the latter case, the court may require the other party to provide those documents.

4.    The party seeking the refusal of enforcement of a judgment given in another Member State shall not be required to have a postal address in the Member State addressed. Nor shall that party be required to have an authorised representative in the Member State addressed unless such a representative is mandatory irrespective of the nationality or the domicile of the parties.

#### Article 48

The court shall decide on the application for refusal of enforcement without delay.

#### Article 49

1.    The decision on the application for refusal of enforcement may be appealed against by either party.

2.    The appeal is to be lodged with the court which the Member State concerned has communicated to the Commission pursuant to point (b) of Article 75 as the court with which such an appeal is to be lodged.

#### Article 50

The decision given on the appeal may only be contested by an appeal where the courts with which any further appeal is to be lodged have been communicated by the Member State concerned to the Commission pursuant to point (c) of Article 75.

#### Article 51

1.    The court to which an application for refusal of enforcement is submitted or the court which hears an appeal lodged under Article 49 or Article 50 may stay the proceedings if an ordinary appeal has been lodged against the judgment in the Member State of origin or if the time for such an appeal has not yet expired. In the latter case, the court may specify the time within which such an appeal is to be lodged.

2.    Where the judgment was given in Ireland, Cyprus or the United Kingdom, any form of appeal available in the Member State of origin shall be treated as an ordinary appeal for the purposes of paragraph 1.

SECTION 4

**Common provisions**

*Article 52*

Under no circumstances may a judgment given in a Member State be reviewed as to its substance in the Member State addressed.

*Article 53*

The court of origin shall, at the request of any interested party, issue the certificate using the form set out in Annex I.

*Article 54*

1.    If a judgment contains a measure or an order which is not known in the law of the Member State addressed, that measure or order shall, to the extent possible, be adapted to a measure or an order known in the law of that Member State which has equivalent effects attached to it and which pursues similar aims and interests.

Such adaptation shall not result in effects going beyond those provided for in the law of the Member State of origin.

2.    Any party may challenge the adaptation of the measure or order before a court.

3.    If necessary, the party invoking the judgment or seeking its enforcement may be required to provide a translation or a transliteration of the judgment.

*Article 55*

A judgment given in a Member State which orders a payment by way of a penalty shall be enforceable in the Member State addressed only if the amount of the payment has been finally determined by the court of origin.

*Article 56*

No security, bond or deposit, however described, shall be required of a party who in one Member State applies for the enforcement of a judgment given in another Member State on the ground that he is a foreign national or that he is not domiciled or resident in the Member State addressed.

*Article 57*

1.    When a translation or a transliteration is required under this Regulation, such translation or transliteration shall be into the official language of the Member State concerned or, where there are several official languages in that Member State, into the official language or one of the official languages of court proceedings of the place where a judgment given in another Member State is invoked or an application is made, in accordance with the law of that Member State.

2.    For the purposes of the forms referred to in Articles 53 and 60, translations or transliterations may also be into any other official language or languages of the institutions of the Union that the Member State concerned has indicated it can accept.

3.    Any translation made under this Regulation shall be done by a person qualified to do translations in one of the Member States.

CHAPTER IV

**AUTHENTIC INSTRUMENTS AND COURT SETTLEMENTS**

*Article 58*

1.    An authentic instrument which is enforceable in the Member State of origin shall be enforceable in the other Member States without any declaration of enforceability being required. Enforcement of the authentic instrument may be refused only if such enforcement is manifestly contrary to public policy (ordre public) in the Member State addressed.

The provisions of Section 2, Subsection 2 of Section 3, and Section 4 of Chapter III shall apply as appropriate to authentic instruments.

2.    The authentic instrument produced must satisfy the conditions necessary to establish its authenticity in the Member State of origin.

*Article 59*

A court settlement which is enforceable in the Member State of origin shall be enforced in the other Member States under the same conditions as authentic instruments.

*Article 60*

The competent authority or court of the Member State of origin shall, at the request of any interested party, issue the certificate using the form set out in Annex II containing a summary of the enforceable obligation recorded in the authentic instrument or of the agreement between the parties recorded in the court settlement.

CHAPTER V

**GENERAL PROVISIONS**

*Article 61*

No legalisation or other similar formality shall be required for documents issued in a Member State in the context of this Regulation.

L  351/18   EN   Official Journal of the European Union   20.12.2012

### Article 62

1.    In order to determine whether a party is domiciled in the Member State whose courts are seised of a matter, the court shall apply its internal law.

2.    If a party is not domiciled in the Member State whose courts are seised of the matter, then, in order to determine whether the party is domiciled in another Member State, the court shall apply the law of that Member State.

### Article 63

1.    For the purposes of this Regulation, a company or other legal person or association of natural or legal persons is domiciled at the place where it has its:

(a)  statutory seat;

(b)  central administration; or

(c)  principal place of business.

2.    For the purposes of Ireland, Cyprus and the United Kingdom, 'statutory seat' means the registered office or, where there is no such office anywhere, the place of incorporation or, where there is no such place anywhere, the place under the law of which the formation took place.

3.    In order to determine whether a trust is domiciled in the Member State whose courts are seised of the matter, the court shall apply its rules of private international law.

### Article 64

Without prejudice to any more favourable provisions of national laws, persons domiciled in a Member State who are being prosecuted in the criminal courts of another Member State of which they are not nationals for an offence which was not intentionally committed may be defended by persons qualified to do so, even if they do not appear in person. However, the court seised of the matter may order appearance in person; in the case of failure to appear, a judgment given in the civil action without the person concerned having had the opportunity to arrange for his defence need not be recognised or enforced in the other Member States.

### Article 65

1.    The jurisdiction specified in point 2 of Article 8 and Article 13 in actions on a warranty or guarantee or in any other third-party proceedings may be resorted to in the Member States included in the list established by the Commission pursuant to point (b) of Article 76(1) and Article 76(2) only in so far as permitted under national law. A person domiciled in another Member State may be invited to join the proceedings before the courts of those Member States pursuant to the rules on third-party notice referred to in that list.

2.    Judgments given in a Member State by virtue of point 2 of Article 8 or Article 13 shall be recognised and enforced in accordance with Chapter III in any other Member State. Any effects which judgments given in the Member States included in the list referred to in paragraph 1 may have, in accordance with the law of those Member States, on third parties by application of paragraph 1 shall be recognised in all Member States.

3.    The Member States included in the list referred to in paragraph 1 shall, within the framework of the European Judicial Network in civil and commercial matters established by Council Decision 2001/470/EC ($^1$) ('the European Judicial Network') provide information on how to determine, in accordance with their national law, the effects of the judgments referred to in the second sentence of paragraph 2.

## CHAPTER VI

### TRANSITIONAL PROVISIONS

### Article 66

1.    This Regulation shall apply only to legal proceedings instituted, to authentic instruments formally drawn up or registered and to court settlements approved or concluded on or after 10 January 2015.

2.    Notwithstanding Article 80, Regulation (EC) No 44/2001 shall continue to apply to judgments given in legal proceedings instituted, to authentic instruments formally drawn up or registered and to court settlements approved or concluded before 10 January 2015 which fall within the scope of that Regulation.

## CHAPTER VII

### RELATIONSHIP WITH OTHER INSTRUMENTS

### Article 67

This Regulation shall not prejudice the application of provisions governing jurisdiction and the recognition and enforcement of judgments in specific matters which are contained in instruments of the Union or in national legislation harmonised pursuant to such instruments.

_____
($^1$) OJ L 174, 27.6.2001, p. 25.

*Article 68*

1.    This Regulation shall, as between the Member States, supersede the 1968 Brussels Convention, except as regards the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 355 of the TFEU.

2.    In so far as this Regulation replaces the provisions of the 1968 Brussels Convention between the Member States, any reference to that Convention shall be understood as a reference to this Regulation.

*Article 69*

Subject to Articles 70 and 71, this Regulation shall, as between the Member States, supersede the conventions that cover the same matters as those to which this Regulation applies. In particular, the conventions included in the list established by the Commission pursuant to point (c) of Article 76(1) and Article 76(2) shall be superseded.

*Article 70*

1.    The conventions referred to in Article 69 shall continue to have effect in relation to matters to which this Regulation does not apply.

2.    They shall continue to have effect in respect of judgments given, authentic instruments formally drawn up or registered and court settlements approved or concluded before the date of entry into force of Regulation (EC) No 44/2001.

*Article 71*

1.    This Regulation shall not affect any conventions to which the Member States are parties and which, in relation to particular matters, govern jurisdiction or the recognition or enforcement of judgments.

2.    With a view to its uniform interpretation, paragraph 1 shall be applied in the following manner:

(a) this Regulation shall not prevent a court of a Member State which is party to a convention on a particular matter from assuming jurisdiction in accordance with that convention, even where the defendant is domiciled in another Member State which is not party to that convention. The court hearing the action shall, in any event, apply Article 28 of this Regulation;

(b) judgments given in a Member State by a court in the exercise of jurisdiction provided for in a convention on a

particular matter shall be recognised and enforced in the other Member States in accordance with this Regulation.

Where a convention on a particular matter to which both the Member State of origin and the Member State addressed are parties lays down conditions for the recognition or enforcement of judgments, those conditions shall apply. In any event, the provisions of this Regulation on recognition and enforcement of judgments may be applied.

*Article 72*

This Regulation shall not affect agreements by which Member States, prior to the entry into force of Regulation (EC) No 44/2001, undertook pursuant to Article 59 of the 1968 Brussels Convention not to recognise judgments given, in particular in other Contracting States to that Convention, against defendants domiciled or habitually resident in a third State where, in cases provided for in Article 4 of that Convention, the judgment could only be founded on a ground of jurisdiction specified in the second paragraph of Article 3 of that Convention.

*Article 73*

1.    This Regulation shall not affect the application of the 2007 Lugano Convention.

2.    This Regulation shall not affect the application of the 1958 New York Convention.

3.    This Regulation shall not affect the application of bilateral conventions and agreements between a third State and a Member State concluded before the date of entry into force of Regulation (EC) No 44/2001 which concern matters governed by this Regulation.

CHAPTER VIII

**FINAL PROVISIONS**

*Article 74*

The Member States shall provide, within the framework of the European Judicial Network and with a view to making the information available to the public, a description of national rules and procedures concerning enforcement, including authorities competent for enforcement, and information on any limitations on enforcement, in particular debtor protection rules and limitation or prescription periods.

The Member States shall keep this information permanently updated.

*Article 75*

By 10 January 2014, the Member States shall communicate to the Commission:

(a) the courts to which the application for refusal of enforcement is to be submitted pursuant to Article 47(1);

(b) the courts with which an appeal against the decision on the application for refusal of enforcement is to be lodged pursuant to Article 49(2);

(c) the courts with which any further appeal is to be lodged pursuant to Article 50; and

(d) the languages accepted for translations of the forms as referred to in Article 57(2).

The Commission shall make the information publicly available through any appropriate means, in particular through the European Judicial Network.

*Article 76*

1. The Member States shall notify the Commission of:

(a) the rules of jurisdiction referred to in Articles 5(2) and 6(2);

(b) the rules on third-party notice referred to in Article 65; and

(c) the conventions referred to in Article 69.

2. The Commission shall, on the basis of the notifications by the Member States referred to in paragraph 1, establish the corresponding lists.

3. The Member States shall notify the Commission of any subsequent amendments required to be made to those lists. The Commission shall amend those lists accordingly.

4. The Commission shall publish the lists and any subsequent amendments made to them in the *Official Journal of the European Union*.

5. The Commission shall make all information notified pursuant to paragraphs 1 and 3 publicly available through any other appropriate means, in particular through the European Judicial Network.

*Article 77*

The Commission shall be empowered to adopt delegated acts in accordance with Article 78 concerning the amendment of Annexes I and II.

*Article 78*

1. The power to adopt delegated acts is conferred on the Commission subject to the conditions laid down in this Article.

2. The power to adopt delegated acts referred to in Article 77 shall be conferred on the Commission for an indeterminate period of time from 9 January 2013.

3. The delegation of power referred to in Article 77 may be revoked at any time by the European Parliament or by the Council. A decision to revoke shall put an end to the delegation of the power specified in that decision. It shall take effect the day following the publication of the decision in the *Official Journal of the European Union* or at a later date specified therein. It shall not affect the validity of any delegated acts already in force.

4. As soon as it adopts a delegated act, the Commission shall notify it simultaneously to the European Parliament and to the Council.

5. A delegated act adopted pursuant to Article 77 shall enter into force only if no objection has been expressed either by the European Parliament or the Council within a period of two months of notification of that act to the European Parliament and the Council or if, before the expiry of that period, the European Parliament and the Council have both informed the Commission that they will not object. That period shall be extended by two months at the initiative of the European Parliament or of the Council.

*Article 79*

By 11 January 2022 the Commission shall present a report to the European Parliament, to the Council and to the European Economic and Social Committee on the application of this Regulation. That report shall include an evaluation of the possible need for a further extension of the rules on jurisdiction to defendants not domiciled in a Member State, taking into account the operation of this Regulation and possible developments at international level. Where appropriate, the report shall be accompanied by a proposal for amendment of this Regulation.

*Article 80*

This Regulation shall repeal Regulation (EC) No 44/2001. References to the repealed Regulation shall be construed as references to this Regulation and shall be read in accordance with the correlation table set out in Annex III.

*Article 81*

This Regulation shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union*.

It shall apply from 10 January 2015, with the exception of Articles 75 and 76, which shall apply from 10 January 2014.

This Regulation shall be binding in its entirety and directly applicable in the Member States in accordance with the Treaties.

Done at Strasbourg, 12 December 2012.

| *For the European Parliament* | *For the Council* |
|---|---|
| *The President* | *The President* |
| M. SCHULZ | A. D. MAVROYIANNIS |

_____

*ANNEX I*

**CERTIFICATE CONCERNING A JUDGMENT IN CIVIL AND COMMERCIAL MATTERS**

**Article 53 of Regulation (EU) No 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters**

1.     COURT OF ORIGIN

1.1.     Name:

1.2.     Address:

1.2.1.     Street and number/PO box:

1.2.2.     Place and postal code:

1.2.3.     Member State:

AT ☐ BE ☐ BG ☐ CY ☐ CZ ☐ DE ☐ EE ☐ EL ☐ ES ☐ FI ☐ FR ☐ HU ☐ IE ☐ IT ☐ LT ☐LU ☐ LV ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SE ☐ SI ☐ SK ☐ UK ☐

1.3.     Telephone:

1.4.     Fax

1.5.     E-mail (if available):

2.     CLAIMANT(S) ([1])

2.1.     Surname and given name(s)/name of company or organisation:

2.2.     Identification number (if applicable and if available):

2.3.     Date (dd/mm/yyyy) and place of birth or, if legal person, of incorporation/formation/registration (if relevant and if available):

2.4.     Address:

2.4.1.     Street and number/PO box:

2.4.2.     Place and postal code:

2.4.3.     Country:

AT ☐ BE ☐ BG ☐ CY ☐ CZ ☐ DE ☐ EE ☐ EL ☐ ES ☐ FI ☐ FR ☐ HU ☐ IE ☐ IT ☐ LT ☐ LU ☐ LV ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SE ☐ SI ☐ SK ☐ UK ☐ Other (please specify (ISO-code)) ☐

2.5.     E-mail (if available):

3.     DEFENDANT(S) ([2])

3.1.     Surname and given name(s)/name of company or organisation:

3.2.     Identification number (if applicable and if available):

3.3.     Date (dd/mm/yyyy) and place of birth or, if legal person, of incorporation/formation/registration (if relevant and if available):

3.4.     Address:

3.4.1.     Street and number/PO box:

3.4.2.     Place and postal code:

3.4.3.     Country:

AT ☐ BE ☐ BG ☐ CY ☐ CZ ☐ DE ☐ EE ☐ EL ☐ ES ☐ FI ☐ FR ☐ HU ☐ IE ☐ IT ☐ LT ☐ LU ☐ LV ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SE ☐ SI ☐ SK ☐ UK ☐ Other (please specify (ISO-code)) ☐

3.5.     E-mail (if available):

4. THE JUDGMENT

4.1. Date (dd/mm/yyyy) of the judgment:

4.2. Reference number of the judgment:

4.3. The judgment was given in default of appearance:

4.3.1. ☐ No

4.3.2. ☐ Yes (please indicate the date (dd/mm/yyyy) on which the document instituting the proceedings or an equivalent document was served on the defendant):

4.4. The judgment is enforceable in the Member State of origin without any further conditions having to be met:

4.4.1. ☐ Yes (please indicate the date (dd/mm/yyyy) on which the judgment was declared enforceable, if applicable):

4.4.2. ☐ Yes, but only against the following person(s) (please specify):

4.4.3. ☐ Yes, but limited to part(s) of the judgment (please specify):

4.4.4. ☐ The judgment does not contain an enforceable obligation

4.5. As of the date of issue of the certificate, the judgment has been served on the defendant(s):

4.5.1. ☐ Yes (please indicate the date of service (dd/mm/yyyy) if known):

4.5.1.1. The judgment was served in the following language(s):
BG ☐ ES ☐ CS ☐ DE ☐ ET ☐ EL ☐ EN ☐ FR ☐ GA ☐ IT ☐ LV ☐ LT ☐ HU ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SK ☐ SL ☐ FI ☐ SV ☐ Other (please specify (ISO-code)) ☐

4.5.2. ☐ Not to the knowledge of the court

4.6. Terms of the judgment and interest:

4.6.1. Judgment on a monetary claim [3]

4.6.1.1. Short description of the subject-matter of the case:

4.6.1.2. The court has ordered
.......................................................... (surname and given name(s)/name of company or organisation) [4]
to make a payment to:
.......................................................... (surname and given name(s)/name of company or organisation)

4.6.1.2.1. If more than one person has been held liable for one and the same claim, the whole amount may be collected from any one of them:

4.6.1.2.1.1. ☐ Yes

4.6.1.2.1.2. ☐ No

4.6.1.3. Currency:
☐ euro (EUR) ☐ Bulgarian lev (BGN) ☐ Czech koruna (CZK) ☐ Hungarian forint (HUF) ☐ Lithuanian litas (LTL) ☐ Latvian lats (LVL) ☐ Polish zloty (PLN) ☐ Pound Sterling (GBP) ☐ Romanian leu (RON) ☐ Swedish krona (SEK) ☐ Other (please specify (ISO code)):

4.6.1.4. Principal amount:

4.6.1.4.1. ☐ Amount to be paid in one sum

4.6.1.4.2. ☐ Amount to be paid in instalments ($^5$)

| Due date (dd/mm/yyyy) | Amount |
|---|---|
|  |  |
|  |  |

4.6.1.4.3. ☐ Amount to be paid regularly

4.6.1.4.3.1. ☐ per day

4.6.1.4.3.2. ☐ per week

4.6.1.4.3.3. ☐ other (state frequency):

4.6.1.4.3.4. From date (dd/mm/yyyy) or event:

4.6.1.4.3.5. If applicable, until (date (dd/mm/yyyy) or event):

4.6.1.5. Interest, if applicable:

4.6.1.5.1. Interest:

4.6.1.5.1.1. ☐ Not specified in the judgment

4.6.1.5.1.2. ☐ Yes, specified in the judgment as follows:

4.6.1.5.1.2.1. Amount:

or:

4.6.1.5.1.2.2. Rate … %

4.6.1.5.1.2.3. Interest due from ................... (date (dd/mm/yyyy) or event) to ................. (date (dd/mm/yyyy) or event) ($^6$)

4.6.1.5.2. ☐ Statutory interest (if applicable) to be calculated in accordance with (please specify relevant statute):

4.6.1.5.2.1. Interest due from ................... (date (dd/mm/yyyy) or event) to ................. (date (dd/mm/yyyy) or event) ($^6$)

4.6.1.5.3. ☐ Capitalisation of interest (if applicable, please specify):

4.6.2. Judgment ordering a provisional, including a protective, measure:

4.6.2.1. Short description of the subject-matter of the case and the measure ordered:

4.6.2.2. The measure was ordered by a court having jurisdiction as to the substance of the matter

4.6.2.2.1. ☐ Yes

4.6.3. Other type of judgment:

4.6.3.1. Short description of the subject-matter of the case and the ruling by the court:

4.7. Costs ($^7$):

4.7.1. Currency:

☐ euro (EUR) ☐ Bulgarian lev (BGN) ☐ Czech koruna (CZK) ☐ Hungarian forint (HUF) ☐ Lithuanian litas (LTL) ☐ Latvian lats (LVL) ☐ Polish zloty (PLN) ☐ Pound Sterling (GBP) ☐ Romanian leu (RON) ☐ Swedish krona (SEK) ☐ Other (please specify (ISO code)):

4.7.2. The following person(s) against whom enforcement is sought has/have been ordered to bear the costs:

4.7.2.1. Surname and given name(s)/name of company or organisation: ($^8$)

4.7.2.2. If more than one person has been ordered to bear the costs, the whole amount may be collected from any one of them:

| | |
|---|---|
| 4.7.2.2.1. | ☐ Yes |
| 4.7.2.2.2. | ☐ No |
| 4.7.3. | The costs of which recovery is sought are as follows: ($^9$) |
| 4.7.3.1. | ☐ The costs have been fixed in the judgment by way of a total amount (please specify amount): |
| 4.7.3.2. | ☐ The costs have been fixed in the judgment by way of a percentage of total costs (please specify percentage of total): |
| 4.7.3.3. | ☐ Liability for the costs has been determined in the judgment and the exact amounts are as follows: |
| 4.7.3.3.1. | ☐ Court fees: |
| 4.7.3.3.2. | ☐ Lawyers' fees: |
| 4.7.3.3.3. | ☐ Cost of service of documents: |
| 4.7.3.3.4. | ☐ Other: |
| 4.7.3.4. | ☐ Other (please specify): |
| 4.7.4. | Interest on costs: |
| 4.7.4.1. | ☐ Not applicable |
| 4.7.4.2. | ☐ Interest specified in the judgment |
| 4.7.4.2.1. | ☐ Amount: |
| | or |
| 4.7.4.2.2. | ☐ Rate … % |
| 4.7.4.2.2.1. | Interest due from .................. (date (dd/mm/yyyy) or event) to .................. (date (dd/mm/yyyy) or event) ($^6$) |
| 4.7.4.3. | ☐ Statutory interest (if applicable) to be calculated in accordance with (please specify relevant statute): |
| 4.7.4.3.1. | Interest due from .................. (date (dd/mm/yyyy) or event) to .................. (date (dd/mm/yyyy) or event) ($^6$) |
| 4.7.4.4. | ☐ Capitalisation of interest (if applicable, please specify): |

Done at: …

Signature and/or stamp of the court of origin:

---

($^1$) Insert information for all claimants if the judgment concerns more than one.
($^2$) Insert information for all defendants if the judgment concerns more than one.
($^3$) If the judgment only concerns costs relating to a claim which has been decided in an earlier judgment, leave point 4.6.1 blank and go to point 4.7.
($^4$) If more than one person has been ordered to make a payment, insert information for all persons.
($^5$) Insert information for each instalment.
($^6$) Insert information for all periods if more than one.
($^7$) This point also covers situations where the costs are awarded in a separate judgment.
($^8$) Insert information for all persons if more than one.
($^9$) In the event that the costs may be recovered from several persons, insert the breakdown for each person separately.

*ANNEX II*

## CERTIFICATE CONCERNING AN AUTHENTIC INSTRUMENT/COURT SETTLEMENT ([1]) IN CIVIL AND COMMERCIAL MATTERS

**Article 60 of Regulation (EU) No 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters**

1. COURT OR COMPETENT AUTHORITY ISSUING THE CERTIFICATE

1.1. Name:

1.2. Address:

1.2.1. Street and number/PO box:

1.2.2. Place and postal code:

1.2.3. Member State:

AT ☐ BE ☐ BG ☐ CY ☐ CZ ☐ DE ☐ EE ☐ EL ☐ ES ☐ FI ☐ FR ☐ HU ☐ IE ☐ IT ☐ LT ☐ LU ☐ LV ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SE ☐ SI ☐ SK ☐ UK ☐

1.3. Telephone:

1.4. Fax

1.5. E-mail (if available):

2. AUTHENTIC INSTRUMENT

2.1. Authority which has drawn up the authentic instrument (if different from the authority issuing the certificate)

2.1.1. Name and designation of authority:

2.1.2. Address:

2.2. Date (dd/mm/yyyy) on which the authentic instrument was drawn up by the authority referred to in point 2.1:

2.3. Reference number of the authentic instrument (if applicable):

2.4. Date (dd/mm/yyyy) on which the authentic instrument was registered in the Member State of origin (to be filled in only if the date of registration determines the legal effect of the instrument and this date is different from the date indicated in point 2.2):

2.4.1. Reference number in the register (if applicable):

3. COURT SETTLEMENT

3.1. Court which approved the court settlement or before which the court settlement was concluded (if different from the court issuing the certificate)

3.1.1. Name of court:

3.1.2. Address:

3.2. Date (dd/mm/yyyy) of the court settlement:

3.3. Reference number of the court settlement:

4. PARTIES TO THE AUTHENTIC INSTRUMENT/COURT SETTLEMENT:

4.1. Name(s) of creditor(s) (surname and given name(s)/name of company or organisation) ([2]):

4.1.1. Identification number (if applicable and if available):

4.1.2. Date (dd/mm/yyyy) and place of birth or, if legal person, of incorporation/formation/registration (if relevant and if available):

4.2. Name(s) of debtor(s) (surname and given name(s)/name of company or organisation) ([3]):

4.2.1. Identification number (if applicable and if available):

4.2.2. Date (dd/mm/yyyy) and place of birth or, if legal person, of incorporation/formation/registration (if relevant and if available):

4.3. Name of other parties, if any (surname and given name(s)/name of company or organisation) ([4])

20.12.2012　　　EN　　　Official Journal of the European Union　　　L 351/27

| 4.3.1. | Identification number (if applicable and if available): |
|---|---|
| 4.3.2. | Date (dd/mm/yyyy) and place of birth or, if legal person, of incorporation/formation/registration (if relevant and if available): |
| 5. | ENFORCEABILITY OF THE AUTHENTIC INSTRUMENT/COURT SETTLEMENT IN THE MEMBER STATE OF ORIGIN |
| 5.1. | The authentic instrument/court settlement is enforceable in the Member State of origin |
| 5.1.1. | ☐ Yes |
| 5.2. | Terms of the authentic instrument/court settlement and interest |
| 5.2.1 | Authentic instrument/court settlement relating to a monetary claim |
| 5.2.1.1. | Short description of the subject matter: |
| 5.2.1.2. | Under the authentic instrument/court settlement |
| | .............................................................. (surname and given name(s)/name of company or organisation) [5] |
| | has to make a payment to: |
| | .............................................................. (surname and given name(s)/name of company or organisation) |
| 5.2.1.2.1. | If more than one person has been held liable for one and the same claim, the whole amount may be collected from any one of them: |
| 5.2.1.2.1.1. | ☐ Yes |
| 5.2.1.2.1.2. | ☐ No |
| 5.2.1.3. | Currency: |
| | ☐ euro (EUR) ☐ Bulgarian lev (BGN) ☐ Czech koruna (CZK) ☐ Hungarian forint (HUF) ☐ Lithuanian litas (LTL) ☐ Latvian lats (LVL) ☐ Polish zloty (PLN) ☐ Pound Sterling (GBP) ☐ Romanian leu (RON) ☐ Swedish krona (SEK) ☐ Other (please specify (ISO code)): |
| 5.2.1.4. | Principal amount: |
| 5.2.1.4.1. | ☐ Amount to be paid in one sum |
| 5.2.1.4.2. | ☐ Amount to be paid in instalments [6] |

| Due date (dd/mm/yyyy) | Amount |
|---|---|
| | |
| | |

| 5.2.1.4.3. | ☐ Amount to be paid regularly |
|---|---|
| 5.2.1.4.3.1. | ☐ per day |
| 5.2.1.4.3.2. | ☐ per week |
| 5.2.1.4.3.3. | ☐ other (state frequency): |
| 5.2.1.4.3.4. | From date (dd/mm/yyyy) or event: |
| 5.2.1.4.3.5. | If applicable, until  ..................................................................................... (date (dd/mm/yyyy) or event) |
| 5.2.1.5. | Interest, if applicable |
| 5.2.1.5.1. | Interest: |
| 5.2.1.5.1.1. | ☐ Not specified in the authentic instrument/court settlement |
| 5.2.1.5.1.2. | ☐ Yes, specified in the authentic instrument/court settlement as follows: |

5.2.1.5.1.2.1. Amount:

or

5.2.1.5.1.2.2. Rate ... %

5.2.1.5.1.2.3. Interest due from ................. (date (dd/mm/yyyy) or event) to .................. (date (dd/mm/yyyy) or event) ($^7$)

5.2.1.5.2.    □ Statutory interest (if applicable) to be calculated in accordance with (please specify relevant statute):

5.2.1.5.2.1. Interest due from ................. (date (dd/mm/yyyy) or event) to .................. (date (dd/mm/yyyy) or event) ($^7$)

5.2.1.5.3.    □ Capitalisation of interest (if applicable, please specify):

5.2.2.        Authentic instrument/court settlement relating to a non-monetary enforceable obligation:

5.2.2.1.      Short description of the enforceable obligation

5.2.2.2.      The obligation referred to in point 5.2.2.1 is enforceable against the following person(s) ($^8$) (surname and given name(s)/name of company or organisation):

Done at: ...

Signature and/or stamp of the court or competent authority issuing the certificate:

---

($^1$) Delete as appropriate throughout the certificate.
($^2$) Insert information for all creditors if more than one.
($^3$) Insert information for all debtors if more than one.
($^4$) Insert information for other parties (if any).
($^5$) If more than one person has been ordered to make a payment, insert information for all persons.
($^6$) Insert information for each instalment.
($^7$) Insert information for all periods if more than one.
($^8$) Insert information for all persons if more than one.

Case3:15-cv-00424-SI   Document31-2   Filed04/06/15   Page113 of 180

*ANNEX III*

**CORRELATION TABLE**

| Regulation (EC) No 44/2001 | This Regulation |
|---|---|
| Article 1(1) | Article 1(1) |
| Article 1(2), introductory words | Article 1(2), introductory words |
| Article 1(2) point (a) | Article 1(2), points (a) and (f) |
| Article 1(2), points (b) to (d) | Article 1(2), points (b) to (d) |
| — | Article 1(2), point (e) |
| Article 1(3) | — |
| — | Article 2 |
| Article 2 | Article 4 |
| Article 3 | Article 5 |
| Article 4 | Article 6 |
| Article 5, introductory words | Article 7, introductory words |
| Article 5, point (1) | Article 7, point (1) |
| Article 5, point (2) | — |
| Article 5, points (3) and (4) | Article 7, points (2) and (3) |
| — | Article 7, point (4) |
| Article 5, points (5) to (7) | Article 7, points (5) to (7) |
| Article 6 | Article 8 |
| Article 7 | Article 9 |
| Article 8 | Article 10 |
| Article 9 | Article 11 |
| Article 10 | Article 12 |
| Article 11 | Article 13 |
| Article 12 | Article 14 |
| Article 13 | Article 15 |
| Article 14 | Article 16 |
| Article 15 | Article 17 |
| Article 16 | Article 18 |
| Article 17 | Article 19 |
| Article 18 | Article 20 |
| Article 19, points (1) and (2) | Article 21(1) |
| — | Article 21(2) |
| Article 20 | Article 22 |
| Article 21 | Article 23 |
| Article 22 | Article 24 |
| Article 23(1) and (2) | Article 25(1) and (2) |

| Regulation (EC) No 44/2001 | This Regulation |
|---|---|
| Article 23(3) | — |
| Article 23(4) and (5) | Article 25(3) and (4) |
| — | Article 25(5) |
| Article 24 | Article 26(1) |
| — | Article 26(2) |
| Article 25 | Article 27 |
| Article 26 | Article 28 |
| Article 27(1) | Article 29(1) |
| — | Article 29(2) |
| Article 27(2) | Article 29(3) |
| Article 28 | Article 30 |
| Article 29 | Article 31(1) |
| — | Article 31(2) |
| — | Article 31(3) |
| — | Article 31(4) |
| Article 30 | Article 32(1), points (a) and (b) |
| — | Article 32(1), second subparagraph |
| — | Article 32(2) |
| — | Article 33 |
| — | Article 34 |
| Article 31 | Article 35 |
| Article 32 | Article 2, point (a) |
| Article 33 | Article 36 |
| — | Article 37 |
| — | Article 39 |
| — | Article 40 |
| — | Article 41 |
| — | Article 42 |
| — | Article 43 |
| — | Article 44 |
| Article 34 | Article 45(1), points (a) to (d) |
| Article 35(1) | Article 45(1), point (e) |
| Article 35(2) | Article 45(2) |
| Article 35(3) | Article 45(3) |
| — | Article 45(4) |
| Article 36 | Article 52 |
| Article 37(1) | Article 38, point (a) |
| Article 38 | — |

| Regulation (EC) No 44/2001 | This Regulation |
| --- | --- |
| Article 39 | — |
| Article 40 | — |
| Article 41 | — |
| Article 42 | — |
| Article 43 | — |
| Article 44 | — |
| Article 45 | — |
| Article 46 | — |
| Article 47 | — |
| Article 48 | — |
| — | Article 46 |
| — | Article 47 |
| — | Article 48 |
| — | Article 49 |
| — | Article 50 |
| — | Article 51 |
| — | Article 54 |
| Article 49 | Article 55 |
| Article 50 | — |
| Article 51 | Article 56 |
| Article 52 | — |
| Article 53 | — |
| Article 54 | Article 53 |
| Article 55(1) | — |
| Article 55(2) | Article 37(2), Article 47(3) and Article 57 |
| Article 56 | Article 61 |
| Article 57(1) | Article 58(1) |
| Article 57(2) | — |
| Article 57(3) | Article 58(2) |
| Article 57(4) | Article 60 |
| Article 58 | Article 59 and Article 60 |
| Article 59 | Article 62 |
| Article 60 | Article 63 |
| Article 61 | Article 64 |
| Article 62 | Article 3 |
| Article 63 | — |
| Article 64 | — |
| Article 65 | Article 65(1) and (2) |

L  351/32          EN          Official Journal of the European Union          20.12.2012

| Regulation (EC) No 44/2001 | This Regulation |
|---|---|
| — | Article 65(3) |
| Article 66 | Article 66 |
| Article 67 | Article 67 |
| Article 68 | Article 68 |
| Article 69 | Article 69 |
| Article 70 | Article 70 |
| Article 71 | Article 71 |
| Article 72 | Article 72 |
| — | Article 73 |
| Article 73 | Article 79 |
| Article 74(1) | Article 75, first paragraph, points (a), (b) and (c), and Article 76(1), point (a) |
| Article 74(2) | Article 77 |
| — | Article 78 |
| — | Article 80 |
| Article 75 | — |
| Article 76 | Article 81 |
| Annex I | Article 76(1), point (a) |
| Annex II | Article 75, point (a) |
| Annex III | Article 75, point (b) |
| Annex IV | Article 75, point (c) |
| Annex V | Annex I and Annex II |
| Annex VI | Annex II |
| — | Annex III |

# Attachment 7 – Declaration M.J. Drop

(Article 6:236(n) of Dutch Civil Code)

Dutch text **Article 6:236(n) DCC**

Bij een overeenkomst tussen een gebruiker en een wederpartij, natuurlijk persoon, die niet handelt in de uitoefening van een beroep of bedrijf, wordt als onredelijk bezwarend aangemerkt een in de algemene voorwaarden voorkomend beding

**n.**  dat voorziet in de beslechting van een geschil door een ander dan de rechter die volgens de wet bevoegd zou zijn, tenzij het de wederpartij een termijn gunt van tenminste een maand nadat de gebruiker zich schriftelijk jegens haar op het beding heeft beroepen, om voor beslechting van het geschil door de volgens de wet bevoegde rechter te kiezen

English translation **Article 6:236(n) DCC**

In an agreement between a user and the other party, who is an individual not acting in the conduct of a profession or business, the following terms in general terms and conditions are deemed to be unreasonably onerous:

**n.**  which provides for dispute resolution by a person other than the court having competence under the law or by one or more arbitrators, unless it allows the other party a term of at least one month from the date when the user has invoked the term in writing against the other party, to opt for dispute resolution by the court having competence under the law;

# Attachment 8 – Declaration M.J. Drop

(Article 99 DCCP)

Dutch text **Article 99 DCCP**

1.   Tenzij de wet anders bepaalt, is bevoegd de rechter van de woonplaats van de gedaagde.
2.   Bij gebreke van een bekende woonplaats van de gedaagde in Nederland is bevoegd de rechter van zijn werkelijk verblijf.

English translation **Article 99 DCCP**

1.   The competent Court is the Court of the domicile of the defendant, unless otherwise provided by law.
2.   Absent a known domicile of the defendant in the Netherlands, the competent Court is the Court of his actual residence.

# Attachment 9 – Declaration M.J. Drop

(Article 7 (1) DCCP)

Dutch text Article **7 DCCP**

English translation **Article 7 DDCP**

1. If in matters to be brought before the Court by a summons and complaint the Dutch Court has jurisdiction with regard to one of the defendants, it also has jurisdiction with regard to any other defendants in the same proceedings, provided that there is a connection between the claims of the respective defendants such that the principles of efficiency warrant a joint hearing.

2. If in matters to be brought before the Court by a summons and complaint the Dutch Court has jurisdiction, it also has jurisdiction with regard to any counterclaim and with regard to a claim for indemnification, joinder or intervention, unless insufficient correlation exists between these claims and the original claim.

# Attachment 10 – Declaration M.J. Drop

(Article 9 DCCP)

Dutch text **Article 9 DCCP**

Komt de Nederlandse rechter niet op grond van de artikelen 2 tot en met 8 rechtsmacht toe, dan heeft hij niettemin rechtsmacht indien:

**a.** het een rechtsbetrekking betreft die ter vrije bepaling van partijen staat en de gedaagde of belanghebbende in de procedure is verschenen niet uitsluitend of mede met het doel de rechtsmacht van de Nederlandse rechter te betwisten, tenzij voor rechtsmacht van de Nederlandse rechter geen redelijk belang aanwezig is,

**b.** een gerechtelijke procedure buiten Nederland onmogelijk blijkt, of

**c.** een zaak die bij dagvaarding moet worden ingeleid voldoende met de rechtssfeer van Nederland verbonden is en het onaanvaardbaar is van de eiser te vergen dat hij de zaak aan het oordeel van een rechter van een vreemde staat onderwerpt.

English translation **Article 9 DCCP**

If the Dutch Court has no jurisdiction based on articles 2 through 8, it has jurisdiction nonetheless if:

**a.** it concerns a legal relationship at the discretion of the parties, and the defendant or interested party in the proceedings has appeared other than solely or partly for the purpose of contesting the jurisdiction of the Dutch Court, unless no reasonable interest exists for the jurisdiction of the Dutch Court to apply,

**b.** legal proceedings outside of the Netherlands prove to be impossible, or

**c.** a matter to be brought before the Court by a summons and complaint is sufficiently related to the jurisdiction of the Netherlands, and it is unacceptable of the claimant to require that he submits the matter to the review of a Court of a foreign nation.

# Attachment 11 – Declaration M.J. Drop

(Article 42 Judicial Organization Act)

Dutch text **Article 42 Judicial Organization Act**

De rechtbanken nemen in eerste aanleg kennis van alle burgerlijke zaken, behoudens bij de wet bepaalde uitzonderingen.

English translation **Article 42 Judicial Organization Act**

The District Courts review any civil cases in first instance, subject to any exceptions established by law.

# Attachment 12 – Declaration M.J. Drop

(Article 332 DCCP)

Dutch text **Article 332 DCCP**

1.  Partijen kunnen van een in eerste aanleg gewezen vonnis in hoger beroep komen, tenzij de vordering waarover de rechter in eerste aanleg had te beslissen niet meer beloopt dan € 1750 of, in geval van een vordering van onbepaalde waarde, er duidelijke aanwijzingen bestaan dat de vordering geen hogere waarde vertegenwoordigt dan € 1750, een en ander tenzij de wet anders bepaalt. Voor de toepassing van de eerste zin wordt de tot aan de dag van dagvaarding in eerste aanleg verschenen rente bij de vordering inbegrepen.
2.  Indien de zaak meer dan één vordering tussen dezelfde partijen betreft, is voor de toepassing van het eerste lid beslissend het totale beloop of de totale waarde van deze vorderingen.
3.  Was in eerste aanleg een eis in reconventie ingesteld, dan is voor de toepassing van het eerste lid beslissend het totale beloop of de totale waarde van de vordering in conventie en van de vordering in reconventie, met dien verstande dat met betrekking tot de vordering in reconventie de rente wordt berekend tot aan de dag van instelling van de eis in reconventie. Indien echter de beide zaken zijn gesplitst en daarin afzonderlijk is beslist, zijn op elk van beide vonnissen de gewone regels voor de vatbaarheid voor hoger beroep van toepassing.


English text **Article 332 DCCP**

1.  Parties may appeal an award in first instance, unless the claim about which the Court in first instance decided does not exceed €1,750 or, in case of a claim for which the value has not been established, if clear indications exist that the claim does not represent a value that exceeds €1,750, unless otherwise stipulated by law. Where the first sentence applies, the interest charged up to the day of the summons of the claim in first instance is included in the claim.
2.  If the case pertains to more than one claim between the same parties, the total result or the total value of these claims determines the applicability of the first paragraph.
3.  If a counterclaim was filed in first instance, the total result or the total value of the claim and the counterclaim determines the applicability of the first paragraph, whereby the interest on the counterclaim will be charged up to the day of filing the counterclaim. If, however, both cases are separated and have been decided separately, the common rules for susceptibility to appeal apply to each award.

# Attachment 13 – Declaration M.J. Drop

(Article 398 DCCP)

Dutch text **Article 398 DCCP**

Partijen kunnen beroep in cassatie instellen:
1.  tegen uitspraken, die hetzij in eerste en hoogste ressort hetzij in hoger beroep zijn gewezen;
2.  tegen vonnissen die in eerste ressort op tegenspraak zijn gewezen, indien partijen nadien zijn overeengekomen het hoger beroep over te slaan.


English text **Article 398 DCCP**

Parties may file an appeal with the Supreme Court:
1.  against awards that have been rendered either in first and highest instance, or in appeal
2.  against awards that have been rendered in first instance after full argument on both sides, if parties have subsequently agreed to pass appeals.

# Attachment 14 – Declaration M.J. Drop

(Article 10:2 DCC)

Dutch text **Article 10:2 DCC**

De regels van internationaal privaatrecht en het door die regels aangewezen recht worden ambtshalve toegepast.

English text **Article 10:2 DCC**

The rules of private international law and the laws as designated by these rules will apply ex officio.

# Attachment 15 – Declaration M.J. Drop

(http://www.transparency.org/country#NLD)

OUR VALUES

# DEMOCRACY

HOME          WHO WE ARE          **WHAT WE DO**          GET INVOLVED          NEWS          DONATE

You are currently - Home    What we do    Corruption by country

## CORRUPTION BY COUNTRY / TERRITORY

Country/Territory  Please select ▼

DATA & RESEARCH          PUBLIC OPINION          OUR WORK

SURVEYS & INDICES    REPORTS

CLOSE ALL

### CORRUPTION MEASUREMENT TOOLS

CORRUPTION
PERCEPTIONS INDEX
(2014)

RANK:        SCORE:
8 /175       83 /100

OECD ANTI-BRIBERY
CONVENTION (2011)

BRIBE PAYERS INDEX
(2011)

RANK:        SCORE:
1 /28        8.8 /10

CONTROL OF
CORRUPTION (2010)

GLOBAL CORRUPTION
BAROMETER (2013)

## NETHERLANDS



## FACTS & FIGURES

* POPULATION (2010):
**16.6 MILLION**
* GDP (2010):
**$779.36 BILLION**
* INFANT MORTALITY RATE (PER 1,000 LIVE BIRTHS - 2010):
**3.6**
* LIFE EXPECTANCY (2009)
**80.55 YEARS**
(* World Bank data)

## OUR CHAPTER

TRANSPARENCY INTERNATIONAL

ENFORCEMENT:
## MODERATE

PERCENTILE RANK:
## 98%

SCORE:
## 2.145306346

NETHERLANDS
Phone: +31 (0)6-42 12 52 22
Email: communicatie@transparency.nl
Website: http://www.transparency.nl/

## TWITTER
@Transparantie

## MEASURING TRANSPARENCY



Tweets                                        Follow

Transparantie                          31 Mar
@Transparantie
How Open is the UK Government: UK Open
Governance Scorecard Results: How open is the
UK governme... bit.ly/1EyTk2a #transparency

Transparantie                          31 Mar
@Transparantie
How Open is the UK Government: UK Open
Governance Scorecard Results - Methodology
Description: M... bit.ly/1ywVQPe #transparency

Transparantie                          30 Mar
@Transparantie
Microsoft - When transparency alone isn't
enough: bit.ly/1ytJTtD #transparency
Show Summary

Tweet to @Transparantie

FINANCIAL SECRECY
INDEX (2011)

OPEN BUDGET INDEX
(2010)

RANK:              SCORE:
## 39 /71           49

VALUE:
## 199.7

## OTHER GOVERNANCE AND DEVELOPMENT INDICATORS

GLOBAL
COMPETITIVENESS
INDEX (2012-2013)

HUMAN DEVELOPMENT
INDEX (2011)

PRESS FREEDOM
INDEX (2011-2012)

JUDICIAL
INDEPENDENCE (2011-
2012)

RULE OF LAW (2010)

VOICE &
ACCOUNTABILITY
(2010)

PERCENTILE RANK:
## 97%

SCORE:
## 1.80879992

## HAVE YOUR SAY

By leaving a comment, you acknowledge the terms of use for our comments board.

## ABOUT US

Mission, vision, values
Chapters
Secretariat
Board of directors
Funding and financials
Careers
Frequently asked questions
Initiative Transparente Zivilgesellschaft
Contact us

**Chapter Zone**
**Shárek**

## RESEARCH

Corruption Perceptions Index
Global Corruption Barometer
Bribe Payers Index
Global Corruption Report
Country profiles
National reports
Policy positions
Working papers
Anti-corruption Research Network
Anti-Corruption Helpdesk
Anti-corruption Plain Language Guide
Financial Jargon Buster
Publications

## FOCUS AREAS

Reporting corruption
Tools for fighting corruption
Intergovernmental bodies
Business
Defence and security
Oil and gas
Education
Health
Poverty and development
Sport
Climate change
Whistleblowing
International conventions
Integrity Awards

## MEDIA

Contacts for journalists
Press releases
Events
Speeches and opinion
Blog
Multimedia
Daily Corruption News service
Copyright queries

© Transparency International, 2015 – All Rights Reserved

Privacy – Terms – Impressum – Note about browsers and our site

# Attachment 16 – Declaration M.J. Drop

(http://www.state.gov/documents/organization/160206.pdf)

# THE NETHERLANDS

The Kingdom of the Netherlands includes the Netherlands (population approximately 16.6 million), Aruba (103,000), Curacao (141,000), and St. Maarten (41,000)₁. The Netherlands (the term used to designate the European part of the kingdom) is a constitutional monarchy with a bicameral parliamentary legislative system. The country's 12 provincial councils elect a First Chamber; citizens directly elect a Second Chamber. The most recent general elections, held in June, were considered free and fair. A prime minister and a cabinet representing the governing political parties (traditionally a coalition of at least two major parties) exercise executive authority. Security forces reported to civilian authorities.

Aruba, Curacao, and St. Maarten have unicameral parliamentary systems. They are largely autonomous, except for foreign policy and defense. The Kingdom of the Netherlands is required, according to its charter, to safeguard fundamental human rights and freedoms, good governance, legal certainty, and the soundness of administration in all of its territories. Curacao held free and fair elections in August as did St. Maarten in September.

In the Netherlands, individuals were prosecuted during the year for violations of a law prohibiting public speech that incites hatred or discrimination. There were reports of anti-Semitic incidents, societal discrimination, and violence against some religious and ethnic minorities, violence against women and children, and trafficking in persons for sexual exploitation. In Aruba, Curacao, and St.Maarten, prison conditions remained substandard in some respects.

## RESPECT FOR HUMAN RIGHTS

Section 1      Respect for the Integrity of the Person, Including Freedom From:

  a.      Arbitrary or Unlawful Deprivation of Life

There were no reports that the government or its agents committed arbitrary or unlawful killings.

  b.      Disappearance

---

[1] With the dissolution of the Netherlands Antilles on October 10, Curacao and St. Maarten became separate, largely autonomous, entities within the Kingdom of the Netherlands; three smaller islands, Bonaire (12,800), St. Eustatius (2,700), and Saba (1,600) became special entities with direct ties to the Netherlands.

**THE NETHERLANDS**                                           2

There were no reports of politically motivated disappearances.

     c.    Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices, and there were no reports that government officials employed them during the year.

    Prison and Detention Center Conditions

In the Netherlands, prison and detention conditions generally met international standards, and the government permitted visits by independent human rights observers. No visits occurred in the course of the year. In Aruba, Curacao, and St. Maarten, prison conditions remained substandard in some respects.

In all kingdom territories, authorities permitted prisoners and detainees to maintain regular contact with the outside world and receive visitors. Prisoners were permitted religious observance. They could submit complaints to a supervisory committee, the penitentiary institution's selection official, the prison system's complaint commission, and in many cases had the option to appeal. Complaints were addressed adequately with respect for due process of law. The government monitored prison and detention center conditions.

In the Netherlands, 11,682 persons were held in detention as of September 2009, approximately 7 percent of them women. The total included about 5,500 persons awaiting judicial disposition, about 4,200 serving prison sentences, approximately 500 in detention for not paying a fine, and approximately 500 in detention for failing to meet their community-service obligations.

In Curacao and St. Maarten, authorities have not increased prison capacity sufficiently to allow separate facilities for juvenile offenders, and judges may sentence juveniles under the age of 16 who have committed serious offenses to prisons where they serve time together with adults. A project begun in 2007 that replaced prison with house arrest for selected inmates continued but involved very few individuals. During the year only one inmate was selected for electronic monitoring.

At Bon Futuro Prison in Curacao, renamed Curacao Detention and Correction Center in September, there were several altercations between inmates, and one brief inmate strike by inmates in May, which resulted in some property damage. Prison guards went on strike in September in Curacao over newly implemented prison regulations. In St. Maarten, inmates struck briefly in April over a Public Prosecutor's Office decision to send two inmates to prison in Bonaire.

**THE NETHERLANDS**                                                    3

In July 2009 the UN Human Rights Committee described reports that prison conditions in Bon Futuro Prison and Bonaire Remand Prison remained "extremely harsh." However, improvements were under way as a result of a 2008 allocation of eight million euros ($10.7 million) by the Netherlands government. The Council of Europe's Committee for the Prevention of Torture (CPT) based the improvements on recommendations. The CPT's 2009 report cited improvements in the prisons in Curacao and St. Maarten, including the opening of a youth section in St. Maarten. Authorities completed the renovation of the Bonaire detention center in 2009 in accordance with CPT standards. The renovation of Bon Futuro Prison was under way. Work continued on a construction and renovation project for separate holding facilities for undocumented foreign nationals in Curacao, including that section's specific perimeter security. Also in Curacao, construction of new entry and exit facilities and a workshop for prisoner activities continued. No new construction or renovation took place during the year in St. Maarten. The prison director stated that prison staffing was sufficient. Training for six new guards was scheduled for January 2011.

      d.     Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, and the government generally observed these prohibitions.

      Role of the Police and Security Apparatus

Civilian authorities maintained effective control over the regional police forces, and the government had effective mechanisms to investigate and punish abuse and corruption. There were no reports of impunity involving the security forces during the year.

      Arrest Procedures and Treatment while in Detention

Police officers, acting under the authority of the public prosecutor, conduct criminal investigations. A prosecutor or senior police officer must order any arrests. Authorities must promptly inform detainees of the charges against them. Police may question suspects for a maximum of 12 hours (six hours in Aruba, Curacao, and St. Maarten) and detain them for up to three days (two days in Aruba, Curacao, and St. Maarten), with the possibility of an additional three-day extension in cases of "urgent necessity," by order of the public prosecutor without the permission of a magistrate. However, by the fourth day (the third day in Aruba, Curacao, and St Maarten), the prosecutor must bring detainees before an examining magistrate for questioning and a decision whether to

**THE NETHERLANDS**                                        4

extend detention for another 14 days. The court subsequently reviews the validity of continued detention every 90 days. Extensions depend on progress in the preliminary investigation.

In the Netherlands, in terrorism-related cases, the examining magistrate may order detention for the first 14 days on the lesser charge of "reasonable suspicion" rather than "serious suspicion" required for other crimes.

By law defendants have the right to access to an attorney during questioning; however, after a 2007 visit, the CPT expressed concern that authorities in the Netherlands did not always permit attorneys to be present during the initial period of detention, which may last up to 12 hours. In April the College of Prosecutors-General issued instructions on "giving effect to the right of a detained defendant to consult an attorney prior to substantive questioning." Minors are also entitled to counsel during questioning. The Justice Department has established pilot projects to test the practice of having an attorney present during the initial detention and questioning of an adult suspect.

Authorities in Aruba indicated that if a detainee requested a lawyer, no interrogation would take place without one unless the severity of the case dictated otherwise. A legal aid system existed to provide indigent detainees with legal aid, but such lawyers did not always appear before questioning began. In the Netherlands Antilles, beginning in mid-November 2009 authorities reportedly instituted procedures requiring that police inform defendants of their right to have a family member or other person informed of their arrest and that police document this procedure.

There is no provision for bail, but in the Netherlands authorities avoided lengthy detention before trial unless there were compelling reasons to keep a person in custody.

In 2007 the UN Committee Against Torture criticized the excessive length of pretrial detention and the high number of detainees not convicted of a crime in Aruba and the Netherlands Antilles. The governments of the two territories sought to correct this problem by reducing the number of crimes requiring pretrial detention and implementing other policies aimed at reducing the case backlog, particularly more expeditious processing of cases involving illegal drugs. The backlog of detainees awaiting trial has been significantly reduced.

     e.     Denial of Fair Public Trial

The law provides for an independent judiciary, and the government generally respected judicial independence in practice.

**THE NETHERLANDS**                                    5

Trial Procedures

The law provides for the right to a fair trial, and an independent judiciary generally enforced this right. Trials are public. Juries are not used. The law requires that authorities fully inform defendants about the proceedings at every stage. In criminal trials the law provides for prompt access to counsel (inexpensively for persons with low incomes), the presumption of innocence, and the right to appeal. The accused is not present when the examining magistrate examines witnesses, but his attorney has the right to question them. In most instances defendants and their attorneys have access to government-held evidence relevant to their cases; however, in certain cases involving national security, special procedures permit an examining judge to assess the reliability of official intelligence reports without exposing the identities of intelligence officers or releasing confidential intelligence information to the public or the defendant. In such cases the defense has the right to submit written questions to these witnesses through the examining judge. The law extends the above rights to all citizens.

On July 27, the UN Human Rights Committee took the position that the Netherlands violated the UN International Covenant on Civil and Political Rights by enacting legislation in 2007 that restricts a defendant's right to appeal fines of less than 500 euros ($665) for minor offenses. The legislation provided that an appellate court must first grant permission to the defendant in such a case to file an appeal "in the interest of proper administration of justice." The committee found, however, that the new procedures denied the defendant the right to challenge his conviction effectively. The government did not respond by year's end.

Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

Regional Human Rights Court Decisions

The government was responsive to rulings by the European Court for Human Rights (ECHR). On August 24, the foreign minister issued his annual report on the previous year's ECHR decisions affecting the country. He noted that of the four cases in which the court issued judgments in 2009, no violation of the European Convention on Human Rights had been found in two, while the other two cases were settled on friendly terms. In response to earlier court judgments, the government consolidated the legal basis for wiretapping.

**THE NETHERLANDS** 6

Civil Judicial Procedures and Remedies

There is an independent and impartial judiciary in civil matters. Individuals may bring lawsuits for damages related to a possible human rights violation before the regular court system or specific appeal boards, and once individuals exhaust national remedies, they may appeal to the ECHR.

f.    Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the government generally respected these prohibitions in practice.

Section 2    Respect for Civil Liberties, Including:

a.    Freedom of Speech and Press

The law provides for freedom of speech and of the press, and the government generally respected these freedoms in practice.

Individuals could criticize the government publicly or privately without reprisals.

Disputes occasionally arose over a journalist's right to protect their sources. On September 14, the ECHR ruled in a Dutch case that the right to protect journalistic sources should include a guarantee of review by a judge or other independent and impartial decision-making authority before the police or the public prosecutor gained access to information that would reveal these sources. The case concerned a police seizure of photographs of an illegal automobile race. The photographs had been taken by a journalist of the publication *Autoweek* who assured the participants in the race that their anonymity would be respected. The police believed the photographs would help them track down participants in a series of major robberies. The public prosecutor held that the interests of its investigation outweighed the reporter's asserted right to protect his sources. However, the ECHR ruling found that the right of journalists to protect their sources was sufficiently critical to freedom of the press to require greater protection. Legislation being drafted by the government to bring the country's law into compliance with the court's ruling had not been enacted as of year's end.

It is a crime to engage in public speech that incites hatred, discrimination, or violence against persons because of their race, religion, convictions, gender, sexual orientation, or disability. During the year the government successfully

prosecuted several such cases, notably cases in which judges considered the language in question to be "unnecessarily offensive." The government urged prosecutors and police to give proper attention to incidents of "discrimination," which in the country's jurisprudence includes racially offensive speech. Convictions for these offenses were rare because courts were reluctant to restrict freedom of expression, especially when it took place within the context of a public debate.

In October Geert Wilders stood trial before the Amsterdam District Court on charges of offending, inciting hatred toward, and discriminating against, Muslims. However, due to a number of incidents that raised doubt about the impartiality of the judges, a mistrial was declared, and the case was rescheduled for 2011. Wilders was a member of parliament and a leader of the Party for Freedom. In a number of public statements and in his movie, *Fitna*, Wilders characterized Islam as a violent political ideology that is incompatible with western values. The prosecutor initially declined requests from Muslim and other groups to prosecute Wilders, asserting that his opinions were expressed in the context of a legitimate public debate. However, in January 2009 the Amsterdam Appellate Court ordered the prosecutor to initiate criminal proceedings. In the October trial, the prosecutor requested Wilders' acquittal.

On August 19, an appellate court fined the Arabic European League (AEL) for placing a cartoon on its Web site that expressed the idea that Jews deliberately invented or exaggerated the Holocaust. AEL had stated that they published the cartoon in reaction to earlier Danish cartoons depicting the Prophet Mohammed in a negative way, with the stated intention of demonstrating double standards in the media and public debate. A district court ruled in favor of the AEL on the grounds that the organization's stated objective had nullified its offensive, punishable character. The appeals court, however, disagreed, asserting that the context was not sufficiently clear. In its ruling the court stated that despite the AEL disclaimer, the cartoon was "unnecessarily offensive." It agreed with the ECHR that freedom of expression must be protected, even if it shocks or offends, but noted that the ECHR makes an exception for denying or trivializing the Holocaust. The court concluded that "the Jewish community… must be able to deal with critical statements to a certain degree, even if they could be perceived as offensive, but it is entitled to be spared serious offense based on the Holocaust."

On September 21, the Amsterdam Prosecutor's Office decided not to prosecute the cartoonist Gregorius Nekschot ("Deathblow" in Dutch) for some of his cartoons, even though, in the prosecutor's stated view, the cartoons violated the law on intentional discrimination and incitement to hatred. In announcing his decision, the prosecutor noted that the cartoonist had removed the cartoons from

his Web site and that the complaint dated from five years earlier. The cartoonist and the Netherlands Association of Journalists expressed regret that a judge had no opportunity to rule on the alleged breach of freedom of expression.

Internet Freedom

There were no governmental restrictions on access to the Internet or reports that the government monitored e-mail or Internet chat rooms. Individuals and groups could engage in the peaceful expression of views via the Internet, including by e-mail. More than 90 percent of the population had access to the Internet.

During the year authorities continued to pursue policies to counter incitement to discrimination on the Internet. There were a number of convictions in 2009 and during the year.

The police maintained a list of Web sites they have judged to be purveyors of child pornography and reviewed the list periodically. All major Internet service providers in the Netherlands have agreed not to permit access to those sites.

Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

b.      Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, and the government generally respected these rights in practice.

c.      Freedom of Religion

For a description of religious freedom, see the *2010 International Religious Freedom Report* at www.state.gov/g/drl/irf/rpt/.

d.      Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The laws provide for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected these rights in practice. The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

**THE NETHERLANDS**                                     9

The law prohibits forced exile, and the government did not employ it.

Protection of Refugees

Laws provide for the granting of asylum or refugee status, and the government
has established a system for providing protection to refugees.

Authorities denied asylum to persons who came from so-called safe countries of
origin or who resided for some time in safe countries of transit. They used EU
guidelines to define such countries. Asylum seekers are granted adequate
opportunity to present their cases.

In practice authorities generally provided protection against the expulsion or
return of asylum seekers to countries where their lives or freedom would be
threatened on account of their race, religion, nationality, membership in a
particular social group, or political opinion. In response to criticism that some of
the government's procedures were inadequate to avoid this risk, the asylum
procedures were revised on July 1 to ensure expedited and more scrupulous
processing of asylum applications. Authorities provided economic assistance to
persons who were denied asylum and who chose to return home voluntarily.

During the year the government ended its policy of automatically granting
temporary protection to certain categories of asylum seekers based on country
of origin or other established criteria, a policy favored by the UNHCR and
many nongovernmental organizations (NGOs). Instead, it adopted a policy of
investigating individual asylum applications and determining on a case-by-case
basis whether the individuals concerned would face mistreatment if returned to
their countries of origin. The UNHCR and NGOs, including Amnesty
International (AI), challenged the government when it considered returning
persons to countries where they might be at risk. For example, AI asserted that
authorities planned to return persons to territory in and near Mogadishu that was
controlled by the Transitional Federal Government of Somalia based on an
agreement with that government. However, in AI's view, no part of central or
southern Somalia was a safe destination. These and similar charges resulted in
pressure to return to the practice of not deporting persons in certain categories,
including asylum seekers from such areas as Somalia, Iraq, and Sudan or those
meeting other criteria, such as gays and lesbians, and Christian converts from
Iran.

Several organizations, including AI and the Council for the Administration of
Criminal Law, criticized the manner of detention of aliens prior to deportation.
They maintained that since the aliens were not criminals, authorities should not
subject them to a criminal regime or keep them in detention for extended

periods of time, especially if there was little or no prospect of actual deportation. Courts have ordered the release of aliens if there was no prospect of actual deportation. The state secretary for justice noted that there was no evidence of structural abuse in the treatment of aliens in detention centers. Some NGOs continued to argue that the government did not always keep deportable children out of detention. The state secretary countered that it was at times unfair and inhumane to separate families awaiting deportation. The Council of Europe's European Committee of Social Rights, NGOs, and Dutch courts criticized the government for violating the rights of children by failing to give basic assistance to children whose adult family members had been denied asylum. The government reviewed the situation and decided during the year not to terminate care for children of rejected asylum seekers.

According to the UNHCR, there were slightly fewer than 100,000 asylum seekers and refugees in the country. Official data from Statistics Netherlands (CBS) indicated that at the beginning of 2008 more than 70,000 refugees were living in the country with residence status. Refugees received government assistance in finding housing and they are entitled to social welfare and other social services.

An average of approximately 17,000 persons per year apply for asylum. They are usually housed in asylum centers until a decision has been made on their applications. Rejected asylum seekers, once they have exhausted all possible appeals, are denied further assistance. Several thousand rejected asylum seekers and illegal immigrants were in detention during the year awaiting deportation.

Rejected asylum seekers and those still awaiting decisions on their applications were not permitted to work and they were denied many social services; however, they were given basic sustenance and health care and permitted to attend school.

Stateless Persons

Citizenship is based primarily on the mother's citizenship. According to UNHCR statistics, there were 5,034 stateless persons in the country at the end of 2009.

Parliament has revised the law governing citizenship repeatedly to counter and prevent statelessness, including by providing the opportunity to gain Dutch citizenship. Immigrants may naturalize after five years of legal residence, or after three years if they are married to a citizen. Migrants who are not naturalized are allowed to work, including in the civil service but not the police force or the army. After five years of legal residence, nonnationals have the

right to vote in local elections. To become citizen, they must complete a written naturalization examination that tests both their proficiency in the Dutch language and their knowledge of the country's culture and society.

Section 3      Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage. These rights also apply to the Aruba, Curacao, and St. Maarten.

Elections and Political Participation

During the year, parliamentary elections in the Netherlands were considered free and fair.

Political parties generally operated without restriction or outside interference. On April 9, the Supreme Court, upholding a 2007 appeals court decision, ruled that the government was obliged to ensure that the Protestant Political Reformed Party (SGP) grants women the right to run for office. The SGP maintained that the decision constituted interference with religious freedom and freedom of association, and that the party's female members were not seeking to run for office. The party had already agreed to permit women to become party members following an earlier court decision that would have cost it its subsidy for not doing so. The government did not respond to the Supreme Court ruling by year's end. The SGP, however, has filed an appeal with the ECHR.

There were 61 women in the 150-seat Second Chamber of parliament ("House of Representatives"). Of the 20 Dutch cabinet members four were women. Women also held positions in the parliaments and cabinets of the former Netherlands Antilles, Curacao, St. Maarten, and Aruba, including the position of prime minister of St. Maarten and the prime minister of the Netherlands Antilles prior to its dissolution in October.

In the Netherlands, 17 members of the Second Chamber of parliament were of immigrant descent, including six of Turkish and five of Moroccan descent.

Section 4      Official Corruption and Government Transparency

The law provides criminal penalties for official corruption, and the government generally implemented the law effectively. There were isolated reports of government corruption during the year.

**THE NETHERLANDS**                              12

In 2009, the most recent year for which information was available, authorities imposed disciplinary sanctions on 295 central government employees for abusing their positions.

There are no laws requiring officials to make financial disclosures. The government pursued an active anticorruption policy coordinated by the Internal Affairs Ministry's Bureau for Promotion of Integrity of the Public Sector. The National Criminal Investigation Service coordinated investigations under the supervision of the national prosecutor for corruption.

The law provides for public access to government information, and authorities generally respected that right for both citizens and noncitizens, including foreign media. Whenever authorities denied requests for information, they provided reasons based on the law. Those seeking information could appeal any refusal to the regular courts. Disputes occasionally arose in court over the scope of the government's right to withhold information based on the public interest.

Section 5      Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Several domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were cooperative and responsive to their views.

In the Netherlands, there are no ombudsmen or parliamentary committees dealing exclusively with human rights. However, a citizen may bring any complaint before the Equal Opportunity Commission (CGB), the national ombudsman, the Commercial Code Council, or the Council of Journalism, depending on the circumstances.

Section 6      Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on age, race, gender, disability, language, political preference, sexual orientation, and social status, and the government generally enforced these prohibitions.

          Women

Rape, including spousal rape, is a crime, and the government effectively prosecuted such crimes. The penalty for rape is imprisonment not exceeding 15

years or a fine. The maximum sentence for marital rape is eight years in prison. According to a 2008 report on crime and law enforcement published by the Justice Ministry's Scientific Research and Documentation Center and the CBS, in 2007 there were 3,459 registered cases of rape and sexual assault involving 2,118 suspects.

Domestic violence was the most prevalent form of violence in society. A factsheet issued by the Ministry of Justice in May 2009 indicated that there were approximately 500,000 incidents of household violence annually. Approximately 40 percent of the population experienced some form of domestic violence during their lives; 10 percent of these reported experiencing some form of physical, sexual, or mental abuse at least weekly, and 4 percent had been raped. According to police records, approximately 85 percent of victims were women. Police estimated that victims reported approximately 12 percent of all cases. The government continued to implement a 2008-11 national action plan to intensify the fight against household violence that included a national survey on its scope. In June the College of Prosecutors-General, which supervises the operation of the national and regional prosecutors' offices, issued new instructions for investigating and prosecuting cases of domestic violence and so-called honor violence.

In Aruba, the criminal code specifies additional penalties for violent offenses when committed against family members.

In the Netherlands, spousal abuse carries a penalty that is one-third more severe than ordinary battery. Police records indicated that approximately 3 percent of spousal abuse cases reported to police resulted in arrests. The government provided support to the national organization Movisie (formerly TransAct), which assisted victims of domestic and sexual violence and trained police and prosecutors in investigating and prosecuting related crimes. The government subsidized shelters for battered women. Mayors may impose temporary restraining orders on perpetrators of household violence; police figures indicated that 2,150 restraining orders were issued nationwide in 2009. In October the government repeated a public information campaign against domestic violence.

In May the Justice Ministry, together with several NGOs, repeated the annual national information campaign to combat forced marriages and the abandonment by immigrants of their spouses in their country of origin. The campaign was intended to generate awareness among certain groups of young immigrants regarding the risks which they might be running in this regard and inform them about precautionary measures they could take to prevent forced

marriage or being left behind during vacations in their parents' country of origin.

According to a report published in August, the National Expertise Center on Honor-Related Violence (LEC-EGG) received of 445 reports of possible honor violence in 2009, compared to 553 in 2008 and 493 in 2007. Of the 445 reports received in 2009, 54 percent involved threats, 31 percent physical violence, 3 percent allegations of murder, 3 percent attempted murder, and 2 percent rape. The government has addressed the problem vigorously and continued a five-year program started in 2006 to combat honor violence that focused on prevention, protection, and criminal prosecution. In 2008 the government set up LEC-EGG within the regional police department in The Hague. The center, accessible seven days a week and 24 hours a day, developed a checklist to help the police and other professionals identify honor violence cases.

Female genital mutilation (FGM) was practiced on both women and young girls (see section 6, Children).

The law requires employers to take measures to protect workers from sexual harassment; however, sexual harassment was a problem. In June the CBS published a study on sexual harassment which estimated that in 2009 one in 40 women was subject to unwelcome sexual advances. The study indicated that 20 percent of the unwanted advances occurred in the workplace and that only 10 percent were reported to the police. The government continued a public-awareness campaign and took measures to counter harassment among civil servants; no information was available on their effectiveness. The Working Conditions Act commits employers to protect employees against aggression, violence, and sexual intimidation. Complaints against employers who fail to provide sufficient protection can be submitted to the CGB. Victims of sexual assault or rape in the workplace must report the incidents to the police since they are criminal offenses.

The government recognized the basic right of couples and individuals to decide freely and responsibly the number, spacing, and timing of their children, and to have the information and means to do so free from discrimination, coercion, and violence. There were no restrictions on the right to access contraceptives. The government provided skilled attendance during childbirth, including obstetric and postpartum care. Men and women received equal access to diagnosis and treatment for sexually transmitted infections, including HIV. According to 2008 estimates published by the World Health Organization, the United Nations Children's Fund (UNICEF), the UN Food Program, and the World Bank, the maternal mortality rate was nine deaths per 100,000 live births.

## THE NETHERLANDS                    15

Under the law women have the same rights as men, including rights in family law, property law, and the judicial system.

In the Netherlands, approximately 68 percent of women were employed in 2009, nearly 75 percent of them part time. Female and male unemployment rates were 5.3 and 4.5 percent, respectively. The Ministry of Social Affairs and Employment reported that the higher rate of unemployment among women, their reduced chances for promotion, and their generally lower-ranking positions compared with men resulted primarily from their higher level of part-time employment status. According to EU statistics, the disparity between men's and women's earnings in the country's private sector was 23.6 percent in 2008; adjusted for level of experience and expertise required for the jobs, the differential was 7 percent.

The government provided affirmative action programs for women, and collective labor agreements usually included provisions to strengthen the position of women. In 2009 the CGB received 473 complaints of discrimination, 16 percent of which related to gender.

Children

Children obtain citizenship through their parents. Registration of all births is mandatory.

Child abuse was a problem. The Ministry for Youth and Family reported in September that an estimated 107,000 children were abused annually, of whom fewer than 50 percent were known to professional organizations. Experts estimated that approximately 50 to 80 children died each year from some form of abuse. In 2009 the Child Abuse Reporting Center received almost 60,000 reports of possible child abuse, 12 percent more than in 2008. In March 2009 the government launched a two-year publicity campaign to encourage the public to report signs of possible child abuse. In 2008 the government began to require physicians to report child abuse, overriding professional confidentiality. Despite increased government funding for the Council for the Protection of Children, there still were long waiting lists for assistance.

The law prohibits FGM. The maximum penalty is 12 years in prison. In May 2009 the Ministry of Health published an FGM prevalence study which indicated that, of the 1,200 pregnant women and girls from high-risk countries (Somalia, Ethiopia, and Egypt) examined by midwives in 2008, a total of 470 had undergone FGM. In 2007 the government's National Public Health Council estimated that at least 50 girls a year underwent FGM, probably in the native countries of their parents; the FGM committee established by the Ministry of

Health estimated that 16,000 girls and 32,000 women had been subjected to the procedure. The government continued a long-term program to combat FGM through primary prevention and early identification, and the Health Ministry committed more than one million euros (approximately $1.3 million) annually to combat FGM. The funds were used for information campaigns for at-risk groups and among professionals whose occupations bring them into contact with immigrant girls. They were also used for projects designed to engage key individuals in communities where FGM occurred. In August 2009 the College of Prosecutors-General issued new instructions for investigating and prosecuting cases of child abuse, including a chapter devoted to FGM.

Prostitution under the age of 18 is illegal. Anyone who forces a minor to engage in prostitution is liable to a sentence of up to eight years, or up to 12 years if the victim is under 16. Because there were no reliable statistics on the number of underage prostitutes, the government in 2009 asked Comensha, the national human trafficking victim registration center, to set up a national registration system for underage prostitution. During the year the system became operational.

The Netherlands and the Caribbean parts of the kingdom were not destinations for child sex tourism. The law provides penalties for nationals and legal residents of the country who abuse minors abroad, even if the offense is not a crime in the country where the abuse occurs. In November 2009 the government installed the Taskforce on Child Pornography and Child Sex Tourism to intensify the fight against these crimes. The country has a statutory rape law. The penalty for rape is imprisonment not exceeding 15 years, a fine, or both. The minimum age for consensual sex is 16. The law prohibits production, possession, and distribution of child pornography for which there is a maximum penalty of eight years' imprisonment. In January legislation came into force that makes gaining access to child pornography on the Internet a crime with a maximum penalty of four years in prison. In Aruba, Curacao, and St. Maarten, this awaited ratification.

The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. For information on international parental child abduction, please see http://travel.state.gov/abduction/country/country_3781.html

Anti-Semitism

According to the Jewish Social Work organization, approximately 45,000 Jews resided in the Netherlands.

Anti-Semitic incidents, including threats, verbal abuse, and desecration of monuments and cemeteries, continued to occur. The Center for Information and Documentation on Israel (CIDI) reported a significant rise in the number of reported incidents in 2009 and 2010. CIDI stated, however, that "serious incidents" remained rare. The frequency of incidents appeared to be correlated with the political situation in the Middle East. For example, incidents sharply increased in June following the Israeli action against the Gaza Flotilla. They included spraying red paint on the front doors of synagogues in the towns of Amersfoort and Utrecht and an incident on June 6, during which passers-by shouted "Heil Hitler" when Chief Rabbi Binyomin Jacobs was speaking at a memorial ceremony at the former concentration camp in Vught. CIDI pushed for more action against anti-Semitic Internet sites, which it characterized as one of the main means of disseminating anti-Semitic and racist ideologies. It also sought tougher action against Holocaust denial, better registration of anti-Semitic incidents, and more attention to Holocaust education. Explicitly anti-Semitic sentiments were widespread among certain segments of the Muslim community, pro-Palestinian groups, and fringe nationalist and neo-Nazi groups.

In its most recent report, the Registration Center for Discrimination on the Internet (MDI) in 2009 reported a sharp increase in anti-Semitic statements. During that year it received 399 reports of anti-Semitism, of which it considered 258 to be punishable, including 41 denials of the Holocaust. Whereas the Web sites of right-wing extremists traditionally accounted for most of the anti-Semitic expressions on the Internet, the MDI found that such expressions were increasingly present on mainstream interactive websites.

On August 19, the Arnhem Appellate Court fined the AEL for a cartoon on the AEL Web site that expressed the idea that Jews deliberately invented or exaggerated the Holocaust (see Section 2.a.).

In September the government initiated an updated action plan to combat discrimination in general and anti-Semitism in particular. The plan underlined the importance of a local approach through cooperation between local authorities and Jewish and non-Jewish organizations to include the reporting and filing of complaints, improved tracking down and prosecution of offenders, and education and the dissemination of information on discrimination. For example, the government sponsored special training courses for teachers, peer education projects, and education programs that focused specifically on anti-Semitism and Holocaust denial. It also sponsored the Jewish Moroccan Network, which sought to reduce tensions between Jews and Moroccans.

In early December, Dutch politician and former EU commissioner Frits Bolkstein advised Dutch Jews, particularly those that stand out due to their

dress, to leave the country because of what he described as increasing anti-Semitism, especially amongst Dutch Moroccans. After he was criticized for this statement, Bolkstein stated that his intentions were to urge the Dutch "not look away" from the realities and denied that he ever called on Jews to leave the country.

The government-funded Article 1 National Association Against Discrimination set up several projects at elementary, secondary, and vocational training schools to counter racism and discrimination.

There were no reports of anti-Semitic incidents in Curacao, St. Maarten, or Aruba.

Trafficking in Persons

For information on trafficking in persons, please see the Department of State's annual Trafficking in Persons Report at www.state.gov/g/tip

Persons with Disabilities

Discrimination against persons with disabilities is illegal in all parts of the kingdom, but government enforcement was inadequate, and there were some reports that such discrimination occurred. The penal code provides penalties for discrimination in employment, education, access to health care, and the provision of state services. In 2009 the CGB received 473 complaints of discrimination, 17 percent of which related to persons with disabilities. Although CGB rulings are not binding, they usually were implemented. The law requires that persons with disabilities have access to public buildings, information, and communications, but public buildings and public transport often were not easily accessible in practice.

National/Racial/Ethnic Minorities

The kingdom's constitution prohibits racial, national, or ethnic discrimination in all kingdom territories.

In the Netherlands, incidents of physical assault against minorities were rare, but members of minority groups experienced verbal abuse and intimidation, and were at times denied access to public venues, such as discotheques.

A Muslim community of approximately 850,000 persons faced frequent discrimination. Members of immigrant groups also faced discrimination in housing and employment. According to the CBS, in 2009 the minority

unemployment rate (11 percent) remained roughly three times that of the ethnic Dutch workforce (4 percent), while the unemployment rate among minority youth was 25.3 percent compared to 11.6 percent for native Dutch youth.

The government pursued an active campaign to increase public awareness of racism and discrimination. The government initiated a national campaign to counter discrimination and to improve the reporting of hate crimes, including hate speech, by using a special Web site.

Within the police, the National Discrimination Expertise Center (LECD) worked to optimize the criminal processing of discrimination cases. The LECD cooperated closely with the prosecutor's offices, local antidiscrimination units, and the MDI. These organizations also registered incidents and issued reports. Data from the LECD, the CGB, and the Racism and Extremism Monitor of the Anne Frank Foundation provided insights into the extent of incidents of discrimination. These organizations voiced concern about the reluctance of victims to report incidents.

In each region a discrimination consultation body, which included police, the prosecutor's office, and antidiscrimination units, evaluated incidents of discrimination. In 2009 the LECD registered 160 reported offenses of discrimination. This number was lower than the annual average over the previous decade, but the apparent decline could have been the result of a new method of registering such offenses. The offenses were discrimination based on race (51 percent) and religion (anti-Semitism, 35 percent; and anti-Islam, 5 percent). Also in 2009 officials prosecuted 194 offenses, brought 137 indictments, obtained 135 convictions, and entered into 20 out-of-court settlements.

In 2009 the MDI registered 577 instances of Internet discrimination that it asserted were punishable, a significant decrease from 2008. Half of these instances were anti-Semitic. Those responsible removed most (86 percent) of offending sites voluntarily when the MDI asked them to do so. The MDI reported six cases to the prosecutor's office; cases brought before a court produced several convictions.

Most defamation cases filed in criminal courts concerned racial defamation. Civil lawsuits often alleged discrimination against persons who were not ethnically Dutch in the supply of such services as cell phones and access to clubs. The CGB focused on discrimination in the labor market, including discrimination in the workplace, unequal pay, termination of labor contracts, and preferential treatment of ethnically Dutch employees.

Societal Abuses, Discrimination, and Acts of Violence Based on Sexual
Orientation and Gender Identity

In the Netherlands, there are no government impediments to the organization of
gay events. The gay rights organization COC called for government policies to
increase societal acceptance of homosexuality, for example, through mandatory
information at schools on homosexuality and the transgender community. There
were several gay pride marches during the year. During the year the Justice
Ministry reported a rise in harassment due to homosexual activity. Most
incidents consisted of verbal epithets and abuse. Police placed a high priority on
combating antigay violence.

Caribbean society remained much less accepting of homosexuality and the
transgender community; however, there were no known cases of abuse or
violence against individuals in this community in Aruba or the former
Netherlands Antilles during the year. There were no gay pride marches.

Other Societal Violence or Discrimination

There were no specific reports of societal violence against persons with
HIV/AIDS. However, the government sponsored a national campaign against
societal stigmatization of persons with HIV/AIDS.

Section 7     Worker Rights

a.     The Right of Association

The law allows workers to form or join independent unions of their own
choosing without prior government authorization or excessive requirements, and
workers exercised this right in practice. Approximately 25 percent of the legally
employed workers were unionized. The law allows unions to conduct their
activities without interference, and the government protected this right in
practice. The right to strike is based on the European Social Charter, and
workers exercised this right by conducting legal strikes. Requirements for
conducting a legal strike were not excessively lengthy or cumbersome.
Regulations prohibit retaliation against legal strikers. Public-sector workers
generally have the right to strike, but a magistrate may forbid a strike that
threatens the public welfare or safety. For example, magistrates have often
prohibited police actions because of the essential services police perform.

b.     The Right to Organize and Bargain Collectively

**THE NETHERLANDS**                                21

The law provides for the right to organize, and specific laws provide for the right to collective bargaining; workers exercised these rights in practice. According to the Christian Trade Union Federation, collective bargaining agreements covered approximately 85 percent of the workforce.

The law prohibits antiunion discrimination.

There were no special laws or exemptions from regular labor laws in export processing zones.

c.      Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor; however, there were reports that such practices occurred. See the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip

According to the national rapporteur for trafficking in persons, the highest risk sectors for labor exploitation included domestic employment, temporary employment agencies, agriculture and horticulture, restaurants, hotels, and construction. In 2009 the Labor Inspectorate conducted approximately 11,000 inspections at many of these high-risk workplaces.

d.      Prohibition of Child Labor and Minimum Age for Employment

The government effectively enforced laws and policies to protect children from exploitation in the workplace; however, children were trafficked for commercial sexual exploitation. See the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip

The minimum age for employment is 16 years. Special rules apply to schoolchildren 16 and 17 years of age. For example, the law prohibits persons under the age of 18 from working overtime, at night, or in activities dangerous to their physical or mental well-being. A tripartite labor commission composed of representatives from the government, enterprises, and unions monitored hiring practices and conducted inspections. The commission enforced the laws effectively.

Holiday work and after-school employment are subject to very strict rules set by law. The Ministry of Labor's inspection office, which is responsible for enforcement, found that during the year 70 percent of companies employing holiday workers and children younger than 18 complied with regulations.

e.      Acceptable Conditions of Work

**THE NETHERLANDS** 22

In the Netherlands, the minimum wage for adults is 1,416 euros ($1,883) per month, which provides an adequate standard of living for a worker and family. The Labor Ministry establishes the minimum wage. The minimum wage in Curacao and St. Maarten was 7.30 Netherlands Antillean Guilders ($4.10) per hour.

Dutch law establishes a 40-hour workweek. The average workweek in the Netherlands was 38.7 hours for full-time workers and 20 hours for part-time workers. Persons who work more than five hours per day are entitled to a 30-minute rest period. Overtime is regulated. The Labor Inspectorate effectively enforced the labor laws.

A tripartite labor commission actively monitored and effectively enforced working conditions, including comprehensive occupational safety and health standards set by law. The Ministry of Labor and Social Affairs also monitored standards. Workers could remove themselves from dangerous working conditions without jeopardizing their continued employment, and they exercised this right in practice.

Workers in the significant underground economy enjoyed neither the minimum wage nor any of the other legal, administrative, or safety protections available to other workers.

# Attachment 17 – Declaration M.J. Drop

(Article 150 DCCP)

Dutch text **Article 150 DCCP**

De partij die zich beroept op rechtsgevolgen van door haar gestelde feiten of rechten, draagt de bewijslast van die feiten of rechten, tenzij uit enige bijzondere regel of uit de eisen van redelijkheid en billijkheid een andere verdeling van de bewijslast voortvloeit.

English text **Article 150 DCCP**

The party that invokes the legal consequences of any facts or rights alleged by him carries the burden of proof, unless a different distribution of the burden of proof arises from any special rule or from the principle of reasonability and fairness.

# Attachment 18 – Declaration M.J. Drop

(Article 152 DCCP)

Dutch text **Article 152 DCCP**

1.  Bewijs kan worden geleverd door alle middelen, tenzij de wet anders bepaalt.
2.  De waardering van het bewijs is aan het oordeel van de rechter overgelaten, tenzij de wet anders bepaalt.


English text **Article 152 DCCP**

1.  Evidence may be produced by any means, unless otherwise established by law.
2.  The review of the evidence is left to the discretion of the Court, unless otherwise provided by law.

# Attachment 19 – Declaration M.J. Drop

(Article 176 DCCP)

Dutch text **Article 176 DCCP**

1. Voor zover bij verdrag of EG-verordening niet anders is bepaald, kan de rechter, indien een getuige in het buitenland woont, aan een door hem aan te wijzen autoriteit van het land waar de getuige zijn woonplaats heeft, verzoeken het verhoor, indien mogelijk onder ede, te houden, of dat verhoor opdragen aan de Nederlandse consulaire ambtenaar tot wiens ressort de woonplaats van die getuige behoort.
2. De rechter bepaalt dan tevens de termijn die in acht genomen moet worden bij het betekenen aan de wederpartij van de plaats, de dag en het uur waarop dit verhoor wordt gehouden en stelt mede de dag vast waarop de zaak weer op de rol zal komen.
3. Het proces-verbaal van dit getuigenverhoor heeft gelijke kracht als dat van het door de Nederlandse rechter gehouden verhoor.

English text **Article 176 DCCP**

1. In as far as not otherwise established by Treaty or EC Regulation, if a witness resides abroad the Court may request an authority, to be designated by the Court, of the country where the witness is domiciled to conduct the hearing, if possible under oath, or instruct the Dutch consular officer, under whose jurisdiction the domicile of the witness belongs, to conduct the hearing.
2. In such event the Court also establishes the term to be observed for serving the other party the notice of the place, date and time of this hearing, and also determines the date on which the matter will be included on the cause list.
3. The transcript of this witness hearing has the same legal effect as that of a hearing held by the Dutch Court.

# Attachment 20 – Declaration M.J. Drop

(The 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters)



**20. CONVENTION ON THE TAKING OF EVIDENCE
ABROAD IN CIVIL OR COMMERCIAL MATTERS[1]**

*(Concluded 18 March 1970)*

The States signatory to the present Convention,
Desiring to facilitate the transmission and execution of Letters of Request and to further the accommodation of the different methods which they use for this purpose,
Desiring to improve mutual judicial co-operation in civil or commercial matters,
Have resolved to conclude a Convention to this effect and have agreed upon the following provisions –

CHAPTER I – LETTERS OF REQUEST

## Article 1

In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.
A Letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated.
The expression "other judicial act" does not cover the service of judicial documents or the issuance of any process by which judgments or orders are executed or enforced, or orders for provisional or protective measures.

## Article 2

A Contracting State shall designate a Central Authority which will undertake to receive Letters of Request coming from a judicial authority of another Contracting State and to transmit them to the authority competent to execute them. Each State shall organise the Central Authority in accordance with its own law.
Letters shall be sent to the Central Authority of the State of execution without being transmitted through any other authority of that State.

## Article 3

A Letter of Request shall specify –
*a)*　the authority requesting its execution and the authority requested to execute it, if known to the requesting authority;
*b)*　the names and addresses of the parties to the proceedings and their representatives, if any;
*c)*　the nature of the proceedings for which the evidence is required, giving all necessary information in regard thereto;
*d)*　the evidence to be obtained or other judicial act to be performed.

---

[1] This Convention, including related materials, is accessible on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Evidence Section". For the full history of the Convention, see Hague Conference on Private International Law, *Actes et documents de la Onzième session (1968)*, Tome IV, *Obtention des preuves* (219 pp.).

Where appropriate, the Letter shall specify, *inter alia* –
e) the names and addresses of the persons to be examined;
f) the questions to be put to the persons to be examined or a statement of the subject-matter about which they are to be examined;
g) the documents or other property, real or personal, to be inspected;
h) any requirement that the evidence is to be given on oath or affirmation, and any special form to be used;
i) any special method or procedure to be followed under Article 9.

A Letter may also mention any information necessary for the application of Article 11.
No legalisation or other like formality may be required.


## Article 4

A Letter of Request shall be in the language of the authority requested to execute it or be accompanied by a translation into that language.
Nevertheless, a Contracting State shall accept a Letter in either English or French, or a translation into one of these languages, unless it has made the reservation authorised by Article 33.
A Contracting State which has more than one official language and cannot, for reasons of internal law, accept Letters in one of these languages for the whole of its territory, shall, by declaration, specify the language in which the Letter or translation thereof shall be expressed for execution in the specified parts of its territory. In case of failure to comply with this declaration, without justifiable excuse, the costs of translation into the required language shall be borne by the State of origin.
A Contracting State may, by declaration, specify the language or languages other than those referred to in the preceding paragraphs, in which a Letter may be sent to its Central Authority.
Any translation accompanying a Letter shall be certified as correct, either by a diplomatic officer or consular agent or by a sworn translator or by any other person so authorised in either State.


## Article 5

If the Central Authority considers that the request does not comply with the provisions of the present Convention, it shall promptly inform the authority of the State of origin which transmitted the Letter of Request, specifying the objections to the Letter.


## Article 6

If the authority to whom a Letter of Request has been transmitted is not competent to execute it, the Letter shall be sent forthwith to the authority in the same State which is competent to execute it in accordance with the provisions of its own law.


## Article 7

The requesting authority shall, if it so desires, be informed of the time when, and the place where, the proceedings will take place, in order that the parties concerned, and their representatives, if any, may be present. This information shall be sent directly to the parties or their representatives when the authority of the State of origin so requests.


## Article 8

A Contracting State may declare that members of the judicial personnel of the requesting authority of another Contracting State may be present at the execution of a Letter of Request. Prior authorisation by the competent authority designated by the declaring State may be required.


## Article 9

The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed.

However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties.

A Letter of Request shall be executed expeditiously.


## Article 10

In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.


## Article 11

In the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege or duty to refuse to give the evidence –
*a)*   under the law of the State of execution; or
*b)*   under the law of the State of origin, and the privilege or duty has been specified in the Letter, or, at the instance of the requested authority, has been otherwise confirmed to that authority by the requesting authority.

A Contracting State may declare that, in addition, it will respect privileges and duties existing under the law of States other than the State of origin and the State of execution, to the extent specified in that declaration.


## Article 12

The execution of a Letter of Request may be refused only to the extent that –
*a)*   in the State of execution the execution of the Letter does not fall within the functions of the judiciary; or
*b)*   the State addressed considers that its sovereignty or security would be prejudiced thereby.

Execution may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not admit a right of action on it.


## Article 13

The documents establishing the execution of the Letter of Request shall be sent by the requested authority to the requesting authority by the same channel which was used by the latter.

In every instance where the Letter is not executed in whole or in part, the requesting authority shall be informed immediately through the same channel and advised of the reasons.


## Article 14

The execution of the Letter of Request shall not give rise to any reimbursement of taxes or costs of any nature.

Nevertheless, the State of execution has the right to require the State of origin to reimburse the fees paid to experts and interpreters and the costs occasioned by the use of a special procedure requested by the State of origin under Article 9, paragraph 2.

The requested authority whose law obliges the parties themselves to secure evidence, and which is not able itself to execute the Letter, may, after having obtained the consent of the requesting authority, appoint a suitable person to do so. When seeking this consent the requested authority shall indicate the approximate costs which would result from this procedure. If the requesting authority gives its consent it shall reimburse any costs incurred; without such consent the requesting authority shall not be liable for the costs.

### Article 15

In a civil or commercial matter, a diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, take the evidence without compulsion of nationals of a State which he represents in aid of proceedings commenced in the courts of a State which he represents.

A Contracting State may declare that evidence may be taken by a diplomatic officer or consular agent only if permission to that effect is given upon application made by him or on his behalf to the appropriate authority designated by the declaring State.

### Article 16

A diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, also take the evidence, without compulsion, of nationals of the State in which he exercises his functions or of a third State, in aid of proceedings commenced in the courts of a State which he represents, if —

a) a competent authority designated by the State in which he exercises his functions has given its permission either generally or in the particular case, and

b) he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

### Article 17

In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if —

a) a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and

b) he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

### Article 18

A Contracting State may declare that a diplomatic officer, consular agent or commissioner authorised to take evidence under Articles 15, 16 or 17, may apply to the competent authority designated by the declaring State for appropriate assistance to obtain the evidence by compulsion. The declaration may contain such conditions as the declaring State may see fit to impose.

If the authority grants the application it shall apply any measures of compulsion which are appropriate and are prescribed by its law for use in internal proceedings.

### Article 19

The competent authority, in giving the permission referred to in Articles 15, 16 or 17, or in granting the application referred to in Article 18, may lay down such conditions as it deems fit, *inter alia*, as to the time and place of the taking of the evidence. Similarly it may require that it be given reasonable advance notice of the time, date and place of the taking of the evidence; in such a case a representative of the authority shall be entitled to be present at the taking of the evidence.

Article 20

In the taking of evidence under any Article of this Chapter persons concerned may be legally represented.

Article 21

Where a diplomatic officer, consular agent or commissioner is authorised under Articles 15, 16 or 17 to take evidence –
a)    he may take all kinds of evidence which are not incompatible with the law of the State where the evidence is taken or contrary to any permission granted pursuant to the above Articles, and shall have power within such limits to administer an oath or take an affirmation;
b)    a request to a person to appear or to give evidence shall, unless the recipient is a national of the State where the action is pending, be drawn up in the language of the place where the evidence is taken or be accompanied by a translation into such language;
c)    the request shall inform the person that he may be legally represented and, in any State that has not filed a declaration under Article 18, shall also inform him that he is not compelled to appear or to give evidence;
d)    the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken;
e)    a person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11.

Article 22

The fact that an attempt to take evidence under the procedure laid down in this Chapter has failed, owing to the refusal of a person to give evidence, shall not prevent an application being subsequently made to take the evidence in accordance with Chapter I.

CHAPTER III – GENERAL CLAUSES

Article 23

A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.

Article 24

A Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence. However, Letters of Request may in all cases be sent to the Central Authority.
Federal States shall be free to designate more than one Central Authority.

Article 25

A Contracting State which has more than one legal system may designate the authorities of one of such systems, which shall have exclusive competence to execute Letters of Request pursuant to this Convention.

Article 26

A Contracting State, if required to do so because of constitutional limitations, may request the reimbursement by the State of origin of fees and costs, in connection with the execution of Letters of

Request, for the service of process necessary to compel the appearance of a person to give evidence, the costs of attendance of such persons, and the cost of any transcript of the evidence.

Where a State has made a request pursuant to the above paragraph, any other Contracting State may request from that State the reimbursement of similar fees and costs.

## Article 27

The provisions of the present Convention shall not prevent a Contracting State from –
*a)*    declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;
*b)*    permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;
*c)*    permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

## Article 28

The present Convention shall not prevent an agreement between any two or more Contracting States to derogate from –
*a)*    the provisions of Article 2 with respect to methods of transmitting Letters of Request;
*b)*    the provisions of Article 4 with respect to the languages which may be used;
*c)*    the provisions of Article 8 with respect to the presence of judicial personnel at the execution of Letters;
*d)*    the provisions of Article 11 with respect to the privileges and duties of witnesses to refuse to give evidence;
*e)*    the provisions of Article 13 with respect to the methods of returning executed Letters to the requesting authority;
*f)*    the provisions of Article 14 with respect to fees and costs;
*g)*    the provisions of Chapter II.

## Article 29

Between Parties to the present Convention who are also Parties to one or both of the Conventions on Civil Procedure signed at The Hague on the 17th of July 1905 and the 1st of March 1954, this Convention shall replace Articles 8-16 of the earlier Conventions.

## Article 30

The present Convention shall not affect the application of Article 23 of the Convention of 1905, or of Article 24 of the Convention of 1954.

## Article 31

Supplementary Agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention unless the Parties have otherwise agreed.

## Article 32

Without prejudice to the provisions of Articles 29 and 31, the present Convention shall not derogate from conventions containing provisions on the matters covered by this Convention to which the Contracting States are, or shall become Parties.

Article 33

A State may, at the time of signature, ratification or accession exclude, in whole or in part, the application of the provisions of paragraph 2 of Article 4 and of Chapter II. No other reservation shall be permitted.
Each Contracting State may at any time withdraw a reservation it has made; the reservation shall cease to have effect on the sixtieth day after notification of the withdrawal.
When a State has made a reservation, any other State affected thereby may apply the same rule against the reserving State.

Article 34

A State may at any time withdraw or modify a declaration.

Article 35

A Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the designation of authorities, pursuant to Articles 2, 8, 24 and 25.
A Contracting State shall likewise inform the Ministry, where appropriate, of the following –
a) the designation of the authorities to whom notice must be given, whose permission may be required, and whose assistance may be invoked in the taking of evidence by diplomatic officers and consular agents, pursuant to Articles 15, 16 and 18 respectively;
b) the designation of the authorities whose permission may be required in the taking of evidence by commissioners pursuant to Article 17 and of those who may grant the assistance provided for in Article 18;
c) declarations pursuant to Articles 4, 8, 11, 15, 16, 17, 18, 23 and 27;
d) any withdrawal or modification of the above designations and declarations;
e) the withdrawal of any reservation.

Article 36

Any difficulties which may arise between Contracting States in connection with the operation of this Convention shall be settled through diplomatic channels.

Article 37

The present Convention shall be open for signature by the States represented at the Eleventh Session of the Hague Conference on Private International Law.
It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

Article 38

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 37.
The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

Article 39

Any State not represented at the Eleventh Session of the Hague Conference on Private International Law which is a Member of this Conference or of the United Nations or of a specialised agency of that Organisation, or a Party to the Statute of the International Court of Justice may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 38.
The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.
The Convention shall enter into force for a State acceding to it on the sixtieth day after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the sixtieth day after the deposit of the declaration of acceptance.

## Article 40

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification indicated in the preceding paragraph.

## Article 41

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 38, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

## Article 42

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 37, and to the States which have acceded in accordance with Article 39, of the following –

*a)* the signatures and ratifications referred to in Article 37;

*b)* the date on which the present Convention enters into force in accordance with the first paragraph of Article 38;

*c)* the accessions referred to in Article 39 and the dates on which they take effect;

*d)* the extensions referred to in Article 40 and the dates on which they take effect;

*e)* the designations, reservations and declarations referred to in Articles 33 and 35;

*f)* the denunciations referred to in the third paragraph of Article 41.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 18th day of March, 1970, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Eleventh Session of the Hague Conference on Private International Law.

# Attachment 21 – Declaration M.J. Drop

(Overview signatories latter Convention)



# HAGUE EVIDENCE CONVENTION - ACCEPTANCES OF ACCESSIONS
*(status on 25 March 2015)*

## STATES THAT HAVE ACCEDED TO THE CONVENTION
*(in chronological order, from left to right)*

**CONTRACTING STATES** (with method in which State became Party to Convention)

R = Ratification
A = Accession
Su = Succession

| CONTRACTING STATES | Method |
|---|---|
| **MEMBER STATES HCCH** | |
| ALBANIA | A |
| ARGENTINA | A |
| AUSTRALIA | A |
| BELARUS | A |
| BOSNIA AND HERZEGOVINA | A |
| BRAZIL | A |
| BULGARIA | A |
| CHINA* | A |
| CROATIA | A |
| CYPRUS | A |
| CZECH REPUBLIC | Su |
| DENMARK | R |
| ESTONIA | A |
| FINLAND | R |
| FYR OF MACEDONIA | A |
| FRANCE* | R |
| GERMANY | R |
| GREECE | R |
| HUNGARY | A |
| ICELAND | A |
| INDIA | A |
| ISRAEL | R |
| ITALY | R |
| KOREA, REPUBLIC OF | A |
| LATVIA | A |
| LITHUANIA | A |
| LUXEMBOURG | R |
| MALTA | A |
| MEXICO | A |
| MONACO | A |
| MONTENEGRO | A |
| MOROCCO | A |
| NETHERLANDS* | R |
| NORWAY | R |
| POLAND | A |
| PORTUGAL | R |
| ROMANIA | A |
| RUSSIAN FEDERATION | A |
| SERBIA | A |
| SINGAPORE | A |
| SLOVAKIA | Su |
| SLOVENIA | A |
| SOUTH AFRICA | A |
| SPAIN | R |
| SRI LANKA | A |
| SWEDEN | R |
| SWITZERLAND | R |
| TURKEY | R |
| UKRAINE | A |
| UNITED KINGDOM* | R |
| UNITED STATES* | R |
| VENEZUELA | A |
| **NON-MEMBER STATES HCCH** | |
| ARMENIA | A |
| BARBADOS | A |
| COLOMBIA | A |
| KUWAIT | A |
| LIECHTENSTEIN | A |
| SEYCHELLES | A |

R = Ratification
A = Accession
Su = Succession

\* = This State has also made a declaration extending the Convention to one or more territories. See the Hague Conference's website.

1 = The Government of the People's Republic of China, representing the Government of the SAR of Hong Kong, accepts the accession of …

2 = The Government of the People's Republic of China, representing the Government of the SAR of Macao, accepts the accession of …

■ = The Convention has entered into force between … and …

× = The accession has been accepted, but the Convention has not yet entered into force between … and ….
For the date of entry into force, see www.hcch.net/index_en.php?act=conventions.status&cid=82 and click on the A\* next to the acceding State in question.

**N.B.: It is important to note that the Convention is by definition in force between all the States that have ratified the Convention.**

**How to read the table - example:**
The Convention has entered into force between Ukraine and Slovenia

It should be noted that, because Slovenia acceded to the Convention before Ukraine, it was for Slovenia to accept the accession by Ukraine and not vice versa.

For more information, see the Hague Conference's website: www.hcch.net.

# Attachment 22 – Declaration M.J. Drop

(Article 6:95 DCC)

Dutch text **Article 6:95 DCC**

De schade die op grond van een wettelijke verplichting tot schadevergoeding moet worden vergoed, bestaat in vermogensschade en ander nadeel, dit laatste voor zover de wet op vergoeding hiervan recht geeft.

English text **Article 6:95 DCC**

The damages to be paid pursuant to a legal obligation to pay damages consists of loss to property, rights and interests and any other detriment, to the extent that the law confers a right to damages therefor.

# Attachment 23 – Declaration M.J. Drop

(Article 6:106 DCC)

Dutch text **Article 6:106 DCC**

1. Voor nadeel dat niet in vermogensschade bestaat, heeft de benadeelde recht op een naar billijkheid vast te stellen schadevergoeding:
   a. indien de aansprakelijke persoon het oogmerk had zodanig nadeel toe te brengen;
   b. indien de benadeelde lichamelijk letsel heeft opgelopen, in zijn eer of goede naam is geschaad of op andere wijze in zijn persoon is aangetast;
   c. indien het nadeel gelegen is in aantasting van de nagedachtenis van een overledene en toegebracht is aan de niet van tafel en bed gescheiden echtgenoot, de geregistreerde partner of een bloedverwant tot in de tweede graad van de overledene, mits de aantasting plaatsvond op een wijze die de overledene, ware hij nog in leven geweest, recht zou hebben gegeven op schadevergoeding wegens het schaden van zijn eer of goede naam.
2. Het recht op een vergoeding, als in het vorige lid bedoeld, is niet vatbaar voor overgang en beslag, tenzij het bij overeenkomst is vastgelegd of ter zake een vordering in rechte is ingesteld. Voor overgang onder algemene titel is voldoende dat de gerechtigde aan de wederpartij heeft medegedeeld op de vergoeding aanspraak te maken.

English text **Article 6:106 DCC**

1. For any detriment that is not a loss to property, rights and interests, the injured person is entitled to fair compensation of damages to be established:
   a. if the liable party had the intent to cause such detriment;
   b. if the injured person has incurred physical injury, his honor or reputation has been impugned or if his person in any other way has been afflicted;
   c. if the detriment lies in any damage to the remembrance of a deceased person and is inflicted to a not judicially separated spouse, registered partner, or relative to the second degree of the deceased, provided that the injury took place in a manner that would have entitled the deceased, if he were still alive, to compensation for the damage to his honour or reputation.
2. The right to compensation as referred to in the previous paragraph is not subject to any transfer or seizure, unless this was stipulated by contract or a relevant claim was filed with the Court. For transfers under general title it is sufficient for the entitled party to notify the other party of his claim for compensation.